**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DALILA YEEND and BOUNNAM PHIMASONE,**

                                   **Plaintiffs,**

         **v.**                                              **1:20-CV-1281**
                                                             **(TJM/CFH)**


**AKIMA GLOBAL SERVICES, LLC, a/k/a AGS,**

                                   **Defendant.**
_____

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**

                         **DECISION & ORDER**

         Before the Court is Plaintiffs' motion to remand the case to the Supreme Court of

Rensselaer County, New York.  See dkt. # 18.  Defendant opposes the motion.

**I.     Background**

         This case arises out of Plaintiffs' detention at the Buffalo Federal Detention Facility

("BFDF") that the United States Immigration and Customs Enforcement ("ICE") agency

operates in Batavia, New York.  Plaintiffs filed their state-court summons and complaint on

September 3, 2020.  See Complaint ("Cmplt.") dkt. # 1-3.  The Complaint alleges that

while detained at the BFDF Plaintiffs Dalila Yeend and Bounnam Phimasone "were

employed by Defendant Akima Global Servcies, LLC ("AGS"), the large for-profit

corporation that operates" that facility.  Id. at ¶ 1.  AGS allegedly failed to pay Plaintiffs for

their labor.  Id.  Instead, they received a $1 commissary credit for every day they worked.

Id.  Plaintiffs' pay was the same regardless of the hours they worked.  Id.

Plaintiffs allege that "AGS contracts with the federal government to confine immigrants at the detention center."  Id. at ¶ 2.  Without stating specifically who pays AGS or under what authority, Plaintiffs allege that AGS "is paid a daily rate for each bed filled per day."  Id. at ¶ 2.  ACS also "hires non-detained employees to work in its kitchen and perform maintenance work[.]" Id. at ¶ 3.  Plaintiffs allegedly performed similar work.  Id. at ¶ 3.  Plaintiffs allege that these workers "are paid at market rates for their labor," presumably by AGS.  Id.  Plaintiffs also contend that "AGS increases its profits by failing to pay Plaintiffs and other detainees for their work."  Id.  Moreover, they insist, AGS's pay practices "[depress] local wages and [exploit] detainees[.]" Id. at ¶ 4.  These detainees are often held indefinitely "without ever committing a crime."  Id.  The wages that detainees such as Plaintiffs receive fail to meet the New York State minimum wage and violate State law.  Id. at ¶ 5.  Use of such unpaid labor, Plaintiffs claim, also violates Article III, Section 24 of the New York Constitution.  Id.  Plaintiffs have now been released from immigration detention and reside lawfully in New York.  Id. at ¶ 6.

Plaintiffs' Complaint alleges that ICE is an agency of the United States Department of Homeland Security ("DHS").  Id. at ¶ 18.  ICE's "mission is to 'promote homeland security through the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration."  Id.  ICE "detains" a variety of persons "who are awaiting resolution of various immigration matters."  Id. at ¶ 19.  Like the Plaintiffs in this case, many individuals ICE holds "are released back in to the United States following a period of detention."  Id.  AGS is one of a number of "private, for-profit corporations" that ICE contracts with to bring about "this mass incarceration of immigrants" by having those

companies "[manage] operations for [a] civil detention center" like BFDF.  Id. at ¶ 20.

Plaintiffs contend that AGS earns millions of dollars each year from United States

taxpayers, and the company's "profits are enhanced by taking the Plaintiffs' labor without

payment of wages as required by law."  Id. at ¶ 22.

Plaintiffs allege that AGS's contract with ICE mandates that the company "comply

with state and local laws."  Id. at ¶ 23.  The New York Constitution, Article III, Section 24,

provides that "no person in any [ ] prison, penitentiary, jail or reformatory, shall be required

or allowed to work, while under sentence thereto, at any trade, industry or occupation,

wherein or whereby his or her work, or the product or profit of his or her work, shall be

farmed out, contracted, given or sold to any person, firm, association or corporation."  Id.

at ¶ 24.

AGS employed Plaintiffs to work "in their Detention Center."  Id. at ¶ 25.  Among the

jobs Plaintiffs performed were "delivering and serving meals, cleaning, sweeping,

mopping, taking out trash, . . . custodial duties, and generally maintaining the 650-bed

detention center."  Id.  AGS also uses detainee workers in food preparation, custodial work

in the kitchen, recreation area, processing area, common areas in the housing units, in the

main hallways and "traverse areas," on the grounds, and as librarians.  Id. at ¶ 26.  AGS

pays other non-detained workers for food preparation and custodial work "similar to that

performed by Plaintiffs and other detainees."  Id. at ¶ 27.

