**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DALILA YEEND and BOUNNAM PHIMASONE,**

                              **Plaintiffs,**

       **v.**                                                    **1:20-CV-1281**
                                                                 **(TJM/CFH)**


**AKIMA GLOBAL SERVICES, LLC, a/k/a AGS,**

                              **Defendant.**
_____

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**

### DECISION & ORDER

       Before the Court is Plaintiffs' motion to strike certain affirmative defenses, dkt. # 15,

and motion to transfer the case to either the Western District of New York or to the

Southern District of New York, dkt. # 40.  Defendant opposes both motions.  The parties

have briefed the issues and the Court will decide the matter without oral argument.

**I.      Background**

       This case arises out of Plaintiffs' detention at the Buffalo Federal Detention Facility

("BFDF") that the United States Immigration and Customs Enforcement ("ICE") agency

operates in Batavia, New York.  Plaintiffs filed their state-court summons and complaint on

September 3, 2020.  See Complaint ("Cmplt.") dkt. # 1-3.  The Complaint alleges that

while detained at the BFDF Plaintiffs Dalila Yeend and Bounnam Phimasone "were

employed by Defendant Akima Global Servcies, LLC ("AGS"), the large for-profit

1

corporation that operates" that facility. Id. at ¶ 1. AGS allegedly failed to pay Plaintiffs for their labor. Id. Instead, they received a $1 commissary credit for every day they worked. Id. Plaintiffs' pay was the same regardless of the hours they worked. Id.

Plaintiffs contend that the conditions and terms of their employment violated various aspects of New York labor law regulating the terms, conditions, hours, and pay of employment. Id. at ¶¶ 69-75. Their Complaint contains six causes of action. Count One raises a "constitutional tort" claim under New York law. Count Two alleges that AGS violated New York's minimum wage law and seeks damages and attorneys fees. Count Three alleges Defendant violated provisions of the New York labor law concerning spread of hours and split shifts. Count Four alleges that Defendant violated New York labor law by failing to provide adequate notice concerning wages. Count Five alleges a violation of New York labor law in Defendant's failure to provide proper wage statements. Count Six is a tort claim for unjust enrichment.

After Defendant removed the case to this Court, the Plaintiffs filed a motion to remand. See dkt. # 18. The Court denied that motion. See dkt. # 29. Previous to that decision, Plaintiffs filed a motion to strike certain affirmative defenses. See dkt. # 15. After the Court's decision denying their motion to remand, Plaintiffs filed a motion to transfer the case to one of two other federal courts, arguing that either of those courts would be more convenient for the parties. See dkt. # 40. Defendants oppose both motions.

II. **LEGAL STANDARDS**

    **A.** **Motion to Transfer**

2

Plaintiffs seek to transfer venue.  Federal law provides that "[f]or the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. ¶ 1404(a).  "Congress enacted § 1404(a) to permit change of venue between federal courts."  <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 253 (1981).  "District Courts have broad discretion in making determinations of convenience under Section 1404(a)[.]"  <u>D. H. Blair & Co. v. Gottdiender</u>, 462 F.3d 95, 106 (2d Cir. 2006).  Courts employ a number of factors on a "case-by-case-basis."  <u>Id.</u> Among the factors to consider are:

> "(1) the plaintiff's choice of forum, (2) the convenience of the witnesses, (3) the location of the relevant documents and relative ease of access to sources of proof, (4) the convenience of the parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties."

<u>Id.</u> (quoting <u>Albert Fadem Trust v. Duke Energy Corp.</u>, 214 F.Supp.2d 341, 343 (S.D.N.Y. 2002)).  The proponent of transfer must produce clear and convincing evidence to convince the court to grant that motion.  <u>New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.</u>, 599 F.3d 102, 113-114 (2d Cir. 2010).

**B.    Motion to Strike Affirmative Defenses**

Federal Rule of Civil Procedure 12(f) permits the Court to "strike from any pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "'[M]otions to strike under Rule 12(f) are generally disfavored and granted only if there is strong reason to do so.'"  <u>Kochan v. Kowalski</u>, 478 F.Supp.3d 440, 450 (W.D.N.Y. 2020) (quoting <u>Holland v. Chase Bank USA, N.A.</u>, 475 F.Supp.3d 272, 275 (S.D.N.Y. 2020)).  "When assessing whether to strike an affirmative defense, district

3

courts . . . consider first whether the affirmative defense satisfies the plausibility standard articulated in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed. 929 (2007), recognizing that 'applying the plausibility standard to any pleading is a 'context-specific task.'" Trs. of the N.Y. City Dist. Council v. M.C.F. Associs., 530 F.Supp.3d 460, 464 (S.D.N.Y. 2021) (quoting GEOMC Co. v. Calmare Therapeutics, Inc., 918 F.3d 92, 97-98 (2d Cir. 2019)).  For an affirmative defense, "'the relevant context will be shaped by the nature of the affirmative defense,' including whether the nature of the affirmative defense means the necessary facts were readily available within the narrow window to respond to the complaint." Am. Home Energy Inc. v. AEC Yield Capital, LLC, 2022 U.S. Dist. LEXIS 34886, at *43 (E.D.N.Y. Feb. 28, 2022) (quoting GEOMC, 918 F.3d at 98.  A party seeking to strike an affirmative defense "must demonstrate that (1) there is no question of fact that might allow the party proffering the affirmative defenses to succeed; (2) there is no question of law that might allow that party to succeed; and (3) the movants would be prejudiced by inclusion of the defense." Id. at *42.  "A factually sufficient and legally valid defense should always be allowed if timely filed even if it will prejudice the plaintiff by expanding the scope of the litigation." Id. (internal citation omitted).

