## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

DALILA YEEND, BOUNNAM PHIMASONE,
ELVIN MINAYA RODRIGUEZ, LISA LAPOINTE,
and SHANTADEWIE RAHMEE,

Individually, and on behalf of all others similarly
situated as Class Representatives,

                               Plaintiffs,

        v.

AKIMA GLOBAL SERVICES, LLC,

                            Defendants.

**Case No. 1:20-cv-01281-TJM-CFH**

**CLASS AND REPRESENTATIVE ACTION**

**JURY TRIAL REQUESTED**

**FIRST AMENDED COMPLAINT**

## PRELIMINARY STATEMENT

1. While detained at the Buffalo Federal Detention Facility in Batavia, New York ("Detention Center" or "Batavia"), Plaintiffs Dalila Yeend, Bounnam Phimasone, Elvin Minaya Rodriguez, Lisa Lapointe, Shantadewie Rahmee, and other former and current detainees who participated in the so-called Voluntary Work Program (collectively "Plaintiffs"), were employed by Defendant Akima Global Services, LLC ("AGS"), the large for-profit corporation that operates the civil detention center. AGS forced them to provide labor and then failed to pay them wages for it, instead giving them $1 a day or less in commissary credit, regardless of the number of hours they worked.

2. The individual named plaintiffs bring this action on their own behalf and on behalf of all others similarly situated, as class representatives.

3. AGS contracts with the federal government to confine immigrants at the detention center and is paid a daily rate for each bed filled per day.

4.      If not for Plaintiffs' labor, AGS would have to hire non-detained employees at market rates to perform the kitchen, maintenance, and other work it requires detainees to do. AGS increases its profits by effectively requiring detainees to operate their own jail, and by failing to pay them adequately for their work.

5.      Despite its status as a federal contractor, AGS depresses local wages and exploits detainees by using the labor of detainee-employees, many of whom are being held in indefinite detention, and all of whom are being held for civil immigration matters rather than as punishment for criminal violations, to perform functions essential to the running of its business.

6.      AGS employed Plaintiffs. In the context of their detention, AGS's employment of Plaintiffs for subminimum wages was coercive and exploitative, and Plaintiffs' labor constituted forced labor within the meaning of the Trafficking Victims Protection Reauthorization Act ("TVPRA").

7.      AGS's captive workforce is not paid the New York State minimum wage. AGS's use and exploitation of detainee-employees violates New York's minimum wage laws, New York Labor Law ("NYLL") § 650, *et seq*., and the TVPRA, and constitutes unjust enrichment.

8.      Plaintiffs seek damages and declaratory and injunctive relief for Defendant's willful violations of the New York Labor Law, and Trafficking Victims Protection Reauthorization Act.

9.      Plaintiffs bring their claims individually and on behalf of a class of persons pursuant to Rule 23(a), (b)(3) of the Federal Rules of Civil Procedure, and seek to toll the applicable statutes of limitations on behalf of the class.

## JURISDICTION AND VENUE

10.   This Court has jurisdiction pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1581 *et seq.* and 28 U.S.C. §§ 1331 and 1337.  As this action arises under Acts of Congress regulating commerce, jurisdiction over Plaintiffs' claims for declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202.

11.   With respect to the state law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 in that the state law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

12.   Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1), as AGS has subjected itself to the Court's personal jurisdiction with respect to this civil action.

## THE PARTIES

13.   Plaintiff Dalila Yeend is an adult individual and resident of the State of New York, Rensselaer County.

14.   Plaintiff Bounnam Phimasone is an adult individual and resident of the State of New York, Oneida County.

15.   Plaintiff Elvin Minaya Rodriguez is an adult individual and resident of the State of New York, New York County.

16.   Plaintiff Lisa Lapointe is an adult individual and a resident of Canada.

17.   Plaintiff Shantadewie Rahmee is an adult individual and a resident of the State of New York, Queens County.

18.   Defendant AGS is a Foreign Limited Liability Company operating in Genesee County, New York and at all times relevant to this complaint, operated the Batavia Detention Center located at 4250 Federal Drive, Batavia, New York 14020.

19.     At all times relevant to this Complaint, Plaintiffs were employees of Defendant as that term is defined by the NYLL §§ 190(2) and 651(5) and its implementing regulations, 12 N.Y.C.R.R. § 142-2.14(a).

20.     Upon information and belief, at all times relevant to the Complaint, Defendant made all relevant decisions regarding Plaintiffs' wages, working conditions, and employment status at Batavia.

21.     At all times relevant to the Complaint, Defendant had the power to hire and fire Plaintiffs, set their wages, retain time and/or wage records, and otherwise control the terms and conditions of Plaintiffs' employment at Batavia.

22.     At all times relevant to the Complaint, Defendant had the power to stop any illegal pay practices at Batavia.

23.     At all times relevant to the Complaint, Defendant was an employer of Plaintiffs as that term is defined by of NYLL §§ 190(3) and 651(6) and employed Plaintiffs and permitted them to work within the meaning of NYLL §§ 2(7) and 651(5), and 12 N.Y.C.R.R. § 142-2.14(a).

