**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **DALILA YEEND, BOUNNAM** | ) | |
| **PHIMASONE, ELVIN MINAYA** | ) | |
| **RODRIGUEZ, LISA LAPOINTE, AND** | ) | |
| **SHANTADEWIE RAHMEE,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **CASE NO.: 1:20-CV-01281-TCM-CFH** |
| | ) | |
| **AKIMA GLOBAL SERVICES, LLC,** | ) | |
| **a/k/a AGS,** | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 19(b) AND
MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56**

**COUNSEL FOR DEFENDANT,
AKIMA GLOBAL SERICES LLC**

/s/ *Jessica L. Marrero*
Jessica L. Marrero
Amiel J. Provosty (*pro hac vice*)
**THE KULLMAN FIRM**
*A Professional Law Corporation*
1100 Poydras Street, Suite 1600
New Orleans, Louisiana 70163-1600
T: 504-524-4162 | F: 504-596-4114
JLM@KullmanLaw.com
AJP@KullmanLaw.com

Heather F. Crow (*pro hac vice*)
**THE KULLMAN FIRM**
*A Professional Law Corporation*
2915 Kerry Forest Parkway - Suite 101
Tallahassee, FL 32309
T: 850-296-1953 | F:504-596-4189
HFC@kullmanlaw.com

# TABLE OF CONTENTS

INDEX OF EXHIBITS ...................................................................................................... ii

MEMORANDUM OF LAW ............................................................................................... 1

I.      INTRODUCTION AND PROCEDURAL BACKGROUND ...................................... 1

II.     FACTUAL BACKGROUND ...................................................................................... 2

     a.     The Facility ....................................................................................................... 2

     b.     The Parties ........................................................................................................ 3

     c.     Detention at BFDF ........................................................................................... 4

     d.     The Origins of Voluntary Work Program. .................................................... 4

     e.     The ICE-AGS Contract. .................................................................................. 6

     f.     The Voluntary Work Program at BFDF. ...................................................... 8

     g.     Compliance with the Contract. ..................................................................... 10

     h.     Plaintiff's Claims .......................................................................................... 11

     i.     ICE's Integral Involvement in the Case. ..................................................... 12

III.    ARGUMENT ............................................................................................................ 13

IV.   This Matter Should be Dismissed Pursuant to Rule 19. ...................................... 13

     a.     ICE Is a Necessary Party to Plaintiffs' Claims for Damages .............................. 16

     b.     The Harvey Declaration Highlights ICE's Status as a Necessary Party to
           Plaintiffs' Claims for Monetary and Injunctive Relief. ........................................ 17

     c.     Dismissal is the Appropriate Remedy Because Joinder of ICE is Infeasible. ...... 21

V.     This Matter Should be Dismissed Pursuant to Rule 56. ...................................... 22

     a.     Summary Judgment Standard ........................................................................... 22

     b.     This Matter Should be Dismissed under the Government Contractor Defense. .... 23

VI.   CONCLUSION ......................................................................................................... 25

## INDEX OF EXHIBITS

**Exhibit 1**  Performance Based National Detention Standards (PBNDS) 2011, Rev. 2016 (excerpts)

**Exhibit 2**  Declaration of George Harvey

**Exhibit 3**  Declaration of Laura Mitchell

        **Exhibit 3-A**  ICE-AGS Contract

        **Exhibit 3-B**  ICE RFP

        **Exhibit 3-C**  AGS Contractor Proposed Pricing

**Exhibit 4**  Declaration of Craig Trippany

        **Exhibit 4-A**  Detainee Housing Unit Officer Post Order

        **Exhibit 4-B**  Kitchen Officer Post Order

        **Exhibit 4-C**  Corridor Officer Post Order

        **Exhibit 4-D**  Work Detail Officer Post Order

        **Exhibit 4-E**  Barber Shop Officer Post Order

        **Exhibit 4-F**  Recreation Officer Post Order

        **Exhibit 4-G**  Buffalo Federal Detention Facility (BFDF) Handbook

        **Exhibit 4-H**  National Detainee Handbook

        **Exhibit 4-I**  VWP Agreement (Form BFDF-0016)

        **Exhibit 4-J**  Selected Email Correspondence re: ICE Audits

**Exhibit 5**  Deposition of Craig Trippany (excerpts)

**Exhibit 6**  ICE Audit Report Landing Page

        **Exhibit 6-A**  2019 Audit Report

        **Exhibit 6-B**  2019 Audit Summary

**Exhibit 6-C**   2021 Audit Report

**Exhibit 6-D**   2021 Audit Summary

**Exhibit 6-E**   2022 Audit Report

**Exhibit 6-F**   2022 Audit Summary

**Exhibit 7**       "New York – Office of the Principal Legal Advisor" Page of U.S. Immigration and Customs Enforcement website (last visited 2/7/2024)

**Exhibit 8**       Batavia Immigration Court landing page, Web Site of the U.S. Department of Justice (last visited 2/7/2024)

**Exhibit 9**       Deposition of Bounnam Phimasone (excerpts)

**Exhibit 9-A**    VWP Agreement Executed by Phimasone (Dep. Ex. 7)

**Exhibit 10**     Deposition of Dalila Yeend (excerpts)

**Exhibit 10-A**   VWP Agreement Executed by Yeend (Dep. Ex. 5)

**Exhibit 11**     Deposition of Elvin Minaya Rodriguez (excerpts)

**Exhibit 11-A**   VWP Agreement Executed by Rodriguez (Dep. Ex. 6)

**Exhibit 12**     Deposition of Lisa LaPointe (excerpts)

**Exhibit 12-A**   VWP Agreement Executed by LaPointe (Dep. Ex. 5)

**Exhibit 13**     Deposition of Shantadewie Rahmee (excerpts)

**Exhibit 13-A**   VWP Agreement Executed by Rahmee (Dep. Ex. 8)

**Exhibit 14**     Deposition of Denise Bordonaro (excerpts)

**Exhibit 15**     Deposition of Gail Brabon (excerpts)

**Exhibit 16**     Declaration of Cory Reffner

**Exhibit 17**     Declaration of Robert V. Roberts, Contracting Officer, ICE

**Exhibit 17-A**   ICE-Chenega Contract

**Exhibit 18**   Deposition of Troy Ireland (excerpts)

**Exhibit 19**   Relevant Excerpts of Detention Operations Manual, U.S. Department of Homeland Security

**Exhibit 20**   Relevant Excerpts INS Detention Standard: Detainee Handbook, U.S. Department of Homeland Security

## MEMORANDUM OF LAW

Defendant, Akima Global Services, LLC ("AGS" or "Defendant"), hereby submits the following Memorandum in Support of its Motion to Dismiss Pursuant to Fed. R. Civ. P. 19(b) and Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56:

## I.  INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiffs were all formerly detained by the United States Government, Department of Homeland Security ("DHS") Immigration and Customs Enforcement ("ICE") for immigration violations and housed at the Buffalo Federal Detention Facility in Batavia, New York ("BFDF" or "Batavia").[1]  Plaintiffs Yeend and Phimasone initially filed this lawsuit in state court on September 3, 2020, alleging claims under the New York Constitution; the New York Labor Law ("NYLL"); and of unjust enrichment.  It was removed to this Court on October 16, 2020.[2]  Nearly two years later, after protracted motion practice by Plaintiffs and significant discovery, on September 8, 2022, Plaintiffs amended the Complaint adding three new plaintiffs; restyled the matter as a putative class action; dropped the constitutional claim; and added a claim under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1594 ("TVPRA").[3]  Further discovery efforts ensued, which involved significant oversight by ICE.  Fact discovery is now complete, and expert discovery is in progress.  Plaintiff's motion for class certification is due in April 2024.

