# Deposition Transcript

Case Number: 1:20-cv-01281-TJM-CFH
Date: July 25, 2023

In the matter of:

# YEEND, et al. v AKIMA GLOBAL SERVICES, LLC

# Craig Trippany



**CERTIFIED COPY**

Reported by:

Melissa Leonetti
Notary Public, RPR

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

EXHIBIT 5

```
 1
 2   UNITED STATES DISTRICT COURT
 3   NORTHERN DISTRICT OF NEW YORK
 4   ------------------------------------------------X
 5   DALILA YEEND, BOUNNAM PHIMASONE, ELVIN
     MINAYA RODRIGUEZ, LISA LAPOINTE and
 6   SHANTADEWIE RAHMEE,
 7   Indivually, and on behalf of all others
     similarly situated as Class Representatives,
 8
 9                     Plaintiffs,
10          -against-                     Case No.:
                                       1:20-cv-01281-TJM-CFH
11   AKIMA GLOBAL SERVICES, LLC,
12                     Defendants.
13   ------------------------------------------------X
14
15
                                    July 25, 2023
16                                  9:33 A.M.
17
18       EXAMINATION BEFORE TRIAL of CRAIG TRIPPANY, a
19   Non-Party Witness herein, taken by the attorney for
20   the Plaintiffs, pursuant to Notice, held remotely,
21   before Melissa Leonetti, RPR, a Notary Public of the
22   State of New York.
23
24                         - - - -
25
```

Page 2

```
 1
 2                A P P E A R A N C E S:
 3
 4   KAUFMAN LIEB LEBOWITZ & FRICK, LLP
           Attorneys for the Plaintiffs
 5         18 East 48th Street, Suite 802
           New York, New York 10017
 6
     BY:   ALISON FRICK, ESQ.
 7         africk@kllflaw.com
 8   WORKER JUSTICE CENTER OF NEW YORK
           Attorneys for the Plaintiffs
 9         9 Main Street
           Kingston, New York 12401
10
     BY:   LAURA REVERCOMB, ESQ.
11         lrevercomb@wjcny.org
12
     THE KULLMAN FIRM
13         Attorneys for the Defendant
           2915 Kerry Forest Parkway, Suite 101
14         Tallahassee, Florida 32309
15   BY:   HEATHER F. CROW, ESQ.
           hfc@kullmanlaw.com
16
17
18   ALSO PRESENT:
19   IAN BOLDEN, In-house Counsel, Akima
20   ANNE M. DONOHUE, General Counsel, Akima
21   JOANNA SOWA
22   MIRANDA FINESTONE
23   MAUREEN HUSSAIN, WJCNY
24   CRISTINA BRITO, WJCNY
25   OLIVIA POST RICH, WJCNY
```

Page 3

```
 1                      C. TRIPPANY
 2          C R A I G   T R I P P A N Y, after having first
 3   been duly sworn by a Notary Public of the State of
 4   New York, was examined and testified as follows:
 5   EXAMINATION BY
 6   ALISON FRICK, ESQ.:
 7       Q.    Good morning, Mr. Trippany.  My name is
 8   Alison Frick.  We met briefly off the record.  I
 9   represent the plaintiffs in this case along with my
10   co-counsel.
11             I want to thank you for taking the time
12   to talk to us today.  I want to go over some of
13   the ground rules.  The court reporter has already
14   sort of mentioned some of the most important ones.
15             I believe you mentioned off the record
16   you have been deposed before; is that right?
17       A.    Yes.
18       Q.    How many times?
19       A.    I'm going to say once for sure.
20       Q.    And was that deposition in connection
21   with your role at AGS or was it about something
22   else?
23       A.    It was -- I'm trying to remember what it
24   was about, but I want to say it was with AGS.
25       Q.    Okay.
```

Page 4

```
 1                      C. TRIPPANY
 2             Well, I will just refresh your memory
 3   about some of the ground rules here.  So, as the
 4   court reporter said, the most important one is for
 5   us to do our best not to speak over each other.
 6             So I'll ask that you let me get my full
 7   question out even though you know where I'm going,
 8   which I'm sure you will most of the time, before
 9   you start your answer.  And I will likewise try to
10   let you get your entire answer out before I start
11   my next question.
12             Okay?
13       A.    Yes.
14       Q.    It's also really important that you
15   answer with verbal words as opposed to gestures or
16   saying uh-huh, because that's difficult for the
17   court reporter to note on the transcript.
18             Okay?
19       A.    Understood.
20       Q.    If you answer my question, I'm going to
21   assume you understood it.  But of course if you
22   don't understand my question or need me to rephrase
23   it, just let me know and I will do my best to ask
24   another question.
25             Okay?
```

Page 5

```
 1                      C. TRIPPANY
 2       A.    Okay.
 3       Q.    You can ask for a break at any time.  If
 4   there's a question pending, I ask that you answer
 5   the pending question before we go out on a break.
 6             Does that sound fair?
 7       A.    Fair enough.
 8       Q.    Okay.  Wonderful.
 9             Mr. Trippany, as I understand it today,
10   you will be testifying on behalf of the company,
11   AGS, as well as in your personal capacity; is that
12   right?
13       A.    Correct.
14       Q.    Okay.
15             I'm going to show you what was
16   previously marked in another deposition as Exhibit
17   16.  This is the deposition notice that was served
18   on AGS.  I just want to bring your attention to
19   the third page.
20             Have you seen this deposition notice
21   before?
22       A.    Yes.
23       Q.    Did you see it within the last couple of
24   days?
25       A.    Yes.
```

Page 6

1                    C. TRIPPANY
2      Q.   And are you prepared to testify about the
3  voluntary worker program at BFDF?
4      A.   Yes.
5      Q.   Before we get to that, I just want to
6  know a little bit more about your role. What's your
7  title at AGS?
8      A.   My title at AGS is project manager.
9      Q.   And is that project manager specific to
10 the Batavia facility?
11     A.   Correct.
12     Q.   And, Mr. Trippany, if I refer to Batavia
13 or BFDF, do you understand me to be referring to the
14 Buffalo Federal Detention Facility?
15     A.   Yes.
16     Q.   So you're a project manager at Batavia,
17 correct?
18     A.   Yes.
19     Q.   How long have you been in that role?
20     A.   Since March.
21     Q.   Since March of 2023?
22     A.   Correct.
23     Q.   And what was your role before March of
24 2023?
25     A.   I was the deputy project manager.

Page 7

1                    C. TRIPPANY
2      Q.   And how long were you the deputy project
3  manager?
4      A.   Since the beginning of the contract in
5  2015.
6           MS. CROW:  May I insert one thing.  I
7      know we're starting off with the 30(b)(6)
8      portion of the deposition.  When you finish
9      that, can you let us know when we're going to
10     the personal portion of the deposition?
11          MS. FRICK:  Yes.
12     Q.   Prior to AGS taking over the contract at
13 BFDF, did you work for AGS?
14     A.   I did not.
15     Q.   Did you work at the Batavia facility?
16     A.   Yes.
17     Q.   And was that for the company that had the
18 prior contract?
19     A.   Correct.
20     Q.   What was the name of that company again?
21     A.   Valley Metro-Barbosa Group.
22     Q.   What was your role with Valley
23 Metro-Barbosa?
24     A.   I was quality control captain.
25     Q.   And then when AGS took over in 2015, you

Page 8

1                    C. TRIPPANY
2  were promoted to deputy project manager?
3      A.   Correct.
4      Q.   Did you help AGS in its negotiations over
5  the contract with ICE?
6      A.   I don't understand what you're --
7      Q.   Fair enough.  Let me ask a better
8  question.
9           Did you assist AGS in making its
10 proposal to the government -- take the contract in
11 2015?
12     A.   No.
13     Q.   So let's talk about your role as the
14 deputy project manager.  What were your job duties
15 as deputy project manager?
16     A.   Basically as the deputy project manager,
17 I oversaw all of the support services side of the
18 house, which was our warehouse operations, food
19 service operations, laundry, commissary.
20     Q.   Anything else?
21     A.   I also worked closely with security.  I
22 was basically the right-hand man for the project
23 manager.
24     Q.   And who was the project manager during
25 that time?

