### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

DALILA YEEND and            CIVIL ACTION NO.
BOUNNAM PHIMASONE,          1:20-CV-01281
    Plaintiffs,
VERSUS
AKIMA GLOBAL SERVICES, LLC,
a/k/a AGS,
    Defendant.

DEPOSITION OF BOUNNAM PHIMASONE, given in the above-entitled cause, pursuant to the following stipulation, via Zoom videoconferencing, before Sandra P. DiFebbo, Certified Shorthand Reporter, in and for the State of Louisiana, on the 6th day of April, 2023, commencing at 8:30 AM, CST.

### Page 2

APPEARANCES (Via Zoom):

WORKER JUSTICE CENTER OF NEW YORK
BY: OLIVIA POST RICH,
    ATTORNEY AT LAW
    LAURA REVERCOMB,
    ATTORNEY AT LAW
    MAUREEN HUSSAIN,
    ATTORNEY AT LAW
    CRISTINA BRITO,
    ATTORNEY AT LAW
    9 Main Street
    Kingston, New York 12401
    Representing the Plaintiffs

THE KULLMAN FIRM
BY: HEATHER F. CROW,
    ATTORNEY AT LAW -and-
    JESSICA L. MARRERO,
    ATTORNEY AT LAW
    1100 Poydras Street
    Suite 1600
    New Orleans, Louisiana 70163
    Representing the Defendant

LAOTIAN INTERPRETER:
    Rotchana Yandell

Reported By:
    Sandra P. DiFebbo
    Certified Shorthand Reporter
    State of Louisiana

### Page 3

EXAMINATION INDEX

                    Page
BY MS. CROW:           5, 103
BY MS. RICH:           100

EXHIBIT INDEX

                    Page
Exhibit 1        22
Exhibit 2        26
Exhibit 3        28
Exhibit 6        31
Exhibit 7        59
Exhibit 8        82
Exhibit 9        86

### Page 4

STIPULATION

It is stipulated and agreed by and between Counsel for the parties hereto that the deposition of BOUNNAM PHIMASONE is hereby being taken pursuant to the Federal Rules of Civil Procedure for all purposes in accordance with law;

That the formalities of reading and signing are specifically reserved;

That the formalities of sealing, certification, and filing are hereby specifically waived.

That all objections, save those as to the form of the question and responsiveness of the answer are hereby reserved until such time as this deposition or any part thereof is used or sought to be used in evidence.

* * * * *

Sandra P. DiFebbo, Certified Shorthand Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness remotely.

1 (Pages 1 to 4)

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

EXHIBIT 9

Page 5

1   BOUNNAM PHIMASONE, having been duly
2   sworn by the reporter, through the interpreter,
3   who was also duly sworn by the reporter to
4   interpret English to Laotian and Laotian to
5   English, was examined and testified on his oath
6   as follows:
7   EXAMINATION BY MS. CROW:
8       Q.  Good morning, Mr. Phimasone.  My name is
9   Heather Crow, and I am an attorney for Akima Global
10  Services.
11      A.  Good morning.
12      Q.  Have you ever given a deposition before?
13      A.  No.
14      Q.  Do you understand that you are under
15  oath?
16      A.  I understand.
17      Q.  This will just be a question and answer
18  session this morning.  If you don't understand a
19  question that I've asked, please let me know, and
20  I'll reask it or ask it a different way.
21      A.  Yes.
22      Q.  I would ask that you don't guess or
23  estimate or speculate, but if you are, please let
24  me know.
25      A.  Yes.  I will tell the truth.

Page 6

1       Q.  Are you on any medication or have any
2   condition that would affect your ability to give
3   full and truthful answers today?
4       A.  I just had my breakfast this morning, and
5   I took my diabetes medication.
6       Q.  Please let me know today if you need a
7   break as we go.  I'm happy to take a break as long
8   as there is not an open question on the table.
9       A.  Yes.  That will be fine.
10      Q.  And if I say AGS today, do you understand
11  that I'm referring to the defendant in this matter,
12  Akima Global Services?
13      A.  I don't understand.  I don't know what it
14  means.
15      Q.  Do you know who Akima Global Services
16  are?
17          THE INTERPRETER:
18              This is the interpreter for the
19          record, Counselor.  Could you spell the
20          first word, please?
21          MS. CROW:
22              A-K-I-M-A.
23          {INTERPRETER CONVERSES WITH WITNESS}
24          THE WITNESS:
25              No.

