## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

DALILA YEEND and
BOUNNAM PHIMASONE,
    Plaintiffs
          CIVIL ACTION NO.1:20-cv-01281
VERSUS
AKIMA GLOBAL SERVICES, LC,
A/k/a AGS,
    Defendant

    DEPOSITION OF DALILA YEEND, given via Zoom Videoconferencing in the above-entitled cause, pursuant to the following stipulation, before Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, commencing at 8:35 o'clock a.m., on Wednesday, the 22nd day of March, 2023.

## Page 2

```
          I N D E X
                            Page
Caption                       1
Appearances                   3
Agreement of Counsel          4
Examination
   MS. CROW                   6
   MS. HUSSAIN              136
Reporter's Certificate      140
```

## Page 3

APPEARANCES (Via Zoom Videoconferencing):

For the Plaintiff:

WORKER JUSTICE CENTER OF NEW YORK
Attorneys at Law
BY:  MAUREEN HUSSAIN, ESQ.
     LAURA REVERCOMB, ESQ.
     OLIVIA POST RICH, ESQ.
9 Main Street
Kingston, New York   12401

For the Defendant:
THE KULLMAN FIRM
A Professional Law Corporation
BY:  HEATHER F. CROW, ESQ.
     JESSICA L. MARRERO, ESQ.
1600 Energy Centre
1100 Poydras Street
New Orleans, Louisiana   70163

Also Present:  ANNE DONOHUE, ESQ.
              IAN BOLDEN, ESQ.

Reported By:  Raynel E. Schule
            Certified Shorthand Reporter
            State of Louisiana

## Page 4

       S T I P U L A T I O N

    It is stipulated and agreed by and among Counsel for the parties hereto that the deposition of DALILA YEEND is hereby being taken via Zoom Videoconferencing pursuant to the Federal Rules of Civil Procedure for all purposes in accordance with law;

    That the formalities of reading and signing are not specifically waived;

    That the formalities of sealing, certification, and filing are hereby specifically waived.

    That all objections, save those as to the form of the question and responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof is used or sought to be used in evidence.
              * * * * *

    Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

Page 5

```
 1            PROCEEDINGS
 2            THE COURT REPORTER:
 3            Would counsel please identify
 4       themselves and their affiliations
 5       and also stipulate that by agreement
 6       of all parties this deposition is
 7       being taken via videoconferencing,
 8       and there is no objection to the
 9       witness being sworn in remotely.
10            MS. HUSSAIN:
11            Good morning, Maureen Hussain,
12       counsel for the Plaintiffs from the
13       Worker Justice Center of New York.
14       With me is also Cristina Brito for
15       the Worker Justice Center of New
16       York.  We have no objection to the
17       witness being sworn in remotely.
18            MS. CROW:
19            Heather Crow with The Kullman
20       Firm on behalf of Akima Global
21       Services.  We have no objection.
22       DALILA YEEND, having been first duly
23  sworn by Raynel E. Schule, was examined and
24  testified on her oath as follows:
25            EXAMINATION
```

Page 6

```
 1  BY MS. CROW:
 2  Q.  Good morning.  My name is Heather Crow, and
 3       I'm here to take your deposition this
 4       morning.  Have you ever given a deposition
 5       before?
 6  A.  No, I have not.
 7  Q.  Okay.  I'm just going to go through a few
 8       sort of basics for that.  First, would you
 9       tell me your full name.
10  A.  Dalila Yeend.
11  Q.  All right, and Ms. Yeend, do you understand
12       that you are under oath?
13  A.  Yes, I do.
14  Q.  All right, and this is just a
15       question-and-answer session.  If you don't
16       understand a question, please let me know.
17       I'm happy to -- to rephrase it or to repeat
18       it.  Otherwise, I'll assume that you
19       understand.  Is that fair?
20  A.  Yes.
21  Q.  And I'll also ask you to verbally answer
22       yes or no.  You're doing a great job, but I
23       remind people that because sometimes you
24       want to just nod your head or shake your
25       head, and that makes it more difficult for
```

Page 7

```
 1       actually the court reporter to get a clean
 2       record.  Also I'll ask you to not guess or
 3       not speculate, but if you do, please let me
 4       know that that's what you're doing.
 5  A.  Okay.
 6  Q.  Are you on any medication or medical
 7       treatment that would affect your ability to
 8       give full and truthful answers today?
 9  A.  No.  I'm on prenatal vitamins at the
10       moment, but that's it.
11  Q.  Okay.  Let me know if you need a break.  I
12       don't think this is going to be any sort of
13       marathon today, but typically I try to take
14       a break every hour or so.
15  A.  Okay.
16  Q.  If you need a break before that, not a
17       problem, just let me know.  As long as
18       there's not a question on the table, we can
19       take a break at any point.
20  A.  Okay.  Thank you.
21  Q.  If I say AGS today, do you understand that
22       that means Akima Global Services?
23  A.  Yes, I do.
24  Q.  Okay.  I'll show you a series of documents
25       today.  Some of that will simply be to
```

