Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

DALILA YEEND and
BOUNNAM PHIMASONE,
    Plaintiffs
           CIVIL ACTION NO.1:20-cv-01281
VERSUS
AKIMA GLOBAL SERVICES, LC,
a/k/a AGS,
    Defendant

    DEPOSITION OF LISA LaPOINTE, given via Zoom Videoconferencing in the above-entitled cause, pursuant to the following stipulation, before Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, commencing at 12:35 o'clock a.m., on Tuesday, the 27th day of June, 2023.

Page 2

```
              I N D E X
                             Page
     Caption                   1
     Appearances               3
     Agreement of Counsel      4
     Examination
        MS. CROW               5
        MS. RICH             113
     Reporter's Certificate   116
```

Page 3

APPEARANCES (Via Zoom Videoconferencing):

For the Plaintiff:

WORKER JUSTICE CENTER OF NEW YORK
Attorneys at Law
BY: CRISTINA BRITO, ESQ.
    LAURA REVERCOMB, ESQ.
    OLIVIA POST RICH, ESQ.
9 Main Street
Kingston, New York   12401

For the Defendant:
THE KULLMAN FIRM
A Professional Law Corporation
BY: HEATHER F. CROW, ESQ.
    JESSICA L. MARRERO, ESQ.
    MIRANDA FINESTONE, ESQ.
1600 Energy Centre
1100 Poydras Street
New Orleans, Louisiana  70163

Also Present: ANNE DONOHUE, ESQ.
              IAN BOLDEN, ESQ.

Reported By: Raynel E. Schule
             Certified Shorthand Reporter
             State of Louisiana

Page 4

S T I P U L A T I O N

    It is stipulated and agreed by and among Counsel for the parties hereto that the deposition of LISA LaPOINTE is hereby being taken via Zoom Videoconferencing pursuant to the Federal Rules of Civil Procedure for all purposes in accordance with law;

    That the formalities of reading and signing are not specifically waived;

    That the formalities of sealing, certification, and filing are hereby specifically waived.

    That all objections, save those as to the form of the question and responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof is used or sought to be used in evidence.
           * * * * *
    Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

1 (Pages 1 to 4)

EXHIBIT 12

Page 5

1    PROCEEDINGS
2         THE COURT REPORTER
3         Will counsel please identify
4    themselves and their affiliations
5    and also stipulate that by agreement
6    of all parties this deposition is
7    being taken via videoconferencing,
8    and there is no objection to the
9    witness being sworn in remotely.
10        MS. RICH:
11        This is Olivia Post Rich with
12   Worker Justice Center for Plaintiff.
13   We have no objection.
14        MS. CROW:
15        And this is Heather Crow with the
16   Kullman Firm on behalf of Defendant,
17   Akima Global Services, and we have
18   no objection.
19        LISA LaPOINTE, having been first duly
20   sworn by Raynel E. Schule, Certified
21   Shorthand Reporter, was examined and
22   testified on her oath as follows:
23        EXAMINATION
24   BY MS. CROW:
25   Q.  Good afternoon, Mrs. LaPointe.  My name is

Page 6

1    Heather Crow.  As I said earlier, I'm with
2    the Kullman, and I'm here representing
3    Akima Global Services today.  Have you ever
4    given a deposition before?
5    A.  No.
6    Q.  And do you understand today that you're
7    under oath?
8    A.  Yes.
9    Q.  And this will just be a question-and-answer
10   session.  If you don't understand the
11   question that I ask, please let me know;
12   otherwise, I'll assume that you understood
13   the question.  I'm happy to rephrase or
14   repeat if you don't understand what I asked
15   you.
16   A.  Okay.
17   Q.  I am going to also ask you today to please
18   answer verbally yes or no, rather than nod
19   your head or shake your head so that the
20   court reporter can get all of that down.
21   A.  Okay.
22   Q.  Also I ask you to avoid guessing today.  If
23   you do guess or estimate, please let me
24   know that you're making a guess.  Are you
25   on any medication or medical treatment that

Page 7

1    would affect your ability to give full and
2    truthful answers today?
3    A.  No.
4    Q.  If you need a break, please let me know.
5    I'm happy to take a break.  The only caveat
6    would be just to not leave an open question
7    on the table; otherwise, I'm happy to take
8    a break if you need one.
9    A.  Thank you.
10   Q.  If I say, "AGS" today, do you understand
11   that I'm talking about the defendant in
12   this matter, Akima Global Services?
13   A.  Yes.
14   Q.  Okay, and just to confirm, you are -- are
15   you a native English speaker?
16   A.  Yes.
17   Q.  Today I'll also show you a series of
18   documents, some of them may be simply to
19   identify it for our record.  Some of them
20   might be to ask you questions.  When I put
21   a document up on your screen, please let me
22   know if you need for me to zoom in or zoom
23   out or up or down or to slow down.  I'm
24   happy to do all of those things so that you
25   have a chance to look at the document.