Plaintiffs allege that they "were not paid for their labor" and "[i]nstead . . . received

$1 per day in commissary credit, regardless of" the "hours they worked."  Id. at ¶ 28.  AGS

determined the number of hours Plaintiffs worked.  Id. at ¶ 29.  "Plaintiffs were captive and

routinely required to be ready, willing, and able to perform any task asked of them" during

the day.  Id. at ¶ 30.  AGS put Plaintiffs' wages into their commissary accounts, where they

could only purchase items Defendant offered for sale.  Id. at ¶ 31.  The money could not

be converted to cash.  Id.  Instead, Plaintiffs could use their earnings only on "toiletries,

non-perishable food items, thermal clothing and other similar items" sold in the

commissary.  Id. at ¶ 33.  Plaintiffs are only permitted to make phone calls to family and

friends outside the facility if they have cash in their commissary account.  Id. at ¶ 35.  AGS

operated the commissary.  Id. at ¶ 33.  Detainees are not permitted to possess money in

the BFDF.  Id. at ¶ 34.

Plaintiffs never received a written statement "at the time of their hiring or at any

subsequent time" that gave them "the name and contact information of their employer, or

their rates of pay."  Id. at ¶ 36.  They never received paystubs that laid out the hours they

had worked each week.  Id. at ¶ 37.  They did not receive the New York State minimum

wage for the hours they worked.  Id. ¶ 38.  Plaintiffs' low pay rate left them with insufficient

funds to communicate with their family or provide them with support.  Id. at ¶ 39.  Plaintiffs

also could not speak to their attorneys, gain access to adequate toiletries, buy food from

the commissary, and lacked sufficient funds to provide for themselves after release from

the facility.  Id.

"[A] security guard for Defendant AGS" allegedly "hired Plaintiff Yeend to work on

kitchen duty" at the facility in early July 2018.  Id. at ¶ 40.  A guard instructed Plaintiff on

how to perform the job and told her when she needed to be at work each day.  Id. at ¶ 41.

Until Plaintiff's release on August 17, 2018, Plaintiff worked on the kitchen staff.  Id. at ¶

42.  She "was responsible for a food cart."  Id.  She did custodial work and food-cart

support three times a day during meal periods.  Id.  Plaintiff worked every day.  Id.  She

4

worked about one and one-half hours at breakfast, another one and one-half hours at lunch, and about two hours at dinner.  Id. at ¶ 43.  Plaintiff's tasks "included transporting the food cart to and from the kitchen, arranging and serving food, collecting trays, wiping tables, sweeping and mopping."  Id.  She worked 4-5 hours a day, seven days a week.  Id. at ¶ 44.  Every day that she worked the time between the start of her work and the end of her day exceeded ten hours.  Id. at ¶ 45.  She did not work consecutive hours.  Id. Plaintiff also occasionally did other work outside the kitchen work.  Id. at ¶ 49.  On one occasion, she cleaned a housing cell "that had become infected with head lice."  Id.

At the end of each week, Plaintiff Yeend signed a sheet provided by AGS that verified the number of days she worked.  Id. at ¶ 46.  She received $1 for each day.  Id. This compensation came in the form of a credit in her commissary account.  Id. at ¶ 48. Defendant did not pay Plaintiff for the work she did outside the kitchen.  Id. at ¶ 49.  When she helped remove the head lice, AGS "paid" her for this work "by giving her items AGS had confiscated from other women who had been transferred out of" the facility.  Id. Plaintiff Yeend never received a pay stub or other written documentation of her work hours and pay.  Id. at ¶ 50.  AGS only provided cash to Plaintiff when she won her release; AGS provided Plaintiff with cash for the amount remaining in her commissary account.  Id. at ¶ 51.

A security guard "hired" Plaintiff Bounnam Phimasone in late 2018 to work in maintenance at the facility.  Id. at ¶ 52.  During his detention, Phimasone did custodial work in the common area of the housing unit.  Id. at ¶ 53.  He buffed and cleaned the floors, regularly using cleaning chemicals and heavy tools.  Id.  AGS provided the tools and chemicals for that work.  Id. at ¶ 54.  AGS's agents told Plaintiff what work to do and

5

assigned his work schedule.  Id. at ¶ 55.  Plaintiff worked about three hours a day, five

days a week, from his hiring until his release from detention on August 6, 2019.  Id. at ¶

56.  He often had to clean floors twice, as they became dirty after the first cleaning.  Id. at

¶ 57.  He worked six hours a day when he had to clean the floors twice.  Id.