## III.   ANALYSIS

Because the Court would permit the transferee court to determine the motion to strike affirmative defenses if transfer were appropriate, the Court will first address that motion.

### A.   Motion to transfer

The Plaintiffs seek transfer to either of two districts, the Southern District of New

4

York and the Western District of New York.  The Defendant opposes both, arguing that the Southern District of New York is not an appropriate venue because that court would lack personal jurisdiction over the Defendant, and that neither district is more convenient than this district for the parties.

### i.    Southern District of New York

Defendant first argues that the Southern District of New York is not an appropriate venue because that Court could not exercise personal jurisdiction.  Under 28 U.S.C. § 1404(a), a Court may transfer a civil case "to any other district or division where it might have been brought[.]" 28 U.S.C. § 1404(a).  This rule requires that "the transferor court . . . be satisfied that the transferee court is one where the action 'might have' or 'could have' been brought–that is, that the transferee court would have personal jurisdiction over the defendant." Stein Fibers, Ltd. v. Bondex Telas Sin Tejar, C.A., No. 1:08-CV-210, 2009 U.S. Dist. LEXIS 9619, at *17 (N.D.N.Y. Feb. 10, 2009).  "[W]hether a venue is 'wrong' or 'improper' is generally governed by 28 U.S.C. § 1391." Atl. Marine Constr. Co. v. United States Dist. Court, 571 U.S. 49, 55 (2013).  Defendant argues that the case could not have been brought in the Southern District of New York under federal law because the Defendant is not a resident in that district and personal jurisdiction could not be asserted over the Defendant there.  Defendant points to 28 U.S.C. §§ 1391(b) and (d) in making this argument.  28 U.S.C. § 1391(b)(1) establishes that venue is proper in any district where a Defendant resides.  28 U.S.C. § 1391(d), however, provides that, in a State with more than one judicial district, a defendant resides in each district where that defendant could be subject to personal jurisdiction.  28 U.S.C. § 1391(d).

In general, a party may bring a civil action in: "(1) a judicial district in which any

defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(b). "When venue is challenged, the court must determine whether the case falls into one of the three categories set out in § 1391(b)." Alt. Marine Constr. Co., 571 U.S. at 56. "The first two paragraphs of § 1391(b) define the preferred judicial districts for venue in a typical case, but the third paragraph provides a fallback option[.]" Id.

The operative provision here is Section 1391(b)(1), since the parties agree that no part of the events giving rise to the claims occurred in this district but do not contend that no judicial district could provide venue. The question is thus whether Defendant is a resident of the Southern District within the meaning of the statute. Section 1391 contains two residency provisions that could apply. Section 1391(d) applies to corporations, and establishes residency in any judicial district where the corporation would be subject to personal jurisdiction. Section 1391(c)(2) provides, in relevant part, that "an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question[.]" 28 U.S.C. §1391(c)(2).

The basis that Plaintiffs provide for asserting personal jurisdiction over Defendant in the Southern District of New York is the fact that Defendant's registered agent for service

6

is located in that district and thus a resident there.[1]   Defendant's position is that AGS cannot be a resident of the Southern District because personal jurisdiction cannot be established against the corporation in that District where the corporation's only presence is through an agent for service.  The Second Circuit Court of Appeals has held that, under New York law, "a foreign corporation does not consent to general jurisdiction in New York by merely registering to do business in the state and designating an in-state agent for service of process under" the appropriate New York statute.  Chufen Chen v. Dunkin' Brands, Inc., 954 F.3d 492, 499 (2d Cir. 2020).  Thus, if this standard applies to the Defendant, Defendant is not subject to personal jurisdiction in the Southern District and not a resident for venue purposes there.

Plaintiffs argue that, since AGS is a limited liability company and not a corporation, Section 1391(d) does not apply.  Instead, Plaintiffs contend, the Court should rely on Section 1391(c)(2).  Plaintiffs insist that this provision permits venue in the Southern District of New York because it does not contain the requirement that the judicial district in question be treated as if the district were a state unto itself.  Instead, Plaintiffs need only show that the entity in question–AGS–is subject to personal jurisdiction in the State of New York.  Since AGS does not argue that the State of New York could not assert personal jurisdiction over AGS in other parts of New York, such as the Western District or the Northern District, AGS is also a resident of the Southern District.

The Court is not persuaded by the Plaintiffs' position.  None of the cases to which

---

[1]See Exh. A to Plaintiffs' motion to transfer, which is a New York State Department of State Division of Corporations document establishing that Akima Global Services, LLC is an Alaska, LLC, with a Registered Agent for Service in New York, New York.