**STATEMENT OF FACTS**

24.     The Department of Homeland Security ("DHS") contains the agency United States Immigration and Customs Enforcement ("ICE"), whose stated mission is to "promote homeland security through the criminal and civil enforcement of federal laws governing border control, customs, trade and immigration." ICE has over 20,000 employees deployed across all 50 states, the District of Columbia, and in numerous foreign countries. In 2019, ICE's budget exceeded eight billion dollars.

25.     ICE detains individuals, including victims of torture, asylum seekers, survivors of human trafficking, victims of crimes, individuals who were brought to the United States as children, U.S. citizens, lawful permanent residents with significant ties to their local

community, and others who are awaiting resolution of various immigration matters. As happened with at least some of the Plaintiffs, many of these individuals are released back into the United States following a period of detention.

26. ICE effectuates this mass incarceration of immigrants by contracting with private, for-profit corporations, including Defendant, which manages operations for the civil detention center at Batavia.

27. AGS imposes prison-like conditions on the civil detainees at Batavia, despite the fact that they are not incarcerated as punishment pursuant to a criminal conviction. AGS limits and controls the amount of time civil detainees may spend outdoors or out of their cells in common areas; the food detainees eat and the timing of meals; the temperature in the facility; the amount of clothing detainees may have; visits with loved ones; access to mail and phones; access to commissary; access to showers; access to personal property; access to medical care; and access to television, which is frequently the only recreational activity available within the Detention Center.

28. The food available to detainees was insufficient, substandard, and at times inedible, including undercooked chicken, broccoli with worms in it, and milk past its expiration date.

29. Defendant maintains the facility at an uncomfortably cold temperature, and issues only a t-shirt and shorts to detainees. Detainees who cannot afford to purchase thermal clothing from the commissary wrap themselves in the one blanket issued to them to try to stay warm.

30. Upon information and belief, Defendant AGS earns millions of dollars each year, paid for by U.S. taxpayers.

31. AGS's profits are enhanced by taking detainees' labor without payment of wages as required by law.

32.  Defendant AGS's contract with ICE requires AGS to comply with federal, state, and local laws.

33.  At all times relevant to this Complaint, Defendant employed civil immigration detainees to perform labor in the Detention Center. The range of tasks performed by detainees included but were not limited to delivering and serving meals, washing dishes, moving tables and chairs, cleaning common areas (including sweeping, mopping, and buffing floors), cleaning bathrooms, emptying trash cans, painting, and generally maintaining the 650-bed detention center.

34.  AGS uses detainee workers to perform essential functions such as food preparation and custodial duties (in the kitchen, recreation area, barber area, processing area, common areas of the housing units, main hallways and traverse areas), ground maintenance within the perimeter of the facility, and librarian duties.

35.  In addition to employing detained workers to fulfill these tasks, AGS also employs some non-detained workers. Upon information and belief, AGS pays its non-detained workers at least the New York State minimum wage.

36.  Detainees are not paid for their labor. Instead, they receive up to $1 per day in commissary credit for their labor, regardless of how many hours they work. On occasion, they are not given the commissary credit at all; on some occasions, detainees are "compensated" for their labor with items from the commissary or the personal property of other detainees who have left the Detention Center.

37.  Defendant controls how many hours detainees work.

38.  The individuals detained at the Detention Center are captive and required to perform any task demanded of them, between their morning wake up count and lights out, at the facility.

39.     The paltry wage Defendant pays to detained employees is not paid to them in cash. Rather, Defendant deposits detainees' wages into commissary accounts from which detainees can only make authorized purchases of items offered for sale by Defendant and which cannot be converted into cash.

40.     Each housing unit in the Detention Center has a commissary, where detainees in good standing can purchase food and necessary supplies, such as packets of ramen noodles, Cheetos and other packaged snacks, soap and other hygiene products, or toothpaste.

41.     Funds deposited in commissary accounts could only be used for purchasing toiletries, non-perishable food items, thermal clothing, and other similar items from the detention center commissary, which was operated by Defendant AGS.

42.     When detainee workers make commissary purchases, they are giving their wages directly back to AGS in a "company store" arrangement. This arrangement is compounded by AGS's scheme, plan, and pattern of intentionally depriving detained immigrants of basic necessities, such as adequate clothing and edible food, that can only be purchased at the commissary.

43.     Detainees are not allowed to carry money inside the Detention Center. When detainees are processed into Batavia, they are required to relinquish all funds in their possession to the processing officer.

44.     Detainees are charged for making phone calls to family and friends outside of the Detention Center and are prohibited from making phone calls to family and friends unless they have funds in their commissary account.

45.     Detainee workers are not provided with a written statement, at the time of their hiring or at any subsequent time, indicating the name and contact information of their employer or their

rates of pay.

46. Detainee workers are not provided with paystubs indicating the hours they worked each week.

47. Detainee workers are not paid the applicable New York State minimum wage for each hour worked in a workweek.

48. Defendant does not pay detainee workers an additional hour of pay at the minimum wage rate for each day their spread of hours—the time from the beginning to the end of their shift—exceeded 10 hours.

49. Defendant does not pay detainee workers an additional hour of pay at the minimum wage rate for each day they worked a split shift, which is a schedule of daily hours in which the working hours required or permitted are not consecutive.