However, before the Court is required to consider class certification and the merits of Plaintiffs' claims, two dispositive threshold issues must be addressed: (i) the inability to join ICE, an indispensable party, due to sovereign immunity requires dismissal under Rule 19(b); and (ii) the undisputed facts demonstrate that AGS is entitled to derivative immunity under the government

---

[1] *See* First Am. Compl., ECF No.80, *passim.*
[2] Notice of Removal, ECF No. 1.
[3] First Am. Compl., ECF No. 80.

contractor defense. These issues wholly preclude Plaintiffs' claims; accordingly, this case should be summarily dismissed.[4]

## II.      FACTUAL BACKGROUND

### a.      The Facility

BFDF is a Service Processing Center ("SPC"), which is an "ICE owned and operated" facility for housing immigration detainees.[5] Unlike privately owned detention centers operated via contract with DHS-ICE, the BFDF SPC is a federal detention facility owned, overseen, and operated by ICE, who maintains a significant presence on site.[6] AGS, as the security contractor, does not operate or manage BFDF; instead, the facility administrator, *i.e.*, the ICE Assistant Field Office Director ("AFOD") for the Buffalo Field Office, is the ICE senior officer in charge of BFDF, and oversees the detention, compliance, and processing of detainees at BFDF.[7] ICE Enforcement and Removal Operations ("ERO") staff serve as administrative and supervisory staff over AGS personnel on site.[8] BFDF houses the ICE Principal Legal Advisor for the Buffalo Field Office, ICE immigration officers, supervisors, and compliance officers.[9] AGS's top official on site, the Project Manager, reports to the AFOD, and AGS takes direction from the ICE management team.[10] An ICE Chief of Security also works at the site to ensure compliance with all procedures.[11]

---

[4] In the interest of judicial economy, AGS submits that these critical threshold issues should be addressed before the Court is required to examine the merits of Plaintiffs' claims. By filing this Motion, AGS does not waive any other defenses or arguments challenging the merits of Plaintiffs' claims and AGS reserves its right to file a subsequent Rule 56 motion for that purpose.

[5] *See* Defendant's Statement of Undisputed Facts ("SUF"), filed herewith, at ¶ 1. ICE employs several types of detention facilities for housing immigrant detainees: Service Processing Centers (SPCs); Contract Detention Facilities (CFSs); and State or local government facilities managed through Intergovernmental Service Agreements (IGSAs). *See* SUF at ¶¶ 1, 2.

[6] SUF at ¶¶ 2, 4.

[7] SUF at ¶¶ 6, 7.

[8] SUF at ¶ 5.

[9] SUF at ¶ 8.

[10] SUF at ¶ 18.

[11] SUF at ¶ 9.

BFDF houses only ICE detainees.[12]  The facility includes housing units, indoor and outdoor recreation areas, a chapel, law library, indoor basketball court, common areas, a kitchen, and laundry.[13]  It also includes processing and visitation areas and a medical unit staffed by ICE Health Services Corp and ICE-contracted healthcare providers.[14]  BFDF is also home to the Batavia Immigration Court and its staff, under the jurisdiction of the Office of the Chief Immigration Judge and Department of Justice, as well as a warehouse for storing governmental property.[15]

### b.      The Parties

Plaintiffs were all detained by ICE at BFDF for various periods of time.[16] Each Plaintiff was taken into custody by ICE following a violation of U.S. immigration law coupled with a legal violation, arrest, and/or a criminal conviction (some having transferred to BFDF from incarceration).[17]  During their detention, Plaintiffs remained wards of the federal government.[18]

Defendant AGS is a private entity that provides specific, limited services to ICE at BFDF pursuant to a written contract (the "ICE-AGS Contract").[19]  AGS's responsibilities are limited to specific "detention management services" expressly defined by contract, including administrative support for detainee intake; security services; transport, food preparation, and laundry services for detainees; and facilitating the Voluntary Work Program and commissary system as required by ICE.[20] AGS employs security guards and non-officer kitchen and laundry workers.[21] The ICE-AGS Contract mandates that any AGS employee who works on this contract "shall be a United

---

[12] SUF at ¶ 11.
[13] SUF at ¶ 3.
[14] *Id.*
[15] SUF at ¶¶ 15, 16.
[16] *See* First Am. Compl., ECF No.80 at ¶¶ 1, 60, 73, 90, 116, 141.
[17] SUF at ¶ 13.
[18] *Id.*
[19] SUF at ¶ 14.
[20] SUF at ¶ 15.
[21] SUF at ¶ 24.

States citizen," among other requirements.[22] Since 1998, prior contractors performed these same functions pursuant to similar contracts.[23] AGS does not provide maintenance or janitorial services at BFDF; ICE contracts directly with a different, unrelated contractor for such services.[24]

### c.    Detention at BFDF

Detainees are classified at intake by risk assessment as low, medium, or high security based on specific standards promulgated by ICE.[25]  ICE provides color-coded detainee uniforms based on that classification.[26] ICE provides toiletries (soap, toothbrushes, toothpaste, and other hygiene items) and bedding, and specifies how many of each item are provided to detainees at intake.[27]

Within the housing units, ICE has promulgated detailed "post orders" for operation which provide a daily schedule and instructions for such things as official detainee counts throughout the day; mealtimes; television usage; recreation times; when medications are dispensed; and other daily activities within the units.[28]  Officers conduct rounds, confirm detainees keep their living areas neat, and oversee daily activities, all of which are expressly set forth in ICE post orders.[29]

### d.    The Origins of Voluntary Work Program.

Congress has long authorized federal agencies to pay detained immigrants for labor, thus providing the genesis of the Voluntary Work Program ("VWP"); the statute permits "payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed…"[30]

---

[22] SUF at ¶ 25.
[23] SUF at ¶¶ 16, 17.
[24] SUF at ¶¶ 20, 22.
[25] SUF at ¶ 26.
[26] SUF at ¶ 27.
[27] SUF at ¶ 28.
[28] SUF at ¶ 30.
[29] *Id.*
[30] 8 U.S.C. § 1555.