Page 9

1                    C. TRIPPANY
2      A.   From 2015 to -- I want to say -- 2019 was
3  Charles Mule.  And then after that until March was
4  Joseph Coulson [phonetic].
5      Q.   Was Joseph Coulson already working at
6  Batavia before becoming the project manager?
7      A.   He had retired.  He worked at this
8  facility with ICE.  He had retired and then was
9  hired as a project manager.
10     Q.   As deputy project manager, what was your
11 role, if any, with respect to overseeing the
12 voluntary worker program?
13     A.   I worked closely with our support staff
14 who oversaw the training of detainees in the housing
15 units.
16     Q.   As deputy project manager, other than
17 working with the support staff to oversee the
18 training of detainees, did you have any other
19 oversight role with respect to the worker program?
20          MS. CROW:  Objection to the form.
21          You can answer.
22     A.   No.
23     Q.   And as project manager now, what are your
24 job duties?
25     A.   I oversee the entire contract from all of

Page 10

1                  C. TRIPPANY
2   security, all of support services. I'm in charge of
3   all of it.
4       Q.   When you say the entire contract, what is
5   AGS's role at the facility?
6       A.   It's to provide food service,
7   transportation, and security operations for ICE.
8       Q.   Does it have any other role?
9       A.   I think that covers it.
10      Q.   What is the voluntary worker program?
11      A.   I'm not sure what you're asking. What is
12  it you're -- can you rephrase that.
13      Q.   I'm asking what your understanding of the
14  voluntary worker program is.
15      A.   The voluntary worker program is set up
16  for detainees to volunteer to do projects or tasks
17  within the facility basically.
18      Q.   Do you know why it's offered?
19      A.   I can't hear you.
20      Q.   Why is the program offered?
21      A.   The program's offered to give detainees
22  the opportunity to have things to keep them busy, to
23  keep them occupied, to give them -- to get them out
24  of just being in a unit, you know, 24 hours a day
25  with nothing to do.

Page 11

1                  C. TRIPPANY
2       Q.   Isn't it true that most of the detainee
3   workers are actually working in their unit?
4       A.   No.
5       Q.   Tell me where the detainee workers work.
6       A.   The voluntary detainee workers work in
7   areas such as kitchen, barbershop, processing, and
8   housing units.
9       Q.   Anywhere else?
10      A.   At this time, no.
11      Q.   Are detainees no longer cleaning the main
12  corridor?
13      A.   I do apologize. They do come out and
14  clean the main corridor.
15      Q.   And they clean the recreation room, or
16  the gym, right?
17      A.   It would be those same workers, yes. I
18  apologize.
19      Q.   And those same workers clean the law
20  library?
21      A.   Yes.
22      Q.   Is there a name for that group of
23  workers? Is that the work detail?
24      A.   It would just be considered a work
25  detail, yes.

Page 12

1                  C. TRIPPANY
2       Q.   Are there other work details?
3       A.   Let me think. I covered -- they'll go
4   into medical. They'll also clean the first section
5   inside of medical. They will remove garbage.
6            But that -- that's, to the best of my
7   knowledge, about it.
8       Q.   So the detainees who work the work detail
9   are doing the tasks that you just described,
10  correct?
11      A.   Can you repeat that.
12      Q.   It was a bad question.
13           I'm just trying to get the name of the
14  those tasks, and so I believe that it's called the
15  work detail and I just want to make sure that's
16  correct. Is that right?
17      A.   We would consider it a work detail, yes.
18      Q.   And when you say "a" work detail, my
19  question is whether there are other work details?
20      A.   It would all fall under work detail.
21      Q.   How many detainees are in the work detail
22  at one time?
23      A.   Three, four.
24      Q.   Do you know that or are you guessing?
25      A.   It's going to vary depending on, you

Page 13

1                  C. TRIPPANY
2   know, the amount of detainees we have, what's going
3   on. But typically I would see three or four. I
4   can't give you an exact number right at this moment.
5       Q.   If I wanted to know which detainees
6   participated in the work program, say each month
7   throughout the contract, what records exist to
8   reflect that?
9       A.   There would be a record with ICE for sure
10  in their detainee file that showed if they worked in
11  the program.
12      Q.   Does AGS keep a list of detainees who are
13  participating in the work program at any given time?
14      A.   As far as a list that's kept since we
15  started the work program? Is what you're asking.
16      Q.   Well, let's just take it currently.
17           Is there a list that exists currently
18  that lists which detainees are participating in
19  the work program today?
20      A.   Each housing unit would have a list of
21  volunteer workers.
22      Q.   So are you saying that AGS does not keep
23  any centralized records regarding who is
24  participating in the detainee worker program?
25           MS. CROW: Objection to the form.

Page 22

1                C. TRIPPANY
2   together the training program which is reviewed and
3   approved by ICE for use at the facility.
4        Q.   The next paragraph on this policy starts
5   with "generally."  Can you read that, please.
6        A.   Where are you looking?
7        Q.   The next paragraph that --
8        A.   I'm sorry.  I see it.
9             Okay.
10       Q.   So under this policy, detainees can be
11  required to work if there are insufficient
12  volunteers, right?
13       A.   They can be, yes.
14       Q.   And has that happened at Batavia?
15       A.   To the best of my knowledge, never.
16       Q.   You have never had a situation where
17  there were too few detainee workers?
18       A.   To the best of my knowledge, no.
19       Q.   What about during COVID?
20       A.   During COVID, there were times, for
21  instance, where -- it's not that we didn't have
22  sufficient volunteers; we were instructed not to
23  utilize them during COVID for their own protection
24  and safety.  That was by ICE.
25       Q.   Okay.

Page 23

1                C. TRIPPANY
2        I'm going to go to the third page under
3   the section called Work Conditions.  In the middle
4   of the page here, it says:  Detainees will not be
5   assigned make-work projects.
6             Do you see that?
7        A.   Yes.
8        Q.   What does that mean?
9             MS. CROW:  Objection to the form.
10            You can answer.
11       A.   Make-work would just be just something to
12  do, just make up things to do.
13       Q.   So under this policy, it means that
14  detainees will be assigned jobs that actually need
15  to get done, right?
16            MS. CROW:  Objection to the form.
17       A.   Could you repeat that.
18       Q.   So this policy says detainees will not be
19  assigned make-work projects, right?
20       A.   Correct.
21       Q.   So that means that they will be assigned
22  jobs that actually need to get done, right?
23       A.   It is jobs that are already being done
24  that they are assisting or learning a trade to do
25  that they volunteered to do that they're already

Page 24

1                C. TRIPPANY
2   being done.  It's not because we need them to do it.
3        Q.   So when you say the jobs are already
4   being done, who is already doing them?
5        A.   Well, if you're in the kitchen, for
6   instance, our kitchen staff, we have sufficient
7   staff that are already there to complete all tasks
8   within the kitchen.
9             If a detainee volunteer worker were
10  brought in, it's because -- it's to help them get
11  out of the unit, to learn a trade, to keep them
12  from, you know, going crazy within the housing
13  unit.  It gives them time out of the unit and
14  learning a trade that they can use when they get
15  out on release.
16       Q.   What about in the unit?  Who is already
17  doing the jobs that detainees do in the units?
18       A.   In the units, the detainees are doing the
19  job.
20       Q.   The detainees are cleaning the bathrooms,
21  right?
22       A.   Correct.
23       Q.   They're sweeping and mopping the floors,
24  correct?
25       A.   Correct.  They're under our supervision.

Page 25

1                C. TRIPPANY
2        Q.   Under supervision of AGS officers, right?
3        A.   Correct.
4        Q.   And if detainees weren't there to clean
5   the showers, someone else would have to do it,
6   right?
7        A.   We would have to go back to ICE and
8   determine what they would want to do, correct.
9        Q.   And ICE could tell you you need to take
10  care of it, right?
11       A.   No, not correct.  We are there to
12  supervise.  We are not cleaners.  We would have to
13  go back to ICE and they would have to either mod the
14  contract or look for bringing in some other
15  contractor.  But it is not our responsibility to
16  clean.
17       Q.   Isn't it true that the contract state
18  that AGS is responsible for the cleanliness of the
19  housing units?
20       A.   AGS is responsible for overseeing the
21  cleanliness of the unit.
22       Q.   Doesn't the contract state:  Contractor
23  is ultimately responsible for the cleanliness of the
24  BFDF housing units?
25       A.   It does state that.