Page 7

1   BY MS. CROW:
2       Q.  Are you familiar with -- just a moment.
3       A.  Okay.
4       Q.  Are you familiar with the company that
5   provided the guard services at the Batavia
6   Detention Center?
7           THE INTERPRETER:
8               This is the interpreter, Counsel.
9           Batavia did you say?
10          MS. CROW:
11              B-A-T-A-V-I-A.
12          {INTERPRETER CONVERSES WITH WITNESS}
13          THE WITNESS:
14              No.  I don't know.
15  BY MS. CROW:
16      Q.  Do you understand that ICE, I-C-E,
17  references the United States Immigration and
18  Customs Enforcement?
19      A.  No.  I don't know, because I don't know
20  how to read or write.
21      Q.  If I refer to Batavia, do you understand
22  that that is the federal detention center in
23  Buffalo?
24      A.  Previously, I did not know.  I didn't
25  know until I went in there.

Page 8

1       Q.  If I say Batavia today, do you understand
2   that I'm referring to the federal detention
3   facility in Buffalo?
4       A.  No.  I would not remember.
5           MS. RICH:
6               I think -- (inaudible.)
7           MS. CROW:
8               I'm sorry.
9           THE INTERPRETER:
10              This is the interpreter for the
11          record.  I couldn't hear you, Counsel.
12          MS. RICH:
13              Because I'm on mute, but my client
14          isn't.  I just wanted to know.  I think
15          the detention facility is in Batavia,
16          not Buffalo.
17          THE COURT REPORTER:
18              Say that again.
19          MS. CROW:
20              You are right.  My apologies.
21          THE COURT REPORTER:
22              Where did you say it was?
23          MS. RICH:
24              In Batavia, New York, not Buffalo,
25          New York.  It's not far from Buffalo,

Page 13

```
 1        THE WITNESS:
 2           Yes.  I got married two times.  One
 3        to Laotian and another one to an
 4        American.
 5        THE INTERPRETER:
 6           And the interpreter could not hear
 7        the end of it.
 8        MS. CROW:
 9           I'm sorry.  You couldn't understand
10        the end of his answer?
11        THE INTERPRETER:
12           Yes.
13        MS. CROW:
14           Would you mind asking him to repeat
15        that?
16           {INTERPRETER CONVERSES WITH WITNESS}
17        THE WITNESS:
18           I am still living with the American.
19   BY MS. CROW:
20        Q.  What is the American spouse's name?
21        A.  Jennifer.  Jennifer.
22        Q.  And her last name?
23        A.  (In English) Tran.
24        THE INTERPRETER:
25           Tran?
```

Page 14

```
 1        THE WITNESS:
 2           Yes.
 3   BY MS. CROW:
 4        Q.  What is your address?
 5        A.  1219.
 6        THE INTERPRETER:
 7           Interpreter could not understand the
 8        pronunciation of the street.
 9   BY MS. CROW:
10        Q.  What is the city?
11        A.  In Utica.  In New York.
12        MS. CROW:
13           How long has he lived there?
14           {INTERPRETER CONVERSES WITH WITNESS}
15        THE WITNESS:
16           I've been there for over 20 years.
17   BY MS. CROW:
18        Q.  Anyone live there with you?
19        A.  Right now there is only one uncle.  A
20   friend of mine passed away a week before my father
21   did.
22        Q.  Did the friend live with you?
23        A.  Yes.  My friend and I used to live
24   together for more than 20 years, but my friend just
25   pass away before my father did.
```

Page 15

```
 1        Q.  How long before your father passed away?
 2        A.  My friend pass away a week before, and
 3   then the following day my father passed away.
 4        MS. CROW:
 5           So the friend passed away a week
 6        before his father or a day before?
 7           {INTERPRETER CONVERSES WITH WITNESS}
 8        THE WITNESS:
 9           One day.
10   BY MS. CROW:
11        Q.  Did you go to high school?
12        A.  I attended high school, but I did not
13   complete because I was old, and I could not learn.
14        Q.  Where did you attend high school?
15        A.  I attended at Parker High School.
16        Q.  Where is that?
17        A.  In Utica, New York.
18        Q.  I want to go back really quickly.  The
19   friend that you mentioned that passed away, what
20   was his name?
21        A.  First name was Vieng.
22        THE INTERPRETER:
23           This is the interpreter's spelling
24        for the record.  V, as Victor, I, E as
25        Edward, N, as Nancy, G, as George, last
```