Page 8

```
 1       identify for the record.  Some of them I
 2       may ask you questions about.  I want you to
 3       take your time so that you can look at the
 4       whole document as much time as you need
 5       before you answer any questions, and if you
 6       need me to zoom in or zoom out or scroll up
 7       or down, please let me know, and I'm happy
 8       to do that.
 9  A.  Okay.
10  Q.  Okay.  All right, and one last thing, I'll
11       try really hard not to talk over you.
12       Sometimes that happens, especially with
13       Zoom, and I'll ask that you do the same
14       only again so that our court reporter gets
15       a clean record.
16  A.  All right.
17  Q.  All right.  So I want to show you what I
18       want to screen share with you for a moment.
19       Hang on one second.  I'm having technical
20       difficulties with my mouse.  There we go.
21       Can you see that?
22  A.  I can now.
23  Q.  Okay.  All right, and I'll just scroll
24       through this.  I just want you to identify
25       this if you can, but this is the lawsuit
```

**Page 9**

1    that was filed in -- I'm sorry -- the
2    pleading that was filed in this lawsuit.
3    Have you seen this Complaint before?
4    Sorry. Tell me if you need me to scroll up
5    or down.
6  A. Yeah. I'm -- I'm not sure.
7  Q. Okay. When this lawsuit was filed, did you
8    have a chance to review it before it was
9    filed?
10 A. I have reviewed a lot of paperwork in
11   regards to the lawsuit.
12 Q. Do you know if you reviewed the lawsuit
13   itself, the Complaint that was filed with
14   the Court?
15 A. This directly, I'm unsure.
16 Q. All right, and what is your date of birth?
17 A. 9-9-82, September 8th, 1982.
18 Q. Okay, and what was your country of birth?
19 A. Australia.
20 Q. And English is your first language?
21 A. Yes, it is.
22 Q. Okay. Are you married?
23 A. Yes, I am.
24 Q. Okay. Do you have children?
25 A. Yes, I do.

**Page 10**

1  Q. How many children do you have?
2  A. I have three.
3  Q. Okay, and are all of your children and your
4    spouse in the U.S.?
5  A. Yes.
6  Q. And what's your address?
7  A. 1244 2nd Street, Rensselaer, New York,
8    12144.
9  Q. And how long have you lived there?
10 A. It will be three years in October.
11 Q. Okay. Any history of drug or alcohol
12   abuse?
13 A. No, none.
14 Q. What about your education, did you graduate
15   from high school?
16 A. I have a GED that I received once I moved
17   to the United States.
18 Q. And do you have any schooling beyond high
19   school, technical school, or college?
20 A. Just some, like, certificates that I got at
21   Young Adult Learning Academy in New York
22   City.
23 Q. Okay, and what did those specialize in?
24 A. Exploring early childhood.
25 Q. Okay. Are you currently employed?

**Page 11**

1  A. Not currently, no.
2  Q. Have you been involved in any prior
3    litigation, any other lawsuits or
4    administrative complaints?
5  A. No.
6  Q. Have you ever filed for bankruptcy?
7  A. No, I have not.
8  Q. And are you an U.S. Citizen?
9         MS. HUSSAIN:
10            Objection.
11        MS. CROW:
12            Are you objecting to the form?
13        MS. HUSSAIN:
14            We're objecting that questions
15   about immigration status are outside
16   the scope of discovery in this case.
17   They're not relevant to any matters
18   in dispute and could potentially
19   confuse the real issues in the case.
20        MS. CROW:
21            Okay. Are you instructing her
22   not to answer this question?
23        MS. HUSSAIN:
24            No.
25 BY MS. CROW:

**Page 12**

1  Q. Ms. Yeend, are you an U.S. Citizen?
2  A. I have my green card.
3  Q. Okay. All right. Now, today we're going
4    to be talking about the time that you were
5    in detention in 2018 at the Buffalo Federal
6    Detention Facility. Were you placed in
7    detention at any other time besides that
8    particular period of time?
9  A. No, I was not.
10 Q. Okay. Have you ever been convicted of a
11   crime?
12 A. No, I have not.
13 Q. What did you do to prepare for your
14   deposition today?
15 A. I'm sorry. I didn't hear what you said.
16 Q. What did you do to prepare for your
17   deposition today? And I am not asking
18   about the conversations with your counsel.
19 A. Well, I mean, I think I just remembered a
20   lot of my time that was spent in Batavia.
21 Q. I'm -- I'm glad you said that. If I refer
22   to the Buffalo facility or the Buffalo
23   Federal Detention Facility or Batavia,
24   that's all the same thing for purposes of
25   our conversation today.