Page 8

1    A.  Okay, thank you.
2         (Off the record.)
3    BY MS. CROW:
4    Q.  All right.  I want to share a screen with
5    you.  All right.  Tell me if you can see
6    that screen.
7    A.  Yes, I can.
8    Q.  All right.  Have you seen this document
9    before?  And just give me a moment, I'll
10   scroll through it.  And I understand that
11   this is too fast for you to read, but do
12   you recognize this as the lawsuit that was
13   filed in this matter?
14   A.  Yes.
15   Q.  Okay.  Did you review the lawsuit before it
16   was filed at least as it pertains to you?
17   A.  No.
18   Q.  What's your date of birth?
19   A.  March 23rd, 1971.
20   Q.  And your country of birth?
21   A.  Canada.
22   Q.  Okay.  Have you ever been married?
23   A.  Yes.
24   Q.  How many times?
25   A.  Once.

Page 9

1  Q. Are you married now?
2  A. No.
3  Q. Do you have any children?
4  A. Yes.
5  Q. And what are their ages?
6  A. 34.
7  Q. What's your current address?
8  A. Current time, Number -- Apartment 14, 23
9     Larder Court, Saint John, New Brunswick,
10    and the postal code is E2K 2R3.
11 Q. All right, and how long have you lived
12    there?
13 A. Three and a half years.
14 Q. Do you have any history of drug or alcohol
15    abuse?
16 A. No.
17 Q. Okay. Did you go to high school?
18 A. No.
19 Q. What's the highest level of education that
20    you have?
21 A. College.
22 Q. And where did you go to college?
23 A. Eastern College in Saint John, Brunswick.
24 Q. And did you graduate?
25 A. Yes.

Page 10

1  Q. Do you have a degree?
2  A. Yes.
3  Q. What's that in?
4  A. A certificate. Sorry.
5  Q. Okay, and what's that in?
6  A. Paralegal.
7  Q. Okay. Are you currently employed?
8  A. Yes.
9  Q. And where are you employed?
10 A. Gorman Nason Law Firm.
11 Q. And where is that?
12 A. In Saint John, New Brunswick, Canada.
13 Q. How long have you worked there?
14 A. A year and two months, three months.
15 Q. Have you ever personally been involved in
16    any prior litigation? In other words, have
17    you ever been a plaintiff or a defendant in
18    a prior lawsuit?
19 A. No.
20 Q. Have you ever filed any sort of an
21    administrative complaint with a
22    governmental agency?
23 A. No.
24 Q. Have you ever filed for bankruptcy?
25 A. No.

Page 11

1  Q. What country are you a citizen of?
2  A. Canada.
3  Q. Today we're discussing the Buffalo Federal
4     Detention Facility. Sometimes we refer to
5     it as Batavia where it's located. If I
6     say, "Batavia" or the "Buffalo Facility,"
7     you understand the facility that we're
8     talking about?
9  A. Yes.
10 Q. Despite the detention period that we're
11    talking about today at Buffalo Federal
12    Detention Facility, have you ever
13    previously been placed in ICE detention?
14 A. No.
15         MS. RICH:
16         Objection.
17 BY MS. CROW:
18 Q. Have you ever been convicted of a crime?
19         MS. RICH:
20         Objection.
21         THE WITNESS:
22         Yes.
23 BY MS. CROW:
24 Q. How many times?
25 A. Once.

Page 12

1  Q. And where was that?
2  A. Orleans County, New York.
3  Q. I'm sorry. There was a little bit of a
4     blip. You said Orleans?
5  A. Orleans County in New York.
6  Q. Okay, and when was that?
7          MS. RICH:
8          Objection.
9          THE WITNESS:
10         December the 9th -- December '19
11    -- December, oh, let's see.
12    December '19. I'm -- I'm not a
13    hundred-percent sure on the exact
14    date.
15         MS. RICH:
16         Off the record for a second.
17         (Off the record.)
18 BY MS. CROW:
19 Q. Did you say December of 2019. Is that what
20    you said?
21 A. It was December 2019. I believe it was on
22    the 9th. It was either the 9th or the 10th
23    when -- the date, so --
24 Q. And is that the date that you were arrested
25    or convicted or what happened on that date?