    Every Thursday, an AGS security officer brought Plaintiff to a guard's office.  Id. at

¶ 58.  There, Plaintiff signed a paper that confirmed the work he had performed the

previous week and the number of days he worked.  Id. $5.00 would be transferred to

Plaintiff's commissary account.  Id.  Plaintiff did not receive cash, but instead obtained a

$5 commissary credit.  Id. at ¶ 59.  Plaintiff did not provide any written consent to deposit

his earnings in the commissary account.  Id. at ¶ 60.  Plaintiff did not receive a pay stub or

any other written documentation of his earnings.  Id. at ¶ 61.  The only wages he actually

received came when he left the facility and the Defendant "cashed out" his commissary

account.  Id. at ¶ 62.  He never received a pay stub that documented his hours and

earnings.  Id. at ¶ 63.  The hours he worked were not consecutive.  Id. at ¶ 64.  He last

worked on August 6, 2019.  Id. at ¶ 65.

    Plaintiffs further allege that Defendant "controlled" their "wages, hours worked, and

working conditions."  Id. at ¶ 66.  AGS "provided all necessary equipment and work

uniforms[.]"  Id.  Plaintiffs faced "the constant implicit threat of discipline or other negative

changes in the conditions of their confinement[.]"  Id. at ¶ 67.  AGS could eliminate such

"privileges" as making phone calls or using the commissary or recreation area.  Id.

Defendant could also punish the Plaintiffs by placing them in "disciplinary segregation,

solitary confinement, or" refer them to criminal prosecution.  Id.  "Defendant AGS had

complete control, not only over" Plaintiffs' "employment, but also over every aspect of their

lives in detention." Id.

Plaintiffs contend that the conditions and terms of their employment violated various aspects of New York labor law regulating the terms, conditions, hours, and pay of employment. Id. at ¶¶ 69-75. Their Complaint contains six causes of action. Count One raises a "constitutional tort" claim under New York law. Count Two alleges that AGS violated New York's minimum wage law and seeks damages and attorneys fees. Count Three alleges Defendant violated provisions of the New York labor law concerning spread of hours and split shifts. Count Four alleges that Defendant violated New York labor law by failing to provide adequate notice concerning wages. Count Five alleges a violation of New York labor law in Defendant's failure to provide proper wage statements. Count Six is a tort claim for unjust enrichment.

Defendant filed a notice of removal in this Court on October 16, 2020. See dkt. # 1. Defendant cited several grounds for removal. AGS contended that the Federal Officer Removal Statute, 28 U.S.C. § 1442, permitted removal. Defendant is a government contractor, and the Complaint raises claims related to conduct directed by the government and to which AGS has a colorable federal defense. Defendant thus alleges that the Court has jurisdiction. Moreover, Defendant claims, the Court has jurisdiction because the case involves questions of federal law and federal issues. Defendant also alleges that the Court has diversity jurisdiction in this matter.

In support of the removal notice, Defendant included the affidavit of Laura Mitchell, President of AGS. See dkt. # 1-1 ("Mitchell Declaration"). As she has been AGS President since 2012, Mitchell is "familiar with AGS' current and historical operations." Id. at ¶ 2. Mitchell also reviewed business records to prepare to make the declaration. Id. at

¶ 3.  The records that Mitchell reviewed included "AGS' corporate information, AGS' contract with the United States government for services provided at" BFDF, "and information concerning detainees held at BFDF."  Id. at ¶ 4.

Mitchell avers that AGS signed a contract with ICE in 2014 and has since "provided detention management support services for BFDF."  Id. at ¶ 7.  The contract defines what services AGS provides, and specifies that "AGS 'shall perform' all services in accordance with specified federal standards, including ICE's Performance Based National Detention Standards ("PBNDS") and other federal standards for DHS detention facilities[.]" Id. at ¶ 8.  Among the standards that AGS must follow are those of the American Correctional Association and the National Commission on Correctional Health Care.  Id.  AGS must also comply with "post orders and general directives" and "policies" at the facility, "all of which are drafted and promulgated by ICE."  Id.

The contract between AGS and DHS/ICE mandates that "detainees be provided the opportunity to participate in the Voluntary Detainee Work Program."  Id. at ¶ 9.  That program, the PBNDS specify, "is aimed at reducing any 'negative impact of confinement . . . through decreased idleness, improved morale and fewer disciplinary incidents' and provides detainees with the opportunity 'to work and earn money while confined.'"  Id.  ICE's classification standards, which ICE sets, determine whether a detainee is eligible for the program.  Id. at ¶ 10.  ICE also "set the Program's budget, defined the daily rate for detainees who opted to participate in the Program, established specified work details for the Program, and provided necessary equipment and tools for the Program."  Id.  The contract also specifies that AGS must "provide training and limited oversight services relating to the Program."  Id. at ¶ 11.