Plaintiffs point answer this question.  Indeed, the case law in this Circuit on whether Section 1391(d) applies to entities like limited liability corporations is sparse; Plaintiffs point to no such cases.  Plaintiffs cite to Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC, 324 F.Supp.3d 366 (W.D.N.Y. 2018) to argue that "at least one district court in this Circuit to have considered where a limited liability company resides found § 1391(c)(2) to be the operative provision."  The court's jurisdiction in that case, however, grew out of admiralty law, and the court concluded that the venue rules in Section 1391 do not apply in such cases, even if the general rules for transferring venue do.  Id. at 373-74. The court considered Section 1391(c)(2) only in connection with one defendant's principal place of business, and not with whether that defendant was actually a "resident" in that district.  This case does not establish that the Court must find that venue is appropriate in the Southern District of New York because another court in another New York district asserted personal jurisdiction over the Defendant here.  Defendant's citation is also not very helpful.  Defendant points to a footnote in one case where the trial court assumed that Section 1391(d) would apply to an LLC.  See Spiciarich v. Mexican Radio Corp., 2015 U.S. Dist. LEXIS 89924 at *14 n.4 (S.D.N.Y. July 10, 2015).  That court's decision also established, however, that "the parties have not addressed where the corporate defendants . . . reside for purposes of sections 1391(b)(1) and 1391(d)."  Id.

The Court is more persuaded by the idea that the issue for venue is whether a defendant could be subject to personal jurisdiction in the particular district in question, rather than the entire state.  How the purposes of the venue statute would be served by the rules the Plaintiffs propose is unclear, since the rule that the Defendant points to would permit venue wherever in a state a corporate defendant has sufficient presence to be

hailed into court.  Such a rule would thus compliment the venue statute.

In the end, however, the Court need not reach this issue.  As will be shown below, the Court concludes that transfer to the Southern District would not be proper even if venue were available.

Plaintiffs argue that the Southern District represents a more convenient forum than this one.  They address the factors outlined above in a general way.

Plaintiffs first argue that they did not choose this venue, but instead chose the Supreme Court of Rensselaer County, New York.  They contend that the Southern District would be more convenient for the parties, attorneys, and witnesses.  The undersigned judge sits in Binghamton, New York, which the Plaintiffs point out is more than 140 miles from the Rensselaer County courthouse.  The Southern District is much closer for the Plaintiffs attorneys, who work mostly from Hawthorne, New York and Kingston, New York. Plaintiffs themselves are persons "of lesser means," having worked for Defendant for $1 a day, and they argue that their convenience should weigh more heavily on this issue. Plaintiffs also contend that New York City, as a transportation hub, would be more convenient for Defense counsel, who work out-of-state, than the Northern District.  The two witnesses identified by the Defendant in their disclosures also reside outside the District.  Traveling to the Southern District would be easier for these witnesses than the Northern District, Plaintiffs claim.

In terms of the location of relevant documents, relative ease of access to sources of proof, the locus of operative facts, and the availability of process for compelling unwilling witnesses, Plaintiffs argue that "the Northern District holds no advantage over the Southern District."  They point out that "the locus of operative facts [is] in Batavia, where

9

the detention facility is located, within the Western District of New York." Any records maintained by the Defendants, Plaintiffs presume, will be found either in Defendant's headquarters in Virginia, or in Batavia, New York. None of the records Plaintiffs might seek are located in this District. In any case, "Plaintiffs expect that most documents will be exchanged electronically, reducing the importance of the physical location of hard copy records." The witnesses, who are corporate officers, can also be "commanded to attend trial equally throughout the state."

The Court is not persuaded by these arguments that the factors weigh in favor of transferring venue. As explained, the Court largely considers seven factors in determining whether to grant a motion to transfer:

> "(1) the plaintiff's choice of forum, (2) the convenience of the witnesses, (3) the location of the relevant documents and relative ease of access to sources of proof, (4) the convenience of the parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties."

D. H. Blair, 462 F.3d at 106 (quoting Albert Fadem Trust, 214 F.Supp.2d at 343). Setting aside the Plaintiffs' choice of forum for later, Plaintiffs have not pointed to any factor that weighs substantially in favor of transfer to the Souther District. The major inconvenience that the Plaintiffs note is that the United States District Courthouse in Binghamton, New York, is more than 140 miles from the Rensselaer County Courthouse, where they originally filed the case. While the Plaintiffs are correct that the Binghamton courthouse is a considerable distance from the Rensselaer County Courthouse, another courthouse in this District is in Albany. Google Maps reveals that courthouse is 7.7 miles from the