50. The failure to compensate detainee workers for their labor denies them the financial resources necessary to communicate with family, to plan for their future needs and support their families, to speak with their attorneys, to have access to adequate toiletries, to obtain the commissary food they would otherwise buy, and to provide for themselves following their release from incarceration.

51. AGS controls detainee workers' wages, hours worked, and working conditions. AGS provides all necessary equipment and work uniforms for detainees to perform their work.

52. Detainee workers work under the constant implicit threat of discipline or other negative change in the conditions of their confinement, including the loss of privileges and entertainment, the ability to make phones calls, and use of the commissary or recreation. They could also face severe penalties, such as disciplinary segregation, solitary confinement, and/or referral for criminal prosecution, as Defendant AGS had complete

control not only over their employment, but also over every other aspect of their lives in detention.

53.   Defendant's utilization of detainee labor allows them to exploit a captive labor force.

54.   Though work was nominally "voluntary" on the part of each detained individual, detained labor was not an optional component of Defendant's business operations.  On occasions when Defendant had not obtained enough "volunteer" laborers to do the work necessary to run the detention center, AGS restricted access to phones or the few recreational activities available to detainees, such as television or yard time, until enough people "volunteered" to do the necessary work.

55.   It was common for detainees who participated in the work program to agree to perform additional jobs and tasks when requested by detention center staff for fear of retaliation.

56.   AGS frequently retaliated against detainees for failure to "volunteer" to work by turning off the television in the common area, which led to fights among detainees as television was one of very few activities available in the Detention Center. Detainees invariably "volunteered" in response to this kind of retaliatory deprivation and in order to try to keep the peace within the detention center.

57.   AGS also controlled the temperature at Batavia; the amount, content, and timing of food available to detainees at meals; and the inventory and prices of items for sale at the commissary. By keeping the temperature of the facility uncomfortably cold yet providing detainees only shorts and short sleeve shirts, minimizing the amount of food available, and setting high prices for commissary items, AGS created conditions that coerced detainees to work in order to purchase thermal clothing, food, and other basic items from the commissary.

*Plaintiff Dalila Yeend*

58.   In or around early July of 2018, AGS hired Plaintiff Dalila Yeend to work on kitchen duty in the Detention Center.

59.   A security guard employed by Defendant AGS instructed Ms. Yeend on how to perform her job and at what times she needed to work each day.

60.   From then until her release from immigration detention on August 17, 2018, she worked on the kitchen staff and was responsible for a food cart. Ms. Yeend performed custodial duties and food cart support for three shifts per day (one shift for each meal period), every day, seven days a week.

61.   Ms. Yeend worked at least in part because there was almost nothing else to do apart from watching television, and the forced lack of activity was negatively impacting her mental health.

62.   Ms. Yeend worked approximately one to one and a half hours for each breakfast shift, another one to one and a half hours for each lunch shift, and approximately two hours for each dinner shift.

63.   Her duties included transporting the food cart to and from the kitchen, arranging and serving food, collecting trays, wiping tables, and sweeping and mopping the floors.

64.   Ms. Yeend worked 4-5 hours per day, seven days a week.

65.   Each day Ms. Yeend worked, the interval between the beginning and the end of her workday exceeded 10 hours. Each day Ms. Yeend worked, her schedule of daily hours worked were not consecutive.

66.   At the end of each week, Defendant AGS required Ms. Yeend to sign a sheet verifying the number of days she worked, and "paid" her $1.00 per day of work ($7.00 per week), to be

deposited into her commissary account.

67.   Ms. Yeend was not provided a copy of this verification sheet.

68.   Defendant AGS did not provide Ms. Yeend with any pay stub or other written document indicating her work hours and pay along with her weekly wages or at any other time.

69.   Ms. Yeend's only form of compensation for her labor was $1 per workday in commissary credit that Defendant AGS gave her on a weekly basis.

70.   Ms. Yeend did not provide advance written consent to Defendant AGS to deposit her wages in her commissary account.

71.   Defendant AGS occasionally required Ms. Yeend to perform other work in addition to her regular work as kitchen staff, for which she was not credited at all. For example, on one occasion, Defendant AGS required Ms. Yeend to clean and sterilize three housing cells that had been infested with head lice. Defendant AGS "paid" Ms. Yeend for this work by giving her items AGS had confiscated from other women who had been transferred out of Batavia.

72.   Not until August 17, 2018, when Ms. Yeend won her release from immigration detention, did Defendant AGS give her cash wages for the work she had performed, when Defendant "cashed out" Ms. Yeend's commissary account.

*Plaintiff Bounnam Phimasone*

73.   In late 2018, approximately one week into his detention at Batavia, a security guard for Defendant AGS hired Bounnam Phimasone to work in maintenance in the detention center. He began work that same day.

74.   Throughout his detention, Mr. Phimasone performed custodial duties in the common area of the housing unit. He regularly buffed and cleaned the floors. To perform his job duties,

10

Mr. Phimasone regularly worked with cleaning chemicals and utilized used heavy tools to keep the facility tidy.