"[V]olunteers are compensated one dollar ($1.00) per day for their participation. The amount of payment was set by congressional act."[31] The Appropriation Act specifies that such allowances may be paid for work performed while in custody under the immigration laws "at a rate ***not in excess*** of $1 per day."[32]  That amount has not changed.[33]

On September 20, 2000, the DHS Immigration and Naturalization Service ("INS")(a precursor to ICE) issued a Detention Operations Manual, setting forth detention standards for immigration detainees.[34]  It stated that detainees are compensated "in accordance with the facility's standard policy."[35]  It further mandated that "***in SPCs*** [such as BFDF]***, the stipend is $1.00 per day***…"[36] INS simultaneously issued a policy requiring a Detainee Handbook for immigrants in detention, and providing a required template for the federal Officer in Charge ("OIC") to follow in developing a local handbook applicable to the OIC's specific facility.[37]  With respect to the VWP, it stated that "***[w]ages are $1.00 per day***."[38] That has not changed.

ICE later promulgated the Performance Based National Detention Standards (2011) ("PBNDS") (updated in 2016) regarding the conditions of confinement, operations and management expectations.[39]  PBNDS specifically endorses the VWP and explains it provides detainees with the opportunity to work and earn money while confined, on a voluntary basis;

---

[31] *Alvarado Guevara v. I.N.S.,* 902 F.2d 394, 396 (5th Cir. 1990) (citing Dept. of Justice Appropriation Act, 1978, Pub.L. No. 95–86, 91 Stat. 426 (1978)).
[32] PL 95–86 (HR 7556), PL 95–86, AUG. 2, 1977, 91 Stat 419 (emphasis added); *see also* SUF at ¶¶ 53, 54.
[33] *Id.*
[34] SUF at ¶¶ 55-57.
[35] *Id.*
[36] *Id.* (emphasis added)
[37] SUF at ¶¶ 58.
[38] *Id.* (emphasis added).  This is consistent with the BFDF Handbook, which states that "wages are $1 per day" for VWP participants at BFDF, which is an ICE-owned SPC. *See* SUF at ¶ 67.
[39] SUF at ¶ 59.

enhances operations and services through detainee productivity; and reduces the negative impact of confinement through "decreased idleness, improved morale and fewer disciplinary incidents."[40] The VWP is implemented at various facilities around the country, including at BFDF.[41]

### e.    The ICE-AGS Contract.

AGS bid for the security contract at BFDF in response to an ICE-promulgated Request for Proposal ("RFP") in 2014.[42]  AGS was awarded the Contract and has provided contractually defined services at BFDF since early 2015 through the present.[43]  The ICE-AGS Contract mandates the implementation of the VWP at BFDF and unequivocally defines the rate of pay as $1 per day.[44]

The RFP included Section B, a spreadsheet in which offerors (such as AGS) were instructed to insert their pricing proposals—a "bid unit price"—for specific contract line-item numbers ("CLINs").[45]  All CLIN unit prices were blank for completion by the offerors except for one—the VWP, which mandated that "***Detainees earn $1 per day***."[46]  Offerors had no discretion as to the detainee payment rate or the design of the VWP program.[47]  Likewise, the instructions in Section B of the RFP ("Supplies or Services and Prices/Costs") provided a table for completion with offerors' proposed unit prices.[48]  Here, too, all unit prices were blank except for the VWP, which was prefilled by the government at a rate of $1 per day.[49]

In addition, the instructions for Section L specified that the offeror's pricing template,

---

[40] SUF at ¶ 60.
[41] SUF at ¶ 61.
[42] SUF at ¶ 23.
[43] *Id.*
[44] SUF at ¶¶ 31, 44.
[45] SUF at ¶¶ 33, 34.  CLINs included unit price bids for processing, transportation and stationary guard service hours; sack lunches; detention bed days; and more.  *Id.*
[46] SUF at ¶¶ 35.
[47] SUF at ¶¶ 41.
[48] SUF at ¶ 36.
[49] *Id.*

attachment 10 to the RFP, be included with the proposal.[50]  The template provided for ten different CLINS with a blank space for the proposed unit price for all except two—one of which was the VWP, and contained a prefilled unit price of $1 per day.[51]  The instructions expressly mandated that offerors **shall not change** the prefilled CLINS, quantities, units or **unit prices**.[52]  Finally, Section M provided the evaluation factors, and mandated that all bids track the requirements as set forth in the RFP; in other words, the failure to submit the Attachment 10 pricing template or adhere to Schedule B as instructed would result in elimination.[53]  In short, there was no opportunity for negotiation or discretion as to the rate of pay for the VWP at the BFDF.[54]  ICE mandated that detainees were to be paid **_exactly_** $1 per day as a requirement of bids for the contract.[55]

AGS submitted its proposal in compliance with the RFP requirements, including the mandatory VWP rate of $1 per day.[56]  AGS was ultimately awarded the contract and began providing services in February 2015.[57]  The ICE-AGS contract is subject to Federal Acquisition Regulations ("FAR"), which expressly bind the government and AGS, and prevent any unilateral modifications by AGS or bilateral changes not duly approved by both parties.[58]

Moreover, the Contract expressly states that the ICE contracting officer "does not have the authority to modify the stated terms of the contract or approve any action that would result in additional charges to the Government, beyond what is stated in the CLIN schedule."[59]  Critically,

---

[50] SUF at ¶ 37.
[51] SUF at ¶ 38.
[52] SUF at ¶ 39.
[53] SUF at ¶ 40.
[54] SUF at ¶ 41.
[55] _Id._
[56] SUF at ¶ 42.
[57] SUF at ¶ 43.
[58] _Id._
[59] SUF at ¶ 41.

the contract dictates, in relevant part as to CLIN 0004, Detainee VWP, that "[t]he contractor **will be reimbursed** on the award document for **expenses as incurred**."[60]   It further states that "**[d]etainees earn $1.00 per day**."[61]

       **f.**      **The Voluntary Work Program at BFDF.**

       In light of the Congressionally-recognized benefits of the VWP, ICE requires that AGS implement the program at BFDF, yet the program is strictly defined by ICE.[62]   ICE determines the specific work details and job assignments available for detainees who opt to participate in the VWP at BFDF.[63]   Further, as a whole, detainee labor is performed, or not, at the direction of ICE.[64] For example, during the COVID-19 pandemic, ICE halted detainee workers from working in the kitchen, laundry, barbershop, and other common areas for specific periods.[65]   AGS cannot override such a decision.[66]   Further, ICE classification standards mandate which detainees are eligible for particular work details within the VWP.[67]   AGS simply supervises the detainees who opt into the program and pays detainees on behalf of ICE.[68]

       During intake at BFDF, ICE detainees are provided with two handbooks, both issued by ICE-ERO: the National Detainee Handbook, which generally addresses rights, rules, programs,

---

[60] SUF at ¶ 44.