Page 26

1                C. TRIPPANY
2     Q.   We're going to keep looking at this
3  policy.  The heading for the next section of this
4  policy says Removal From Work Program.  It's at the
5  bottom of this page, but the actual content is at
6  the top of the next page.
7          So this lays out how detainees may be
8  removed from the work program, correct?
9     A.   I'm reading it.  Okay.
10    Q.   So detainees can be removed for poor
11 performance is one of the reasons, right?
12    A.   Yes.
13    Q.   They can be removed from the program for
14 other reasons like misconduct, correct?
15    A.   Correct.
16    Q.   And then at the bottom of that bullet
17 point list, it talks about how an officer can remove
18 a detainee, correct?
19    A.   Let me read that.
20    Q.   Sure.
21    A.   Correct.
22    Q.   So it's up to the supervising officer to
23 determine if a detainee is performing poorly, right?
24    A.   Correct.
25    Q.   The officer needs to determine if they're

Page 27

1                C. TRIPPANY
2  performing, as this says, quote, up to standards,
3  correct?
4     A.   Correct.
5     Q.   Okay.
6          Do any officers from ICE oversee the
7  detainees as they are performing work?
8          MS. CROW:  Objection to the form.
9     A.   Are you asking me if anyone from ICE ever
10 see them doing their work?  Is that what you're
11 asking?
12    Q.   No.  It was a bad question.
13         Are there any ICE officers who
14 supervise detainees when they are participating in
15 the work program?
16    A.   No, not directly.
17         MS. FRICK:  I'm going to mark a new
18    exhibit.  It's going to be Plaintiff's
19    Exhibit 41.
20         (Whereupon, a handbook was marked as
21    Plaintiff's Exhibit 41 for identification, as
22    of this date.)
23    Q.   This is the national detainee handbook.
24         Do you see that?
25    A.   I do.

Page 28

1                C. TRIPPANY
2     Q.   There's also a detainee handbook specific
3  to Batavia, correct?
4     A.   Correct.
5     Q.   What is the difference between these two
6  handbooks?
7     A.   The national detainee handbook covers, in
8  general, the ICE facilities.  And the local covers
9  more at the local level with more of our facility
10 policies in place in that handbook.
11    Q.   Are detainees given a copy of both
12 handbooks or just one?
13    A.   They are given both.
14    Q.   If there's a conflict between the two,
15 which one governs?
16    A.   The facility handbook.  There may be
17 policies at this facility that aren't in place at
18 another facility, so our local would take
19 jurisdiction over it.
20    Q.   Understood.
21         I'm going to scroll to page 20 which
22 discusses the work program.
23         MS. CROW:  Are you able to zoom in on
24    that at all?
25         MS. FRICK:  Yes.  It's harder to scroll

Page 29

1                C. TRIPPANY
2  when it's zoomed in.  Here we go.  I'm going
3  to zoom in and I'll scroll around.
4     Q.   Is that large enough for you to see?
5     A.   Yes.
6     Q.   So the first sentence says:  If your
7  facility has a volunteer worker program.
8          Do you see that?
9     A.   I do.
10    Q.   So there's no requirement that a facility
11 have a voluntary worker program, right?
12         MS. CROW:  Objection to the form.
13    A.   I guess I need you to rephrase that.
14 What do you mean there's no requirement?
15    Q.   Does ICE require a voluntary work program
16 to exist at every facility?
17         MS. CROW:  Objection to the form.
18    A.   I can't speak for every facility.  I can
19 speak for this facility, and it's required here.
20    Q.   How do you know that it's required?
21    A.   It's part of our contract with ICE.
22    Q.   The contract specifies that you must have
23 this program?
24    A.   That we will have this program.
25    Q.   It also down in the next section says:

CRAIG TRIPPANY  
JULY 25, 2023

JOB NO. 646857

Page 30

C. TRIPPANY

Will I get paid for my work. This handbook says if you participate in the voluntary work program at your facility, you will get at least $1 for each day you work.

    Do you see that?

A. I do.

Q. Okay.

    So. The national standard is that detainees should be paid at least $1 a day?

MS. CROW: Objection to the form.

A. Are you asking me?

Q. Yes.

A. Okay. Yes.

Q. And AGS pays $1 a day, correct?

A. We pay $1 a day per our contract with ICE.

Q. Is it your understanding that the dollar a day is $1 per day or $1 per assignment per day?

A. Our contract states $1 a day.

Q. So if a detainee works multiple jobs in one day, they get paid $1, correct?

A. A detainee -- I guess I'm not following. You're asking me are they working more than one job?

Q. If a detainee works more than one job in

Page 31

C. TRIPPANY

a single day, they get paid $1 for that day of work, right?

A. A detainee gets paid $1 a day to work a job. They can't work more than eight hours a day. We're not supposed to work them more than eight hours a day five days a week.

Q. Understood.

    My question was: If a detainee works two jobs in one day, they still get paid $1 a day as if they worked one job, correct?

A. Yes.

Q. If you look under the picture under the photo here, it again talks about you could be fired for not performing work satisfactorily.

    Do you see that?

A. Yes, I see that.

Q. And, again, that's up to the officers to determine that the work is done in a satisfactory manner?

A. Correct.

Q. Now I'm going to show you what was previously marked as Exhibit 2, which is the Batavia facility handbook, and I'm going to go to page 8 of this document which discusses the voluntary work

Page 32

C. TRIPPANY

program. I will zoom in so you can read it.

    So at the start here, this lists the jobs available at Batavia, correct?

A. I have to read it.

Q. Sure.

A. Correct.

Q. All right.

    Are there any jobs -- are there any other jobs that detainees have held at the facility during the contract period that aren't listed here?

A. If there are, they would have been things that came up that ICE requested we look at doing. The only one I can think of possibly would be painting.

Q. Was there a time that ICE requested painting to be done?

A. Yes.

Q. How was that request conveyed?

A. It would come up in a meeting or through a phone call, just stating we've got some areas if you could look at, seeing if we could get volunteers to assist.

Q. Do you recall specifically this coming up

Page 33

C. TRIPPANY

in a meeting or a phone call or are you assuming that that's how it came up?

A. No, it did come up. I don't know the exact year, but, yeah, it has come up.

Q. And you're saying that it would never be -- that request from ICE would not have been made in an email?

A. No.

Q. Why not?

A. I can't speak for why ICE did it that way. But it would have come up in a meeting just stating that, hey, we've got some areas, the population is down, it would be a good time to do some painting, could we look at seeing if we have volunteers to paint.

    That's just the way it came up.

Q. Okay.

    Looking at this list of jobs, how long does each job take?

A. It depends on the area. If you're looking at the kitchen, kitchen staff, the assignments where the volunteers would come in would be probably four or five hours in the morning.

    And then maybe in the afternoon, the

Page 38

1                C. TRIPPANY
2     A.    Can you repeat that, please.
3     Q.    AGS determined that these would be the
4  jobs that were offered at Batavia, right?
5     A.    No.
6     Q.    Who determined that?
7     A.    ICE determines the areas and the work
8  that is to be completed.
9     Q.    Isn't it true that AGS has determined at
10 different points during the contract period whether
11 to use detainees in assisting with laundry?
12    A.    Repeat that.
13    Q.    During the contract period, haven't there
14 been times where detainees have assisted with
15 laundry?
16    A.    At the direction of ICE, correct.
17    Q.    How do you know that it was at the
18 direction of ICE?
19    A.    We were asked by ICE to have some folding
20 brought down to one of the housing units.  We had
21 females held at the time to have them do some
22 folding so that they would be able to be out of that
23 rhythm of just sitting in a unit doing nothing and
24 having -- learning a trade.
25          So it was determined that we see if

Page 39

1                C. TRIPPANY
2  there's volunteers that would want to do some
3  folding.
4     Q.    When Valley Barbosa had the contract,
5  didn't detainees work in the laundry room?
6     A.    Yes.
7     Q.    And AGS determined it would be more cost
8  efficient to not have detainees in the laundry room,
9  right?
10    A.    That's not the way the contract was bid.
11 I can't say it was AGS that determined that.  The
12 way the contract was proposed was there would be no
13 officer in the unit.
14    Q.    So you don't know why --
15          MS. FRICK:  Withdrawn.
16    Q.    You don't know one way or the other
17 whether it was AGS who determined to not use
18 detainees in the laundry room, right?
19    A.    I do not.
20    Q.    All right.
21          Looking at this list of jobs, the
22 cleaning that's happening in these areas and the
23 kitchen jobs, these aren't make-work jobs, are
24 they?
25    A.    They are not make-work jobs, no.