Page 16

```
 1        name Kesone.  This is the interpreter's
 2        spelling.  K, as Karen, E, as Edward,
 3        S, as Sam, O, N, as Nancy, E, as
 4        Edward.
 5   BY MS. CROW:
 6        Q.  Vieng Kesone?
 7        A.  Correct.
 8        Q.  Are you employed?
 9        A.  No.
10        Q.  Have you been employed since you left the
11   Batavia facility?
12        A.  No.
13        Q.  Have you ever been involved in a prior
14   lawsuit?
15        A.  No.
16        Q.  Do you hold U. S. Citizenship?
17        MS. RICH:
18           Objection.
19        THE WITNESS:
20           No.
21           {COURT REPORTER REQUESTS CLARIFICATION}
22        MS. RICH:
23           Let me take one break so I can move
24        my laptop closer for the client.
25        THE INTERPRETER:
```

4 (Pages 13 to 16)

Page 17

1    This is the interpreter. The
2    interpreter is going to repeat the last
3    sentence from the deponent before the
4    court reporter started to say
5    something.
6        THE WITNESS:
7           May I take a bathroom break?
8        MS. CROW:
9           Yes.
10          {BRIEF RECESS}
11       MS. RICH:
12          I want to make sure the record
13       reflects the objections I made before.
14       I objected to those questions about
15       Batavia being located in Buffalo. That
16       was because it is in Batavia. It's not
17       a big deal, and I objected to questions
18       about his citizenship status, and I
19       objected to the question of how many
20       times he was married.  Laura, do you
21       have anything else?
22       MS. REVERCOMB:
23          No.  That's it.
24       MS. CROW:
25          I think we can only take objections

Page 18

1    from one attorney.
2        {INTERPRETER CONVERSES WITH WITNESS}
3        THE WITNESS:
4           Correct.
5    BY MS. CROW:
6        Q.  Mr. Phimasone, how many times have you
7    been detained at the Batavia facility?
8        A.  Two times.
9        Q.  When was the first time?
10       A.  I don't remember.  I do not remember the
11   date or the month.
12       Q.  Does 2009 to 2011 sound familiar?
13       A.  Yes, correct.
14       Q.  Were you detained again beginning in
15   2018?
16       A.  Correct.
17       Q.  Any history of drug or alcohol abuse?
18       MS. RICH:
19          Objection. You may answer.
20       THE WITNESS:
21          I used to take drug when I was
22       younger.  I was a drug addict.
23   BY MS. CROW:
24       Q.  Do you still use those drugs?
25       MS. RICH:

Page 19

1          Objection.  You may answer.
2       THE WITNESS:
3          I stop long time ago.
4    BY MS. CROW:
5        Q.  Were you using any illegal drugs while
6    you were inside of the detention facility at
7    Batavia?
8       MS. RICH:
9          Objection.
10      THE WITNESS:
11         No.
12   BY MS. CROW:
13       Q.  Have you ever been convicted of a crime?
14      MS. RICH:
15         Objection.
16      THE WITNESS:
17         Yes.  When I was younger, I used to
18      have conviction.
19   BY MS. CROW:
20       Q.  What was that for?
21       A.  I took drugs.
22       Q.  Do you remember the date?
23       A.  No.  It has been too many years.
24       Q.  Do you remember where that occurred?
25       A.  It happened in Utica, New York.