13

1  A. Yes.
2  Q. Does that -- does that work for you?
3  A. Yes.
4  Q. Okay. All right. Did you have any
5     conversations about your deposition with
6     anyone besides your attorney?
7  A. No, I did not.
8  Q. Do you have any recorded conversations or
9     written statements from any current or
10    former AGS or ICE employees?
11 A. No.
12        MS. HUSSAIN:
13        Objection to form.
14 BY MS. CROW:
15 Q. Do you have any recorded or written
16    statements from any current or former
17    detainees at Batavia?
18        MS. HUSSAIN:
19        Objection to form.
20 BY MS. CROW:
21 Q. You can answer.
22 A. No, I do not. I know that when I left the
23    facility, I received two phone calls from
24    detainees that were in Batavia but they are
25    recorded I believe by the facility and so

14

1     it wasn't anything that was in regards to
2     this case I guess or this deposition.
3  Q. Okay. All right. So you're saying that
4     someone called you from within the facility
5     and ICE recorded it?
6  A. I believe the facility records the
7     conversations, not ICE, but that's just to
8     my knowledge of using the phone systems
9     that when you call out from the facility,
10    it says that they're recording the phone
11    conversation.
12 Q. Okay. All right. So you don't -- you're
13    not sure who records it?
14 A. No. I -- I believe it's the -- the company
15    that -- that the facility uses to use their
16    phone systems.
17 Q. Now, you were at Batavia beginning in July
18    of 2018. Is that correct?
19 A. Yes.
20 Q. Do you happen to recall the --
21 A. Actually, I was there June.
22 Q. June, okay. Do you remember the date?
23 A. I was detained on May 27th, and I got to
24    Batavia on June 2nd.
25 Q. All right. What's the reason that you were

15

1     detained?
2  A. Originally?
3  Q. Yes. I'm sorry. Go ahead.
4  A. I believe it was -- I believe my attorney
5     objected to the question.
6        MS. HUSSAIN:
7        That's okay, Ms. Yeend. You can
8     -- you can answer the question.
9        THE WITNESS:
10       Originally I was pulled over for
11    doing a rolling stop through a stop
12    sign in Troy, New York, and then I
13    was taken to Troy Precinct, Troy,
14    New York Precinct and went in front
15    of a Judge -- stayed there over
16    night, went in front of a Judge in
17    the morning, and the Judge released
18    me on my own recognizance, and I
19    believe then ICE issued a warrant --
20    a warrant for my arrest for
21    violating an Order of Supervision I
22    believe, and then they came and got
23    me after I was released on my own
24    recognizance.
25 BY MS. CROW:

16

1  Q. ICE came?
2  A. Yes.
3  Q. Okay, and did you go straight to Batavia at
4     that point?
5  A. No, I did not.
6  Q. Where did you go first?
7  A. I was taken to the Homeland Security Office
8     in Latham, New York.
9  Q. I'm sorry. Where in New York?
10 A. Latham, New York.
11 Q. All right, and that's -- you went from
12    there to Batavia?
13 A. No.
14 Q. Where did you go next?
15 A. I was taken there and held in Latham for an
16    entire day, and then I was transported by
17    ICE Officers to Albany County Jail.
18 Q. Okay, and how long were you there?
19 A. Three days.
20 Q. And from Albany Jail, where did you go?
21 A. I was transported from Albany County Jail
22    back to the Latham Office of Homeland
23    Security, and then I was transported from
24    the Latham Office to Batavia to the
25    detention facility.

**17**

1  Q. When you were processed in at Batavia, any
2     cash, property, jewelry, et cetera that you
3     had with you at the time, was that stuff
4     placed in holding for you?
5  A. Yes, it was.
6        MS. HUSSAIN:
7            Objection to form.
8  BY MS. CROW:
9  Q. Okay, and was all that property provided
10    back to you when you were processed out?
11 A. Yes, it was.
12 Q. Okay. Do you recall the date you were
13    released from Batavia?
14 A. August 16th, 2018.
15 Q. Okay. I want to show you another document.
16    Give me just a moment. We'll mark this as
17    "Exhibit 2." Can you see this?
18 A. Yes, I can.
19 Q. All right, and I'll just scroll down so you
20    can take a look at it. Does this document
21    look familiar to you?
22 A. Yes, it does.
23        MS. HUSSAIN:
24            Ms. Crow, do you want to identify
25        this by Bates Stamp Numbers for the

**18**

1     record.
2        MS. CROW:
3            Yes, we certainly can do that.
4  BY MS. CROW:
5  Q. And Ms. Yeend, if you look in the corner,
6     can you see my cursor?
7  A. Yes.
8  Q. Okay. These little numbers in the corner
9     are Bates Numbers, and so we'll use this
10    today on occasion to refer to certain page
11    numbers.
12 A. Okay.
13 Q. Let me go all the way to the bottom just so
14    you can see all the way through. All
15    right, and this is Bates No. PL57 through
16    PL74. Do you recognize this as the
17    National Detainee Handbook?
18 A. Yes, I do.
19 Q. And would you have been provided with a
20    copy of this when you got to Batavia?
21        MS. HUSSAIN:
22            Objection to form.
23        THE WITNESS:
24            No, I wasn't.
25 BY MS. CROW:

**19**

1  Q. Okay. Was this ever provided to you?
2  A. The ICE Offices at Homeland Security in
3     Latham did provide me this book when they
4     transported me to Albany County Jail, and
5     officers in Albany County Jail removed this
6     book from myself.
7  Q. So ICE gave it to you, but Albany County
8     Jail removed it from you?
9  A. Yes.
10 Q. Okay. Were you ever given another copy of
11    it?
12 A. No, I was not. I found another copy of it,
13    a different copy, similar in looks or when
14    cleaning out a closet with other detainees
15    at the request of an AGS Officer.
16 Q. Okay. So you found another copy of it at
17    Batavia?
18 A. Yes.
19 Q. Okay. All right, and did you keep that
20    copy?
21 A. Yes.
22 Q. Do you recall when that was?
23 A. It was at the end of my stay at Batavia.
24    It was within the last two weeks of me
25    being there.

**20**

1  Q. Okay, and to your knowledge, was this
2     handbook available to you while you were at
3     Batavia? In other words, could you have
4     gone to the library and get it or go onto
5     the computer and -- and look at it?
6        MS. HUSSAIN:
7            Objection to form.
8        THE WITNESS:
9            No, we could not. If it was made
10       available, it was not made to my
11       knowledge that it was available.
12 BY MS. CROW:
13 Q. Okay. You understand this was a handbook
14    that was created and issued by ICE?
15 A. Yes, I do.
16 Q. And I'm sorry, one more thing for the
17    record here. We've been saying, "ICE," but
18    you understand that I'm referring to United
19    States Immigration and Customs Enforcement?
20 A. Yes, I do.
21 Q. All right, and so Batavia -- and again, I
22    just want to ask you a couple of questions
23    to make sure we have it clear on the
24    record, but Batavia or the Buffalo Facility
25    is a detention facility that belongs to the

Page 21

```
 1    Federal Government?
 2         MS. HUSSAIN:
 3              Objection to form.
 4  BY MS. CROW:
 5  Q.  You can answer.
 6  A.  I'm not sure.  The Federal Government runs
 7    it.  I'm not sure who owns that detention
 8    facility.
 9  Q.  Now, while you were at Batavia, you
10    understood that you could volunteer or you
11    could participate in the volunteer work
12    program?
13         MS. HUSSAIN:
14              Objection to form.
15         THE WITNESS:
16              I don't think the word,
17    "volunteer" was ever used.  When I
18    was asked if I wanted to be in the
19    work program, I don't recall ever
20    hearing the word "volunteer."
21  BY MS. CROW:
22  Q.  You were asked if you wanted to
23    participate?
24  A.  Yes.
25  Q.  And you understood that you would receive
```

Page 22

```
 1    $1.00 per day for each day that you
 2    participated in the program?
 3  A.  Yes, I did.
 4  Q.  And those payments went into your
 5    commissary account?
 6  A.  Yes, they did.
 7  Q.  Now, the facility had rules about
 8    possessing money or possessing cash.  Is
 9    that correct?
10         MS. HUSSAIN:
11              Objection to form.
12         THE WITNESS:
13              I don't think anyone possessed
14    cash in the facility.  I'm not sure
15    what their specific rules were, but
16    there was a chain of -- you know,
17    process with receiving any kind of
18    cash from anyone.  It had to be sent
19    in a certain way and deposited into
20    your commissary a certain way, so
21    forth.  You could only have a
22    certain amount in your commissary at
23    any given time.
24  BY MS. CROW:
25  Q.  Okay.  So was it your understanding that
```

Page 23

```
 1    cash was not permitted in the facility?
 2  A.  Yes, it is my understanding.
 3  Q.  Okay.  All right, and any reason you can
 4    think of for that rule?
 5         MS. HUSSAIN:
 6              Objection to form.  Calls for
 7    speculation.
 8         THE WITNESS:
 9              I'm not sure.
10  BY MS. CROW:
11  Q.  All right, and you mentioned a moment ago
12    that the cash or that money that was sent
13    was put into your commissary account?
14  A.  Yes.
15  Q.  Okay.
16  A.  And the money that I arrived originally at
17    Batavia was -- was also deposited into my
18    commissary account.
19  Q.  Okay, and could you -- could you put money
20    into your commissary account from family
21    and friends?
22  A.  No, I could not deposit it.
23  Q.  Could family or friends deposit funds into
24    your commissary account?
25  A.  There was certain avenues they would have
```

Page 24

```
 1    to take, but yes, they could.
 2  Q.  Okay.  When you were released from the
 3    facility, were any remaining funds in your
 4    commissary account cashed out and given to
 5    you?
 6  A.  Yes, they were.
 7  Q.  Did you understand while you were at
 8    Batavia that you could submit complaints or
 9    grievances about any issues that you were
10    having?
11         MS. HUSSAIN:
12              Objection to form.
13         THE WITNESS:
14              Yes, I did after a time.  Upon
15    immediate me being there, I was not
16    made aware of that, but after a
17    period of time, then I was aware
18    that you could put in written --
19    written requests or written
20    complaints.
21  BY MS. CROW:
22  Q.  Okay.  All right, and would you give this
23    to the Grievance Officer?
24         MS. HUSSAIN:
25              Objection to form.
```