3 (Pages 9 to 12)

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

EXHIBIT 12

Page 13

1  A. Arrested.
2  Q. And what were you arrested for?
3  A. Possession of narcotics.
4  Q. And what happened with your case?
5        MS. RICH:
6           I'm just going to make a blanket
7        objection to this whole thing so I
8        don't have to say it every time, but
9        she can answer these questions.
10 BY MS. CROW:
11 Q. I'm sorry. Go ahead. What was -- what was
12    the outcome of your case?
13 A. I -- you know, I made a mistake. I served
14    my time, and I've moved on.
15 Q. Did you -- did you plead -- did you plead
16    guilty? Is that what happened? Did --
17 A. Yes.
18 Q. -- you go to trial?
19 A. No.
20 Q. Okay, and were you -- were you incarcerated
21    or put on probation? What happened?
22 A. I -- I had time served.
23 Q. What did you do to prepare for this
24    deposition?
25 A. Meetings with my lawyers and a lot of

Page 14

1     recollect -- recollection or remembering,
2     sorry, my time at Batavia.
3  Q. Did you have conversations with anyone
4     besides your counsel?
5  A. No. I have one friend from there, and I
6     don't talk to anybody else from there, so
7     no.
8  Q. Okay, and who's your friend from there?
9  A. I called her India.
10 Q. Is she a plaintiff in this matter?
11 A. Yes.
12 Q. Did you speak with her about this
13    deposition?
14 A. No.
15 Q. Did you review any documents?
16 A. I'm sorry. Could you reaffirm the
17    question. I'm not sure what you mean.
18    What --
19 Q. I'm sorry. Did you review any documents in
20    preparation for the deposition today?
21 A. Yes.
22 Q. What did you review?
23 A. A variation of documents that were compiled
24    between my lawyers and myself.
25 Q. Okay. So I don't want to know what you

Page 15

1     talked about with your lawyers. I just
2     would like for you to identify which
3     documents you looked at.
4  A. I looked at the preliminary statement.
5  Q. I'm sorry. The --
6  A. The preliminary statement and the Notice of
7     Deposition.
8  Q. Okay, and what do you mean by, "the
9     preliminary statement"?
10 A. The document that you just showed me.
11 Q. The Complaint?
12 A. Sorry. The Complaint. That's it. That's
13    what I looked at.
14 Q. Got you. Okay, got you. I just want to
15    make sure we were on the same page. All
16    right. Anything else?
17 A. No.
18 Q. Do you have any recorded conversations with
19    any current or former AGS or ICE employees?
20 A. No.
21 Q. What about any detainees?
22 A. No.
23 Q. Do you have any written statements by any
24    current or former AGS or ICE employees?
25 A. No.

Page 16

1        MS. RICH:
2           Objection.
3  BY MS. CROW:
4  Q. Do you have any written statements by any
5     other current or former detainee?
6  A. No.
7  Q. Now, you were detained at the Buffalo
8     Federal Detention Facility in Batavia
9     beginning in December of 2019?
10 A. Yes.
11 Q. And the issue that we spoke of earlier, the
12    possession of narcotics, is that the
13    incident that is why you were brought into
14    detention?
15       MS. RICH:
16          Objection to form.
17       THE WITNESS:
18          I was an overstay.
19 BY MS. CROW:
20 Q. Okay. So you -- you said you were an
21    overstay. Were you in the U.S. on a visa?
22 A. Yes.
23 Q. What kind of a visa were you in the U.S.
24    on?
25 A. B2 maybe.

4 (Pages 13 to 16)

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

EXHIBIT 12

Page 17

1  Q. Did the overstay get discovered as part of
2     that -- as part of that arrest?
3  A. Yes.
4  Q. And you were taken into custody at some
5     point where?
6  A. Can you clarify.
7  Q. Sure. When you were first arrested, where
8     were you taken into custody?
9  A. County jail.
10 Q. All right, and were you transferred from
11    the county jail to -- to the Buffalo
12    facility?
13 A. Yes.
14 Q. How long were you in the county jail before
15    you were transferred?
16 A. Three days.
17 Q. And when you were processed in at the
18    Buffalo Federal Facility, any property,
19    cash, jewelry, et cetera that you might
20    have had with you at the time, was that
21    property placed in holding for you?
22 A. I had no property.
23 Q. Okay. You didn't have any jewelry or cash
24    or clothing or anything like that?
25 A. Oh, sorry. Yeah, I had one piece of