8

Mitchell further relates that the contract with DHS/ICE has "a limited budget specifically earmarked for the Program." Id. at ¶ 12.  The contract "expressly states that 'Detainees earn $1.00 per day.'" Id.  The funds detainees earn are placed in their commissary accounts, and any funds still in the account upon a detainee's release are returned to the detainee. Id.  By the contract's terms, any profits from commissary sales must be placed "in a 'Health and Welfare Fund'" that "is used to procure goods and services" to "benefit the general detainee population at BFDF[.]" Id. at ¶ 13.  The funds can be used to buy items such as "televisions, computers, printers, movies, and sports equipment." Id.  The property purchased by these means, the contract provides, becomes the property of ICE when installed at BFDF. Id.  Once the contract ends, funds remaining in the accounts "are transferred to the U.S. Treasury or a future contractor at ICE's discretion." Id.  The contract also requires at all AGS employees must by United States citizens.  Id. at ¶ 14.

Plaintiffs filed the instant motion to remand on November 30, 2020.  See dkt. # 18.  The parties then briefed the issues, bringing the case to its present posture.

## II.    LEGAL STANDARD

"'[F]ederal courts are courts of limited jurisdiction,' and, as such, 'lack the power to disregard such limits as have been imposed by the Constitution or Congress.'" Purdue Pharma L. P. v. Kentucky, 704 F.3d 208, 213 (2d Cir. 2013) (quoting Durant, Nichols, Houston & Cortese-Costa, PC v. Dupont, 565 F.3d 56, 62 (2d Cir. 2009)).  28 U.S.C. § 1441(a), "'the federal removal statute[,] allows a defendant to remove an action to the United States District Court in 'any civil action brought in a State Court of which the district courts of the United States have original jurisdiction.'" Id. (quoting Bounds v. Pine Belt

9

Mental Health Care Res., 593 F.3d 209, 215 (2d Cir. 2010) (in turn quoting 28 U.S.C. §

1441(a)).   A party removing a case to federal court "has the burden of establishing that

removal is proper." United Food & Commercial Workers Union, Local 919 v. Centermark

Properties Meridian Square, 30 F.3d 298, 301 (2d Cir. 1994).  "A single claim over which

federal-question jurisdiction exists is sufficient to allow removal."  Broder v. Cablevision

Sys. Corp., 418 F.3d 187, 194 (2d Cir. 2005).  Still, "'[i]n light of the congressional intent to

restrict federal court jurisdiction, as well as the importance of preserving the independence

of state governments, federal courts construe the removal statue narrowly, resolving any

doubts against removability.'" Purdue Pharma, 704 F.3d at 213 (quoting Lupo v. Human

Affairs Int'l, Inc., 28 F.3d 269, 274 (2d Cir. 1994)).

## III.   ANALYSIS

In removing the case, Defendant cited three bases for the Court's original

jurisdiction.  AGS alleged that the Court had jurisdiction pursuant to the Federal Officer

Removal Statute, 28 U.S.C. § 1442, that the Court had jurisdiction pursuant to 28 U.S.C. §

1331 because the case involves questions of federal law and federal issues, and that the

Court has diversity jurisdiction over a matter that involves citizens of different states and

the amount in controversy exceeds $75,000.  For reasons that will become clear, the

Court will address the first of these grounds only and then evaluate Plaintiffs' argument

that the Court should abstain from hearing the case.

### A.   The Federal Officer Removal Statute

#### i.   Legal Standard

The Federal Officer Removal Statute "authorizes '[t]he United States or any agency

thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof' to remove actions 'for or relating to any act under color of such office.'" Agyin v. Razmzan, 986 F.3d 168, 174 (2d Cir. 2021) (quoting 28 U.S.C. § 1442(a)(1)).  Removal under that statute "'must be predicated on a colorable federal defense.'" Id. (quoting Mesa v. California, 489 U.S. 121, 129 (1989)).  In the Second Circuit, a party seeking removal on this basis "'must demonstrate that (1) the defendant is a 'person' under the statute, (2) the defendant acted 'under color of federal office,' and (3) the defendant has a 'colorable federal defense.'" Id. (quoting Coumo v. Crane Co., 771 F.3d 113, 115 (2d Cir. 2014) (in turn quoting Isaacson v. Dow Chem. Co., 517 F.3d 129, 135 (2d Cir. 2008)).  "The inquiry on [a] motion to remand is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." Crane Co., 771 F.3d at 116.