Rensselaer County Courthouse.[2]  The undersigned frequently hears cases in Albany, and other judges are available in that facility should an emergency arise.  The named Plaintiffs in this case reside in Rensselaer and Oneida Counties in New York.  See Complaint, dkt. # 1-3, at ¶¶ 9-10.  Both those counties are in the Northern District, not the Southern District.  The Court fails to see how traveling for litigation outside of the district in which the Plaintiffs actually reside is more convenient than continuing litigation in this District.  In responding to the motion, Defendant relates that counsel will have to travel to New York, no matter the District in which the case is held.  Defendant explains that "Travel to Albany is not patently more onerous than travel to Manhattan that it would warrant transfer to a district wholly unconnected to the case."  The Court accepts those representations about how onerous the Defendant considers travel.  The Plaintiffs themselves admit that there would be no advantage to completing discovery in moving to the Southern District.  They also fail to point to any advantage to the witnesses in transferring to the Southern District; they simply contend that transfer would be no more inconvenient.  The Court acknowledges that Plaintiffs are individuals without great means, while Defendant is a corporation possessed of more resources.  While this weighs in the favor of Plaintiffs' position, their willingness to travel to districts where they do not live to participate in the ligation limits the weight their status provides.  The parties agree that none of the events given rise to the litigation occurred in the Southern District.  Thus, except for the Plaintiffs'

---

[2]See https://www.google.com/maps/dir/Rensselaer+County+Supreme+Ct,+80+2nd+St,+Troy,+NY+12180/445+Broadway,+Albany,+NY+12207/@42.689573,-73.7916597,12z/data=!3m1!4b1!4m13!4m12!1m5!1m1!1s0x89de0f06566b4503:0x3946c09efdc9559!2m2!1d-73.6919603!2d42.7286649!1m5!1m1!1s0x89de0a272fc732ef:0x8743f9d9eb8c93e!2m2!1d-73.7502355!2d42.6496377 (consulted March 10, 2022).

choice of forum and their lesser means, none of the factors weigh in favor of transfer to any great degree.

The Plaintiffs initially filed their case in Rensselaer County, which is located within this District.  Clearly, Plaintiffs would prefer to have the case heard in a District other than this one.  At the same time, "[a] motion to transfer venue 'is not ordinarily granted at the request of the party who chose the forum in the first place.'" Ferrostal, Inc. v. Union Pac. R.R., 109 F.Supp.2d 146, 151 (S.D.N.Y. 2000) (quoting Tucker Anthony, Inc. v. Bankers Trust Co., No. 93 Civ. 0257 (SWK), 1994 U.S. Dist. LEXIS 128,  at *19, 1994 WL 9683, at *6  (S.D.N.Y. Jan. 10, 1994)).  Because "[a] plaintiff moving to transfer venue has already had an opportunity to choose the venue when filing the action . . . a plaintiff moving to transfer must demonstrate, *inter alia*, that after the action was filed there was a change of circumstances that warrants transferring the action to the transferee forum."  Id.  Plaintiffs initially chose a forum located in the Northern District, even if that forum was a state court. The Defendant exercised a defendant's right to remove the case to federal court.  That federal court was the court in the federal district that encompassed the state court. Plaintiffs argue, however, that "removal of the case to federal court, and the Court's determination that federal subject matter jurisdiction exists, constitute significant changes." This argument does not persuade the Court.  The basis for federal jurisdiction existed when they filed their case, so no change of circumstances occurred except that Plaintiffs preferred the state forum.

Moreover, the Court notes that Plaintiffs first attempted to remand the case to state court, and only sought to transfer when the Court denied that motion.  Under those circumstances, the Court is inclined to suspect that the motion to transfer has less to do

with attempting to find a more convenient forum than with trying to find a judge more likely to agree with Plaintiffs' arguments. In considering a motion to transfer, a trial court should be deferential to a plaintiff's choice of forum. Iragorri v. United Techs. Corp., 274 F.3d 65, 71 (2d Cir. 2001). That deference, however, "varies with the circumstances." Id. Courts provide less deference "the more it appears that the plaintiff's" chosen forum "was motivated by forum-shopping reasons[.]" Id. That appearance exists here, and the Court will not provide deference to Plaintiffs' forum choice, which shifted after a Court decision that was not in their favor.

The Court finds that Plaintiffs have not met their burden of providing clear and convincing evidence to convince the Court that the Southern District of New York would be a more convenient forum for this action. The Plaintiffs' motion will be denied in this respect.

### ii.  Western District of New York

Plaintiffs in the alternative argue for transfer to the Western District of New York. The Plaintiffs offer only a brief argument in support of transfer to that District. They point out that venue is proper because a substantial part of the acts or omissions that led to this action occurred in that district. They also argue that the venue in the Western District would be more convenient for Defendant's employees who will testify who work in Batavia, New York. Batavia is in the Western District. Courthouses in the Western District are also located in Rochester and Buffalo, which are more convenient transportation hubs for out-of-state witnesses than the Northern District. The Western District is also "more convenient for Plaintiffs and their counsel than the Northern District, as the Work Justice Center of New York maintains an office in Rochester." Defendants responds in the same

13

fashion as with the earlier motion regarding the convenience of materials and witnesses.

The Court is likewise unpersuaded by the Plaintiffs' arguments with respect to the Western District.  Plaintiffs do not point to any change in circumstances that would justify permitting them to choose a new forum, and the Court repeats suspicions about forum shopping.  Moreover, the Court is unpersuaded by Plaintiffs' arguments that, despite the fact that they reside and work in the Northern District, the Western District would be more convenient because Plaintiffs' attorneys also have an office in Rochester.  Defendant's employees who work in Batavia may find litigating in the Western District more convenient, but their convenience does not outweigh the other factors.  The Court will therefore deny the motion in this respect as well.