75.    Mr. Phimasone worked at least in part because he believed that if he did not work, he would not have a good reference and would never be allowed to leave the Detention Center.

76.    Defendant AGS supplied all the chemicals and tools, including the buffer, necessary for Mr. Phimasone's work.

77.    Defendant AGS, through its agents, directed Mr. Phimasone's what work tasks to perform and assigned his work schedule.

78.    Mr. Phimasone worked approximately three hours per day, five days per week, from the time he was hired until the date of his release from immigration detention, on August 6, 2019.

79.    Not infrequently, the floors became dirty again after Mr. Phimasone had cleaned them for the day, and he was required to buff and clean the floors a second time. On these occasions, Mr. Phimasone worked approximately six hours per day.

80.    Every Thursday, Mr. Phimasone was brought by an AGS officer into a security guard's office and told to signed a paper confirming he performed his work duties and the number of days on which he performed labor, and that $5.00 would be transferred into his commissary account.

81.    Mr. Phimasone was not provided with a copy of this paper.

82.    Mr. Phimasone did not receive wages. Instead, Mr. Phimasone's only form of compensation for his labor was $1 per workday ($5 per week) in commissary credit, deposited on a weekly basis.

83.    Throughout his detention, Mr. Phimasone needed to have snacks on hand to regulate his

blood sugar; he regularly purchased these snacks from the commissary.

84.   Mr. Phimasone did not provide advance written consent to Defendant AGS to deposit his wages in his commissary account.

85.   Defendant AGS did not provide Mr. Phimasone with any pay stub or other written document indicating his work hours and pay along with his weekly wages, or at any other time.

86.   Not until August 6, 2019, when Mr. Phimasone was released from immigration detention, did Defendant AGS give him cash wages for the work he had performed, when Mr. Phimasone's commissary account was "cashed out."

87.   Mr. Phimasone was never provided with a paystub documenting his hours worked or pay received.

88.   Each day Mr. Phimasone worked, his schedule of daily hours worked were not consecutive.

89.   Mr. Phimasone's last day of work was August 6, 2019.

   ***Plaintiff Elvin Minaya Rodriguez***

90.   Plaintiff Minaya Rodriguez was detained at Batavia from April 26, 2019 until April 1, 2021.

91.   From around June 2019 to September 2019, Mr. Minaya Rodriguez worked as a cleaner. During this time, he worked for about an hour each day, five days per week. His duties included sweeping, mopping, and disposing of garbage. He performed this work throughout the bottom floor of the unit.

92.   Defendant AGS supplied all the tools, such as brooms and mops, necessary for Mr. Minaya Rodriguez's work.

93.   Defendant AGS, through its agents, directed Mr. Minaya Rodriguez regarding his work

tasks and assigned his work schedule.

94.   Occasionally, Mr. Minaya Rodriguez would perform additional jobs or tasks outside of his regular cleaning schedule when another detained worker was sick or otherwise could not do their work.

95.   In or around September 2019, Mr. Minaya Rodriguez was approached by a female officer who worked in the kitchen about him also working in the kitchen. Upon information and belief, this officer was employed by AGS.

96.   Mr. Minaya Rodriguez agreed to work in the kitchen in part because detainees who worked in the kitchen received more and higher quality food, and he otherwise often felt hungry and lacked the means to purchase food through the commissary. For example, cooks sometimes gave kitchen workers food that was better seasoned, properly cooked, and/or not on the menu for the rest of the detainees. Detained kitchen staff workers would also have first choice if there were leftovers.

97.   From around September 2019 to March 2020, Mr. Minaya Rodriguez worked as a dishwasher in the kitchen approximately 5 days a week from 12:30 to 6:30 pm.

98.   During this time, Mr. Minaya Rodriguez worked alongside non-detained co-workers performing similar tasks.

99.   Mr. Minaya Rodriguez's duties included washing dishes, sweeping, squeegeeing the floor, and taking out the trash.

100.  On several occasions, Mr. Minaya Rodriguez witnessed officials in AGS shirts giving instructions, informing people if they were doing a job poorly, and instructing ICE officials to fire detainees from the work program.

101.  Around March 2020, detainees were not permitted to work in the kitchen anymore because

of COVID-19.

102. Soon thereafter, Mr. Minaya Rodriguez received a call from a processing officer who asked him to work distributing food in the dormitories.

103. From approximately March 2020 to January 2021 and again from February 2021 to April 1, 2021, Mr. Minaya Rodriguez would receive carts loaded with food to distribute to the dorms in his unit; distribute the food; count the spoons, forks, and trays; load empty trays back into the cart; and put the cart back into the hallway outside the unit door.

104. During these periods, Mr. Minaya Rodriguez worked distributing food to his unit approximately seven days a week, from 6 a.m. to 7 a.m., from 12 p.m. to 1 p.m., and from 5:30 p.m. to 6:30 p.m., serving breakfast, lunch, and dinner each day.

105. During these periods, although Mr. Minaya Rodriguez worked seven days a week, he only received $5 in his commissary account weekly.