[61] *Id.*  Notably, this mandate as to the VWP stipend at the BFDF SPC has been consistent with VWP stipends for all SPCs at varying locations, as stated in the ICE-issued Detention Operations Manual.  *See* SUF at ¶¶ 55-57.

[62] SUF at ¶¶ 31, 35.  *See also* SUF at ¶¶ 50-52, 68-71.

[63] SUF at ¶¶ 68, 70-72.

[64] *Id.*

[65] SUF at ¶ 71.

[66] SUF at ¶ 71.

[67] SUF at ¶ 73.

[68] SUF at ¶¶ 68-70, 74.  The contract provides for a true pass-through of VWP expenses directly to ICE, as ICE reimburses AGS for "expenses as incurred" while limiting the VWP pay rate to $1 per day.  SUF at ¶¶ 44-45.

and procedures for detainees nationwide;[69] and the BFDF Handbook, which contains "the specific rules, regulations, policies and procedures that must be followed while in custody at the [BFDF] facility."[70]  Where there is a more specific rule, the local handbook governs.[71]  For example, the National Handbook generally addresses the VWP and payment for participation, but advises detainees to "[c]heck your local facility's rules."[72]  The BFDF Handbook, with policies specific to the BFDF facility, addresses the VWP and states unequivocally that "[w]ages *are* $1 per day."[73]

In addition, ICE provides a standardized Detainee Voluntary Work Program Agreement ("VWP Agreement"), form BFDF-0016, that bears the federal agency header (but not the contractor's).[74]  The VWP Agreement was created by ICE at least prior to 2004, and was revised periodically, including in January 2004, 2009, July 2010 (all before AGS assumed the contract), and in May 2018.[75]  Each update specifically states that "Compensation ***shall be $1.00 per day***."[76]  Each Plaintiff signed such a form.[77]

All detainees who opt to participate in the program receive the incentive payment of $1 per day in accordance with the ICE-AGS Contract and consistent with the Detention Operations Manual, BFDF Handbook, and VWP Agreement.[78]  Because ICE forbids detainees from possessing cash at BFDF, the payment is deposited in their commissary accounts.[79]  Any remaining

---

[69] SUF at ¶ 64. The National Detainee Handbook explains that a handbook will be provided from the local facility to which a detainee is assigned that explains its local rules.  SUF at ¶ 66.
[70] SUF at ¶ 64.
[71] SUF at ¶¶ 65.
[72] SUF at ¶ 66.
[73] SUF at ¶ 67. Notably, this is consistent with the Contract which sets VWP wages as $1 per day. SUF at ¶ 44.
[74] SUF at ¶ 50.
[75] SUF at ¶ 51.
[76] SUF at ¶ 52.
[77] SUF at ¶ 88.
[78] SUF at ¶ 74.
[79] SUF at ¶ 75.

funds are cashed out to detainees upon release.[80]  AGS does not set commissary prices, nor reap

any profit.  Any commissary profits are placed in a fund and used for detainee recreation purchases;

if any funds remain at the end of the contract, that money becomes the property of ICE.[81]

### g.   Compliance with the Contract.

It is axiomatic that pursuant to the FARs, as a contractor, AGS is not permitted to deviate

or exceed the scope of the contract.[82]  To that end, BFDF is audited every six months by the Office

of Detention Oversight, and periodically under PBNDS.[83]  Since 2015, the BFDF has been audited

under PBNDS seven times[84] (March 2015;[85] March 2016;[86] March 2017;[87] March 2018;[88] April

2019;[89] March 2021[90]; and August 2022[91]) by an independent third party engaged by the federal

government.[92]  Such audits are comprehensive examinations of 42 standards with over 600

components and take a team of auditors three days to complete.[93]  Auditors inspect the facility,

records, interview detainees and staff, observe staff-detainee interactions, and perform other

investigative actions.[94]  For each audit between 2015 and present, of the elements of the audit

attributable to AGS, AGS has received a 100% compliance rating every time, with no

---

[80] SUF at ¶ 76.
[81] SUF at ¶ 77.
[82] *See* FAR 43.103(a); SUF at ¶ 43.
[83] SUF at ¶ 79.
[84] SUF at ¶ 80.  The 2020 PBNDS audit, at the onset of COVID-19, was cancelled.
[85] SUF at ¶ 80 (facility met all standards other than certain minor matters controlled by ICE, dealing with medical record transfers, mail, and the location of the suicide watch safe cell).
[86] *Id.* D-3255-3256 (stating the facility met all standards.)
[87] *Id.* D-3258-3259 (stating "no issues" and indicating auditor praise of the kitchen and staff.)
[88] *Id.* D-3260-3261 (noting "another 100% score on PBNDS 3rd party audit.")
[89] *Id.* D-3262-3263 (ICE Officer in Charge email indicating "no deficiencies on all standards.")
[90] *Id.* D-3266-3267 ("Another successful PBNDS Audit …[with] no major findings by the auditors.")
[91] *Id.* D-2612-2616 (Audit results reflecting meets all 40 standards).
[92] SUF at ¶¶ 80-81.
[93] SUF at ¶ 81.
[94] SUF at ¶ 82.

deficiencies.[95]    In addition, contract deviations are reported to ICE via a Contract Discrepancy Report.[96] Since 2015, AGS has not had a single discrepancy reported on the contract.[97]

AGS pays, and has paid, $1 per day to VWP participants at BFDF in compliance with ICE's unequivocal instruction.[98]  Such expenses are then submitted for reimbursement from the federal government.[99]  ICE has paid all invoices since the contract's inception, and has never rejected an invoice.[100]  As demonstrated by the parties' course of conduct and audit results over the past 9 years, AGS has complied with its contract with the federal government and meets PBNDS standards without deviation.[101]    In other words, AGS follows ICE's instructions completely.