Page 40

1                C. TRIPPANY
2     Q.    They're jobs that somebody needs to do,
3  right?
4     A.    They're jobs that AGS does, correct.
5          MS. FRICK:  We've been on the record
6     for an hour.  Let's take a break.  It's
7     10:31.  We'll come back in about five or six
8     minutes.
9          (Whereupon, there was a pause in the
10    proceeding.)
11    Q.    Earlier you mentioned a training
12 lieutenant.  Who is that training lieutenant?
13    A.    It can vary.  It depends on if the
14 lieutenant is on vacation or -- so I mean, it could
15 be one of our AGS supervisors.  But that can vary
16 depending on vacations and time off.
17          I can tell you typically it's been
18 Lieutenant Shank, but he has since left the
19 company.  And I think right now it's just being
20 covered by several different lieutenants until a
21 new one is chosen.
22    Q.    How long was Lieutenant Shank the main
23 lieutenant?
24    A.    Several years.
25    Q.    When did he leave AGS?

Page 41

1                C. TRIPPANY
2     A.    He left AGS due to health reasons about a
3  month ago.
4     Q.    Thinking back to my questions about
5  tracking hours, when detainees leave their housing
6  units, are their movements recorded in some way?
7     A.    What do you mean by leave their housing
8  unit?
9     Q.    For example, if a detainee goes to work
10 in the kitchen, is his movement from the housing
11 unit to the kitchen recorded in some way?
12    A.    Just -- it would be recorded on -- with
13 the new office -- wherever they're going -- I'm
14 trying to think what do you mean by recorded.  It
15 would probably be recorded through camera video.
16    Q.    Okay.
17          But are there any logbooks that would
18 note when a detainee is coming to a certain area
19 or leaving a certain area?
20    A.    Yes.
21    Q.    Okay.
22          What are those logbooks?
23    A.    It's a post logbook.
24    Q.    And what is recorded specifically in that
25 logbook?

Page 46

1                 C. TRIPPANY
2    Q.   There's also a line that says LL/Rec.
3         Do you see that?
4    A.   Yes.
5    Q.   What is that job?
6    A.   Leisure library and recreation, so that
7  would be the library area and the recreation/gym
8  area.  So they would be in there -- if a detainee
9  came down looking for a book or looking for
10 miscellaneous items in the leisure library, the
11 detainee worker would be there to assist, showing
12 them where things were.
13        In the gym area, they would be, you
14 know, sweeping, buffing, depending on what was
15 going on in that area.
16   Q.   So that's a separate cleaning job from
17 the work detail?
18   A.   Leisure library/Rec would do their own
19 detailing, yes.
20   Q.   How long did that -- how many hours did
21 the detainees who were working in the leisure
22 library/rec work per day?
23   A.   Again, I would have to say no more than
24 three or four hours at a time.
25   Q.   What is that based on?

Page 47

1                 C. TRIPPANY
2    A.   Just my personal knowledge of the area
3  and, you know, past.
4    Q.   Are there certain hours during which the
5  library or the rec room is closed?
6    A.   It is not open in the evenings.  It's
7  only opened during the day until 8 o'clock at night.
8    Q.   So is it open for more than four hours?
9    A.   In between counts -- I would have to say
10 it's not open more than four hours in between each
11 count.
12   Q.   Is it open more than four hours total in
13 a given day?
14   A.   Not at one time.  If you were to add up
15 in between the counts, yes.
16   Q.   So if it's open for more than four hours
17 total in a given day, what basis do you have to say
18 that the workers in those areas only worked three to
19 four hours?
20   A.   Just based on what would be required to
21 do.
22   Q.   So is it your testimony that the library
23 could be open and that there's no detainee worker
24 there?
25   A.   That could be possible, yes.

Page 48

1                 C. TRIPPANY
2    Q.   Is that what happens?  Or is it just
3  possible?
4    A.   At times, if you're asking me could there
5  be no workers in the law library, yes.
6    Q.   What is the regular practice of staffing
7  the law library?
8         MS. CROW:  Objection.
9    A.   There is no practice.  It's -- it's -- if
10 there's a worker or a detainee that's volunteered to
11 go down and be there, then they'll be there.  If
12 there's nothing for them to do or if there's nobody
13 that's going down to the leisure library, there
14 wouldn't be requirement to have anyone there.
15        It might be open with an officer there,
16 but that doesn't necessarily mean that there's
17 anybody there at that time.
18   Q.   Are there any rules that ensure that the
19 detainees working in the library or the rec do not
20 work for more than three to four hours?
21   A.   It is our policy for all areas where
22 there's voluntary work that they are not worked more
23 than eight hours a day, five days a week, as set by
24 ICE.
25   Q.   And given that AGS does not track

Page 49

1                 C. TRIPPANY
2  detainee hours, I'm trying to understand how AGS
3  ensures that detainees do not work more than eight
4  hours.
5    A.   It's our training and our protocol not
6  to.  Can I sit here and tell you that it would never
7  happen?  It is not our practice.
8    Q.   But sitting here today, you don't
9  actually know how many hours a detainee typically
10 worked in the library or rec area, correct?
11   A.   I've given you an average of what I do
12 know.
13   Q.   And that's based just on your
14 understanding of the job, right?
15   A.   Correct.
16   Q.   Have you ever supervised detainees in the
17 library or the recreation area?
18   A.   I have not.
19   Q.   What is the job in processing?
20   A.   Are you talking voluntary work program
21 job?
22   Q.   Where it says processing here on this
23 list.
24   A.   Oh, okay.
25        There are processing volunteer workers

Page 58

```
 1                  C. TRIPPANY
 2   the medical area?
 3       A.   Yes.
 4       Q.   Let's look at 2019.  So we're going to
 5   look at the week of June 8, 2019.  It now lists --
 6   it no longer lists the work detail and now has a
 7   sally detail and floor detail.
 8            Do you know what those are?
 9       A.   They're both cleaning details.  One was
10   doing the sally port or the sally area just outside
11   the housing unit and one was doing the floors in the
12   corridor.
13       Q.   Were the sally detail workers doing
14   something different than what the work detail
15   workers had been doing in the prior year?
16       A.   Not that I would be aware of.
17       Q.   It was just a different name given to
18   their job?
19       A.   Yes.
20       Q.   And the floor detail, is that specific
21   buffing?
22       A.   Floor detail would be buffing, stripping,
23   waxing.
24       Q.   How long does the buffing, stripping, and
25   waxing take?
```

Page 59

```
 1                  C. TRIPPANY
 2       A.   It depends on the area.  Again, three to
 3   four hours at a time, to my knowledge.
 4       Q.   What is your basis for saying that the
 5   stripping, buffing, and waxing takes three to four
 6   hours at a time?
 7       A.   Just from my knowledge of the facility
 8   and seeing them doing those areas in the past.
 9       Q.   They typically do that work in the middle
10   of the night, right?
11       A.   It depends on the floor and the area.
12   When I spoke of them doing the floors at night, that
13   was the main corridor, the one that would get most
14   of the usage during the day.
15       Q.   So what are the other areas that the
16   floor detail covers other than the main corridor?
17       A.   They could be working in a housing unit
18   that was emptied at the time.  If there was a unit
19   that was down and they wanted to go in and detail
20   that unit before more detainees came in, it could
21   possibly be that.  They could be working in the
22   processing area doing a floor detail in there.  It
23   could be anywhere within the facility.
24       Q.   Are there any records to indicate where
25   the floor detail was working on any given day?
```