Page 20

1        Q.  Did you spend any time incarcerated
2    because of that?
3        MS. RICH:
4           Objection.
5        THE WITNESS:
6           Yes.  I was arrested, and I was in
7        jail.
8    BY MS. CROW:
9        Q.  Was that for criminal possession of a
10   controlled substance?
11       MS. RICH:
12          Objection.
13       THE WITNESS:
14          Yes.  I was a drug addict with my
15       friends.  I did not.
16   BY MS. CROW:
17       Q.  Do you know if that's a felony?
18       MS. RICH:
19          Objection.
20       THE WITNESS:
21          I did not know.  I only knew that I
22       took drugs, and I got arrested.  That's
23       it.
24   BY MS. CROW:
25       Q.  For this next question, I don't want to

5 (Pages 17 to 20)

Page 21

1  know any of the information discussed with your
2  attorneys.
3       A.  Yes.
4       Q.  What did you do to prepare for this
5  deposition, if anything?
6       A.  After I took my meal, I slept well, and I
7  was just thinking about how much suffering I had
8  when I was inside there.
9       Q.  Did you meet with your counsel to prepare
10 for this?
11      A.  No.  I just tell you the truth, the fact,
12 because I have my experience.
13      Q.  Do you have any recorded statements or
14 conversations with anyone related to your
15 detention?
16      A.  No.
17      Q.  You understood that we had your
18 deposition scheduled for two weeks ago on April the
19 23rd?
20      A.  I understood, but I was ill.
21      Q.  Was that deposition canceled at your
22 request?
23      A.  Yes.  I could not attend.  I was very
24 ill.  I took medication.
25      Q.  When your detention at the Batavia

Page 22

1  facility began, were you transferred to Batavia
2  from the New York Department of Corrections?
3       A.  Correct.
4       Q.  I want to show you a document.  Please
5  let me know if you need to go up or down or to Zoom
6  in.  I'm going to ask you a question about it once
7  I have a chance to show it to you.
8       A.  Yes.
9       Q.  Do you see this document?
10      A.  Yes, yes.
11    MS. RICH:
12       Counsel, can you state the Bates
13       stamps for the record?
14    MS. CROW:
15       Yes.  It is Bates stamped PL-57
16       through 75.
17 BY MS. CROW:
18      Q.  Have you ever seen this document before?
19      A.  I cannot remember.
20      Q.  I want to look at this page right here.
21 Can you see my cursor moving?
22      A.  I only see letters, but I cannot see them
23 clearly, because they are too small.
24      Q.  Is that better?
25      A.  Yes, yes.  I can see better.

Page 23

1       Q.  Are you able to read that section right
2  there where it says, "Laotian?"
3       A.  No.  I don't know how to read.
4       Q.  When you were in detention at Batavia,
5  you understood that you could participate in the
6  volunteer work program?
7     MS. RICH:
8        Objection.
9     THE WITNESS:
10       No.  Nobody had looked for me.
11 BY MS. CROW:
12      Q.  I don't understand the answer.
13      A.  They were looking for me.  That's how I
14 got the job.
15    MS. CROW:
16       Someone offered him the job?
17       {INTERPRETER CONVERSES WITH WITNESS}
18    THE WITNESS:
19       Yes.  The police in there pull me to
20    take this job.
21 BY MS. CROW:
22      Q.  What job were you assigned to do?
23      A.  They told me to do buffing.
24      Q.  Did you understand that you would receive
25 $1 per day as an incentive payment for each day

Page 24

1  that you participated in the work program?
2     MS. RICH:
3        Objection.
4     THE WITNESS:
5        When they gave me the job, they did
6     not pay -- they did not tell me how
7     much.  I was only given a dollar.  Then,
8     on the following day, they asked me to
9     sign a document, and I asked other
10    people how come I did not get paid
11    much, and they told me they only pay a
12    dollar.
13       {COURT REPORTER REQUESTS CLARIFICATION}
14 BY MS. CROW:
15      Q.  Did you understand that everyone in the
16 facility was being paid $1 per day?
17    MS. RICH:
18       Objection.
19    MS. CROW:
20       I'll reask that question.
21 BY MS. CROW:
22      Q.  Did you understand that all of the
23 detainees who were working were being paid $1 per
24 day?
25      A.  No.  I did not know.