29

1  Q. What about the food?
2  A. Not that I can recall.
3  Q. What about the temperature in the facility?
4  A. Not that I can recall, no.
5  Q. Clothing or bedding?
6  A. I -- the bedding and the clothing, you were
7     provided with a pair of pants and a shirt,
8     and you -- it was -- it was quite cold in
9     the facility, so you had to -- when you
10    first got there if you were able to get any
11    kind of money in your commissary --
12    commissary or had any money in your
13    commissary, upon arriving detainees because
14    it was so cold advised me that I should buy
15    thermal pants and a thermal shirt because
16    it was quite cold in the facility in the
17    unit. So as far as clothing, they did
18    provide us with a jumpsuit, and then -- and
19    slippers, but we -- you had to provide
20    yourself with anything else to keep warm.
21 Q. Did you buy thermals while you were in
22    there?
23 A. I did after a period of time when I had
24    enough money in my commissary.
25 Q. Do you recall what you purchased?

30

1  A. Thermal pants and I believe a thermal
2     shirt. It would have been a long-sleeve
3     thermal pants and a long-sleeve thermal
4     shirt.
5  Q. Okay. I have another document to show you,
6     and we'll mark this as "Exhibit 4," and it
7     starts on D-275. Can you see that?
8  A. I can see the top of it, yes.
9  Q. Okay. Do you -- and I'm going to scroll
10    down and give you a minute to look at it,
11    but what I want to do is ask if you
12    recognize this?
13 A. Yes, I do recognize this.
14 Q. All right, and do you recognize this as the
15    Buffalo Federal Detention Facility
16    handbook?
17 A. I recognize this as the book that I found
18    in the -- in the facility when I was
19    cleaning out the closet with other
20    detainees. It looks similar --
21 Q. Okay.
22 A. -- similar to the ICE handbook that was
23    given to me, the Immigration and Customs
24    Handbook. As I said earlier, I found a
25    book that looked similar but wasn't the

31

1     same. This is the book that I found in the
2     closet.
3  Q. Okay. All right, and I'm just scrolling
4     down just to make sure that you've had a
5     chance to -- just to make sure that's the
6     only thing in this exhibit. Okay. When
7     you found this copy of this book or a copy
8     --
9  A. There was a box -- there was a box actually
10    with a bunch of copies of it.
11 Q. Okay, and I'm sorry if I asked you this a
12    moment ago, but did you scan a copy of
13    that?
14 A. We asked the officer who asked us to clean
15    out the supply closet that was on the
16    second floor of the unit if we could keep a
17    copy. It was myself and two other
18    detainees. I do not recall their first and
19    last names at the moment, but it was myself
20    and two other detainees who helped clean
21    out that closet over the course of two
22    days, and the officer who supervised us
23    cleaning that closet who also asked us to
24    clean the closet said we could keep a copy.
25 Q. Okay. All right. When -- we touched on

32

1     this just a moment ago, but when you're
2     placed in detention, you are provided with
3     certain clothing. Is it right -- is it
4     correct that that included two sets of the
5     uniform?
6  A. Yes.
7  Q. And that was I believe you said made up of
8     long pants, shoes, and a shirt?
9  A. Yes.
10 Q. And those come in different colors
11    depending on your classification. Is that
12    right?
13 A. Yes, yes. In the women's unit it's blue
14    and orange.
15 Q. All right, and blue is for an immigration
16    violation?
17 A. Yes.
18 Q. And orange is for non-violent criminals?
19         MS. HUSSAIN:
20         Objection to form.
21         THE WITNESS:
22         I believe so.
23 BY MS. CROW:
24 Q. And what color was your uniform?
25 A. Orange.

## Page 33

1  Q. All right. Were you also issued several
2     sets of underwear, some T-shirts, and
3     socks?
4  A. Yes.
5  Q. Towels?
6  A. Yes.
7  Q. Slip-on sneakers and shower shoes?
8  A. Yes.
9  Q. Were you issued a jacket?
10 A. No. No one was.
11 Q. Were you aware that you could request one?
12 A. No, I was not. I didn't see a single
13    female in the entire unit with a jacket, so
14    I don't think anyone was aware that you
15    could get one.
16 Q. And you were also issued shorts?
17 A. No, I was not.
18 Q. Were you issued certain hygiene items like
19    toothbrush, toothpaste, combs, those kinds
20    of things?
21          MS. HUSSAIN:
22          Objection to form.
23 BY MS. CROW:
24 Q. You can answer --
25 A. Yes.