Page 18

1     jewelry. So yes.
2  Q. Okay. So that was placed in holding for
3     you, and was it returned to you when you
4     were -- when you were released?
5  A. Yes.
6  Q. You were released from Batavia on or around
7     April the 3rd, 2020?
8  A. Yes.
9  Q. I'll show you another document. Bear with
10    me for a second. I'll just share the
11    screen again. All right. Can you see
12    that?
13 A. Yes.
14 Q. All right. We'll mark this as "Exhibit 2."
15    Do you recognize this as --
16         MS. RICH:
17         Counsel, can you please read the
18    Bate's Stamp.
19         MS. CROW:
20         Sure. It begins on PL57 I
21    believe. PL57 through 74.
22 BY MS. CROW:
23 Q. Do you recognize this as the Detainee
24    Handbook that you would have received
25    during your detention?

Page 19

1  A. Yes.
2  Q. Did you understand that this was a handbook
3     issued by ICE?
4  A. No.
5  Q. And who did you believe issued the handbook
6     or did you know?
7  A. The officers, AGS.
8  Q. Let me ask -- let me ask that question a
9     little bit differently. Who did you
10    receive the handbook from?
11 A. The officers.
12 Q. Okay. Do you know who prepared the
13    handbook?
14 A. No.
15 Q. When I say, "ICE," you understand that I'm
16    referring to the United States Immigration
17    & Customs Enforcement?
18 A. Yes.
19 Q. And did you understand that you were being
20    held in a detention facility that belongs
21    to the United States Federal Government?
22 A. Yes.
23 Q. And you understood that the facility had
24    rules about possession of cash or currency
25    inside the facility?

Page 20

1  A. Yes.
2  Q. And is it accurate that no one was allowed
3     to possess cash inside the facility as a
4     detainee?
5  A. Yes, yes.
6  Q. I'll show you another document. All right,
7     and this is marked as -- we'll mark this as
8     "Exhibit 3." It Bates No. PL97. And you
9     produced this in discovery. Do you
10    recognize this?
11 A. Yes.
12 Q. Okay. Can you tell me what this is?
13 A. That's the sheet that I received when I
14    left. It's a withdrawal receipt.
15 Q. I'm sorry. Withdrawal receipt, is that
16    what you said?
17 A. Yes.
18 Q. Okay. All right, and this reflects that
19    your release date was April the 3rd, 2020,
20    and that you had $22.60 paid out to you?
21 A. Yes.
22 Q. Aside from this document, do you have any
23    other documents from your time at the
24    Buffalo Facility?
25 A. No.

5 (Pages 17 to 20)

Page 25

1  should have to see.
2  Q.  Was it once? Was it twice? Was it three
3      times?
4  A.  I mean, it was multiple.
5  Q.  I'm not asking for exact. I'm sorry.
6  A.  Right. It was multiple times so I couldn't
7      give you an exact number of times.
8  Q.  And what about the chicken, how many times
9      would you say you had undercooked chicken?
10 A.  Every time. So again, they serve it
11     multiple times a week.
12 Q.  Are you saying that every time you had
13     chicken, it was undercooked?
14 A.  Yes.
15 Q.  You also talked about the conditions a
16     moment ago. What conditions are you
17     referring to?
18 A.  The temperature.
19 Q.  And tell me what's wrong with the
20     temperature?
21 A.  It's freezing.
22 Q.  Did the group get a response to the
23     grievance?
24 A.  No.
25 Q.  Do you recall approximately when that

Page 26

1      grievance was submitted?
2  A.  I do not.
3  Q.  I have another screen -- another document
4      to share. Can you see that?
5  A.  Yes.
6  Q.  We'll mark this as "Exhibit 4." Do you
7      recognize this as the Buffalo Federal
8      Detention Facility handbook?
9  A.  No.
10         MS. RICH:
11            Could you read the Bates Stamp
12     for the record, please.
13         MS. CROW:
14            It begins on D275, and it goes
15     through 303.
16 BY MS. CROW:
17 Q.  Have you ever seen this, this handbook?
18 A.  Now that you've scrolled down, yes.
19 Q.  Okay. All right. Now, when you -- and I'm
20     going to ask you a couple of questions
21     about some of the things that are in this
22     handbook. When you're placed in detention,
23     you're provided with certain items of
24     clothing?
25 A.  Yes.