The Court will address each part of the test in turn, relying on the filings in this case.

### ii.    "A Person Under the Statute"

The Complaint here alleges that Defendant is a "Limited Liability Company[.]" Complt. at ¶ 11.  Mitchell submitted a supplemental affidavit in response to Plaintiffs' motion that avers that AGS is a limited liability corporation, and that at the time of the filing of the Complaint AGS was the "wholly owned subsidiary" of another corporation.  Second Mitchell Declaration, dkt. # 21-2, at ¶¶ 5, 9.  "[T]he term 'person' includes corporate persons." Isaacson, 517 F.3d at 136.   The Court finds that the evidence demonstrates that Defendant AGS is a person within the meaning of the statute.  The parties do not

appear to contest this issue.

### iii.  "Acting Under"

Next, the Court must determine whether Defendant acted under color of federal office in the events that gave rise to this action.  As for this portion of the test, "'[c]ritical under the statute is to what extent the defendants acted under federal direction at the time they were engaged in the conduct now being sued upon.'" In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 488 F.3d 112, 124-125 (2d Cir. 2007) (quoting Ryan v. Dow Chem Co., 781 F.Supp. 934, 947 (E.D.N.Y. 1992)).  Removal is improper when the plaintiff shows only that "the acts complained of were performed under the 'general auspices' of a federal officer."  Id. at 125 (quoting Ryan, 781 F.Supp. at 947).  The inquiry "depends heavily on the facts of each case and the particular conduct giving rise to the plaintiff's cause of action."  Id.  "The words 'acting under' are broad, and "the Supreme Court "has made clear that the statute must be 'liberally construed.'" Watson v. Philip Morris Co., 551 U.S. 142, 147 (2007) (quoting Colorado v. Symes, 286 U.S. 510, 517 (1932)).  Still, "the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply complying with the law."  Id. at 152 (italics in original).  Instead, an "acting under" "relationship involves 'an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.'" Agyin, 986 F.3d at 175 (quoting Watson, 551 U.S. at 152) (emphasis in original).  Removal is appropriate in cases that "'involve defendants working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government.'" Id. at 176-177 (quoting Ruppel v. CBS Corp., 701 F.3d 1176, 1181 (7th Cir. 2012)).

Defendant argues that the Plaintiffs' complaint here–that Defendant violated New York labor law by paying Plaintiffs only $1 a day for their labor, failing to provide them with proper time sheets, and failing to pay the proper amount for the types of shifts they worked–arose because of the mandates in the contract that AGS signed with ICE.  The contract that Defendant signed created "obligations and limitations" that "form the basis for Plaintiffs' claims."  Plaintiffs contend that Defendant only acted under the general auspices of a federal officer, and have not established that they acted within the direct control of any federal officer.  Moreover, the federal regulations that establish that a detainee must be paid at least $1.00 a day do not set a specific rate.  See www.ice.gov/detention-standards/2011 at 407, establishing rate of Compensation for Work Program in detention facilities (visited 8/10/21).   As such, Plaintiffs contend, Defendant has not met its burden to show that "the conduct at issue in this action–namely, supervision and control over labor and compensation–fell within the control and discretion of the Defendant, and outside of any specific federal directive."

The Court finds that Defendant has met its burden to show that the case stems from conduct performed under color of federal law.  "Over time," the second part of the test "has come to be known as the causation requirement."  Isaacson, 517 F.3d at 137. For "non-governmental corporate defendants, such entities must demonstrate that the acts for which they are being sued  . . occurred *because* of what they were asked to do by the government."  Id. (emphasis in the original).  The offense here surely arises out of what the Defendant was asked to do by the government: provide detainees with employment at a federal detention facility and pay them a wage and under terms that allegedly violated New York labor law.  The government had a program with specified

13

conditions designed to provide employment for detainees, and Defendant contracted with the government to carry that program out in a specific way laid out in the contract.  As Mitchell's declaration makes clear, the contract and federal regulations provided for who the Defendant could hire, the terms under which those hired could work, how much they could be paid,[1] when they could work, and when their employment would end.  Moreover, Defendant's involvement in the work program was part of specific programming at the facility which was designed to benefit detainees in particular ways.  That kind of work constitutes an "acting under . . . relationship [that] involves 'an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.'" Agyin, 986 F.3d at 175.  The Defendant has met this part of its burden as well.