### B. Motion to Strike Affirmative Defenses

Plaintiffs move to strike a number of the affirmative defenses raised in the Defendant's answer.[3]  Defendants oppose the motion.  The Court will address each of the affirmative defenses the Plaintiffs challenge in turn.

### i. Federal Enclave

Plaintiffs argue that the Court should strike the federal enclave defense raised by the Defendants in their answer.  They contend that the Court rejected this defense as a basis for jurisdiction and found that Defendants had pleaded insufficient facts to support

---

[3]Plaintiffs filed their motion before the Court ruled on Plaintiffs' motion to remand. There, the Court concluded that this matter involved federal issues.  In their reply to Defendant's answer to the motion to strike, Plaintiffs acknowledged that the Court's decision on the remand motion prevented Plaintiffs' from succeeding on the instant motion with respect to some of the affirmative defenses.  Plaintiffs no longer believe they have a basis to strike Defendant's preemption and third-party causation defenses.  The motion will be denied with respect to those defenses as unopposed.

such a defense.  As such, they argue, the Court must strike that defense for insufficient factual support.  Defendant responds that the availability of the defense will depend on discovery; who exactly owns the detention facility that housed Plaintiffs, when that purchase became effective, and whether the land was a federal enclave when New York passed the wage and hours laws in question will require information not presently in the Defendant's hands.  They also argue that Plaintiffs have not shown any prejudice from allowing the defense to go forward.

The Court's decision and order denying the motion to remand addressed this issue:

The United States Constitution provides that the United States has exclusive authority over "all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, dock Yards, and other needful buildings."  U.S. Const. art 1, sec. 8, cl.17.  These locations have been "deemed 'federal enclaves' within which the United States shall have exclusive jurisdiction.'"  Akin v. Ashland Chem. Co., 156 F.3d 1030 (10th Cir. 1998).  "'It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation."  Sundaram v. Brookhaven Nat'l Labs., 424 F.Supp.2d 545, 569 (E.D.N.Y. 2006)(quoting Goodyear Automic Corp. v. Miller, 486 U.S. 174, 180 (1988)).  As such, "'a federally owned facility performing a federal function is shielded from state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation."  Id. (quoting Goodyear Automic Corp., 486 U.S. at 181).  States "[lose] the right to legislate with respect to activities occurring in the enclave unless" the state "reserved its right to do so when it consented to the purchase of the property by the United States."  Id.  Laws passed after the transfer of jurisdiction do not apply.  Id.  Courts have fond that state anti-discrimination laws, environmental laws, and common law claims not recognized at the time of transfer do not apply.  Id.  Here, Defendant argues that a colorable defense exists related to a federal enclave.  If this were the only basis for the Defendant's claim of a colorable federal defense, the Court would reject that defense as a basis for jurisdiction.  To take advantage of the defense, the Defendant would need to show both that the BFDF is on land owned by the federal government and that the New York labor laws in question were enacted after the United States obtained the land that contains the BFDF.  Defendant's notice of removal alleges only that BFDF is an "ICE-owned facility that temporarily houses federal immigration detainees[.]" Defendant does not explain what that "ownership" entails, who owns the land on which the BFDF sits and under what terms, or when the government took control of the facility.  Even if

there were some evidence of ownership, Defendant fails to allege that the BFDF appeared before the New York labor laws in question.  Defendant has failed to meet its burden in this respect.

Dkt. # 29, at 19-20.

Based on the materials provided in the notice of removal and in the proceedings surrounding the motion to remand, materials with which the Court presumes the parties' familiarity, the Court finds that Defendant has adequately pled the affirmative defense of a federal enclave, even if that defense did not provide a basis for remand.  A genuine issue of fact exists as to who owns the detention center, when that detention center came into such ownership, and the effect of that ownership on the ability of New York to assert its labor laws over that property.  Discovery may reveal that Defendant has an adequate defense in this respect, and the Court sees no prejudice to the Plaintiffs from Defendant asserting such a defense if one is available.  The Court will deny the motion in this respect.

### ii.    Joinder of Department of Homeland Security and Immigration and Customs Enforcement

Defendant's fourth affirmative defense contends that "Plaintiffs have failed to join defendants required by Rule 19 of the Federal Rules of Civil Procedure, namely the Department of Homeland Security and I[mmigration] [and] C[ustoms] E[nforcement]." Anser, dkt. # 6, at Affirmative Defenses, ¶ 4.  Plaintiffs claim that Defendants have not explained how these proposed necessary parties are necessary, and therefore the defense is not sufficient as pled.  They also contend that DHS and ICE are not essential parties for their claims under New York law, as liability for violations of the wage/hours law is joint and several.  Defendant points out that the Complaint alleges that ICE and DHS

were federal agencies in charge of processing and detaining immigrants, and that

Defendant's answer states that AGS operated facilities according to rules and standards,

including wage levels, set by ICE and DHS.

Courts have concluded that a failure to name the party considered indispensable

and a failure to provide any factual allegations for why that party is necessary is grounds

for striking an affirmative defense.  Car-Freshner Corp. v. Just Funky LLC,, No.