106. In or around January 2021, for about a month, Mr. Minaya Rodriguez was called back to work in the kitchen to work as a dishwasher and resumed his schedule working 5 days a week from 12:30 p.m. to 6:30 p.m. During this time, he also would regularly sign up for odd jobs outside of his kitchen shifts. When COVID-19 rates increased, he was reassigned to the job of distributing food to his unit.

107. No matter how many different jobs he performed or hours he worked, Mr. Minaya Rodriguez never received more than $1 per day in commissary credit as wages for his labor.

108. When Mr. Minaya Rodriguez worked more than five days a week, he still only received $5 in commissary credit for the week.

109. Mr. Minaya Rodriguez did not provide advance written consent to Defendant AGS to deposit his wages in his commissary account.

14

110. Defendant AGS did not provide Mr. Minaya Rodriguez with any pay stub or other written document indicating his work hours and pay along with his weekly wages or at any other time.

111. Mr. Minaya Rodriguez's employment ended on or around April 1, 2021, when he was released from immigration detention.

112. Not until April 1, 2021, when Mr. Minaya Rodriguez won his release from immigration detention, did Defendant AGS give him cash wages for the work he had performed, when Defendant "cashed out" his commissary account.

113. When Mr. Minaya Rodriguez's commissary account was "cashed out," he never received the five dollars he had earned for his last week of work.

114. The commissary credit Mr. Minaya Rodriguez received for his work, though nominal, was of great significance to him during his detention, especially during the pandemic when his family members were less able to contribute money to his commissary fund.

115. Mr. Minaya Rodriguez experienced hunger and lost weight during this time, when the only commissary credit available to him was the $5 deposited by AGS for each week of his labor.

*Plaintiff Lisa Lapointe*

116. Plaintiff Lisa Lapointe was detained at Batavia from December 13, 2019 until April 3, 2020.

117. Ms. Lapointe began working on December 15, 2019, because detention center staff informed her that if nobody was available to fill the position and perform the work, they would take away the television and turn off the phones that detainees used to communicate with friends, family, and legal counsel.

15

118.   Ms. Lapointe took the threat seriously because this happened throughout her detention: AGS agents turned off the television and phones when nobody "volunteered" to perform the required work. Typically, after the phones and television had been turned off, detainees would pressure each other to agree to work in order to end the deprivation.

119.   From December 15, 2019 until around February 2020, Ms. Lapointe worked as a cleaner.

120.   AGS provided Ms. Lapointe a several-minute training on which chemicals to use and required that she confirm in writing she took the training.

121.   Ms. Lapointe was trained by a member of the custodial team who wore a custodial uniform.

122.   While working as a cleaner, Ms. Lapointe performed a variety of different tasks, including scrubbing the walls and tiles of the showers, collecting all the garbage in the unit and placing it in a bin located outside the unit doors, and buffing and mopping floors throughout her unit.

123.   AGS provided Ms. Lapointe with all the tools necessary to perform these tasks, including the chemicals, sponges, mops, and buffer.

124.   During this time period, Ms. Lapointe worked for approximately three hours each day, five days a week. She would generally perform one shift at 2 p.m. and another shift at 10 p.m.

125.   No matter how many hours Ms. Lapointe worked, AGS paid her no more than $1 per workday, deposited into her commissary account.

126.   On one occasion during this period, Ms. Lapointe was tasked with painting walls in other empty units. AGS provided Ms. Lapointe with the paint and paintbrushes. For this work, instead of receiving wages or commissary credit, she was given a radio.

127.   In or around February of 2020, Plaintiff Lapointe began working a food service job.

128.   Ms. Lapointe took the food service job at least in part because it provided more reliable

access to food. For example, detained kitchen staff workers had first choice if there were leftovers after serving a meal.

129.   Access to food and agency over her own food intake was important to Ms. Lapointe, as she, like many other detainees, experienced gastrointestinal distress after eating meals in Batavia; she also suffered from gallstones during her time in detention. When she informed AGS that she needed to avoid fatty foods for her gallbladder health, she was given no accommodation nor provided with any additional or different food. Ms. Lapointe accepted a food service job so that she would have access to food that was less likely to aggravate her condition.

130.   Plaintiff Lapointe experienced hunger and weight loss during her detention. She experienced lightheadedness, fatigue, dizziness, and headaches on a daily basis. She also suffered several gallbladder attacks during her detention.

131.   From around February 2020 to April 3, 2020, Ms. Lapointe worked for five days a week providing food service. She worked the 6 a.m. breakfast, 12 p.m. lunch, and 5 p.m. dinner shifts, totaling about six to seven hours a day.

132.   During the period in which Ms. Lapointe provided food service, she received carts loaded with food to distribute to the dorms; distributed the food; counted the spoons, forks, and trays; loaded empty trays back onto the cart; and put the cart back into the hallway outside the unit door. Additionally, once a week, Ms. Lapointe was required to "deep clean" dining tables by scrubbing them with a toothbrush and toothpaste.

133.   After the pandemic began in March 2020, Ms. Lapointe was also tasked with sanitizing surfaces within her unit, such as the stairwells going from the bottom tier to the top tier. She performed this work daily in addition to her food service shifts. Ms. Lapointe usually

spent about 10 minutes performing this work, 2-4 times a day.