### h.  Plaintiff's Claims.

Plaintiffs, all former ICE detainees at BFDF and VWP participants, were paid $1/day in accordance with ICE requirements but claim they should have been paid the applicable New York minimum wage by AGS.[102]  Plaintiffs also allege that AGS was unjustly enriched by their work, which was largely janitorial in nature. Plaintiffs claim they were forced to work in the VWP to earn money to purchase food and clothing from the commissary because the facility was uncomfortably cold and they were deprived of "basic necessities."  Under legally and factually flawed theories, Plaintiffs seek damages under the NY Labor Law, the Trafficking Victims Protection Reauthorization Act ("TVPRA"), and for unjust enrichment.[103]

---

[95] SUF at ¶ 83.
[96] SUF at ¶ 84.
[97] SUF at ¶ 85.
[98] SUF at ¶ 89.
[99] SUF at ¶¶ 48, 87.
[100] SUF at ¶ 87.
[101] SUF at ¶¶ 80-87.
[102] *See* Am. Compl., ECF No. 80, *passim*.
[103] *Id.*

As is clear, however, janitorial, maintenance, and barber services are outside the scope of the ICE-AGS contract.[104]  Other, separate third parties are responsible for janitorial, maintenance, and temperature control, subject to separate arrangements with ICE.[105] As such, AGS gains no benefit from that detainee work; *ICE* would receive any savings resulting from the use of detainee labor for such services. In addition, AGS earns no profit from commissary sales, which are either retained by ICE or reinvested in detainee recreational programs.[106]

### i.   ICE's Integral Involvement in the Case.

Significantly, Plaintiffs named AGS, but not ICE, as a party in this lawsuit.  Nevertheless, Plaintiffs issued multiple *Touhy* requests seeking voluminous information and depositions from ICE.[107]  ICE refused to produce witnesses, and Plaintiffs ultimately accepted declarations from ICE employees—including one from George Harvey, the current BFDF AFOD.[108]  Critically, certain statements in the Harvey declaration on behalf of ICE, and particularly as to the amount and reimbursement of VWP detainee payments, conflict with the express language of the ICE-AGS contract, as well as the BFDF Handbook and other ICE-promulgated documents. Plaintiffs also sought a facility tour, as well as photographs and measurements, all provided by ICE, as AGS does not have authority to admit outside parties or provide physical facility data.[109] Further, ICE

---

[104] SUF at ¶¶ 20, 22.  Certain detainee work, such as barber services, would simply not be provided if not handled by detainees, as it is outside the scope of any contractor's work. During the COVID-19 pandemic barber services were not provided at all.  Any minor overlap in kitchen work and laundry folding by detainees is absorbed by existing staffing in the absence of detainee workers. Notably, detainees do not assist in food preparation.  *See* Trippany Decl. at ¶¶ 23-24.

[105] SUF at ¶¶ 20, 22.  AGS does not provide commissary items, set the prices, or profit from the commissary.  *See* SUF at ¶ 77; Trippany Decl. at ¶ 26.

[106] SUF at ¶ 77.

[107] SUF at ¶¶ 91-93.

[108] *Id.*  The Harvey declaration was produced after the close of discovery.  By ICE providing such statements in a written declaration (and after the close of discovery), the Parties were prevented from any cross-examination of Mr. Harvey.

[109] SUF at ¶ 94.

first reviewed and redacted much of the documentation produced by AGS in this matter as all BFDF documents remained property of ICE.  ICE's intrinsic involvement in the discovery process alone underscores AGS's lack of authority at BFDF and ICE's indispensability to this lawsuit.[110]

Further, Plaintiffs have submitted an expert report claiming negative psychological effects while at BFDF, pointing to, among other things, the physical facility, the ICE-designed and mandated VWP, and the "vulnerable situation" of confinement.  Yet AGS is not responsible for the physical facility, creating the VWP, or confining detainees.  All of those decisions are undisputedly made by the federal government.  Plaintiffs have also submitted an expert report regarding alleged damages, which erroneously attributes substantial purported financial gain to AGS for the VWP, yet nearly all of the alleged work relied on in the report was the responsibility of a different ICE contractor, or even ICE itself.[111]  In short, ICE is essential to this lawsuit, and as the Court noted in the early stages of this case, the claims asserted against AGS stem directly from AGS's performance of its contractual obligations to the federal government.

## III.   ARGUMENT

## IV.   This Matter Should be Dismissed Pursuant to Rule 19.

Rule 19 addresses the required joinder of parties.  "Fed. R. Civ. P. 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party." *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000).  First, the court must determine whether a party is "necessary" under Rule 19(a), and if so, whether joinder is feasible. *Id.*  If joinder is not feasible, the court must determine whether the party is indispensable.  If it is, the court must dismiss the action pursuant to Rule 19(b).  *Id.*   Rule 19 is designed to prevent

---

[110] *Id.*

[111] AGS reserves the right to seek the exclusion of Plaintiffs' experts' reports and accompanying testimony under the Federal Rules of Civil Procedure and/or the Federal Rules of Evidence.

scenarios in which a party may be "subject to a substantial risk of incurring … inconsistent obligations…" Fed. R. Civ. P. 19(a)(1)(B)(ii).  That is precisely the scenario in which AGS finds itself here.

A party is necessary if "in that person's absence, the court cannot accord complete relief among existing parties" or if "that person claims an interest [but] the person's absence may … impair or impede the person's ability to protect the interest; or leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." *Fla. Wildlife Fed'n Inc. v. U.S. Army Corps of Engineers*, 859 F.3d 1306, 1308 (11th Cir. 2017); Fed. R. Civ. P. 19; *see also MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 388 (2d Cir. 2006) ("[T]he substantial risk of inconsistent obligations must be caused by the nonparty's absence in the case.").

As this Court recognized at the outset of this case, the allegations here "[s]urely arise[] out of what the Defendant was asked to do by the government. . ." [Doc. 29, p. 13.]  The facility at issue is an ICE-owned and controlled SPC facility.  AGS does not determine who is detained or detainee classifications, which control housing assignments and VWP eligibility.  Congress mandates that at SPCs (such as BFDF), VWP participants are paid $1 per day. Likewise, ICE requires the VWP to be provided at BFDF and ***every ICE-issued document*** applicable to the VWP at BFDF states that detainees are paid ***exactly*** $1 per day.  Yet Plaintiffs have brought AGS before this Court for doing precisely what the federal government instructed.

The ICE-AGS contract, applicable Handbooks, and post orders – in addition to sworn statements by AGS and ICE officials – demonstrate that ICE controls all aspects of AGS's duties at BFDF. ICE owns the facility and controls the conditions of detention. It sets rounds, VWP job assignments, scheduled searches for contraband.  ICE mandates that detainees keep their living

areas clean.[112]  AGS provides food and access to the commissary in accordance with standards set forth by the federal government. AGS has been found perfectly compliant with all ICE directives and requirements, yet AGS is being sued for implementing those very standards because Plaintiffs deem them inadequate.[113]

Through the Harvey Declaration, ICE has now purportedly taken the position that AGS has discretion as to the amount paid to VWP participants.  This position is not only contradictory to the express terms of the ICE-AGS contract concerning the VWP, but also to *every ICE-issued document* that specifically references the VWP at BFDF.  Adjudication of Plaintiffs' claims in light of the significant inconsistencies among the Harvey Declaration, the ICE-AGS contract, relevant FARs, and federally issued VWP mandates would expose AGS to substantial risk of incurring double, multiple, or otherwise inconsistent obligations.