Page 60

```
 1                  C. TRIPPANY
 2       A.   No, not that I'm aware of.
 3       Q.   Is it fair to say that the time that the
 4   floor detail would -- the time that the floor detail
 5   takes depends on the area of the facility that
 6   they're working on?
 7       A.   That's fair.
 8       Q.   How long does it take to perform the
 9   floor detail on the main corridor?
10       A.   It would be done in sections.  They would
11   never do the entire corridor at one time.  So again,
12   it's going to vary by section; three to four hours
13   an area, give or take.
14       Q.   Why would they never do the whole
15   corridor at one time?
16       A.   You wouldn't be able to access the
17   corridor.  You have to break it down into sections
18   so there could still be movement within the
19   corridors.
20       Q.   When you say break it into sections, do
21   you mean --
22            MS. FRICK:  Withdrawn.
23       Q.   Do you have any understanding of why
24   these similar records do not exist for the year
25   2020?
```

Page 61

```
 1                  C. TRIPPANY
 2       A.   Can you make it larger.
 3       Q.   Do you know why we don't have these
 4   records?
 5       A.   I'm speculating that there's been a
 6   change in the programming possibly and they're
 7   having a hard time pulling those records.  But I'm
 8   speculating.
 9       Q.   So you don't know whether there's been a
10   change in the program?
11       A.   I do know there's been a change in the
12   program.
13       Q.   What is the program now?
14            MS. FRICK:  Withdrawn.
15       Q.   What is the software that's used now?
16       A.   I can't answer that.  That is through
17   Trinity and Keefe.  It was upgraded.
18       Q.   So the contract with Trinity/Keefe has
19   stayed the same but there's a new software program?
20   Is that what you're saying?
21       A.   Correct.
22       Q.   It's still the same contractor?
23       A.   Correct.
24       Q.   So these 2021 records are very small,
25   which I apologize for, so let me do my best to make
```

Page 62

1                C. TRIPPANY
2   it visible here.  We're going to look at the week of
3   June 16, 2021.  Now the workers are listed by pod --
4   I'm sorry -- by housing unit.
5            Do you see that?
6       A.   I do.
7       Q.   Is it your understanding that these
8   charts were created from the new software that is
9   used?
10      A.   Yes.
11      Q.   It also shows there were no workers in
12  the law library or the SHU.
13           Do you see that?
14      A.   Yes.
15      Q.   Do you know who was performing those
16  jobs?
17      A.   I can't answer that.  I do not know.
18      Q.   Is there somebody else who regularly
19  cleans the SHU?
20      A.   I can't answer that.  I don't know.
21      Q.   There also don't seem to be any kitchen
22  workers listed on this week.
23           Do you see that?
24      A.   I do.
25      Q.   Do you know why that would be?

Page 63

1                C. TRIPPANY
2       A.   My guess would be this may have been
3   during a COVID period.  I'm speculating.
4       Q.   Today how many detainees work in the
5   kitchen in one shift?
6       A.   Could you repeat that.
7       Q.   Today at the facility, how many detainees
8   work in the kitchen in one shift?
9       A.   It varies.  There are days we have zero
10  detainees working in the kitchen and there could be
11  days we have four on a shift.  But it has varied.
12  Our population has dropped.  We have not had the
13  detainee volunteers.
14      Q.   Why would there be days where there are
15  zero detainees in the kitchen?
16      A.   There are no volunteers.  And if there
17  are volunteers, they have to meet a certain
18  classification to work in a kitchen.  If they don't
19  meet those classifications or pass the medical
20  backgrounds, there are no volunteers.
21      Q.   And so if there are no detainees working
22  in the kitchen, who performs the kitchen tasks the
23  detainees usually perform?
24      A.   AGS performs the tasks with or without
25  detainees.  The detainees would basically be there

Page 64

1                C. TRIPPANY
2   for dishwashing, cleaning, helping to load the
3   carts.
4            Our AGS staff has on -- on line cooks,
5   head cooks, food service workers who do that work
6   regardless if there are detainee volunteers.
7       Q.   The people who are primarily responsible
8   for cleaning and dishes are the detainee kitchen
9   workers, right?
10      A.   That is not correct.  AGS is responsible.
11      Q.   If there are detainee workers in the
12  kitchen, is it fair to say that the detainee workers
13  do the cleaning and the dishes and the AGS workers
14  do not do those things?
15      A.   The AGS workers are still doing it and
16  the volunteer workers assist.
17      Q.   I want to go to 2022.
18           So if we look at 2022 -- I'm just going
19  to show you -- there are a few weeks where there's
20  no data loaded, correct?
21      A.   Correct.
22      Q.   And on other weeks, for example,
23  April 27, 2022, there's no data for a variety of
24  jobs, correct?
25      A.   Correct.

Page 65

1                C. TRIPPANY
2       Q.   Does this suggest to you that these
3   records are incomplete?
4            MS. CROW:  Objection to the form.
5       A.   No.
6       Q.   Why not?
7       A.   It suggests that there was no workers
8   from what it's showing me.  There's no volunteers.
9       Q.   So your understanding is that there were
10  just no detainee volunteers at all for any of these
11  positions in the week of -- in April where there's
12  zero listed?
13      A.   That would be my understanding looking at
14  it.
15      Q.   I'm looking at the week of June 15, 2022.
16  There's no line listed for AM kitchen.
17           Do you know why that is?
18      A.   I do not know why.
19      Q.   Was the population of detainees low in
20  April -- I'm sorry -- in spring and summer of 2022?
21      A.   I can't remember back to 2022 to know if
22  it was low or high or my -- we went through a period
23  where we were much lower in population, but I can't
24  be specific as to the exact dates.
25      Q.   If you wanted to know the detainee

Page 90

1                 C. TRIPPANY
2  chance to read this.  Just let me know when you want
3  me to scroll.  And the email starts on March 23,
4  2020.
5      A.   So it starts with "furthermore" or at the
6  top where "I am recommending"?
7      Q.   It starts at "I am recommending."
8           MS. CROW:  Can you just go up a little
9      bit so we can see the entire header on that.
10          MS. FRICK:  I'm trying to get it all in
11     one.  It's hard for me to tell.  I'll just
12     show you what it looks like.
13     Q.   It's a chain, okay, and then the first
14 email is this email from Adam Vohwinkel.  So I
15 thought you would want to start with that and then
16 you can read this rest.
17     A.   Okay.  Can you scroll down just a little
18 bit.
19     Q.   Yes.
20     A.   That's good.  Okay.
21     Q.   So let me ask you about this email first.
22 Who is Adam Vohwinkel?
23     A.   He was the captain at the time.
24     Q.   The captain of what?
25     A.   Captain for AGS overseeing security.

Page 91

1                 C. TRIPPANY
2      Q.   And it was his recommendation to suspend
3  the kitchen and laundry jobs for the detainee
4  workers?
5      A.   Due to COVID, yes.
6      Q.   Then he wrote that you and he had a plan
7  to ensure the tasks still got completed, right?
8      A.   Yes.
9      Q.   What was that plan?
10     A.   The detainees -- the detainees that were
11 going to the laundry to fold would stay in their
12 unit so we wouldn't have cross-exposure.  And in
13 order to still give them activity, we were bringing
14 certain laundry to them to fold within the unit
15 rather than them going to the laundry and leaving
16 their unit.
17     Q.   AGS was not asking for a contract
18 modification, right?
19     A.   No.
20     Q.   AGS was figuring out a solution to this
21 issue, right?
22     A.   For the safety of the detainees, yes.
23     Q.   Okay.
24          What about the kitchen?  Did AGS make
25 other arrangements for the kitchen work to get

Page 92

1                 C. TRIPPANY
2  done?
3      A.   The kitchen work gets done with or
4  without volunteers.  We're staffed to run with or
5  without detainee volunteers.
6      Q.   This email also discusses the floor and
7  cleaning details.  Is that the work detail that
8  works outside the unit?
9      A.   Yes.
10     Q.   And you were reassuring ICE that --
11          MS. FRICK:  Withdrawn.
12     Q.   AGS was reassuring ICE that that work
13 could continue, right?
14     A.   We were stating that, yeah, there was no
15 commingling so that could continue, correct.
16     Q.   Because that work still needed to get
17 done, right?
18          MS. CROW:  Objection to the form.
19     A.   Yes.
20     Q.   Okay.
21          So we've talked a lot.  You've
22 mentioned in the kitchen that the kitchen work --
23 that the AGS kitchen workers work -- do all the
24 jobs even without detainees, correct?
25     A.   The AGS staff, yes.