6 (Pages 21 to 24)

```
                                                    Page 25
 1      Q.  Those payments of $1 per day for working
 2   were put into your commissary account?
 3      A.  Correct.
 4      Q.  Detainees were prohibited from possessing
 5   cash while in detention; is that correct?
 6      A.  Correct.
 7      Q.  When you were released from the facility,
 8   any funds in your account were cashed out and
 9   provided back to you?
10      A.  First they printed out a check, and then
11   they asked me to sign.  Then they convert it into
12   cash.
13      Q.  So all of the cash that remained in your
14   account was given to you?
15      A.  Correct.
16      Q.  Did you understand while you were in
17   detention that you could submit complaints or
18   grievances about issues that you were having?
19          MS. RICH:
20             Objection.
21          THE WITNESS:
22             I told you I did not -- I could not,
23             because I do not know how to read or
24             write.
25   BY MS. CROW:
```

```
                                                    Page 26
 1      Q.  Could you have someone do that on your
 2   behalf?
 3      A.  No.  The inmates in there could not help
 4   me.  Sometimes I have to hire them.
 5      Q.  I want to show you some additional
 6   documents.
 7      A.  Yes.
 8      Q.  These are Bates Number PL-18 through 21.
 9   Can you see that?
10      A.  Yes.
11      Q.  First, did you write your name there or
12   did someone else write that?
13      A.  No.  Somebody else wrote for me, because
14   I don't know how to write.
15      Q.  This appears to be a detainee request to
16   the facility on December 23rd, 2018.  It reads, "I
17   would like permission to receive sneakers from my
18   family through East Bay."
19      A.  Correct.  Somebody else wrote for me.
20      Q.  So you made a request to order sneakers
21   from an outside vendor?
22      A.  Yes.  I saw other people wearing the
23   shoes, so I asked them, and they helped me.
24      Q.  Do you remember who wrote this for you?
25      A.  No.  It has been several years.  I have
```

```
                                                    Page 27
 1   been out for several years.  I do not remember who
 2   it was.
 3      Q.  Was this approved?  In other words, did
 4   you get the sneakers?
 5      A.  No.
 6      Q.  This next page, which is marked PL-19,
 7   this appears to be a request on April the 26th,
 8   2019, to put pictures in your property and to
 9   receive new pictures.
10      A.  Correct.
11      Q.  Do you remember making that request?
12      A.  I was the requester, but somebody else
13   wrote for me.
14      Q.  Was that request approved?
15      A.  They came to check me.  They claim that I
16   had too many pictures.  They took them away then
17   they gave me knew ones.
18      Q.  Was there a limit on how many pictures
19   you could have at one time?
20      A.  I don't remember.  They told me I had too
21   many pictures.  I had to sign over, give them away,
22   and then they gave me new one.
23      Q.  This third page marked PL-20, this
24   appears to be a request dated April 29th, 2019.  It
25   indicates you have placed 25 pictures in your
```

```
                                                    Page 28
 1   property and that the processing officer, Ryan,
 2   approved?
 3      A.  Correct.
 4      Q.  And you requested six additional pictures
 5   to be provided to you; is that right?
 6      A.  Correct.
 7      Q.  And they gave you those pictures?
 8      A.  Yes, they did.
 9      Q.  You have one more marked PL-21.  This
10   appears to be a request dated, I believe, January
11   the 9th, and you requested Buddhist beads?
12      A.  Correct.
13      Q.  Was that request approved?
14      A.  No.
15      Q.  Did you ever get Buddhist beads while you
16   were in detention?
17      A.  No.
18      Q.  I want to show you another document.
19      A.  Yes.
20      Q.  This will be Exhibit 3.  The Bates
21   numbers are PL-22 through 24.  Do you recognize
22   these?
23      A.  No, I don't, really.
24      Q.  Did you provide these documents to your
25   counsel?
```

Page 29

1   A. I cannot remember.
2   Q. While you were in detention, did you have
3   friends or family deposit money into your account?
4   A. My father and my younger sibling. My
5   younger sibling went to visit, and my father send
6   me money.
7   Q. When you were transferred from the New
8   York Department of Corrections, were the funds that
9   you had in your account there transferred to your
10  account at Batavia?
11  A. Yes. They transfer my money by putting a
12  check in an envelope.
13  Q. That went into your account at Batavia?
14  A. Correct.
15  Q. You could use that money to buy things
16  from the commissary or pay for phone calls?
17  A. I paid for my phone calls and also bought
18  food in there.
19  Q. From the commissary?
20  A. Yes. I bought food from in there, and if
21  I want to eat food that was from outside, then they
22  had to order it for me.
23  Q. Throughout your detention, you generally
24  had between two and $3,000 in your account?
25  A. Yes.