## Page 34

1  Q. -- if you understand.
2  A. Yes, we were.
3  Q. Were soap and shampoo available from
4     dispensers in the housing unit?
5          MS. HUSSAIN:
6          I'm sorry, Heather, I couldn't
7     hear that question clearly. Do you
8     mind repeating.
9  BY MS. CROW:
10 Q. Were soap and shampoo available from
11    dispensers in the housing units?
12 A. No, they were not.
13 Q. What about in the bathrooms?
14 A. The -- the -- well, there's not really a
15    bathroom. You have your sink and your --
16    your toilet in the cell with you, and
17    that's where you sleep with the sink and
18    the toilet in the same cell, and then there
19    is a separate area for group showering, and
20    there was two areas for group showering,
21    and so those areas are just tiled with
22    drains with shower curtains that goes
23    across the opening of each of those areas
24    and with shower faucets about three to
25    four.

## Page 35

1  Q. Okay. Were there any shampoo dispensers in
2     there?
3  A. No, not that I recall. We were given small
4     little hand-held, like, toiletries, and
5     then you could purchase from commissary
6     shampoo or conditioner.
7  Q. Were you issued anything else that I didn't
8     ask you about?
9  A. When -- in -- in the unit if you got your
10    menstrual cycle, you were given tampons or
11    sanitary pads.
12 Q. Okay. Anything else?
13 A. No, not that I can recall. Bedding. So
14    sheets -- actually, sorry, sheets and a
15    pillow and a pillow case.
16 Q. Did you get a blanket?
17 A. Yes, you got one blanket.
18 Q. Now, were there towels -- I'm sorry.
19 A. You -- you got one -- a flat sheet, a
20    blanket, and a pillow and a pillow case,
21    and the mattress was in the cell already.
22 Q. Okay. Were there tablets available for
23    detainee usage for sending and receiving,
24    like, emails for example?
25 A. Yes, there were. They were -- there were

## Page 36

1     multiple occasions where the tablets were
2     not functional. At any given time there
3     was maybe two tablets that were working in
4     the enter unit, the female unit that I was
5     in. At most, maybe two or three tablets
6     would work at a time, but I believe there
7     was a total of five.
8  Q. How many people were in your housing unit
9     at the time?
10 A. I do not recall.
11 Q. Do you have guess? I mean, would it have
12    been ten, a hundred?
13          MS. HUSSAIN:
14          Objection to form.
15 BY MS. CROW:
16 Q. I understand it's an estimate, a guess.
17    I'm just trying to get an idea.
18 A. If I was to guess, maybe anywhere between
19    60 to a hundred at any given time. There
20    were times when there was less when people
21    were removed and whether they were -- some
22    -- some -- there were occasions where women
23    were removed to county jails, and then
24    there was occasions where women were
25    deported, and then there were occasions

Page 57

```
 1    cleanest at the end of the month, you would
 2    get an extra meal tray at dinner.  So
 3    instead of having one meal tray, everyone
 4    in the unit would get a second meal tray if
 5    your unit won the competition of having the
 6    cleanest unit for the month.
 7  Q. Okay.
 8           THE COURT REPORTER:
 9           Heather, one moment.  Someone
10      named Anne Donohue is trying to get
11      in.  Anybody know who that is --
12           MS. CROW:
13           Yeah, she's -- yeah, I'm sorry.
14      That's inhouse counsel for AGS.
15           THE COURT REPORTER:
16           I'm letting her in.  Okay.
17  BY MS. CROW:
18  Q. Now, when you were participating in the
19      voluntary work program, could you have more
20      than one job assignment at any given time
21      or did you only have one assignment?
22  A. You were -- so it was not very structured.
23      I had -- I was for the majority of the time
24      that I was working in Batavia was in charge
25      of handing out -- taking the meal trays off
```

Page 58

```
 1    of the meal cart and handing out the meal
 2    trays at each meal, but there were times
 3    when I was asked to clean the bathroom
 4    because maybe the detainee who was assigned
 5    to clean the bathroom maybe had the day
 6    off.  You worked five days and had two days
 7    off, and so if it was someone's day off,
 8    someone else in the work program was asked
 9    to do maybe double duty to -- to take care
10    of that other area while that person was
11    off.
12  Q. Before you were able to participate you
13      received some sort of training in the
14      voluntary work program.  Is that correct?
15  A. It wasn't training.  I was -- when I was
16      assigned my assignment for the work
17      program, it was after a number of women who
18      were in the work program were removed from
19      the facility and taken to county jail, and
20      so when that happened, there were a number
21      of vacant positions available in the work
22      program, and so some -- some of the women
23      in the unit were approached by specific
24      guards on duty and asked if we would like
25      to participate in this -- in the work
```

Page 59

```
 1    program, and so as a whole I want to say
 2    there was maybe three to five of us who
 3    agreed, and we were given maybe a ten-
 4    minute breakdown of the program and the
 5    fact that we would be working; we would
 6    work five days a week; we would be assigned
 7    what job we would do, and we would sign the
 8    book at the end of the week.  We would get
 9    $5.00, a dollar a day deposited into our
10    commissary.  We could use that $5.00 for
11    the phone or commissary items, and then we
12    were shown the cleaning closet that was in
13    the middle front of the unit right in front
14    of the guards' station, and -- and so we
15    were shown that cleaning closet.  In that
16    cleaning closet the guard pointed out to
17    all of us the two cleaning supplies that
18    were in use, which one was bleach, which
19    one was bleach base, which one was not
20    bleach base, the mop bucket, the mop, the
21    broom, and the refillable empty containers,
22    and we were shown those items and told that
23    the -- the guard on duty would open that
24    closet and let us get those items when we
25    were to do our assigned duties.
```