Page 27

1  Q.  And that's the uniform?
2  A.  Yes.
3  Q.  And do you get two sets of the uniform?
4  A.  Yes.
5  Q.  And that is made up of long pants, shoes,
6      and a shirt?
7  A.  Yes.
8  Q.  And the color of those uniforms depends on
9      your classification. Is that correct?
10 A.  Yes.
11 Q.  What color was your uniform?
12 A.  Orange.
13 Q.  Were you also issued four sets of
14     underwear, T-shirts, and socks?
15 A.  Yes.
16 Q.  Were you issued towels?
17 A.  Yes.
18         (Interruption in connection.)
19 BY MS. CROW:
20 Q.  Okay. So I'll just ask the last three or
21     four questions again just so we have them
22     in the record. You were also issued
23     slip-on sneakers and shower shoes?
24 A.  Yes.
25 Q.  And a jacket?

Page 28

1  A.  Yes.
2  Q.  And two pairs of shorts?
3  A.  Yes.
4  Q.  And hygiene items, toothbrush, toothpaste?
5  A.  Yes.
6  Q.  And soap and shampoo were available from
7      dispensers?
8  A.  Yes.
9  Q.  Okay, and that catches us up. There were
10     also electronic tablets available for usage
11     for detainees to send and receive
12     electronic messages, videochats, things
13     like that?
14 A.  Yes, providing you had money to utilize.
15 Q.  And there were certain things you could use
16     those tablets for that didn't have a cost.
17     Is that correct?
18 A.  Yes.
19 Q.  And those were things, like, if you needed
20     to make a sick call, for example?
21 A.  Yes.
22 Q.  And could you use that tablet also to
23     request, for example, a meeting with your
24     attorney?
25 A.  No.

7 (Pages 25 to 28)

Page 29

1  Q. How did you request a meeting with your
2     attorney?
3  A. Via the phone.
4  Q. Okay. Were there various religious
5     services if you wanted to participate?
6  A. Yes.
7  Q. And was there a schedule posted for those?
8  A. No.
9  Q. How would you know what services would be
10    held when?
11 A. Word of mouth.
12 Q. Now, your housing assignment depended on
13    your classification under ICE. Is that
14    correct?
15 A. No.
16 Q. What did your housing assignment depend on?
17 A. What was available.
18 Q. But isn't it accurate that, for example,
19    individuals who wore blue uniforms couldn't
20    be housed with individuals who wore red
21    uniforms?
22 A. Oh, sorry, I -- I misunderstood the
23    question. I thought you were talking about
24    the work -- the work detail. You're
25    talking about housing. No, you could --

Page 30

1     that's -- that's inaccurate.
2  Q. Okay. Tell me about the classification in
3     housing. Were all three colors in the same
4     housing unit?
5  A. No.
6  Q. Which colors did you -- which color
7     uniforms were in the unit that you were in?
8  A. Blue and orange.
9  Q. Were in a dorm style unit with bunk beds or
10    were you in a cell unit?
11 A. Both.
12 Q. Which one did you start out in?
13 A. Cell lockdown.
14 Q. Okay, and then at some point you were
15    transferred to a different housing unit?
16 A. Yes.
17 Q. And that was a bunk style setup?
18 A. Yes.
19 Q. And were you issued bedding consisting of
20    sheets, a pillow, blankets?
21 A. Yeah.
22 Q. How many blankets did you have?
23 A. One.
24 Q. Were there barber services available for
25    haircuts?

Page 31

1  A. Yes.
2  Q. And there was a library available for
3     detainees to use?
4  A. Yes.
5  Q. And there was also a law library?
6  A. Yes.
7  Q. Was there an area at the facility for
8     public visitation?
9  A. Yes.
10 Q. So you could have family or friends come
11    and visit?
12 A. No.
13 Q. No. Who was allowed to visit?
14 A. Sorry. Did -- you're asking me if I had
15    family or friends come to visit?
16 Q. Let me ask the question differently. Could
17    a detainee have family or friends come and
18    visit?
19 A. Yes.
20 Q. Okay. Could a detainee also set up an
21    in-person meeting with their legal counsel?
22 A. Yes.
23 Q. Could detainees send or receive mail?
24 A. Yes.
25 Q. Could detainees have funds deposited into

Page 32

1     their account by family or friends?
2  A. Yes, if you had the proper card in order to
3     do that.
4  Q. Did you have weather permitting outdoor
5     recreation each day?
6  A. Yes, as long as you went to work.
7  Q. What do you mean, "as long as you went to
8     work"?
9  A. Meaning that if there was a job that needed
10    to be done and it wasn't completed and
11    somebody didn't do it, then rec was
12    cancelled.
13 Q. Would recreation be cancelled for the
14    entire housing unit?
15 A. Yes.
16 Q. When you had outdoor recreation, what sort
17    of things could you do outside?
18 A. Maybe play basketball or walk around.
19 Q. Okay, and there was also an indoor common
20    area, a dayroom?
21 A. Yes.
22 Q. Okay, and that indoor room was an indoor
23    recreation room, you could do things like
24    play board games or play cards or watch
25    television?