### iii.   Colorable Federal Defense

Defendant must also have a colorable federal defense to take advantage of the federal officer removal statute.  "Courts have imposed few limitations on what qualifies as a colorable federal defense."  Isaacson, 517 F.3d at 138.  "Given that the removal statute more generally is 'not narrow or limited' and that one of its purposes is 'to have such

---

[1]Plaintiffs argue that the regulations provide for a minimum wage of $1.00 an hour, but do not limit the wage to that amount.  They contend that Defendant therefore had discretion and did not act under federal law in a way that would invoke Federal Officer jurisdiction.  Mitchell's affidavit indicates, however, that the contract between the parties specified the wage rate for detainees.  While Plaintiffs complain that they have not been provided a copy of the contract and neither has the Court, the Court notes that Mitchell signed her declaration and filed it with the Court, and the Court may accept that representation.  In any case, the Court's decision is not based solely on whether the government directed the wage rate here.  As a general matter, there is no dispute that Defendant's role here was to employ and pay detainees in a federal detention center.  Defendant clearly had to find employees from detainees, who were subject to the facility's rules, standards, and requirements.  Defendant did not provide a service at the BFDF and receive compensation for that service, completing a task for the government without any additional government input.  Defendant helped carry out the duties of ICE at the facility.

defenses litigated in the federal courts,' the federal defense requirement is satisfied in 'all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law.'" Id. at 139 (quoting Willingham v. Morgan, 395 U.S. 402, 406-407 (1969)).  A colorable defense "need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense be tried in federal court." Id. (quoting Willingham, 395 U.S. at 407).

Defendant contends that AGS has offered two colorable federal defenses.  First, AGS argues that New York labor law's attempt to regulate employment of immigration detainees is preempted by federal control over immigration.  Congress set the wage rate for immigrant detainees, and such decisions preempt State efforts to regulate wages. Moreover, the Defendant's agreement with ICE conflicts with State minimum wage laws, another preemption defense.  Second, Defendant argues that the federal enclave doctrine protects AGS from claims under State law.  Plaintiffs argue that the Court should employ a presumption against preemption and find that federal law does not attempt to preempt the State's right to regulate labor.  Plaintiffs likewise contend that the enclave doctrine does not apply because no evidence exists to demonstrate that the BFDF is actually a federal enclave.

The Court will address each defense in turn.

### i.    Preemption

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." Arizona v. United States, 567 U.S. 387, 398 (2012).  These "two sovereigns" can sometimes enact laws that are "in conflict or at cross-purposes." Id. at 399.  "The

Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every state shall be bound thereby, any Thing in the Constitution or Laws of the any state to the Contrary notwithstanding.'" Id. (quoting U.S. Const. Art. VI, cl. 2). "Congress has the power to pre-empt state law." Id. Beyond such "express" preemption, Congress can preempt state law in two other ways. Id. "First," Congress can occupy an entire field, and an "intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" Id. (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). "Second, state laws are pre-empted when they conflict with federal law." Id. Two types of such "conflict pre-emption" exist: where 'compliance with both federal and state regulations is a physical impossibility'"; and "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Id. (quoting, in turn, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963) and Hines v. Davidowitz, 312 U.S. 52, 67 (1941)). "In pre-emption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" Id. at 400 (quoting Rice, 331 U.S. at 230).

Defendant asserts that AGS has a colorable defense that federal laws and regulations governing immigration preempt New York's attempts to regulate wages paid to detainees. Defendant points out that Plaintiffs' claims would cause the State of New York to regulate the wages paid to immigration detainees, and that the Supreme Court has

16

determined that immigration is an area where the federal government has a clear power to regulate.  See Arizona, 567 U.S. at 394-395.  Congress has specifically empowered DHS/ICE to spend funds for payment "to aliens, while held in custody under the immigration laws."  8 U.S.C. § 1555(d).  The rate of pay for such work "may be specified from time to time in the appropriation Act involved."  Id.  At least one court has interpreted this provision to exempt immigrant detainees from the federal Fair Labor Standards Act and permit payment of $1 a day to detainees.  Alvarado Guevara v. INS, 902 F.2d 394, 396-97 (5th Cir. 1990).  Defendant also points out that federal law prohibits employment of aliens not authorized to be present in the United States.  See 8 U.S.C. § 1324a(a)(1)(A).  Treating detainees as employees for the purpose of New York labor law would conflict with federal prohibitions on hiring them.