5:19cv289,  2019 U.S. Dist. LEXIS 203958, at *25 (N.D.N.Y. Nov. 25, 2019); see also,

GEOMC, 918 F.3d at 99 (court properly struck an affirmative defense of failure to join a

necessary party when the allegation was "vague" and pointed to "unnamed third parties.").

Such is not the case here.  Defendant specifically named the third parties in question, and

the Complaint and the answer, as explained, both described the connection between the

actions about which Defendants complain–wages and working conditions–and the

allegedly necessary defendants.  The pleading is sufficient with respect to this defense,

and the Court will deny the motion in this respect.

### iii.    Legality of Proposed Relief

Plaintiffs next argue that Defendant's 12th affirmative defense, which contends that

the requested relief violates the law,[4] should be stricken because Defendants do not

---

[4]The twelfth affirmative defense states:

Plaintiffs' requested relief violates the law, and is otherwise impossible to attain in conformance with the law.  At all relevant times to this lawsuit, Plaintiffs did not have a legal right to work in the United States.  Further, Plaintiffs did not have a legal right to receive minimum wage rates because neither Plaintiff sought approval from ICE for employment with Defendant, and neither Plaintiff was qualified to work for Defendant under Defendant's contract with ICE.

Answer, at Affirmative Defenses, ¶ 12.

identify any law which would be violated if Plaintiffs obtain their sought-after relief.  They

argue that, instead, requiring the Defendant to pay the relief due them under applicable

minimum-wage and hours laws is legal in New York, even if Plaintiffs lacked authorization

to work under federal law.  They point to a number of cases that establish that a party's

immigration status does not determine whether New York's labor laws apply to them.

Defendant, pointing to the Court's conclusion in the order denying the motion to remand

that preemption might prevent the application of New York labor law under the

circumstances, argues that they have indeed plead that the relief provided the Plaintiffs

might violate federal law.

The Court previously held that:

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect."  Arizona v. United States, 567 U.S. 387, 398 (2012).  These "two sovereigns" can sometimes enact laws that are "in conflict or at cross-purposes."  Id. at 399.  "The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every state shall be bound thereby, any Thing in the Constitution or Laws of the any state to the Contrary notwithstanding.'"  Id. (quoting U.S. Const. Art. VI, cl. 2).  "Congress has the power to pre-empt state law."  Id.  Beyond such "express" preemption, Congress can preempt state law in two other ways.  Id.  "First," Congress can occupy an entire field, and an "intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"  Id. (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).  "Second, state laws are pre-empted when they conflict with federal law."  Id.  Two types of such "conflict pre-emption" exist: where 'compliance with both federal and state regulations is a physical impossibility'"; and "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  Id. (quoting, in turn, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963) and Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).  "In pre-emption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'"  Id. at 400 (quoting Rice, 331 U.S. at 230).

Defendant asserts that AGS has a colorable defense that federal laws and regulations governing immigration preempt New York's attempts to regulate wages paid to detainees. Defendant points out that Plaintiffs' claims would cause the State of New York to regulate the wages paid to immigration detainees, and that the Supreme Court has determined that immigration is an area where the federal government has a clear power to regulate. See Arizona, 567 U.S. at 394-395. Congress has specifically empowered DHS/ICE to spend funds for payment "to aliens, while held in custody under the immigration laws." 8 U.S.C. § 1555(d). The rate of pay for such work "may be specified from time to time in the appropriation Act involved." Id. At least one court has interpreted this provision to exempt immigrant detainees from the federal Fair Labor Standards Act and permit payment of $1 a day to detainees. Alvarado Guevara v. INS, 902 F.2d 394, 396-97 (5th Cir. 1990). Defendant also points out that federal law prohibits employment of aliens not authorized to be present in the United States. See 8 U.S.C. § 1324a(a)(1)(A). Treating detainees as employees for the purpose of New York labor law would conflict with federal prohibitions on hiring them.

Plaintiffs dispute that preemption applies to this case. They point out that federal immigration law does not purport to displace state wage and hour law, and that courts have been clear that an employee is entitled to the minimum wage in New York and damages under federal wage and hours law, regardless of immigration status. See, e.g., Saavedra v. Mrs. Bloom's Direct, Inc., No. 17cv2180, 2018 U.S. Dist. LEXIS 87550, at *6 (S.D.N.Y. May 24, 2018) ("the precedent in this Circuit is clear that the immigration status of a plaintiff-worker is irrelevant under the FLSA, and that payment under the terms of the settlement to an undocumented worker neither condones nor continues a violation of immigration law."); Affordable Hous. Found., Inc. v. Silva, 469 F.3d 219, 243 (2d Cir. 2006) (payment to undocumented workers for violations of FLSA permitted under federal law); Pacheco v. Chickpea at 14th St., Inc., No. 18 Civ. 251, 2019 U.S. Dist. LEXIS 90714, at *14 (S.D.N.Y. May 30, 2019) ("it is obvious that lawful employment status is not a required element of a NYLL claim."). As such, Plaintiffs claim, federal control over immigration does not preempt state wage and hours laws. These cases answer a different question than the one raised here. None of the plaintiffs in those cases were detainees in a federal facility when they worked for less than the minimum wage.