134.   No matter how many tasks Ms. Lapointe performed or hours she worked, AGS paid her no more than $1 per workday, deposited into her commissary account.

135.   Ms. Lapointe's employment ended on or around April 3, 2020, when she was released from immigration detention.

136.   Ms. Lapointe's only form of compensation for her labor was the commissary credit that Defendant AGS deposited on a weekly basis.

137.   Ms. Lapointe did not provide advance written consent to Defendant AGS to deposit her wages in her commissary account.

138.   Defendant AGS did not provide Ms. Lapointe with any pay stub or other written document indicating her work hours and pay along with her weekly wages or at any other time.

139.   Not until April 3, 2020, when Ms. Lapointe was released from immigration detention, did Defendant AGS give her cash wages for the work she had performed, when Defendant "cashed out" her commissary account.

140.   Plaintiff Lapointe experienced physical and emotional distress during her detention and found her conditions of work coupled with minimal payment to be degrading.

   ***Plaintiff Shantadewie Rahmee***

141.   Plaintiff Shantadewie Rahmee was detained at Batavia from October 28, 2019 until March 31, 2020.

142.   Ms. Rahmee began working for AGS approximately two weeks after entering the facility, as a cleaner and performing other miscellaneous jobs.

143.   Ms. Rahmee learned that a position was available and asked the officer on duty if she could take the position.

144.   Ms. Rahmee felt she had no choice but to work for AGS in order to afford edible food from the commissary.

145.   During her detention, Ms. Rahmee was on a "special diet" because she does not eat beef for religious reasons.  The "special diet" consisted almost entirely of rice and beans; the food she was provided was insufficient to sustain her without purchasing her own food from the commissary..

146.   Moreover, Ms. Rahmee was compelled to work after AGS staff threatened to take away the television, turn off the phones that detainees used to communicate with friends, family, and legal counsel, and deny detainees access to outdoor yard time if nobody "volunteered" to perform the work.

147.   The commissary credit Ms. Rahmee received for her work, though nominal, was of great significance to her during her detention, as there was not sufficient food available without supplementing with food from commissary.

148.   Ms. Rahmee experienced hunger, depression, a constant feeling of hopelessness, and insomnia during her detention.

149.   Ms. Rahmee received a several-minute training on which chemicals to use and was required to confirm in writing that she took the training.

150.   While working as a cleaner, Ms. Rahmee performed a variety of different tasks, including buffing floors throughout her unit, and painting and cleaning empty dorm rooms when detainees were moved.

151.   AGS provided all the tools necessary for Ms. Rahmee to perform these tasks, including the buffer.

152.   During this time, Ms. Rahmee buffed floors every morning from 7 a.m. to 9 a.m., five days

per week.

153. During this time, Ms. Rahmee was also tasked with painting and cleaning empty units from 9 a.m. to 11 a.m. and again from around 5 or 6 p.m. to 9 or 9:30 p.m., six days per week.

154. At times, Ms. Rahmee performed these three tasks in one day, such that her workday spanned over a 10-hour period.

155. No matter how many tasks Ms. Rahmee performed or hours she worked, AGS paid her no more than $1 per workday, deposited into her commissary account.

156. Occasionally if she did a lot of work, such as cleaning a whole unit, she got "paid extra" with commissary items, such as ramen noodles or coffee.

157. Ms. Rahmee's employment with AGS ended on or around March 31, 2020, when she was released from immigration detention.

158. Ms. Rahmee's only form of monetary compensation for her labor was the commissary credit that Defendant AGS deposited on a weekly basis.

159. Ms. Rahmee did not provide advance written consent to Defendant AGS to deposit her wages in her commissary account.

160. Defendant AGS did not provide Ms. Rahmee with any pay stub or other written document indicating her work hours and pay along with her weekly wages or at any other time.

161. Not until March 31, 2020, when Ms. Rahmee was released from immigration detention, did Defendant AGS give her cash wages for the work she had performed, when Defendant "cashed out" her commissary account.

162. Ms. Rahmee experienced physical and emotional distress during her detention and found her conditions of work coupled with minimal payment to be degrading.

**CLASS ACTION ALLEGATIONS**

163. Plaintiffs bring this lawsuit as a class action on behalf of the following class of persons

under Federal Rules of Civil Procedure Rule 23(b)(3).

164.  Plaintiffs seek to certify the following three classes:

(a) All individuals who performed labor for AGS in the "Volunteer Work Program" while detained at Batavia Federal Detention Facility at any time within the ten (10) years prior to the filing of this complaint and the date of final judgment in this matter (the "Forced Labor Class").

(b) All individuals who performed labor for AGS in the "Volunteer Work Program" while detained at Batavia Federal Detention Facility at any time within the six (6) years prior to the filing of this complaint and the date of final judgment in this matter (the "NYLL and Unjust Enrichment Class").

165.  The persons in each Class are so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown to Plaintiffs at this time, there are hundreds if not thousands of Class Members during the past three, six, and 10 years. Upon information and belief, Defendant typically housed over 400 detainees at any given time prior to the COVID pandemic, and over 130 detainees during the pandemic, many of whom worked in the work program prior to being released from detention or transferred to another detention facility.