Moreover, Plaintiffs' claims are based on conditions imposed by ICE itself or other entities unrelated to AGS (*e.g.*, facility temperature, clothing). While Plaintiffs incorrectly speculate that AGS is unjustly enriched by VWP labor, VWP assignments fall outside the scope of the ICE-AGS Contract, and any supposed benefit from such labor would inure to the benefit of ICE and the ICE-owned facility itself.[114]  Finally, Plaintiffs' TVPRA claims center on challenging the ICE-designed VWP and the conditions of detention as illegal trafficking under federal law.  Though the details may vary by facility, the VWP is implemented in federal ICE facilities nationwide. Thus,

---

[112] *See* Ex. 4-G, BFDF Detainee Handbook at D-000277-279 (stating detainees are responsible for keeping living areas clean), D-000292 (identifying "prohibited acts" and listing "refusing to clean assigned living quarters" as "code 306").

[113] For example, as shown above, ICE provides detainee clothing, and mandates exactly which items, and how many are distributed to detainees.  SUF 27.

[114] Of note, the only limited overlap between AGS employees and detainee workers is for limited assistance in the kitchen (with food service, washing dishes and cleaning, as detainees are prohibited from preparing food) (*See* ICE-AGS Contract, D-399).

adjudication of Plaintiffs' TVPRA claims would not only affect ICE's ability to implement the program it designed at BFDF, but also potentially whether the VWP is legal at all.  These facts make clear that ICE is not only a necessary party, but an indispensable party.  Yet, because joinder is infeasible due to governmental sovereign immunity, Rule 19 mandates dismissal.

### a. ICE Is a Necessary Party to Plaintiffs' Claims for Damages.

Courts have dismissed claims under Rule 19 where a defendant's contractual relationship rendered a governmental party "necessary."  In *E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1081 (9th Cir. 2010), the Secretary of the Interior drafted and approved mining leases under the Indian Mineral Leasing Act, with a hiring preference for members of the Navajo Nation. The EEOC sued the mine lessors, alleging Title VII discrimination. *Id.*  The Ninth Circuit dismissed the damages claims because the Secretary was a necessary party but not subject to suit.  *Id.*

The *Peabody* court noted that the lessor of the mines was "caught in the middle of a dispute not of its own making," as the Secretary required the inclusion of the Navajo employment preference and exercised oversight over the leases. *Id.* at 1080. The court reasoned that "it would be profoundly unfair" if the lessor could not seek indemnification from the Secretary for implementing the hiring preferences, and similarly unfair to insist that the lessor disregard the contractual preference while leaving the Secretary the authority to insist on lessor compliance.  *Id.* Moreover, the Secretary had an interest in the contract itself and in his absence, could not protect that interest.  *Id.*  Finding that the suit for damages could not proceed "in equity and good conscience" without the Secretary, the court found the Secretary a necessary party to all claims for damages under Rule 19.[115] *Id.*

---

[115] The Secretary could not be joined because of statutory provisions prohibiting the EEOC from bringing suit against a government agency absent a conciliation agreement. *Id.*

Likewise, here, AGS is "caught in the middle of a dispute not of its own making." AGS is contractually engaged with an agency of the federal government, and provides limited, specified services at an ICE-owned and operated SPC in accordance with that support contract under daily ICE interaction and oversight. AGS is contractually obligated to offer the VWP.  It utilizes an ICE-issued VWP Agreement to document detainees' participation.  AGS pays detainees $1 per day into their commissary account for participation in the VWP as expressly stated in the ICE-AGS contract, the BFDF Handbook, and the VWP Agreement—all issued by ICE.  Yet, it is AGS's strict adherence to these contract terms that has subjected it to this legal action.

Here, as in *Peabody*, AGS's "only sin, if indeed it was a sin, was to comply with" the ICE-issued requirements for the VWP as stated in the contract and related ICE-issued VWP documents. It would be profoundly unfair for a court to award damages against AGS while allowing AGS no redress against the government who mandated the actions now being challenged.  *See Peabody*, 610 F.3d at 1084.  For these reasons alone, Plaintiffs' claims cannot proceed "in equity and good conscience" without ICE and should be dismissed. *See* Fed. R. Civ. P. 19(b).

> **b. The Harvey Declaration Highlights ICE's Status as a Necessary Party to Plaintiffs' Claims for Monetary and Injunctive Relief.**

ICE's status as a necessary party is further highlighted by the Harvey Declaration, which ***directly implicates*** the facts at issue in this lawsuit. The Harvey Declaration, provided on behalf of ICE, contains significant and, frankly, baffling contradictions to the plain terms of the ICE-AGS Contract and relevant ICE-promulgated documents.  For example, the Harvey Declaration states that AGS has "discretion" to pay detainee participants in the VWP more than $1 per day, yet asserts that ICE will reimburse AGS only $1 per day. Such statements not only contradict the parties' past practices for over nine years, but they do not align with the ICE RFP; the ICE-AGS contract; the

current BFDF handbook (and all prior versions)[116]; or the detainee VWP agreement forms, *all* of which **unequivocally state** that compensation is **exactly** $1 per day and **all of which were promulgated by ICE**.  Indeed, ICE, through its BFDF Handbook and VWP Agreement, ***informs detainees directly*** that they will only receive $1 per day for their participation in the VWP.  To suggest that AGS could override ICE's own representations to detainees in ICE custody is simply unfounded.  There is no document prior to the Harvey Declaration that suggests AGS has any discretion whatsoever as to VWP payments at BFDF.[117]  In fact, the relevant FARs and the Contract itself expressly forbid AGS to exercise such discretion.[118]

Critically, and contrary to the Harvey Declaration, the ICE-AGS contract does ***not*** state ICE will reimburse AGS for ***only*** $1 per day.  Instead, it says "[t]he contractor **will be reimbursed** on the award document for ***expenses as incurred***."  Thus, theoretically, if AGS was ordered to ignore the contract language and increase VWP pay,[119] ICE would then be contractually required to reimburse AGS for that increased rate for expenses as incurred.[120]  Yet this is highly problematic

---

[116] SUF 35-36, 41, 44, 46, 52. *See* BFDF Handbook, p.8. Prior versions of the Handbook, including January 2013, promulgated prior to AGS's assumption of the contract, also stated that "[w]ages are $1 per day."  (*See, e.g.* D-2344-2354).

[117] PBNDS, cited by the Harvey Declaration, and which applies *generally* to ICE detention facilities, states that VWP compensation is "at least" $1 per day; yet, it also expressly provides that such compensation shall be "in accordance with the facility's standard policy." PBNDS 2011, ed. 2016, § V(K). Thus, the general policy is clear that the *local policy controls*. And, as noted, BFDF's policy, as set forth in the BFDF Handbook drafted and promulgated by ICE-ERO expressly states that VWP "[w]ages are $1 per day." *See* BFDF Handbook, p. 8.