Page 93

1                 C. TRIPPANY
2      Q.   Okay.
3           I'm going to show you what was marked
4  as Exhibit 9 in an earlier deposition.
5           So these are -- if you look at the
6  bottom, there's an email from Laura Mitchell to
7  you and Mr. Mule asking for a list of tasks
8  performed by the detainee workers in food service
9  and the tasks performed by the AGS food service
10 workers.
11          Do you see that?
12     A.   Can you make it a little bigger.  Okay.
13     Q.   And then you forwarded that request to
14 Jerome Gentry and Anthony Zambito.
15          Who are they?
16     A.   Those are the food manager and assistant
17 manager in food service.
18     Q.   And why did you forward it to them?
19     A.   Because that's their area of
20 responsibility.
21     Q.   They have the best knowledge of the tasks
22 that each type of worker performed?
23     A.   Yes.  They are managers in that
24 department.
25     Q.   And then they sent an attachment that's

Page 94

1                  C. TRIPPANY
2      called a list of duties for all three positions in
3      the kitchen.docx.
4              Do you see that?
5      A.      No, I don't see that.
6      Q.      It's listed at the top as attachments.
7      A.      Okay.
8      Q.      I'm going to show you the attachment.
9      We're going to look at them in reverse order.  We
10     have cook II, the head cook?
11     A.      Uh-huh.
12     Q.      And then cook I with the task listed
13     below.  Food service worker with the tasks listed
14     below.  And then another email from Mr. Gentry that
15     says:  Here is the list for the detainee food
16     service workers.
17             So then that is attached, a list of
18     duties for detainee food service workers?
19     A.      Okay.  Yes.
20     Q.      So detainee food service workers wash and
21     scrub dishes using the dishwasher or manually,
22     right?
23     A.      Yes.
24     Q.      They clean the ovens and other
25     appliances, right?

Page 95

1                  C. TRIPPANY
2      A.      Yes.
3      Q.      And they sweep, buff, mop, polish floors,
4      right?
5      A.      Yes.
6      Q.      And then they assist with some other
7      tasks like wrapping up food or stock rotation,
8      right?
9      A.      Yes.
10     Q.      Okay.
11             So I want you to look at the list of
12     the tasks for -- I can scroll as you need it --
13     AGS food service workers.  Let me know when you
14     want me to scroll.
15     A.      You can scroll.  Okay.
16             What is this I'm looking at?
17     Q.      This is a continuation of the list of
18     jobs --
19     A.      All right.  Can you go back up a minute,
20     please.  Okay.
21     Q.      So is it the AGS food service workers'
22     job to scrub the dishes with the dishwasher or
23     manually?
24     A.      Yeah.
25     Q.      Where is that listed?

Page 96

1                  C. TRIPPANY
2      A.      And assist with dinner dishes, if needed.
3      Wipe down carts, OO.
4      Q.      And is it your testimony that assist with
5      dinner dishes if needed is the same job function as
6      wash and scrub dishes by the use of dish machine or
7      manually?
8      A.      Yes.
9      Q.      Is it fair to say that the detainee
10     workers, if they are there and available, are the
11     ones primarily responsible for doing the dishes?
12     A.      No, they're assisting.  Our staff is also
13     cleaning.
14     Q.      Isn't it true that on the job list, it's
15     the AGS staff who's is listed as assisting, right?
16             MS. CROW:  Objection to the form.
17     Q.      You can answer.
18     A.      What are you asking me?
19     Q.      Isn't it true that on this list of job
20     duties, it's the AGS staff member whose job
21     description is to assist with the dishes?  Right?
22     A.      Yes.
23     Q.      And they assist with the dishes if
24     needed, right?
25     A.      Yes, which they always need.  They're

Page 97

1                  C. TRIPPANY
2      always helping.
3      Q.      So if the detainee workers aren't there,
4      then the AGS staff is responsible for doing all the
5      dishes, correct?
6      A.      Correct.
7      Q.      And if the detainee workers are there,
8      then the AGS worker is responsible the assist with
9      those dishes if needed, right?
10     A.      Correct.
11     Q.      Okay.
12             Is it included in the AGS worker's job
13     duties to run the dishwasher?
14     A.      Yes.
15     Q.      Where?  Where is that listed?
16     A.      It isn't on this list.
17     Q.      So is this an incomplete list?
18     A.      It was a list that was put together at
19     the time because they were asked for a quick list.
20     They tried to list everything.
21     Q.      And this was created by the people that
22     have the best knowledge of the work that the staff
23     does in the kitchen?
24     A.      Correct.
25     Q.      Is there any job duty listed here by the

CRAIG TRIPPANY  
JULY 25, 2023

JOB NO. 646857

Page 98

1          C. TRIPPANY
2  AGS food service worker to buff or polish the
3  floors?
4      A.   I've got to scroll up through the whole
5  thing again.
6           They don't have floors listed.  But it
7  would be AGS's -- our staff would do it.
8      Q.   It's listed as a job duty of the detainee
9  workers, right?
10     A.   It is on this form, yes.
11     Q.   Under AGS's contract with ICE, AGS is
12 responsible for cleaning the kitchen, right?
13     A.   Yes.  And I think the contract states
14 with or without detainee labor.
15     Q.   Talking about the volunteer work program
16 as a whole, how are detainees selected for the
17 program?
18     A.   Could you repeat that, please.
19     Q.   How are detainees selected to participate
20 in the work program?
21     A.   They first submit a request that they
22 want to be involved in the voluntary work program.
23 That would go to the hiring lieutenant, which we
24 spoke of earlier, for his review.  And then it would
25 be looked at by him as far as the classification of

Page 99

1          C. TRIPPANY
2  that detainee to decide if they were eligible for
3  the assignment.
4           Are we talking food service?  Where are
5  you talking?
6      Q.   Any of the detainee work jobs.
7      A.   Okay.
8           So depending on the area, if it was
9  food service, for instance, and they met the
10 classification requirements, it would then go to
11 medical for their review and a medical clearance
12 would have to be done to ensure that the detainee
13 was medically cleared to be around food and in the
14 food service department.
15          And any of the other areas, it would
16 just be done by classification before they were
17 hired.
18     Q.   So are you saying that every detainee who
19 participates in the job program has put in a written
20 request to do so?
21     A.   Yes.
22     Q.   Where are those written requests kept?
23     A.   I can't answer that.  I don't know where
24 they go or where they are kept.
25     Q.   Are the written requests a paper form or

Page 100

1          C. TRIPPANY
2  electronic?
3      A.   It is a paper form.
4      Q.   And you don't know who collects those
5  forms?
6      A.   I can't tell -- let me rephrase that.
7           In like the housing units, a detainee
8  would let the officer in the unit know that they
9  are interested in volunteering for an assignment
10 in the housing unit.
11          If they're working kitchen, we would
12 have to do the form.  I apologize.  I have to
13 restate that.
14     Q.   So the written request form that's
15 reviewed by the hiring housing unit is only for the
16 kitchen?
17     A.   It's for any job that would be outside
18 the housing unit.  So it could be recreation, for
19 instance, or the leisure library, barbershop.  Any
20 area outside of their normal -- the unit where they
21 are assigned.
22     Q.   And are those written request forms paper
23 forms or electronic?
24     A.   It is an electronic form but it's filled
25 out by hand.