Page 30

1   Q. Did the commissary have a variety of
2   items for sale that you could purchase?
3   A. Correct, yes. Just like candies or other
4   snacks.
5   Q. Would you place that order on a tablet?
6   A. Yes. Other people ordered for me,
7   because I don't know how to do it. So whatever I
8   wanted, I pointed, and they did it for me.
9   Q. The tablet, did it have pictures of the
10  items?
11  A. Yes.
12  Q. And those items would be delivered to
13  your housing unit?
14  A. Correct.
15  Q. You could buy snacks and other food
16  items?
17  A. Correct.
18  Q. You could also buy some limited clothing
19  items and other sneakers?
20  A. Merchandise that was in the tablet or in
21  the picture.
22  Q. Could you buy a radio or playing cards?
23  A. Yes.
24  Q. Did you ever have a need to purchase
25  clothing from the commissary?

Page 31

1   A. I only bought a radio.
2   Q. Did you have sufficient funds to purchase
3   snacks or clothing that you might have needed while
4   you were inside Batavia?
5   A. I did, but if I needed something, I would
6   call my younger sibling, my parents, or my wife.
7   Q. Did I understand correctly that you never
8   needed to purchase clothing?
9   A. I was issued some clothing.
10  Q. You didn't need to purchase additional
11  clothing?
12  A. No. I only had to wear prisoner's
13  uniform.
14  Q. I'm going to show you another document.
15  A. Yes.
16  Q. I'll mark this as Exhibit 6. It is Bates
17  Number 275 to 303. Give me just a moment to scroll
18  through this. I'm going to ask if you recognize
19  this.
20  A. After you show me the picture, I will
21  decide whether I recognize it or not.
22  Q. Okay. I understand that you can't read
23  it. I'm just curious if you recognize the
24  document.
25  A. I do not recognize the letters that you

Page 32

1   are showing me.
2   Q. Have you ever seen this cover sheet?
3   A. You mean the picture with the flag?
4       MS. CROW:
5         Well, this was the detention
6         facility handbook. I'm just wondering
7         if he recognizes the handbook.
8         {INTERPRETER CONVERSES WITH WITNESS}
9       THE WITNESS:
10        Yes. I recognize it now. When I
11        entered, I was given this handbook.
12  BY MS. CROW:
13  Q. Okay. Were you able to ask someone to
14  read it to you or translate it to you?
15  A. Ever since I went in there, I was given
16  this handbook. I tried to ask people to help me,
17  but nobody did, because I don't know them. They
18  don't know me.
19  Q. Who did you ask for help?
20  A. Other inmates.
21  Q. Did you ever ask the guard for an
22  interpreter?
23  A. No.
24  Q. When you were placed into the detention,
25  you were provided with some clothing that included

8 (Pages 29 to 32)

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

EXHIBIT 9

Page 33

1  two sets of the uniform?
2      A.  Yes.  The inmate clothing.  They are
3  orange or yellow.
4      Q.  What color was yours?
5      A.  Orange.
6      Q.  Did some people also wear red or blue?
7      A.  Yes.  Other locations, but the place
8  where I was, people wearing yellow, and the other
9  location they wore red.
10      Q.  Did anyone wear blue that you remember?
11      A.  Other places, not where I was.  My unit
12  only had people wearing orange.
13      Q.  Did the uniform consist of long pants, a
14  shirt, and shoes?
15      A.  There were long pant, short, a white
16  shirt and --
17      Q.  I'm sorry.  You said long pants, shorts?
18          THE INTERPRETER:
19             Long pants, shorts, white shirt, and
20  --
21          THE WITNESS (In English):
22             And the orange shirt.
23          THE INTERPRETER:
24             And orange shirt.
25  BY MS. CROW:

Page 34

1      Q.  Did the color of your uniform depend on
2  your classification?
3          MS. RICH:
4             Objection.
5          THE WITNESS:
6             I don't know.
7  BY MS. CROW:
8      Q.  Were you also issued sets of underwear,
9  T-shirts, and socks?
10      A.  Yes.
11      Q.  Were you issued towels?
12      A.  Yes.
13      Q.  Did you receive a pair of slip-on
14  sneakers, and, also, shower shoes?
15      A.  Yes.
16      Q.  Were you issued a jacket?
17      A.  Yes.  One jacket.
18      Q.  Were you issued hygiene items like a
19  toothbrush, toothpaste, and a comb?
20      A.  Yes.  I was given toothpaste, toothbrush,
21  and a comb.
22      Q.  Was there soap and shampoo available from
23  dispensers?
24      A.  Yes, but tiny one.
25          MS. CROW:

Page 35

1             So did he receive small bottles of
2  shampoo and soap?
3             {INTERPRETER CONVERSES WITH WITNESS}
4          THE WITNESS:
5             Yes.
6  BY MS. CROW:
7      Q.  Could you also use the tablet for sending
8  and receiving electronic messages?
9      A.  No.
10      Q.  Did you use the tablets for video chat?
11      A.  No.  I don't know how to use it.
12      Q.  Were there religious services available,
13  if you wanted to participate?
14      A.  Yes, but they had to go to church.
15      Q.  Was the housing unit one big room with
16  bunk beds in it?
17      A.  Yes.  There were large room, parlor room,
18  with bunk beds.  Beds piling on top of each other.
19      Q.  Were you assigned a specific bunk?
20      A.  I was assigned to be on the top.
21      Q.  Were you provided with sheets, a pillow,
22  and blanket?
23      A.  Yes, correct.
24      Q.  How many blankets did you get?
25      A.  Only one.

Page 36

1      Q.  Was there a barber service inside Batavia
2  so that you could get a haircut?
3      A.  Yes, but I had to pay.
4      Q.  Was there a library available for
5  detainees' usage?
6      A.  Yes, but I didn't go in.
7      Q.  Was there also a law library?
8      A.  Yes.
9      Q.  Was there an indoor recreation area?
10      A.  Yes, only for weightlifting.
11      Q.  Did you ever use that facility?
12      A.  Yes, I did.
13      Q.  Was there a day room or a common area
14  where detainees could watch television or play
15  cards?
16      A.  The place where I was, the place for
17  weightlifting and watching TV were together.
18      Q.  Were there telephones there as well for
19  usage?
20      A.  Yes.  There were five telephones on the
21  wall.
22      Q.  Could you use those to call your family
23  or friends?
24      A.  Correct.
25      Q.  You also were permitted to have visitors?

Page 57

```
 1        I think maybe because it was already
 2   rotten there may be some, but I don't
 3   know.
 4   BY MS. CROW:
 5       Q.  Did you see any?
 6       A.  No, no.  After I open, and it smell bad,
 7   so I threw it out.
 8       Q.  You didn't eat it?
 9       A.  No, because it happened two or three
10   times.  It smell bad.
11       Q.  You mentioned turkey.  Was that the only
12   thing that you had with this problem?
13          MS. RICH:
14             Objection.
15          THE WITNESS:
16             Sometime it looks like chicken, and
17          the majority was turkey.
18   BY MS. CROW:
19       Q.  Was the chicken or the turkey raw in the
20   middle or was it cooked frozen and not warmed
21   thoroughly?
22          MS. RICH:
23             Objection.
24          THE WITNESS:
25             Both.
```

Page 58

```
 1   BY MS. CROW:
 2       Q.  Were you ever served sour or curdled
 3   milk?
 4          THE INTERPRETER:
 5             This is the interpreter.  Could you
 6          repeat that again?
 7          MS. CROW:
 8             I'm sorry.
 9   BY MS. CROW:
10       Q.  Were you ever served sour or curdled
11   milk?
12       A.  Yes, because I notice the date, the
13   number that it expired, like a week or two week,
14   and it was still served to me.
15       Q.  Does that mean you can read numbers?
16       A.  Yes.  I saw the date.  I open, and it is
17   kind of rotten.  It smell bad.
18       Q.  Did you report that to a guard?
19       A.  No.  A lot of other inmates threw them
20   out, because some of them got the good one, some of
21   them got the bad one.
22       Q.  So the same day there were some that were
23   good and some that had gone bad?
24          MS. RICH:
25             Objection.
```