Page 60

```
 1  Q. You didn't have to submit any sort of an
 2      application or anything like that in order
 3      to participate in the voluntary work
 4      program?
 5  A. No.  I had to sign a book.
 6  Q. Okay.  Were there a limited number of
 7      available slots for workers in the program?
 8  A. Yes.
 9  Q. Okay, and so all detainees were not part of
10      the voluntary work program?
11  A. No.
12  Q. Only those who signed up.  Is that -- is
13      that correct?
14           MS. HUSSAIN:
15           Objection to form.
16           THE WITNESS:
17           It was a small group of detainees
18      who were asked or selected to
19      participate in the work program.
20      There were women in the unit who
21      wanted to participate in the work
22      program who were excluded by no
23      understanding of my own, but certain
24      -- certain detainees were favored
25      due to the fact that they were
```

Page 61

1  English speaking I believe, and
2  that's why they were approached to
3  be in the work program because the
4  guards on duty would be able to
5  communicate with them better.
6  BY MS. CROW:
7  Q. Okay. Were you aware of anyone that ever
8  decided to quit the work program?
9  A. No, I was not aware that anyone quit the
10  work program. As I said, there were women
11  that were removed from the facility,
12  whether it was because they were sent to
13  county jail or they were removed by
14  deportation, and so slots became available
15  due to those instances. If someone was
16  sick and you were in the work program, if
17  you were ill for a period of time, then
18  your position might be assigned to someone
19  else because you couldn't fulfill your
20  duties, but I don't recall anyone just
21  quitting, no.
22  Q. Were you able to quit if you wanted to?
23  A. I believe so. There was never specific --
24  specific conversation that was had with the
25  guards or the guard who assigned us or who

Page 62

1  supervised us that made us aware of the
2  procedure you would take I guess if you
3  were to say you didn't want to do it
4  anymore.
5  Q. Is it -- is it correct that you -- you told
6  me earlier there was only one housing unit
7  for females --
8  A. Yes.
9  Q. -- at the time you were at Batavia?
10  A. Yes, huh-huh.
11  Q. Okay, and so detainees who were cleaning in
12  the housing unit were only doing it in your
13  own housing unit?
14  A. Yes.
15  Q. You weren't over in the men's unit?
16  A. No.
17  Q. All right. I have a document I'd like to
18  show you. I'm sorry.
19       THE COURT REPORTER:
20       Now -- now someone named Ian
21  Bolden is asking to attend.
22       MS. CROW:
23       Ian is also inhouse counsel for
24  AGS.
25       THE COURT REPORTER:

Page 63

1       Okay. I'll admit him.
2  BY MS. CROW:
3  Q. All right. So this document that I'm going
4  to show you, we'll mark as "Exhibit 5," and
5  I'll scroll down so you have a chance to
6  look at it.
7  A. Huh-huh.
8  Q. And it is marked as Bates No. D-242.
9  A. Huh-huh.
10  Q. All right. Do you recognize this document?
11  A. I do, and the reason that my unit is
12  changed is because my cells were moved and
13  so that's why there's two and one crossed
14  off, but yeah, that's my name. That is not
15  my handwriting that -- where my name is
16  written, that is not my handwriting. Where
17  my unit and my ID number is written, that
18  is not my handwriting.
19  Q. Okay.
20  A. And so my signature, that is my signature.
21  Q. That is your signature?
22  A. Yes.
23  Q. When you signed this, was all of this stuff
24  already filled in?
25  A. Yes.

Page 64

1  Q. Okay, and it looks like you signed up on
2  July the 6th, 2018?
3  A. Yes.
4  Q. And did you fill out this form before you
5  began working in the program?
6       MS. HUSSAIN:
7       Objection to form.
8       THE WITNESS:
9       I don't recall if it was the day
10  that I started work or if it was the
11  day before.
12  BY MS. CROW:
13  Q. Okay, but you didn't work before you signed
14  this form?
15  A. I didn't work in the work program. I did
16  other work in the unit. We were -- as the
17  women in the unit as I said, there was a
18  competition on if the unit was the cleanest
19  in comparison to the male units that were
20  there, and so we did do work in the unit
21  that was not part of the work program. We
22  had to move some of the recreation
23  equipment around because they brought in a
24  StairMaster at one period of time, and so
25  there was work that we did have to do. It