8 (Pages 29 to 32)

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

EXHIBIT 12

Page 45

1   commissary?
2   A.  No.
3   Q.  Do you know who set the prices?
4   A.  No.
5   Q.  Do you know who controlled the temperature
6       inside the facility?
7   A.  No.
8   Q.  Did you have any complaints about the meals
9       other than what you mentioned earlier about
10      the chicken and the broccoli?
11  A.  Yes.
12  Q.  What were those complaints?
13  A.  It was disgusting.  It -- it's, like, it's
14      horrible.  I wouldn't feed that food to a
15      stray cat.
16  Q.  Can you be more specific.
17  A.  More specific than it's disgusting?  It's
18      disgusting food, like, it -- the meat is
19      not cooked.  The food is super greasy.
20      They give you ground beef with, you know,
21      tomato sauce or whatever kind of sauce, and
22      it would really have an eighth of an inch
23      thick of grease on top of it.  It was
24      disgusting.
25  Q.  Aside from the comment that you -- you made

Page 46

1       earlier when you said that you brought the
2       chicken and the broccoli to the attention
3       of the officer and you mentioned a group
4       grievance that was submitted, did you make
5       any other complaints or file any other
6       grievances about the food?
7   A.  No.
8   Q.  When you received your tray of food, would
9       you eat it?
10  A.  Typically, no.
11  Q.  Was there any of the food that you did
12      like?
13  A.  No.  Toast.
14  Q.  You said toast?
15  A.  Yes, that you had to toast yourself by the
16      way.  They didn't toast it for you.  You
17      had to stand in line to use the toaster,
18      and hopefully you made it through the
19      lineup in the amount of time that you had
20      in order to toast your toast.
21  Q.  How many people were in your housing unit
22      or your housing pod at one time?
23  A.  I'm sorry.  Could you repeat.
24  Q.  And I know you -- I know you won't know the
25      exact number.  I'm just asking you to give

Page 47

1       me a -- kind of an estimate.
2   A.  I didn't catch the question.  I'm sorry.
3       Could you please repeat.
4   Q.  Sure.  How many people were in your housing
5       pod or your housing unit at one time?
6   A.  I believe the unit housed I believe 92.  I
7       think we had, you know, anywheres from 60
8       to 70 people approximately.
9   Q.  When you said 92, you believe that's the
10      max?
11  A.  92 beds.
12  Q.  Okay.  So 92 beds, but there were somewhere
13      between 60 and 70 individuals in there.
14      Did I understand that correctly?
15  A.  Yes, approximately.
16  Q.  Okay, and we -- we sort of touched on this
17      a little bit, but you understood that ICE
18      offered a voluntary work program inside the
19      Buffalo facility?
20          MS. RICH:
21          Objection.
22          THE WITNESS:
23          Yes.
24  BY MS. CROW:
25  Q.  I'm sorry.  What you did say?

Page 48

1   A.  Yes.
2   Q.  Okay, and so if we talk about the work
3       program today, that's what we're talking
4       about, the program in which you could be
5       assigned a role for cleaning or helping out
6       with food duty, et cetera in the facility?
7   A.  Yes.
8   Q.  And you mentioned 60 to 70 people in the
9       housing -- in the housing pod.  About how
10      many of those individuals would have had
11      spots in the work program?
12  A.  Almost all.
13  Q.  You believe that there were 60 to 70 spots
14      per pod?
15  A.  I'm not -- I'm not -- I'm not sure of that.
16      I don't know.
17  Q.  Were there people in your housing unit that
18      were not part of the work program?
19  A.  Yes.
20  Q.  Did those folks get the same clothing,
21      bedding, and food as the ones who were
22      working got?
23  A.  Yes.
24  Q.  Did the people who were not part of the
25      program have the same access to television,

12 (Pages 45 to 48)