Plaintiffs dispute that preemption applies to this case.  They point out that federal immigration law does not purport to displace state wage and hour law, and that courts have been clear that an employee is entitled to the minimum wage in New York and damages under federal wage and hours law, regardless of immigration status.  See, e.g., Saavedra v. Mrs. Bloom's Direct, Inc., No. 17cv2180, 2018 U.S. Dist. LEXIS 87550, at *6 (S.D.N.Y. May 24, 2018) ("the precedent in this Circuit is clear that the immigration status of a plaintiff-worker is irrelevant under the FLSA, and that payment under the terms of the settlement to an undocumented worker neither condones nor continues a violation of immigration law."); Affordable Hous. Found., Inc. v. Silva, 469 F.3d 219, 243 (2d Cir. 2006) (payment to undocumented workers for violations of FLSA permitted under federal law); Pacheco v. Chickpea at 14th St., Inc., No. 18 Civ. 251, 2019 U.S. Dist. LEXIS 90714, at *14 (S.D.N.Y. May 30, 2019) ("it is obvious that lawful employment status is not a required

17

element of a NYLL claim.").  As such, Plaintiffs claim, federal control over immigration does not preempt state wage and hours laws.  These cases answer a different question than the one raised here.  None of the plaintiffs in those cases were detainees in a federal facility when they worked for less than the minimum wage.

Plaintiffs also cite to cases from various district courts that address the issue of preemption to argue that courts have concluded that preemption does not apply to the issue of whether detainee wages violate state law.  Plaintiffs overstate the value of these cases to the issue here.  In Washington v. Geo Grp., Inc., 283 F.Supp.3d 967 (W. D. Wa. 2017), for instance, the court evaluated a motion to dismiss by a defendant who challenged the State of Washington's claims that wage payments of $1 a day to detainees violated state minimum wage laws.  Defendant argued that the case should be dismissed because federal regulation of immigration preempted Washington's law.  The court rejected defendant's arguments for express and field preemption, unconvinced by some of the same arguments that Defendant makes here.  Id. at 976-977.  At the same time, the court concluded that "conflict/obstacle preemption issues may become ripe at summary judgment or trial, but at present factual issues abound that preclude a decision based on the pleadings, and before discovery."  Id. at 978.  That Washington court came to the same conclusion on a motion to dismiss in another case brought against the same defendant for failing to pay a detainee the Washington minimum wage.  See Chen v. Geo Group, Inc., 287 F.Supp.3d 1158, 1166-1167 (W.D. Wa. 2017).  A court in California rejected even obstacle/conflict preemption for an immigration detainee seeking compensation under California law.  See Novoa v. Geo Grp., Inc., No. EDCV 17-2514, 2018 U.S. Dist. LEXIS, at 14-16 (C.D. Ca. June 21, 2018).

18

In the case of the defense of preemption, the Court finds that Defendant has presented a colorable federal defense.  While the Court recognizes that some courts have rejected the notion that federal law preempts State minimum wage statutes, the Court notes that the cases cited by the Plaintiffs were not decided by the Second Circuit.   Their authority is merely persuasive.  Those cases were also decided on motions to dismiss, and at least in two of those cases the Court found that factual issues existed that needed to be resolved when it came to conflict preemption.  Since "[p]receisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [this] version of the facts to a federal, not a state, court,'" the Court finds that a colorable federal preemption defense exists in this case. Coumo v. Crane Co., 771 F.3d 113, 116 (2d Cir. 2014) (quoting Willingham, 395 U.S. at 409).  The Court needs more factual detail to determine the interplay between state law, the wages that the contract obligated Defendant to pay, and the structure and purpose of federal immigration law.  Defendant certainly has a "colorable" defense that applying state wage and hours law would frustrate the purpose of federal law relating to the detention of immigrants.

### ii.    Federal Enclave

The United States Constitution provides that the United States has exclusive authority over "all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, dock Yards, and other needful buildings."  U.S. Const. art 1, sec. 8, cl.17.  These locations have been "deemed 'federal enclaves' within which the United States shall have exclusive jurisdiction.'" Akin v. Ashland Chem. Co., 156 F.3d 1030 (10th Cir. 1998). "'It is well settled that the activities of

federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation." Sundaram v. Brookhaven Nat'l Labs., 424 F.Supp.2d 545, 569 (E.D.N.Y. 2006)(quoting Goodyear Automic Corp. v. Miller, 486 U.S. 174, 180 (1988)). As such, "'a federally owned facility performing a federal function is shielded from state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation." Id. (quoting Goodyear Automic Corp., 486 U.S. at 181). States "[lose] the right to legislate with respect to activities occurring in the enclave unless" the state "reserved its right to do so when it consented to the purchase of the property by the United States." Id. Laws passed after the transfer of jurisdiction do not apply. Id. Courts have fond that state anti-discrimination laws, environmental laws, and common law claims not recognized at the time of transfer do not apply. Id.