Plaintiffs also cite to cases from various district courts that address the issue of preemption to argue that courts have concluded that preemption does not apply to the issue of whether detainee wages violate state law. Plaintiffs overstate the value of these cases to the issue here. In Washington v. Geo Grp., Inc., 283 F.Supp.3d 967 (W. D. Wa. 2017), for instance, the court evaluated a motion to dismiss by a defendant who challenged the State of Washington's claims that wage payments of $1 a day to detainees violated state minimum wage laws. Defendant argued that the case should be dismissed because federal regulation of immigration preempted Washington's law. The court rejected defendant's arguments for express and field preemption, unconvinced by some of the same arguments that Defendant makes

here.  Id. at 976-977.  At the same time, the court concluded that "conflict/obstacle preemption issues may become ripe at summary judgment or trial, but at present factual issues abound that preclude a decision based on the pleadings, and before discovery."  Id. at 978.  That Washington court came to the same conclusion on a motion to dismiss in another case brought against the same defendant for failing to pay a detainee the Washington minimum wage.  See Chen v. Geo Group, Inc., 287 F.Supp.3d 1158, 1166-1167 (W.D. Wa. 2017).  A court in California rejected even obstacle/conflict preemption for an immigration detainee seeking compensation under California law.  See Novoa v. Geo Grp., Inc., No. EDCV 17-2514, 2018 U.S. Dist. LEXIS, at 14-16 (C.D. Ca. June 21, 2018).

In the case of the defense of preemption, the Court finds that Defendant has presented a colorable federal defense.  While the Court recognizes that some courts have rejected the notion that federal law preempts State minimum wage statutes, the Court notes that the cases cited by the Plaintiffs were not decided by the Second Circuit.   Their authority is merely persuasive.  Those cases were also decided on motions to dismiss, and at least in two of those cases the Court found that factual issues existed that needed to be resolved when it came to conflict preemption.  Since "[p]receisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [this] version of the facts to a federal, not a state, court,'" the Court finds that a colorable federal preemption defense exists in this case.  Coumo v. Crane Co., 771 F.3d 113, 116 (2d Cir. 2014) (quoting Willingham, 395 U.S. at 409).  The Court needs more factual detail to determine the interplay between state law, the wages that the contract obligated Defendant to pay, and the structure and purpose of federal immigration law.  Defendant certainly has a "colorable" defense that applying state wage and hours law would frustrate the purpose of federal law relating to the detention of immigrants.

Dkt. # 29, at 15-19.  Plaintiff has conceded that preemption is valid affirmative defense

based on the Court's ruling.  The Court recognizes that preemption and the legality of

requested relief are different issues, and that if the Court found that the state laws were

not preempted by federal law, the Court could very well also find that employment of the

Plaintiffs and paying them the New York minimum wage would not violate any law.  Such a

determination, however, depends on the facts of the case.  The Court cannot conclude at

this stage that Defendant could not prevail on such a defense, and will deny the motion in

this respect as well.

### iv.   Civil Duty Exception

Plaintiffs next seek to strike Defendant's 19th affirmative defense, which contends that "Defendant is entitled to require a communal contribution by ICE detainees, including Plaintiffs, in the form of housekeeping tasks under the civic duty exception to the Thirteenth Amendment's prohibition against involuntary servitude."  Affirmative Defenses at ¶ 19.  Plaintiffs contend that they have not alleged any 13th Amendment claims, nor any state claims related to involuntary servitude.  As such, the affirmative defense is irrelevant and should be struck.  Defendants respond that Plaintiff raised a claim under the New York Constitution that "involves an assertion of involuntary servitude."

Defendant cites to federal law that limits the reach of the Thirteenth Amendment's prohibition on involuntary servitude, because "not all situations in which labor is compelled by physical coercion or force of law violate the Thirteenth Amendment."  United States v. Kozminski, 487 U.S. 931, 943 (1988).  Involuntary servitude is permissible as a punishment for a crime, and the Amendment "does not prevent the State or Federal Governments from compelling their citizens, by threat of criminal sanction, to perform certain civic duties."  Id. at 943-44.  Defendant's defense here is that, to the extent that Plaintiffs attempt to allege that they were coerced into involuntary labor, that such coercion did not violate the constitution because the detainee employment programs are authorized by federal law.  Plaintiff's first cause of action, brought pursuant to the New York Constitution, alleges that Defendant "has violated Plaintiffs' constitutional right to be free from having their labor and its profits contracted, given or sold to AGS, in violation of the New York State Constitution, Art. III, Sec. 24."  Complaint, dkt. # 1-3, at ¶ 77.  Plaintiffs cite to no case law that supports this claim.  They do contend, however, that "[n]othing in

the constitutional provision requires that labor be involuntary.  Though the Complaint points out certain inherently coercive aspects of the environment at the civil immigration detention center, none of Plaintiffs' claims require litigation of the 'voluntariness' of their labor.  This defense is a red herring and should be stricken."  Dkt. # 37-1, at 7.