166.  There are questions of law and fact common to the Class which predominate over any questions affecting only individual members, including but not limited to:

a.  Whether AGS is an employer of the Class under the NYLL;

b.  Whether AGS unlawfully failed and continues to fail to pay minimum wage, in

        violation of the NYLL;

    c.  Whether AGS failed to provide hiring and wage statement notices, in violation of the NYLL;

    d.  Whether Defendant received a benefit from the labor of the Class that was greater than the amount of compensation;

    e.  Whether the work performed by the Class constituted forced labor, in violation of the TVPRA; and

    f.  Whether Defendant's conduct constitutes labor trafficking, in violation of the TVPRA.

167.  The claims of the individual named plaintiffs are typical of the claims of the Class, as participants in the work program who have held a variety of roles.

168.  The individual named plaintiffs will fairly and adequately protect the interests of the Class.

169.  Plaintiffs are represented by attorneys from New York Worker Justice Center who have experience in employment and NYLL disputes, trafficking claims, and civil rights litigation, including class actions.

170.  Prosecuting separate actions by individual class members would, as a practical matter, be dispositive of the interests of other members, and run the risk of establishing incompatible standards of conduct for Defendant.

171.  On information and belief, Defendant AGS maintains records identifying which immigrant detainees participated in the Work Program, thereby making composition of the class readily ascertainable.

172.  Questions of law and fact common to the class members predominate, and a class action is superior to other methods for adjudicating the controversy because, given class members'

limited resources and limited access to counsel and the legal complexity of the claims, class

members are unlikely to prosecute separate actions in large numbers. A class action will

permit a large number of similarly situated persons to adjudicate their common claims in a

single forum simultaneously, efficiently, and without the duplication of effort and expense

that numerous individual actions would create.  Plaintiffs are aware of no other pending

damages actions filed by class members. Finally, this class action likely presents no

difficulties in management that would preclude maintenance as a class action.

## FIRST CAUSE OF ACTION

### *Trafficking Victims Protection Reauthorization Act*
### On Behalf of Plaintiffs and the Forced Labor Class

173.  On behalf of themselves and the Class, Plaintiffs re-allege and incorporate by reference all

of the preceding allegations as if fully set forth herein.

174.  Plaintiffs are authorized to bring this civil action claim against Defendant pursuant to the

civil remedies provision of 18 U.S.C. § 1595(a).

175.  In violation of 18 U.S.C. § 1584, Defendant held Plaintiffs and the Forced Labor Class in

involuntary servitude by controlling all aspects of their lives in detention, including their

food intake and ability to contact the outside world. In this context, Defendant's threats and

conduct in cutting off the phone system connecting detainees to loved ones and legal

counsel and depriving them of the precious few forms of recreation available trapped them

into a situation in which at least some detainees had no choice but to work on any given

day.

176.  In violation of 18 U.S.C. § 1589, Defendant knowingly obtained labor from Plaintiffs by

means of serious harm or threats of serious harm, and by means of a scheme, plan, or

pattern intended to cause Plaintiffs to believe that, if they did not perform labor, they or

other detainees would suffer serious harm or physical restraint.

177.    Specifically, AGS withheld or threatened to withhold basic necessities from the Forced Labor Class, thereby forcing them to work for subminimum wages to buy basic necessities at the commissary and avoid hunger, adverse impacts to health, lack of personal hygiene, and lack of contact with loved ones, among other harms.

178.    When AGS perceived that detainees were refusing to provide their labor, AGS threatened to or did impose sanctions such as denying access to phones, the outdoors, or the few recreational outlets available in detention, such as television.

179.    Defendant's conduct is "serious harm" as described in 18 U.S.C. § 1589(c)(2) because it is "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."

180.    AGS knowingly obtained the labor or services of Plaintiffs and Forced Labor Class members by means of a "scheme, plan, or pattern intended to cause [Plaintiffs and class members] to believe that, if [they] did not perform such labor or services, [they] or another person would suffer serious harm or physical restraint," in violation of 18 U.S.C. § 1589(a)(4).

181.    Due to Defendant's TVPRA violations, Plaintiffs and members of the Forced Labor Class are entitled to compensatory and punitive damages, as well as costs and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### *New York Labor Law – Minimum Wage*
### On Behalf of All Plaintiffs and the NYLL and Unjust Enrichment Class

182.    On behalf of themselves and the Class, Plaintiffs re-allege and incorporate by reference all

24

of the preceding allegations as if fully set forth herein.

183. Defendants willfully failed to pay Plaintiffs the minimum wage for hours worked, in violation of New York Labor Law § 652.

184. Due to Defendant's New York Labor Law violations, Plaintiffs and the Class are entitled to recover from Defendant their unpaid minimum wages and an equal amount in the form of liquidated damages, as well as reasonable attorneys' fees, costs of the action, and interest.

## THIRD CAUSE OF ACTION

### *New York Labor Law – Spread of Hours and Split Shift Compensation*
**On Behalf of All Plaintiffs and the NYLL and Unjust Enrichment Class**

185. On behalf of themselves and the Class, Plaintiffs re-allege and incorporate by reference all of the previous allegations as if fully set forth herein.