[118] Notably, if AGS unilaterally increased VWP pay beyond the $1 per day amount stated in CLIN 0004, it would impermissibly increase costs to ICE in violation of the contract.  *See* ICE-AGS contract at D-358 ("The COR does not have the authority to modify the stated terms of the contract or approve any action that would result in additional charges to the Government, beyond what is stated in the CLIN schedule.")

[119] *See* Am. Comp. ¶ 202 (requesting the Court "[d]eclare that Defendant's conduct is in violation of the Trafficking Victims Protection Reauthorization Act and the New York Labor Law").

[120] Indeed, the facts *sub judice* go even further than those in *Peabody* because ICE is implicated in the injunctive relief sought as well.  In *Peabody*, the court allowed claims for injunctive relief to survive because the lessor could file a third-party complaint against the Secretary to prevent the

and would render essential contract terms impossible to perform; Congress has not authorized ICE

to pay VWP participants more than $1 per day, and the contract forbids any modification to CLINs

that would increase costs to ICE.[121]

Moreover, while AGS vehemently denies that VWP participants are "employees" under

state law, if there were such a finding and AGS's actions under the contract were declared illegal

under NYLL (as Plaintiffs claim), the entire VWP program as designed by ICE at BFDF would be

implicated.  Likewise, ICE would necessarily qualify as a joint employer given that it owns and

operates the facility, its managing policies, significant control over the detainees' detention and

participation in the VWP, and the fact that ICE ultimately funds the wages of its own wards.  Such

questions directly implicate the relationship between AGS, ICE, and the detainees vis-à-vis the

injunctive relief sought by Plaintiffs, as well as AGS's right or ability to seek indemnification.

Considering these facts, another case is similarly instructive.  In *Fla. Wildlife Fed'n Inc. v.*

*U.S. Army Corps of Engineers,* conservationist groups filed suit against the Army Corps of

Engineers ("Corps") and two state agencies, the Florida Department of Environmental Protection

("DEP") and the South Florida Water Management District ("SFWMD"), alleging that their

actions were negatively affecting local bodies of water.  859 F.3d 1306, 1308 (11th Cir. 2017).

The SFWMD was dismissed due to sovereign immunity; but further, as it was a necessary party,

---

Secretary from enforcing the discriminatory contract provision.  *See Peabody* at 1084.  Here,
however, such relief is not available to AGS.  AGS's right to reimbursement is predicated on ICE's
contractual mandate that VWP participants "earn $1 per day."  If AGS is required to continue
offering the VWP at BFDF, but at a higher pay rate, it would be unable, without government
consent, to enforce the contractual provision for reimbursement of expenses "as incurred" because
Congress has not authorized ICE to pay more than $1 per day.  Thus, ICE is a necessary party to
both the claims for damages and injunctive relief, further supporting dismissal of the entire action
under Rule 19.

[121] *Id.*  See also ICE-AGS Contract at p. D-358.  Should AGS pay more than $1 per day, ICE would
be unable to reimburse costs as incurred without Congressional authorization, and thus ICE itself
would be in breach of the contract.

it argued that the entire matter should be dismissed against all parties as joinder was infeasible. *Id.*

The court first addressed whether the SFWMD was a necessary party. *Id.* At 1316. As the local sponsor it was fundamentally involved in the Corps' management of the project and operated many of the project's structures. *Id.* Additionally, any adjudication of the Corps' liability or the scope of its authority had the "potential to carve a jagged line through the cooperative arrangements" of the Corps and the SFWMD. *Id.* Because the SFWMD would be inadequately protected against judicial intervention, and because such intervention would affect its relationship with the Corps, the court determined the SFWMD to be a required party under Rule 19. *Id.*

Here, ICE is likewise involved in an integral way with AGS's work at the BFDF, an ICE-owned and operated SPC. Any judicial finding on Plaintiffs' claims regarding the VWP program could significantly affect the ability of AGS or ICE to continue the program. It could also potentially invalidate portions of the ICE-AGS contract, which not only mandates the VWP existence but mandates, among other government requirements, that all employees of AGS who work at BFDF be United States citizens. Further, it would run contrary to the ICE-promulgated BFDF Handbook and related policies. Like the agencies in *Florida Wildlife Federation*, ICE is the sponsor of and mandates the program at issue. ICE owns and manages the facility onsite, and oversees and works alongside AGS daily. The VWP program design and payments are governed by ICE policies and in accordance with the ICE-AGS contract.

Like the mine lessor in *Peabody*, AGS is caught in a dispute not of its own making. Here too, it is profoundly unfair to insist that AGS assume liability for factors not within its contractual scope. It is likewise unfair to require AGS to treat VWP detainees as "employees" under state law or otherwise unilaterally alter the VWP program as designed by ICE, because it would require

AGS to disregard the express terms of its contract without adequate protections.[122] Rule 19 is designed to prevent such scenarios, in which a party like AGS may be "subject to a substantial risk of incurring … inconsistent obligations…" or otherwise impair AGS's ability to protect its own interests. *Fla. Wildlife Fed'n Inc*, 859 F.3d at 1308; Fed. R. Civ. P. 19(a)(1)(B)(ii). And, as noted, ICE is unable to protect its own interests in the contract at issue, as well as potential implications for the VWP in other facilities.

### c.   Dismissal is the Appropriate Remedy Because Joinder of ICE is Infeasible.

ICE, as an agency of the federal government, is protected by sovereign immunity. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.").[123]   It is axiomatic that where a necessary party has sovereign immunity, joinder is not feasible. *Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 547 (2d Cir. 1991) (where tribe had sovereign immunity, joinder was not feasible); *Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 998 (9th Cir. 2020) (joinder of a party protected by sovereign immunity is infeasible).   In such circumstances, courts have found that examination of further elements is unnecessary, and the matter should be dismissed.   As the Second Circuit explained, "when an indispensable party is immune from suit, there is very little room for balancing of other factors set out in rule 19(b), because immunity may be viewed as one of those interests compelling by themselves." *Fluent*, 928 F.2d at 548, citing *Enterprise Mgmt. Consultants,*

---

[122] For example, if AGS was ordered to ignore the contract and increase VWP rates, it would likely be unable to recoup its costs, despite the contract's provision that AGS will be reimbursed for VWP expenses "as incurred," because Congress did not authorize ICE to pay more than $1 per day to VWP participants.  The difference between AGS's costs for the VWP program and the $1 per day authorized reimbursement would significantly alter the parties' intent and expectations under the contract, solely to AGS's extreme detriment with no recourse.