Page 101

1          C. TRIPPANY
2      Q.   And the hiring lieutenant reviews all of
3  those?
4      A.   Yes.
5      Q.   Who is the hiring lieutenant currently?
6      A.   Right now at this moment, it would be
7  Lieutenant Frank Spiotta, S-P-I-O-T-T-A.
8      Q.   Officers sometimes approach detainees
9  directly about working in the program, right?
10     A.   In the housing units, are you referring
11 to?  Yeah, they would let them know that there are
12 jobs available if anybody was interested in
13 volunteering.
14     Q.   An officer might approach a specific
15 detainee to ask if they want to join the program,
16 right?
17     A.   They could, yes.
18     Q.   That wouldn't break any rules, right?
19     A.   No.
20     Q.   Okay.
21          Is it fair to say that detainees who
22 speak English are preferred for the work program?
23     A.   Absolutely not.  That's not a fair
24 statement.
25     Q.   Doesn't the PBNDS say that work

Page 126

1   C. TRIPPANY
2   Q.  One question I have: For job 4 and 5,
3   upper bathroom at 1445 hours and 2230 hours, what
4   does that mean?
5   A.  Those are guidelines for when they should
6   clean those areas.
7   Q.  So it's advising the detainee to clean
8   the bathroom twice; is that right?
9   A.  Yes.
10  Q.  And then what does assist linen mean?
11  A.  The laundry is brought down to each of
12  the housing units after it's been washed and put
13  back, and it's to help hand out the laundry bags
14  back to the detainees.
15  Q.  To confirm, nobody tracks how long each
16  of these jobs takes, correct?
17  A.  Correct.
18  Q.  It also says here at the bottom, the very
19  last part of this page: Detainees may not work or
20  be paid for more than five days in a week.
21      Do you see that?
22  A.  I do.
23  Q.  That reflects the policy that detainees
24  are only supposed to work five days a week, right?
25  A.  Yes.

Page 127

1   C. TRIPPANY
2   Q.  And that no matter what, he's not paid
3   for more than five days, right?
4   A.  Yes. The system is set up for only up
5   the five days.
6   Q.  Can you explain to --
7       MS. FRICK: Well, withdrawn.
8       Okay. I think that I am finished with
9   the 30(b)(6) portion. And I know that we've
10  gone on a million breaks. I don't think I
11  have all that much more to do, but I think it
12  would be helpful if I can confer with
13  co-counsel before we wrap up the 30(b)(6)
14  portion to make sure I haven't left anything
15  off, and then assuming I haven't, we'll come
16  back and just do the non-30(b)(6) portion.
17      Is that acceptable?
18      MS. CROW: Of course.
19      MS. FRICK: Let's take five minutes.
20      (Whereupon, there was a pause in the
21  proceeding, 1:51-1:57.)
22      MS. FRICK: So we can conclude the
23  30(b)(6) portion of the deposition.
24  Q.  So from now on, you'll be answering in
25  your personal capacity.

Page 128

1   C. TRIPPANY
2       Okay, Mr. Trippany?
3   A.  Yes.
4   Q.  So I know that you worked at the facility
5   before AGS took over. When did you begin working at
6   Batavia?
7   A.  It would have been February of 1998.
8   Q.  And was Valley Barbosa the administrator
9   of the facility at that time?
10  A.  No. The contract was with Koosniic at
11  the beginning. It was spelled K-O-O-S-N-I-I-C, and
12  it was Koosniic Joint Venture.
13  Q.  Are there any significant differences
14  between the way that AGS runs the facility compared
15  to the prior contractors that you worked for?
16      MS. CROW: Objection to the form.
17  A.  The contract overall, I mean, they
18  followed the contract just as AGS does now. There
19  may have been some differences in the contract back
20  then, which was 20 some years ago to now. But
21  overall no, they were run the same way with ICE
22  being -- you know, at the direction of ICE.
23  Q.  Okay.
24      AGS officers are responsible for
25  supervising the detainees, correct?

Page 129

1   C. TRIPPANY
2   A.  Overseeing them, yes.
3   Q.  And they're responsible for ensuring the
4   safety and security of the facility, right?
5   A.  Yes.
6   Q.  That requires that officers be in charge,
7   right?
8       MS. CROW: Objection to the form.
9   A.  The officer is -- yes. He is overseeing
10  them, so he would be in charge of that area, yes.
11  Q.  And officers are authorized to give
12  orders the detainees must follow, right?
13  A.  Yes.
14  Q.  And officers determine the detainees'
15  day-to-day living conditions, right?
16      MS. CROW: Objection to the form.
17  A.  The officers adhere to the policies and
18  procedures in place for the day-to-day that's been
19  put in place by ICE.
20  Q.  Understood.
21      But an officer in a housing unit, for
22  example, can decide that the TVs should be on or
23  off, right?
24  A.  No, they're -- it is set that the TVs are
25  on. The only time the officer would determine if

|  | Page 130 |
|---|---|
| 1 | C. TRIPPANY |
| 2 | the TVs were to be turned off is if there was a |
| 3 | situation within the housing unit where the |
| 4 | detainees were acting up or there was a fight or |
| 5 | there was a reason that they had to turn the TVs |
| 6 | off. At that point they would turn them off, |
| 7 | correct. |
| 8 | Q. Right. |
| 9 | If there was a situation that required |
| 10 | the officer's attention, the officer could |
| 11 | restrict the use of tablets in the unit, right? |
| 12 | A. Can you repeat that. |
| 13 | Q. You said that if there's some situation |
| 14 | where detainees are acting up, officers could, for |
| 15 | example, turn off the TV, right? |
| 16 | A. Yes. |
| 17 | Q. And officers could restrict tablet use, |
| 18 | right? |
| 19 | A. Yes. |
| 20 | Q. And they could restrict phone use other |
| 21 | than legal calls, right? |
| 22 | A. Yes. |
| 23 | Q. In terms of the activities that are |
| 24 | offered to detainees other than the work program, |
| 25 | does AGS offer any organized activities in the |

|  | Page 131 |
|---|---|
| 1 | C. TRIPPANY |
| 2 | facility? |
| 3 | A. Does AGS? |
| 4 | Q. Yes. |
| 5 | A. AGS works off what ICE has determined for |
| 6 | activities such as they can go down to recreation. |
| 7 | There's a recreation yard off of each of the housing |
| 8 | units where the detainees can go out and play |
| 9 | handball. They can go outside and play basketball. |
| 10 | They go to religious service if there's a religious |
| 11 | service provider. Those types of things. |
| 12 | Q. If there's a situation in a housing unit, |
| 13 | officers could restrict access to the outdoor |
| 14 | recreation yard for a period of time, right? |
| 15 | MS. CROW: Objection to the form. |
| 16 | A. They would through the communication of |
| 17 | ICE of the situation and their approval to do so, |
| 18 | yes. |
| 19 | Q. So you're saying that an officer does not |
| 20 | have authority without checking with ICE to close |
| 21 | the recreation yard for a time on any given day? |
| 22 | A. If he has a situation, he can close the |
| 23 | rec yard, but he has to notify ICE of the situation |
| 24 | so that they are in approval of why it was closed. |
| 25 | Q. And how does he notify ICE of that |

|  | Page 132 |
|---|---|
| 1 | C. TRIPPANY |
| 2 | situation? |
| 3 | A. He would notify the shift supervisor who |
| 4 | would reach out to ICE leadership. |
| 5 | Q. How does he notify the shift supervisor? |
| 6 | A. By phone or radio. |
| 7 | Q. How does the shift supervisor reach out |
| 8 | to ICE? |
| 9 | A. Either by personally walking down and |
| 10 | speaking with them or through picking up the phone. |
| 11 | There are many ICE employees within the facility at |
| 12 | most times in different departments. |
| 13 | Q. Which ICE employees in the facility have |
| 14 | authority over the officers, the AGS officers? |
| 15 | MS. CROW: Objection to the form. |
| 16 | A. We would take direction from the ICE |
| 17 | management team. |
| 18 | Q. Who is in the ICE management team? |
| 19 | A. There are two AFODs. Those are assistant |
| 20 | facility office directors -- I guess is what it |
| 21 | stands for -- a chief of security. I think that |
| 22 | would be it. |
| 23 | Q. Who are the two AFODs right now? |
| 24 | A. Pete Semkowski. He oversees more the |
| 25 | program side of the house. And then George Harvey |