Page 59

```
 1          THE WITNESS:
 2             Yes.
 3   BY MS. CROW:
 4       Q.  I'd like to show you another document.
 5       A.  Yes.
 6       Q.  We will mark this as Exhibit 7.  Can you
 7   see that?
 8       A.  Yes, I can.
 9       Q.  Give me a moment to scroll down.
10       A.  Yes.
11       Q.  This is marked D-306.
12       A.  Yes.
13       Q.  This appears to be a Detainee Voluntary
14   Work Program Agreement.  Is that your signature?
15       A.  Yes.  The one below it.  That was my
16   signature.
17       Q.  This one?
18       A.  Yes.
19       Q.  I'm indicating where it says, Detainee's
20   Signature.  I am -- also, I see an ID number with a
21   series of numbers.  Do you recall if that was your
22   ID number?
23       A.  Yes.  That's correct.
24       Q.  Do you recall signing a Detainee
25   Voluntary Work Program Agreement?
```

Page 60

```
 1       A.  They asked me, and I sign the form, but I
 2   don't know the content.  I just know that I got to
 3   go to work.
 4       Q.  Did you express interest in working?
 5          MS. RICH:
 6             Objection.
 7          THE WITNESS:
 8             The guards asked me.
 9   BY MS. CROW:
10       Q.  How did they ask you if you didn't
11   understand English?
12          MS. RICH:
13             Objection.
14          THE WITNESS:
15             Because there were several other
16          inmates who used to work there, but
17          they were deported back to their
18          countries.
19   BY MS. CROW:
20       Q.  So you took someone's spot after they
21   left?
22       A.  Yes, unless I accept this kind of job, I
23   would not be able to use telephone.  I would not be
24   able to get more food, and I will have to just stay
25   in my bed.
```

15 (Pages 57 to 60)

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

EXHIBIT 9

Page 105

```
 1                CERTIFICATE
 2
 3           This certification is valid only for
     a transcript accompanied by my original signature
 4   and original required seal on this page.
 5           I, SANDRA P. DIFEBBO, Certified
     Court Reporter, in and for the State of Louisiana,
 6   as the officer before whom this testimony was
     taken, do hereby certify that BOUNNAM PHIMASONE,
 7   after having been duly sworn by me, through the
     interpreter, upon authority of R.S. 37:2554, did
 8   testify as hereinbefore set forth in the foregoing
     104 pages;
 9
             That the testimony was reported by
10   me in stenotype, was prepared and transcribed by me
     or under my personal direction and supervision, and
11   is a true and correct transcript to the best of my
     ability and understanding;
12
             That the transcript has been
13   prepared in compliance with transcript format
     guidelines required by statute or by rules of the
14   board, that I have acted in compliance with the
     prohibition on contractual relationships as defined
15   by Louisiana Code of Civil Procedure Article 1434
     and in rules and advisory opinions of the board;
16
             That I am not related to Counsel or
17   to the parties herein, nor am I otherwise
     interested in the outcome of this matter.
18
19
20
21
         _Sandra P. DiFebbo_
22       Sandra P. DiFebbo,
         Certified Shorthand Reporter
23       #82009
24       Date: 4/18/23
25
```

27 (Page 105)

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

EXHIBIT 9

8-3

**U.S. Department of Homeland Security**
**Immigration & Customs Enforcement**

**Buffalo Federal Detention Facility**
**Batavia, New York**

## DETAINEE VOLUNTARY WORK PROGRAM AGREEMENT

Detainees that participate in the volunteer work program will not be permitted to work in excess of 8 hours daily or 40 hours weekly.

Detainees that participate in the volunteer work program are required to work according to an assigned work schedule and to participate in all work-related training. Unexcused absence from work or unsatisfactory work performance could result in removal from the voluntary work program. Detainees must adhere to all safety regulations and to all medical and grooming standards associated with the work assignment. Compensation shall be $1.00 per day.

I, __PHIMASONE, Bounham__ ID# __023 886 166__, from Housing Unit __B3-868__,
   (Detainee Name)

have read, understand, and agree to comply with the above. I have received and understand relevant safety training regarding my work assignment.

__Custodial__
(Work Assignment)

__Phimasone__ (signature)
(Detainee Signature)

__2-9-11__
(Date)

__[signature]__
(Department Manager Signature)

Original: Department Manager    Blue: Detainee         BFDF-0016
Yellow: Detention File           Pink: COTR            Revised 01/04

D-000306

EXHIBIT 9