137

1  Q.  I understand that you said it's difficult
2      to measure time in detention.  Can you
3      estimate what percentage of your day you
4      would typically have been locked in your
5      cell if you had not been participating in
6      the work program?
7  A.  I don't know what time we went to bed, what
8      time we woke up, so it's really hard to --
9      to estimate.  I want to say maybe 9:00,
10     10:00 o'clock at night until maybe 7:00,
11     8:00 in the morning we were locked in our
12     cell, and then as I said, we were locked in
13     before lunch and before dinner.  The
14     lock-in before dinner was a shorter period
15     than the lock-in before lunch I feel like,
16     but it was long enough that most of the
17     women took naps in those times that they
18     were locked in, and as I said, my -- my
19     specific cell door was popped open 15
20     minutes earlier, but the -- when -- when
21     the door, when the cell door is popped
22     opened, it's a very loud, jarring, like,
23     sound.  Okay, it's, like, a big clank, and
24     so if you're sleeping, you're -- you're
25     woken up by it.

138

1  Q.  Last question is, did you feel nourished
2      and full from the food that was provided to
3      you in the facility?
4  A.  As I said, the food wasn't desirable.  The
5      amounts of food were -- it was, like, a
6      spoonful of meat, a smaller spoonful of the
7      vegetables, maybe a side something, and as
8      I said, we would get commissary items to
9      substitute kind of the meals.  Some of the
10     meals were just really bad to where you
11     just didn't want to eat them, but a lot of
12     the food made you feel really sluggish, and
13     so it made you tired.  As I said a lot of
14     the time in Batavia seemed to be spent
15     sleeping for a lot of the women there.  A
16     lot of women were medicated, and the med
17     nurse would come around at nighttime and
18     give people their meds before being locked
19     in.  My meds helped me sleep at night while
20     I was there.  I do remember being
21     prescribed Trazodone while I was there, and
22     that knocked me out quite heavily, and so,
23     you know, those -- those things I guess.
24     Yeah, so it's really hard to get a
25     semblance of time and things like that.

139

1      Like I said the meals, the three meals and
2      the fact that I worked in the work program,
3      and so those three meals gave me an idea of
4      the day-to-day, kind of the hours in the
5      morning, lunch, dinner.
6  Q.  Okay.  Thank you.  Do you mind if we take a
7      two-minute break?  I think I'm finished,
8      but I just want to confer with my folks.
9          MS. CROW:
10             Sure.
11         (Off the record.)
12         MS. BATAVIA:
13             I have no further questions at
14     this time.
15         MS. CROW:
16             Okay.  I have no further
17     questions.
18     (Whereupon, the taking of the witness'
19         testimony was concluded.)

140

1                C E R T I F I C A T E
2         THIS CERTIFICATION IS VALID ONLY FOR
   A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
3  SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
   PAGE.
4
         I, RAYNEL E. SCHULE, Certified Court
5  Reporter, #77005, in good standing, in and for
   the State of Louisiana, as the officer before
6  whom this testimony was taken, do hereby certify
   that DALILA YEEND, after having been duly sworn
7  by me upon authority of R.S. 37:2554, did
   testify as hereinbefore set forth in the
8  foregoing 139 pages; that this testimony was
   reported by me in stenotype reporting method,
9  was prepared and transcribed by me or under my
   personal direction and supervision, and is a
10 true and correct transcript to the best of my
   ability and understanding; that the transcript
11 has been prepared in compliance with transcript
   format guidelines required by statute or by
12 rules of the Board, that I have acted in
   compliance with the prohibition on contractual
13 relationships, as defined by Louisiana Code of
   Civil Procedure Article 1434 and in rules and
14 advisory opinions of the Board; that I am not of
   counsel, not related to counsel or to the
15 parties herein, nor am I otherwise interested in
   the outcome of this matter.
16
17
18 _____    _____
   Date         Raynel E. Schule, CSR
19              Certified Shorthand Reporter
                State of Louisiana
20
21
22
23
24
25

U.S. Department of Homeland Security  
Immigration & Customs Enforcement

Buffalo Federal Detention Facility  
Batavia, New York

## DETAINEE VOLUNTARY WORK PROGRAM AGREEMENT

Detainees that participate in the volunteer work program will not be permitted to work in excess of 8 hours daily or 40 hours weekly.

Detainees that participate in the volunteer work program are required to work according to an assigned work schedule and to participate in all work-related training. Unexcused absence from work or unsatisfactory work performance could result in removal from the voluntary work program. Detainees must adhere to all safety regulations and to all medical and grooming standards associated with the work assignment. Compensation shall be $1.00 per day.

I, __YEEND, Dalila__, ID# __097 755 554__ from Housing Unit __A1-125A__ (~~122B~~)  
(Detainee name)

have read, understand, and agree to comply with the above. I have received and understand relevant safety training regarding my work assignment.

__Cleaner__  
(Work Assignment)

__[signature]__  
(Detainee Signature)

__7/6/18__  
(Date)

__Laurie Finch__  
(Department Manager Signature)

Original: Department Manager  
Yellow: Detention File

Pink: Detainee  
Gold: COTR

BFDF – 0016  
Revised 07/10

D-000242

EXHIBIT 10