Page 57

1  A. Yes.
2  Q. Okay. Did you ever see detainees cleaning
3     different housing units, for example, and
4     I'm not referring to the empty one that we
5     talked earlier with the painting, but did
6     you ever see detainees cleaning a housing
7     unit that they weren't assigned to?
8  A. No.
9  Q. Did you ever do any work outside of the
10    building itself?
11 A. Sorry. Can you elaborate. Like outdoors?
12 Q. Correct. Did you ever do any kind of work
13    outside of the actual building?
14 A. No.
15 Q. Were you aware of any other detainees that
16    did work outside of the building?
17 A. You don't see other detainees in the other
18    pods, so no.
19 Q. All right. I want to show you a document
20    that we'll mark as "Exhibit 5." All right.
21    Can you see that?
22 A. Yes.
23 Q. And do you recognize this as the Detainee
24    Voluntary Work Program Agreement?
25 A. Yes.

Page 58

1  Q. And this is Bates No. 565, D565. Is that
2     your signature on this document?
3  A. Yes, it is.
4  Q. All right, and at the time you were housed
5     in Unit C2?
6  A. Correct, yes.
7  Q. And that -- that was the lockdown unit?
8  A. Yes.
9  Q. Okay, and 210, was that your bed number, if
10    you remember?
11 A. No.
12 Q. What was --
13 A. C1 was -- wait. C1 was not the lockdown
14    unit. A1 is a lockdown unit. C1 is a --
15    is a dorm.
16 Q. Okay. What was C2?
17 A. C2 was -- is a dorm.
18 Q. Okay.
19 A. So that wasn't the very first paper that I
20    signed obviously. It wouldn't be because
21    the date on it, no. So that's when I was
22    in C2.
23 Q. Okay. All right, and this one is dated
24    January 15, 2020.
25 A. Right.

Page 59

1  Q. The Department Manager here, Laurie --
2     Laurie Finch. Do you recall Ms. Finch?
3  A. I have no clue of who she is.
4  Q. Who gives the training for this -- for the
5     voluntary work program?
6  A. What --
7  Q. Who conducted it?
8  A. I -- again, I believe it was an AGS
9     employee. I have no idea, though, why. I
10    mean, obviously I signed this when I was in
11    C2. This is not the first initial document
12    that I would have signed to work because
13    there was -- I started working when I was
14    in -- like, would have been in 2019.
15 Q. Okay. So do you believe that you signed
16    another one of these when you first came
17    in?
18 A. Yes, I -- I would have signed another one
19    when I first came in because I had a whole
20    other job before that. This is when I went
21    to do the carts, like, work on the food
22    carts.
23 Q. Okay, and would that be true even though it
24    says, "Cleaner" for work assignment?
25 A. I -- I don't know why it says that, and

Page 60

1     that's what I'm saying to you, but I'm
2     telling you that when I went in there, I
3     was a cleaner, and then when I went to C2,
4     I still was a cleaner; however, I moved
5     over to the food carts. So I'm not sure --
6     they must have had us sign another sheet
7     when we went to the other unit because we
8     changed units.
9  Q. Okay.
10          MS. REVERCOMB:
11          I apologize. Can I just
12    interject for a minute. Olivia or
13    Ms. Post Rich is having phone
14    connection issues, and it sounds
15    like the screen is frozen for her,
16    so I'm wondering if we could just
17    pause.
18          MS. CROW:
19          Yeah, sure. Sure, we can go off
20    the record for -- for a couple of
21    minutes.
22          MS. REVERCOMB:
23          Okay. Thank you so much.
24          (Break in proceedings.)
25 BY MS. CROW:

15 (Pages 57 to 60)

Page 113

```
 1        right after and -- and move along if
 2        that's okay.
 3            MS. CROW:
 4            Yeah, that works for me.
 5            MS. RICH:
 6            All right.  Thank you.
 7            (Break in proceedings.)
 8            MS. CROW:
 9            I don't have any other questions.
10                EXAMINATION
11   BY MS. RICH:
12   Q.   Okay.  We just have a few redirect
13        questions.  So Ms. LaPointe, you earlier
14        testified about whether you received -- or
15        I'm sorry, reviewed the lawsuit prior to it
16        being filed.  Do you recall whether your
17        attorneys reviewed the allegations in the
18        Complaint with you prior to filing?
19            MS. CROW:
20            Object to the form.
21            THE WITNESS:
22            I recall speaking about it, yes.
23   BY MS. RICH:
24   Q.   Okay.  Before you testified that the doctor
25        at the facility was the one who denied your
```