Here, Defendant argues that a colorable defense exists related to a federal enclave. If this were the only basis for the Defendant's claim of a colorable federal defense, the Court would reject that defense as a basis for jurisdiction. To take advantage of the defense, the Defendant would need to show both that the BFDF is on land owned by the federal government and that the New York labor laws in question were enacted after the United States obtained the land that contains the BFDF. Defendant's notice of removal alleges only that BFDF is an "ICE-owned facility that temporarily houses federal immigration detainees[.]" Defendant does not explain what that "ownership" entails, who owns the land on which the BFDF sits and under what terms, or when the government took control of the facility. Even if there were some evidence of ownership, Defendant fails to allege that the BFDF appeared before the New York labor laws in question.

Defendant has failed to meet its burden in this respect.[2]

## B.   Abstention

Plaintiffs contend that, even if jurisdiction exists, the Court should abstain from hearing the case.  To hear the case, Plaintiffs claim, would be to interfere with New York's complicated and comprehensive scheme of regulating wages and hours through the Labor Law.  A state court should determine how and where such laws apply.  Moreover, there are state constitutional law questions involved, which are best resolved by New York courts.

Federal courts "may refrain from deciding questions of state law otherwise within [their] jurisdiction, where the controversy falls within one of several categories thought to be inimical to harmonious federalism." Smith v. Metropolitan Property & Liability Ins. Co., 629 F.2d 757, 759 (2d Cir. 1980).   Plaintiffs point to the standard recited in Smith and the doctrine raised in Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25 (1959). Such abstention applies to cases "where a difficult question of state law of substantial import is presented."  Smith, 629 F.2d at 759.  To justify abstention, both "unclear state law" and a "broad impact upon state policy" must exist.  Id.

Even assuming that Plaintiffs have selected a type of abstention that might apply to

---

[2]In any case, the way that Defendant purports to use that defense is to argue that "based upon this doctrine, AGS will argue that any New York laws that are inconsistent with federal purposes, such as the employment of and payment to immigration detainees in federal custody, would not apply within the enclave."  Citing James Stewart & Co. v. Sadrakula, 309 U.s. 94, 103-104 (1940).  That defense appears quite similar to the standard for conflict preemption, a defense that the Court has found colorable.  The defense is not the same as the federal enclave defense.

21

this case,[3] the Court finds that abstention is not appropriate under the terms that the Plaintiffs suggest.  Plaintiffs argue that a ruling in this case would disrupt New York's carefully drawn regulatory scheme regarding hours and wages, and that AGS's payments undercut that scheme.  Thus, they insist, whether AGS can continue to do so implicates an important public policy interest in New York.  Moreover, they contend that New York has not yet determined whether "the labor of civil detainees" is covered by the New York labor law.  They do not cite any cases to support this claim.

Plaintiffs' position ignores the uncontested fact that the detainees in this case were held in federal, not New York custody.  The fact of that federal custody cuts strongly against New York's claim of interest in this case.  Indeed, the Court has found that a colorable preemption defense exists in this case.  The Court has found that Defendant may be able to claim that New York law does not apply here because of where the offenses occurred and under what circumstances.  This is not a case where a court will be requested to decide only a complicated state-law question, and where the answer to that question might undermine only a state regulatory scheme.  Instead, this case involves questions regarding the terms and conditions under which federal detainees can be held.  Such a case is hardly a situation where the federal interest should be subordinated to the state interest.  The question here is whether the Supremacy Clause in the federal constitution prevents New York from enforcing state law at the BFDF.  That invokes a federal interest.

_____

[3]Smith involved a declaratory judgment action that asked the district court to issue "a declaration of the validity under Connecticut law of an exclusionary clause in an automobile insurance policy."  Smith, 629 F.2d at 758.  This case asks the Court to award damages under New York law, not interpret a regulatory scheme.

The Court will deny the motion on these grounds as well.  Because the Court has found grounds for jurisdiction in the Federal Officer Removal Statute, the Court finds no need to address the other bases for jurisdiction the Defendant cites.

## IV.    CONCLUSION

For the reasons stated above, Plaintiffs' motion to remand, dkt. # 18, is hereby DENIED.


**IT IS SO ORDERED.**

Dated: August 23, 2021

Thomas J. McAvoy
Senior, U.S. District Judge

23