The Court will deny the motion in this respect as well.  Plaintiffs have not defined the constitutional claim in a way that is clear to the Court, and they do not provide any useful analysis of the constitutional provision in question. While Plaintiffs may eventually prove correct that the claim does not involve a showing of involuntary servitude, the paucity of argument on this issue causes the Court to conclude that Defendant may have raised a viable defense to whatever claim eventually emerges.  The Court will therefore deny the motion in this respect as well.

### v.    Waiver

Plaintiffs next seek to strike Defendant's twentieth affirmative defense, which alleges that "Plaintiffs knowingly waived their claims when they freely elected to participate in the Voluntary Detainee Worker Program."  Answer, Affirmative Defenses, at ¶ 20. Plaintiffs argue that the defense does not state expressly which rights Plaintiffs allegedly waived, and that law prohibits waiver as a defense to allegations of a minimum wage violation.  Defendant admits that waiver may not be available under New York labor laws, but argues that such a defense could cover Plaintiffs' federal claims.  They contend allegations in the case indicate that Plaintiffs may have participated voluntarily in the work program, and the parties had an agreement for Plaintiffs' participation.

The Court will deny the motion in this respect as well.  Whatever the usefulness of a waiver defense under New York law, this case also involves federal law.  The allegations

in the Complaint and the above-stated affirmative Defense are sufficient to make plausible that a waiver defense exists to at least some of the claims.  The Court recognizes that a worker likely cannot waive application of the Fair Labor Standards Act.  See Mei Xing Yu v. Hasaki Rest., Inc., 944 F.3d 395, 404 (2d Cir. 2019).  As explained in the Court's earlier decision denying remand, the unique factual nature of this case–complaints about wages paid in New York to persons in federal immigration detention–raises issues about whether and which labor laws apply in a federal immigration detention facility.  That situation cautions against eliminating a defense that may emerge depending on the actual nature of the facility where the alleged violations occurred and the actual terms of the custody in which Defendant and the government held Plaintiffs.  The Court also fails to see how prejudice could come to the Plaintiff from this defense.  The nature of the agreement between the Defendant and Plaintiffs will be at issue in this case whether the waiver defense exists, as will the operation of the various labor laws that apply here. Recognizing the procedural posture of this matter and the disfavor in which courts hold motions to strike affirmative defenses, the Court will use its discretion and deny the motion in this respect.

### vi.    Offset

Plaintiffs next seek to strike Defendant's twenty-second affirmative defense, which alleges that "Defendant is entitled to an offset from any award to Plaintiffs for costs incurred by Defendant in providing material benefits, including but not limited to housing, food, clothing, and recreation, to Plaintiffs while detained, as well as costs incurred in operating the Voluntary Detainee Worker Program."  Answer, Affirmative Defenses, at ¶ 22.  They contend that the defense is deficient because Defendant has not provided "a

legal basis" for the defense and "has pleaded no facts as to what housing, food, clothing, or recreation were provided to Plaintiffs, or what 'costs' it believes are properly attributed to Plaintiffs."

The parties point to case law regarding wage disputes under state and federal law to address the question of whether offsets are available for the housing and services provided Plaintiffs by Defendant while Plaintiffs were subject to detention. These cases are only marginally helpful, given the unique situation this litigation represents. The Court finds that more information is necessary to determine whether any–or what kind–of offsets would be available the Defendant under the appropriate law. The Court is also unpersuaded by Plaintiffs' claims that Defendant has not offered sufficient factual allegations to make plausible the source of the offsets.[5] The context of the Complaint, the answer, and the other pleadings make clear that the offset would come from the services the Defendant's contract with the government obligated the Defendant to provide.

---

[5]Plaintiffs contend that an "omission" of the particular facts about housing, food and clothing is "particularly notable, given that Defendant admits it is paid by the federal government for services provided under the contract to operate the detention center, which presumably includes the provision of 'housing, food clothing, and recreation' to detainees." The Court notes that nothing in the law cited above requires a defendant pleading an affirmative defense to plead in detail such information. Indeed, the fact that Defendant operated a detention facility pursuant to an agreement with the government would provide a factual basis to make plausible that Defendant provide such services to the Plaintiffs. Fact pleading is not required under federal law, and the Court would discourage parties who can discern the factual basis for a defense from clogging dockets with pleadings seeking additional factual information. If the Court were to grant the motion to strike the defense for insufficient factual contact, the Court would do so without prejudice. That would mean that Defendant could file an additional, longer answer with affirmative defenses that contained additional pages of facts. Such facts will become available in discovery. Federal dockets (and pleadings) do not need to be larded up with additional factual material, particularly when it is clear that such facts could be developed in discovery.

Plaintiffs will not be prejudiced if the parties are required to determine what services the Defendant provide them.  The Court will deny the motion in this respect as well.

**IV.     CONCLUSION**

For the reasons stated above, Plaintiffs' motion to strike certain affirmative defenses, dkt. # 15, is hereby DENIED.  Plaintiffs' motion to transfer venue, dkt. # 40, is hereby DENIED.

Thomas J. McAvoy
Senior, U.S. District Judge

**IT IS SO ORDERED.**

Dated: March 16, 2022

25