186. Defendant willfully violated Plaintiffs' rights by failing to pay Plaintiffs an additional hour of pay for each day in which the spread of hours exceeded ten in one day, or in which Plaintiffs worked a split shift of daily hours in which the working hours required or permitted are not consecutive, in violation of the NYLL and its regulations.

187. Due to Defendants' New York Labor Law violations, Plaintiffs and the Class are entitled to recover from Defendants, jointly and severally, their unpaid overtime and spread of hours wages and an equal amount in the form of liquidated damages, as well as reasonable attorneys' fees, costs of the action, and interest.

## FOURTH CAUSE OF ACTION

### *New York Labor Law – Wage Notice*
**On Behalf of All Plaintiffs and the NYLL and Unjust Enrichment Class**

188. On behalf of themselves and the Class, Plaintiffs re-allege and incorporate by reference all of the previous allegations as if fully set forth herein.

189.   Defendant willfully failed to provide Plaintiffs, at the time of hiring or any subsequent time, a wage notice in their native language containing the information required by NYLL § 195(a), such as their rate of pay.

190.   Due to Defendant's violations, Plaintiffs and the Class are entitled to recover from Defendant statutory damages for each workday that the violations occurred or continued to occur, together with costs and reasonable attorney's fees, and any other relief that the court deems necessary and appropriate.

### FIFTH CAUSE OF ACTION

*New York Labor Law – Wage Statement*
**On Behalf of All Plaintiffs and the NYLL and Unjust Enrichment Class**

191.   Throughout the entire course of Plaintiffs' employment, Defendant willfully failed to provide Plaintiffs with weekly wage stubs or statements with each payment of wages containing all information required by NYLL § 195(3), such as dates of work, rate of pay for regular and overtime hours, and number of regular and overtime hours worked.

192.   Due to Defendant's violations, Plaintiffs and the Class are entitled to recover from Defendant statutory damages for each workday that the violations occurred or continued to occur, together with costs and reasonable attorney's fees, and any other relief that the court deems necessary and appropriate.

### SIXTH CAUSE OF ACTION

*Unjust Enrichment*
**On Behalf of All Plaintiffs and the NYLL and Unjust Enrichment Class**

193.   On behalf of themselves and the Class, Plaintiffs re-allege and incorporate by reference all of the previous allegations as if fully set forth herein.

194.   Plaintiffs and the Class conferred substantial benefits on the Defendant by their labor for which they are entitled to as-yet unpaid compensation.

195.   Defendant accepted, indeed required, the services from the Plaintiffs as part of their employment.

196.   Plaintiffs reasonably expected to be compensated for their labor, which reasonable expectation Defendant fostered with their weekly payment to Plaintiffs for their labor.

197.   Defendant was unjustly enriched by requiring and permitting labor from its captive workforce at the rate it paid.

198.   The reasonable value of the unpaid time may be readily calculated from the hourly wages paid to non-detained employees by Defendant as modified by the requirements of the applicable statutes.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

199.   Certify this case as a class action pursuant to Fed. R. Civ. P. 23(b)(3) and order prompt issuance of appropriate notice to class members;

200.   Toll the statutes of limitations;

201.   Designate the named Plaintiffs as representatives of each Class;

202.   Declare that Defendant's conduct is in violation of the Trafficking Victims Protection Reauthorization Act and the New York Labor Law;

203.   Award Plaintiffs damages consistent with the TVPRA, including owed wages, liquidated damages, and other compensatory damages, including emotional distress damages, and punitive damages;

204.   Order Defendant to pay to Plaintiffs all minimum wages owed and other applicable damages, consistent with the NYLL;

205.   Order Defendant to pay to Plaintiffs the statutorily prescribed penalties for failure to

provide Plaintiffs with the hiring notice and wage statements required by NYLL;

206.   Award Plaintiffs additional liquidated damages for all wages withheld in violation of the NYLL;

207.   Order Defendant to pay Plaintiffs such amounts necessary to prevent Defendant from being unjustly enriched;

208.   Award the named Plaintiffs (and any subsequently named Plaintiffs) additional appropriate compensation as incentive payments for their particular participation in this litigation benefiting other workers;

209.   Award Plaintiffs reasonable attorneys' fees, costs, and interest; and

210.   Award Plaintiffs such other legal and equitable relief as the Court deems appropriate.

### REQUEST FOR TRIAL BY JURY

Plaintiffs respectfully request a trial by jury as to all claims to which they are entitled.

RESPECTFULLY SUBMITTED,

WORKER JUSTICE CENTER OF
NEW YORK

Maureen Hussain, Esq.
Laura Revercomb, Esq.
Cristina Brito, Esq.
Olivia Post Rich, Esq.
9 Main Street
Kingston, New York 12401
(845) 331-6615


KAUFMAN LIEB LEBOWITZ
& FRICK LLP


 /s/ Alison Frick_____

Alison Frick
Alanna Kaufman
Alyssa Isidoridy
18 E. 48th Street, Suite 802
New York, NY 10017
(212) 660-2332


ATTORNEYS FOR THE PLAINTIFFS

Dated: September 7, 2022