[123] *See also Goode v. United States Dep't of Homeland Sec.*, 815 F. App'x 643, 645 (3d Cir. 2020) (DHS has sovereign immunity from suit).

*Inc. v. United States ex rel. Hodel,* 883 F.2d 890, 894 (10th Cir. 1989) (internal quotations omitted).

Yet, even if this Court determined that further analysis was necessary, the facts are clear that not only is ICE necessary, ICE is indispensable. As the Ninth Circuit concluded, where there is no way to mitigate such unfairness, then "in equity and good conscience" the claims must be dismissed under Rule 19(b). *Peabody,* 610 F.3d at 1084. Here, it would be patently unfair to subject AGS to the potential for liability for simply following ICE's directives without recourse from ICE; nor can ICE protect its own interests in the contract or the VWP as a non-party. The express terms of the ICE-AGS contract, particularly in light of the controlling FARs and Congressional limits on ICE's ability to reimburse AGS for "expenses as incurred" over $1 per day make clear that there is no alternate remedy by which prejudice to AGS could be lessened. As such, because joinder of ICE, as an indispensable party, is not possible, this case should be entirely dismissed under Rule 19.

**V.    This Matter Should be Dismissed Pursuant to Rule 56.**

**a.  Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Plaintiffs may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 322–23; Fed.R.Civ.P. 56(e). A court may consider only competent, admissible evidence in ruling on a summary judgment motion. *Id.* An application of the foregoing standard mandates entry of summary judgment in favor of AGS.

**b. This Matter Should be Dismissed under the Government Contractor Defense.[124]**

The Supreme Court has long held that where a contractor is acting under the direction and authority of the federal government, the contractor is not liable for "executing its will." *Yearsley v. W.A. Ross Const. Co.,* 309 U.S. 18, 21 (1940). "Where the Government's authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor who simply performed as the Government directed." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016), *as revised* (Feb. 9, 2016). Such immunity applies to claims brought under both state and federal law. *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 643 (4th Cir. 2018).

Authorization is "validly conferred" on the contractor if Congress authorized the agency to perform a task and empowered the agency to delegate that task to the contractor. *Id*. That is the case here. "Congress has directed federal officials to detain noncitizens … [and] provides that the Secretary of the Department of Homeland Security (DHS) shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (citing 8 U.S.C. §§ 1225(b)(1)(B)(ii), (b)(2)(A), 1226(a), (c)(1), 1231(a)(6)). Moreover, the Secretary has authority to contract with private parties to carry out the Secretary's responsibilities. *Id.* citing 6 U.S.C. § 112(b)(2). "ICE, a component of DHS, carries out immigration detention … and officials "may enter into contracts … for detention

---

[124] AGS notes a split in authority as to whether derivative immunity stemming from a governmental contract under the *Yearsley* holding is jurisdictional. *See discussion New York by James v. Pennsylvania Higher Education Assistance Agency*, 19 Civ. 9155 (ER), 2020 WL 2097640, *7 (S.D.N.Y., May 1, 2020). *Compare, for example, Posada v. Cultural Care, Inc.*, 66 F.4th 348, 354 (1st Cir. 2023) (finding *Yearsley* not jurisdictional in nature) *with Cunningham,* 888 F.3d at 648-649 (finding *Yearsley* immunity a jurisdictional bar to plaintiff's claims). To the extent this Court determines such immunity to be jurisdictional, derivative immunity would bar Plaintiffs' suit under Rule 12(b)(1).

...” *Id.,* citing 48 C.F.R. § 3017.204-90.  Further, as the Fifth Circuit recognized, the $1.00 per day allowance for work performed while held in custody under the immigration laws “was set by congressional act.”  *Alvarado Guevara*, 902 F.2d at 396, citing Department of Justice Appropriation Act, 1978, Pub.L. No. 95–86, 91 Stat. 426 (1978).  It is axiomatic that Congress has sole authority regarding immigration matters.

Thus, “[t]o the extent that the work performed by [the governmental contractor] was done under its contract with the [federal agency], and in conformity with the terms of said contract, no liability can be imposed upon it for any damages claimed to have been suffered by the [claimants].” *Myers v. United States*, 323 F.2d 580, 583 (9th Cir. 1963).  *Ackerson v. Bead Dredging LLC*, 589 F.3d 196 (5th Cir. 2009) is similarly instructive.  The Fifth Circuit noted that under *Yearsley,* where the actions causing the alleged harm were taken pursuant to contracts with the federal government for purposes authorized by Congress, and where there was no allegation that the contractor “exceeded [its] authority or that [such authority] was not validly conferred,” or that the contractor even “deviated from Congress's direction,” dismissal was appropriate because the contractor had government-contractor immunity.  *Id.*

Here, ICE has authority, validly conferred, to detain aliens and to contract with private parties in furtherance of that goal.  Congress authorized payment of only $1 per day for VWP participation by detainees.  Significantly, there is simply no evidence to suggest AGS exceeded its authority under the ICE-AGS contract - particularly in implementing the VWP or in paying exactly $1 per day to VWP participants.  The contract itself—as well as the policies and handbooks promulgated by ICE—make clear that AGS acted in precise accordance with the contract, at ICE's direction, and in conformity with ICE's own representations to BFDF detainees through its Handbook and VWP Agreement. Because AGS acted in accordance with the ICE-AGS contract –

a fact confirmed by every ICE / PBNDS audit since AGS assumed the contract at BFDF – there can be no dispute that AGS executed the government's will and performed as the government directed.  Just as ICE has immunity from Plaintiff's claims for carrying out its duties, so does AGS in executing those contractually delegated duties.  Accordingly, and because there is no issue of material fact, all claims against AGS should be summarily dismissed.

## VI.    CONCLUSION

For the reasons provided above, Plaintiffs' claims should be dismissed under Rule 19(b) because ICE is an indispensable party who cannot be joined in this action.  The inability to join ICE in this matter leaves AGS subject to a substantial risk of incurring inconsistent obligations under its contract with the federal government which cannot otherwise be remedied.  Further, all of Plaintiff's claims arise from actions required of AGS by the federal government and overseen by the federal government at a government-owned and operated detention facility.  The undisputed facts demonstrate that ICE was duly authorized to contract with AGS for detention management services, including services concerning the VWP, and AGS acted in accordance with its contractual obligations to ICE.  Therefore, the matter should be summarily dismissed under Rule 56 because AGS is immune from Plaintiffs' claims under the federal contractor defense.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 8, 2024, I electronically filed Defendant's Motion to Dismiss and Motion for Summary Judgment, its supporting Memorandum of Law, Statement of Material Facts, and exhibits with the Clerk of the U.S. District Court for the Northern District of New York via the CM/ECF system, which sent notification to all parties of record.

/s/ *Jessica L. Marrero*

***Counsel for Defendant***

26