|  | Page 133 |
|---|---|
| 1 | C. TRIPPANY |
| 2 | is the detention AFOD. |
| 3 | Q. When you say the program side of the |
| 4 | house, what does that entail? |
| 5 | A. He more oversees the deportation end of |
| 6 | the house, the in and outs of the detainees coming |
| 7 | in and out. |
| 8 | They've changed things over the years |
| 9 | where it used to be -- they've changed names and |
| 10 | and titles. There's the two AFODs. It's kind of |
| 11 | a one and a two; George Harvey being the main and |
| 12 | Pete being the number two. |
| 13 | Q. And what is the role of the -- I think |
| 14 | you called it the security officer? The chief of |
| 15 | security? |
| 16 | A. Chief of security works directly with AGS |
| 17 | security to ensure that we're meeting all of their |
| 18 | policies and procedures and -- |
| 19 | Q. Who is that? |
| 20 | A. Eric Von Kramer. |
| 21 | Q. If a detainee refuses to follow an order |
| 22 | from an AGS officer, the officer has the authority |
| 23 | to write that detainee up on disciplinary charges, |
| 24 | right? |
| 25 | A. A corrective action, yes. |

| CRAIG TRIPPANY | JOB NO. 646857 |
|---|---|
| JULY 25, 2023 | |

```
                                                    Page 158
 1                     C. TRIPPANY
 2   where an officer restricted access to the recreation
 3   yard because a detainee refused to perform a work
 4   task?
 5            MS. CROW:  Objection to the form.
 6       A.   Again, it has to do with what type of
 7   work task we're referring to.  If it was just
 8   because they trashed the common area, they weren't
 9   picking up after themselves outside of the --
10   trashed the common area where they just all mingle
11   and sit and watch TV and refused to pick it up, of
12   that nature, yes, it would be different, and yes,
13   that would happen.
14       Q.   What about with respect to a detainee who
15   refuses to do a work task as part of the work
16   program?
17       A.   That would not happen.
18       Q.   Are you saying it's against policy for an
19   officer to, say, turn off the TVs or restrict access
20   to the rec yard in response to a detainee who
21   refuses to perform work as part of the work program?
22            MS. CROW:  Objection to the form.
23       A.   I would say yes, if it -- that that would
24   not happen.
25       Q.   So you're saying that would be against
```

```
                                                    Page 159
 1                     C. TRIPPANY
 2   AGS's policies, right?
 3       A.   That would be against AGS and ICE policy.
 4       Q.   So it's not supposed to happen, right?
 5       A.   That is correct.
 6       Q.   Sitting here today, you can't say for
 7   sure that that's never happened, can you?
 8       A.   I would be speculating.
 9       Q.   Are you aware of a federal regulation
10   that requires AGS to report its profits to the
11   government?
12       A.   I am not aware of that, no.
13       Q.   Do you know whether AGS reports its
14   profits to the government?
15       A.   I'm not aware of that.
16       Q.   Okay.
17            MS. FRICK:  Those are all the questions
18       I have for you.  Thank you for time.
19            MS. CROW:  I have just a couple of
20       quick questions.
21   EXAMINATION BY
22   HEATHER F. CROW, ESQ.:
23       Q.   Mr. Trippany, there were a couple of
24   questions today about paint detail, and I wanted to
25   ask you is that a regular job that is always filled
```

```
                                                    Page 160
 1                     C. TRIPPANY
 2   by detainee workers?
 3       A.   That is not.  And as I brought up earlier
 4   in the deposition, if there was an area that
 5   happened to need painting, it was discussed with us
 6   to see if we could have a detail go in and touch it
 7   up.  It would probably be something that occurred
 8   maybe once a year for a couple of years.  It's rare.
 9       Q.   Just to clarify, when you say a couple of
10   years, do you mean that type of project would happen
11   a couple of years or that it would last a couple of
12   years?
13       A.   That project, it wouldn't last.  It might
14   last a couple of weeks at a time and it might have
15   gone on once a year for a couple of years.
16       Q.   Okay.
17            MS. CROW:  That's all I have.
18   EXAMINATION BY
19   ALISON FRICK, ESQ.:
20       Q.   Did anyone else other than detainees do
21   painting in the facility?
22       A.   There are areas, yes, where the
23   maintenance contractor would do some of the
24   painting.
25       Q.   And are those areas that are restricted
```

```
                                                    Page 161
 1                     C. TRIPPANY
 2   to detainee presence?
 3            MS. CROW:  Objection to the form.
 4       A.   It would be an area either where they
 5   were restricted or the detainee was not allowed to
 6   step up on a ladder due to safety.
 7       Q.   So other than areas where detainees are
 8   restricted or not permitted to stand on ladders, is
 9   there anyone else who has performed painting tasks
10   at the facility other than detainees, to your
11   knowledge?
12            MS. CROW:  Objection to the form.
13       A.   Not to my knowledge.
14            MS. FRICK:  That's all I have.
15            MS. CROW:  Can you read back the last
16       question to me that she just asked.
17            (Whereupon, the requested portion of
18       the record was read.)
19            THE WITNESS:  Can I say anything else
20       or no?
21            MS. FRICK:  Is there something else
22       that you want to add?
23       A.   I just recalled situations that were
24   painted beyond, and that was all of the shower
25   areas.  ICE contracted a contract company to come in
```

Page 162

1              C. TRIPPANY
2  and redo and and spray, paint the shower areas
3  several times over the course of this contract.
4      Q.   Anything else that you can recall?
5      A.   Not that I can recall, no.
6      Q.   Okay.
7           MS. FRICK:  That's it.
8           THE COURT REPORTER:  You're ordering a
9  copy, Heather?
10          (Continued on the next page to
11          include the jurat and signature line.)

Page 163

1              C. TRIPPANY
2           MS. CROW:  Electronic please, yes.  And
3  we are going to read and sign.
4           (Whereupon, Ms. Lapointe's account
5           ledger was marked as Plaintiff's Exhibit 46
6           for identification, as of this date.)
7           (Whereupon, the within examination was
8           concluded.  Time Noted, 2:54 P.M.)

STATE OF NEW YORK)
               ) SS.:
COUNTY OF      )

 I have read the foregoing record of my testimony
taken at the time and place noted in the heading
hereof and I do hereby acknowledge it to be a true
and correct transcript of same.

                    _____
                        CRAIG TRIPPANY
Subscribed and sworn to before me
on this _____ day of _____, 2023.
_____
                    NOTARY PUBLIC

Page 164

               I N D E X

EXAMINATION OF      BY              PAGE
Craig Trippany      Alison Frick    3-159,160-161
                    Heather Crow    159-160

               E X H I B I T S

PLAINTIFF'S         DESCRIPTION     PAGE
41                  Handbook        27
42                  Email           89
43                  Rahmee ledger   121
44                  Sign-in sheet   122
45                  Org chart       153
46                  Lapointe ledger 162

Page 165

               C E R T I F I C A T E

     I, Melissa Leonetti, RPR, a Notary
Public of the State of New York, do hereby certify:
     That the testimony in the within proceeding was
held before me at the aforesaid time and place.
That said witness was duly sworn before the
commencement of the testimony, and that the
testimony was taken stenographically by me, then
transcribed under my supervision, and that the
within transcript is a true record of the testimony
of said witness.
        I further certify that I am not related
to any of the parties to this action by blood or
marriage, that I am not interested directly or
indirectly in the matter in controversy, nor am I in
the employ of any of the counsel.
        IN WITNESS WHEREOF, I have hereunto
signed this 29th day of July, 2023.

*Melissa Leonetti*
Melissa Leonetti

```
                                          Page 166
            ERRATA SHEET
            CHANGES IN TESTIMONY
            YEEND , et al. v AKIMA GLOBAL SERVICES, LLC.
            Craig Trippany
            July 25, 2023
       Page  Line  From                   To
  1    _____
  2    _____
  3    _____
  4    _____
  5    _____
  6    _____
  7    _____
  8    _____
  9    _____
 10    _____
 11    _____
 12    _____
 13    _____
 14    _____
 15    _____
 16    _____
 17    _____
 18    _____
 19    _____
 20    _____
 21    _____
 22    _____
 23
 24    SIGNATURE:_____DATE:_____
 25              Craig Trippany
```