Page 114

```
 1        special diet.  How do you know it was the
 2        doctor and not AGS or -- or another party
 3        who denied you your special diet?
 4   A.   Oh, they just told me I couldn't have a
 5        special diet, like, so I -- I don't know
 6        that it was the doctor or if it was AGS.  I
 7        just know that I was in Medical and asked
 8        for a special diet, and then they came back
 9        to me as it denied.
10   Q.   Okay.
11   A.   Because there was no special diet for me.
12   Q.   And you were asked earlier whether you did
13        anything besides painting and the voluntary
14        work program jobs.  Do you recall any
15        additional duties during COVID such as
16        sanitizing surfaces or --
17   A.   Oh, yes.
18            MS. CROW:
19            Object to the form.  Leading the
20        witness.
21   BY MS. RICH:
22   Q.   You testified about the reasons you
23        switched to the food service job.  Do you
24        -- do you recall if working in the food
25        service job provided any additional access
```

Page 115

```
 1        to food or higher quality food for those
 2        working there?
 3   A.   It did not.
 4            MS. CROW:
 5            Object to the form.
 6   BY MS. RICH:
 7   Q.   Okay.  You testified about the basic needs
 8        that you were deprived of.  You earlier
 9        mentioned that you experienced hunger and
10        weight loss while you were in the facility.
11        Would it be fair to say that you were
12        deprived of access to food?
13            MS. CROW:
14            Object to form.
15            THE WITNESS:
16            Yes.
17   BY MS. RICH:
18   Q.   And would it be fair to say you were
19        deprived of access to medical care?
20            MS. CROW:
21            Object.  Leading the witness.
22            THE WITNESS:
23            Yes.
24            MS. RICH:
25            I have nothing else.
```

Page 116

```
 1            MS. CROW:
 2            Okay.  I have no further
 3        questions.
 4            (Whereupon, the taking of the witness'
 5        testimony was concluded.)
 6              C E R T I F I C A T E
 7       THIS CERTIFICATION IS VALID ONLY FOR A
     TRANSCRIPT ACCOMPANIED BY MY ORIGINAL SIGNATURE
 8   AND ORIGINAL REQUIRED SEAL ON THIS PAGE.
 9       I, RAYNEL E. SCHULE, Certified Court
     Reporter, #77005, in good standing, in and for
10   the State of Louisiana, as the officer before
     whom this testimony was taken, do hereby certify
11   that LISA LaPOINTE, after having been duly sworn
     by me upon authority of R.S. 37:2554, did
12   testify as hereinbefore set forth in the
     foregoing 115 pages; that this testimony was
13   reported by me in stenotype reporting method,
     was prepared and transcribed by me or under my
14   personal direction and supervision, and is a
     true and correct transcript to the best of my
15   ability and understanding; that the transcript
     has been prepared in compliance with transcript
16   format guidelines required by statute or by
     rules of the Board, that I have acted in
17   compliance with the prohibition on contractual
     relationships, as defined by Louisiana Code of
18   Civil Procedure Article 1434 and in rules and
     advisory opinions of the Board; that I am not of
19   counsel, not related to counsel or to the
     parties herein, nor am I otherwise interested in
20   the outcome of this matter.
21
22   7-12-2023    _____
     Date         Raynel E. Schule, CSR
23               Certified Shorthand Reporter
                 State of Louisiana
24
25
```

29 (Pages 113 to 116)

U.S. Department of Homeland Security  
Immigration & Customs Enforcement

Buffalo Federal Detention Facility  
Batavia, New York

## DETAINEE VOLUNTARY WORK PROGRAM AGREEMENT

Detainees that participate in the volunteer work program will not be permitted to work in excess of 8 hours daily or 40 hours weekly.

Detainees that participate in the volunteer work program are required to work according to an assigned work schedule and to participate in all work-related training. Unexcused absence from work or unsatisfactory work performance could result in removal from the voluntary work program. Detainees must adhere to all safety regulations and to all medical and grooming standards associated with the work assignment. Compensation shall be $1.00 per day.

I, LAPOINTE-MAYMAN (Lisa), ID# 208 079 634, from Housing Unit C2-210, have read, understand, and agree to comply with the above. I have received and understand relevant safety training regarding my work assignment.

Cleaner  
(Work Assignment)

L. LaPointe  
(Detainee Signature)

1/15/2020  
(Date)

Laurie Finch  
(Department Manager Signature)

Original: Department Manager  
Yellow: Detention File

Pink: Detainee  
Gold: Chief of Security

BFDF – 0016  
Revised 05/2018

D-000565

EXHIBIT 12