## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

DALILA YEEND and
BOUNNAM PHIMASONE,
    Plaintiffs
            CIVIL ACTION NO.1:20-cv-01281
VERSUS
AKIMA GLOBAL SERVICES, LLC,
a/k/a AGS,
    Defendants

DEPOSITION OF SHANTADEWIE RAHMEE, given via Zoom Videoconferencing in the above-entitled cause, pursuant to the following stipulation, before Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, commencing at 8:35 o'clock a.m., on Tuesday, the 18th day of July, 2023.

## Page 2

```
                I N D E X
                                    Page
     Caption                          1
     Appearances                      3
     Agreement of Counsel             4
     Examination
        MS. CROW                    6, 95
        MS. HUSSAIN                   88
     Reporter's Certificate          97
```

## Page 3

APPEARANCES (Via Zoom Videoconferencing):

For the Plaintiff:

WORKER JUSTICE CENTER OF NEW YORK
Attorneys at Law
BY:  MAUREEN HUSSAIN, ESQ.
     CRISTINA BRITO, ESQ.
9 Main Street
Kingston, New York 12401

For the Defendant:

THE KULLMAN FIRM
A Professional Law Corporation
BY:  HEATHER F. CROW, ESQ.
     AMIEL J. PROVOSTY, ESQ.
1600 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163

Also Present:  ANNE DONOHUE, ESQ.
               IAN BOLDEN, ESQ.

Reported By:  Raynel E. Schule
              Certified Shorthand Reporter
              State of Louisiana

## Page 4

S T I P U L A T I O N

    It is stipulated and agreed by and among Counsel for the parties hereto that the deposition of SHANTADEWIE RAHMEE is hereby being taken via Zoom Videoconferencing pursuant to the Federal Rules of Civil Procedure for all purposes in accordance with law;

    That the formalities of reading and signing are specifically waived;

    That the formalities of sealing, certification, and filing are hereby specifically waived.

    That all objections, save those as to the form of the question and responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof is used or sought to be used in evidence.
               * * * * *

    Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

Page 5

```
 1          THE COURT REPORTER:
 2          Would counsel please identify
 3     themselves and their affiliations
 4     and also stipulate that by agreement
 5     of all parties, this deposition is
 6     being taken via videoconferencing,
 7     and there is no objection to the
 8     witness being sworn in remotely.
 9          MS. CROW:
10          I'm Heather Crow with The Kullman
11     Firm, and I'm here on behalf of
12     Defendant, Akima Global Services,
13     and we so stipulate.
14          MS. HUSSAIN:
15          Maureen Hussain on behalf of the
16     Plaintiffs, and we have no
17     objection.
18          SHANTADEWIE RAHMEE, having been first
19     duly sworn by Raynel E. Schule, Certified
20     Shorthand Reporter, was examined and
21     testified on her oath as follows:
22               EXAMINATION
23     BY MS. CROW:
24     Q.  Good morning.  As I just said, my name is
25         Heather Crow, and I'm here to take your
```

Page 6

```
 1     deposition this morning.  Before we get
 2     started into the meat of this, I'd like to
 3     go over just a few ground rules.  Have you
 4     ever given a deposition before?
 5  A. No, I haven't.
 6  Q. Okay, and you understand that you're under
 7     oath?
 8  A. Yes, I am.
 9  Q. And this will just be a question-and-answer
10     session.  I'll ask you a series of
11     questions for you to answer.  If you don't
12     understand a question, please let me know.
13     I'm happy to rephrase it or to repeat it.
14     If you don't ask me to rephrase or repeat,
15     I'll assume that you understood the
16     question.  Is that fair?
17  A. Fair enough.
18  Q. I will also ask you to please say yes or no
19     in your answers and not nod your head or
20     shake your head because that makes it more
21     difficult for the court reporter to get
22     down.  I'll ask you also not to guess or at
23     least not to guess without letting me know
24     that it's a guess.  Are you on any kind of
25     medication or have any kind of health issue
```

Page 7

```
 1     that would affect your ability to give full
 2     and truthful answers today?
 3  A. No.
 4  Q. Let me know if you need a break as we go.
 5     I'm happy to take a break as long as we
 6     finish any open question that's on the
 7     table.
 8  A. Yes.
 9  Q. If I say, "AGS" today, do you understand
10     that I'm referring to the Defendant in this
11     matter, Akima Global Services?
12  A. Yes.
13  Q. Okay, and you understand that if I say,
14     "ICE," I'm referring to the United States
15     Immigration and Customs Enforcement?
16  A. Yes.
17  Q. And if we're speaking about the Buffalo
18     Federal Detention Center today that's in
19     Batavia, and I call that Batavia, is that
20     acceptable to you?
21  A. Yes.
22  Q. Okay.  Are you a native English speaker?
23  A. Yes, I am.
24  Q. Also today during your deposition I'll show
25     you a series of documents.  I'll show them
```

Page 8

```
 1     on our screen, and some will be just to
 2     identify them for the record.  Some of them
 3     I may ask you questions about.  Please take
 4     your time in looking at the documents.  I'm
 5     happy to zoom in or zoom out or scroll up
 6     or down so that you have all of the time
 7     that you need to look at those documents
 8     before you answer any questions, okay?
 9  A. Yes.
10  Q. All right.  I want to start by showing you
11     a document.  Sorry, it will take just a
12     moment for me to pull this up.  Tell me if
13     you can see that.
14  A. Yes.
15  Q. And I will give a quick scroll down just so
16     you can see what we're looking at.  Do you
17     recognize this as the lawsuit that was
18     filed in this matter?
19  A. Yes, I do.
20  Q. And as it pertains to you, did you provide
21     information for this lawsuit?
22  A. Yes, I have.
23  Q. Did you review the lawsuit before it was
24     filed?
25  A. Yes, I did.
```

Page 9

1  Q. And everything in there is accurate and
2      truthful as it pertains to you?
3  A. Yes.
4  Q. What's your date of birth?
5  A. 12-13-71.
6  Q. And what's your country of origin?
7  A. Suriname.
8  Q. Are you married?
9  A. Yes.
10 Q. What's your address?
11 A. 135-07 224th Street, Laurelton, New York,
12     Laurelton, New York, 11413.
13 Q. And how long have you lived there?
14 A. Almost two years.
15 Q. I'm sorry. You said two years?
16 A. Yeah, almost two years.
17 Q. Okay. Does anyone live there with you?
18 A. My mother, my sister, my kids, and my
19     grandson.
20 Q. Do you have any history of drug or alcohol
21     use?
22 A. No.
23 Q. Did you graduate from high school?
24 A. No.
25 Q. Are you currently employed?

Page 10

1  A. Yes, I am.
2  Q. And where are you employed?
3  A. BJ's Wholesale Club.
4  Q. I'm sorry. Could you repeat that. There's
5      a little bit of a lag I think.
6  A. BJ's Wholesale Club.
7  Q. And how long have you worked at BJ's?
8  A. More than a year.
9  Q. Have you ever been involved in any prior
10     litigation, any other lawsuits?
11 A. No, I haven't.
12 Q. Have you ever filed for bankruptcy?
13 A. No.
14 Q. Have you ever filed an administrative
15     complaint with a governmental agency?
16 A. No.
17         MS. HUSSAIN:
18         I'm going to object to that
19     question.
20 BY MS. CROW:
21 Q. Are you an U.S. Citizen?
22 A. Sorry.
23 Q. Are you an U.S. Citizen?
24 A. No.
25 Q. What country are you a citizen of?

Page 11

1  A. Suriname.
2  Q. And do you have a green card?
3  A. I have --
4         MS. HUSSAIN:
5         I'm going to object to the
6      question.
7         You can answer.
8         THE WITNESS:
9         I have a green card.
10 BY MS. CROW:
11 Q. And when did you receive that?
12 A. When the Judge ordered my stay on March
13     30th, 2020.
14 Q. Now, besides the detention period that
15     we're talking about today at Batavia,
16     have you ever previously been placed in ICE
17     detention?
18        MS. HUSSAIN:
19        I'm going to object to that
20     question also, but you can answer.
21        THE WITNESS:
22        No, I haven't.
23 BY MS. CROW:
24 Q. Have you ever been convicted of a crime?
25 A. No.

Page 12

1  Q. What did you do to prepare for today's
2      deposition?
3  A. I met with my lawyers and went over the
4      case, the questions from you --
5  Q. And did -- and I don't want to know what
6      you discussed with your lawyers, but you
7      looked at some documents?
8  A. Yes, I have.
9  Q. Okay, and what documents were those?
10 A. The -- I can't properly say the name, the
11     inter --
12 Q. The Interrogatories, okay?
13 A. Yes.
14 Q. Got you. Did you have any conversations
15     about the deposition with anyone besides
16     your legal counsel?
17 A. Yes, my mother, my sister, my kids.
18 Q. Do you have any recorded or written
19     statements from any current or former AGS
20     employees?
21 A. No.
22 Q. What about ICE employees?
23 A. No.
24 Q. Do you have any recorded or written
25     statements from any current or former

3 (Pages 9 to 12)

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

EXHIBIT 13

Page 13

1  detainees?
2  A. No.
3  Q. Now, you were detained at the Buffalo
4     facility in Batavia beginning on or around
5     October the 28th, 2019. Is that correct?
6          MS. HUSSAIN:
7          She said, "Yes." I'm not sure if
8     you -- if you heard that.
9          MS. CROW:
10         No, I didn't.
11         THE WITNESS:
12         Yes, yes.
13 BY MS. CROW:
14 Q. Okay, and what's the reason that you were
15    being detained?
16 A. Because --
17         MS. HUSSAIN:
18         Before you answer, I'm going to
19    object to that question. Calls for
20    speculation, but you can answer.
21         THE WITNESS:
22         I was de -- I was detained for --
23    wait, how do I -- okay. I was
24    detained because I didn't testify
25    against -- I'm sorry, I -- I -- I

Page 14

1     didn't testify to the DA, and he
2     said if I didn't testify, he would
3     call ICE.
4  BY MS. CROW:
5  Q. And where was this?
6  A. In Binghamton.
7  Q. Just so I understand, you're saying that
8     you didn't testify to the DA, and so he
9     called ICE?
10 A. Yes.
11 Q. What sort of an issue was it that he wanted
12    you to testify regarding?
13 A. It was -- okay, I had an issue where I was
14    arrested, and they wanted me to testify
15    against the -- I guess the defendant.
16 Q. Against someone else?
17 A. Yeah, against someone else.
18 Q. Okay. What were you arrested for?
19 A. Being at the wrong place at the wrong time.
20 Q. And what do you mean by that?
21 A. I mean, it was more for drugs and drug
22    possession.
23 Q. It was for drug possession?
24 A. Against the other person.
25 Q. Did you have drugs in your possession?

Page 15

1  A. No.
2  Q. Okay. So you were with someone who was
3     arrested for -- for possession?
4  A. Yes.
5  Q. Okay, and you were arrested as well?
6  A. Yes.
7  Q. Were those charges dropped?
8  A. Yes, my charges was dropped.
9  Q. Was that the only time you've ever been
10    arrested?
11 A. Yes.
12         MS. HUSSAIN:
13         Objection.
14 BY MS. CROW:
15 Q. All right, and so did ICE come and pick you
16    up somewhere?
17 A. Yeah, ICE came where I went for -- for not
18    parole -- yeah, kind of parole, but it
19    wasn't really parole for me. I just had to
20    check in with them once a week.
21 Q. Okay, and who were you checking in with?
22 A. I don't remember her name.
23 Q. Do you know who she worked for?
24 A. No, I don't.
25 Q. And why were you having to check in?

Page 16

1          MS. HUSSAIN:
2          Objection.
3  BY MS. CROW:
4  Q. You can answer.
5  A. Okay. I had to check in -- actually, I'm
6     not sure why I had to check in, but I guess
7     we -- I guess -- well, I guess I had to
8     check in until the case was over.
9  Q. Okay. So your case was still pending; the
10    charges hadn't been dropped?
11 A. Yes, my case was pending. The charges
12    hadn't been dropped.
13 Q. Okay. So ICE came and picked you up during
14    one of your check-ins?
15 A. Yes.
16 Q. All right, and where were you taken when
17    you were picked up by ICE?
18 A. I was taken to Batavia.
19 Q. Okay. So you were taken immediately to
20    Batavia?
21 A. No, I went -- first they took me somewhere
22    where they -- I went for processing, and
23    then from there, they took me to Batavia.
24 Q. Okay. When you were processed in at
25    Batavia, did you have any personal property

Page 21

1  A. No.
2  Q. I'll show you another document. We'll mark
3     this one as "Exhibit 4." Have you seen
4     this handbook, and this one is labeled as
5     the Buffalo Federal Detention Facility
6     Handbook, and it begins on D-275 Bates
7     Number. So let me go back to my question.
8     Do you recognize this handbook?
9  A. No.
10 Q. No. You've never seen this book before?
11 A. No.
12 Q. Now, when you're placed into detention,
13    you're provided with certain clothing?
14 A. In detention, we only we had socks,
15    underwear, and uniform.
16 Q. All right, and were you given two sets of
17    the uniforms?
18 A. Yes, two sets of --
19 Q. And the uniform -- I'm sorry. Go ahead.
20 A. Shorts and t-shirt.
21 Q. And the uniform -- let me go back, make
22    sure I understand. So the uniform is made
23    up of long pants, shoes, and a shirt?
24        MS. HUSSAIN:
25        Objection to form.

Page 22

1        THE WITNESS:
2        Yes.
3  BY MS. CROW:
4  Q. All right, and then you were also issued
5     shorts and t-shirts?
6  A. Shorts and t-shirts.
7  Q. And that was in addition to the uniform?
8  A. Yes.
9  Q. All right, and did you also get underwear,
10    socks, and shower shoes?
11 A. Underwear, socks, and shower shoes, yes.
12 Q. Okay, and then a pair of sneakers?
13 A. Yes.
14 Q. Okay. Did you get a jacket?
15 A. Yes.
16 Q. All right. Were you issued towels?
17 A. Yes.
18 Q. What color was your uniform?
19 A. Orange.
20 Q. Did the color of your uniform depend on
21    your classification?
22 A. Yes, it did.
23        MS. HUSSAIN:
24        Objection to form.
25        THE WITNESS:

Page 23

1        Yes, it did.
2  BY MS. CROW:
3  Q. Were you also issued certain hygiene items
4     such as toothbrush, toothpaste, a comb?
5  A. Yes.
6  Q. And were you in a housing unit that was set
7     up with cells or that was in an open bunk
8     type of area?
9  A. Both.
10 Q. You were in both. Which one were you in
11    first?
12 A. The ones with the cells.
13 Q. So you were in the cell units first. Let
14    me -- I'm sorry. Let me repeat that
15    question. When you first came to Batavia,
16    you were in a cell unit?
17 A. Yes.
18 Q. And how long did you remain in the cell
19    unit?
20 A. A month before I was released.
21 Q. Okay. Until a month before?
22 A. Yeah, a month before.
23 Q. All right, and so then approximately a
24    month before you were released you were
25    transferred to an open bunk housing unit, a

Page 24

1     dorm-style housing unit?
2  A. Yes.
3  Q. Were all of the female detainees
4     transferred at the same time?
5  A. Yes.
6  Q. Do you know why that transfer was made?
7  A. Well, we were told that they were using the
8     space that we were in for men jail.
9  Q. In the housing units, the two housing units
10    that you were in, did either of those have
11    dispensers for soap and shampoo?
12 A. No, for soap -- for hand wash, yes. For
13    shampoo, no.
14 Q. Okay. Were you given bottles of soap and
15    shampoo --
16 A. No.
17 Q. -- for use in the showers?
18 A. No, no shampoo for the shower. We had to
19    buy those.
20 Q. Okay. You weren't given any of those --
21    the little bottles of them when you were --
22    when you were brought in?
23 A. No.
24 Q. Another document for you. All right.
25    We'll mark this as "Exhibit 5," and this is

6 (Pages 21 to 24)

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

EXHIBIT 13

Page 25

1  Bates No. PL91. Do you recognize this
2  form?
3  A. Yes.
4  Q. All right, and this is a Special Needs Form
5  that was issued by ICE at Batavia on the
6  day that you were -- on the day that you
7  were brought into Batavia?
8  A. Yes.
9  Q. This is a Special Needs Form?
10 A. Yes.
11 Q. And it's dated 10-29-19. This indicates
12 that for at least through December 1st your
13 housing was required that you be on a lower
14 bunk. Is that right?
15 A. Yes.
16 Q. Why were you required to be on a lower
17 bunk?
18 A. I couldn't climb the top -- top bunk, and I
19 have pain, and the bed was really narrow,
20 and I was afraid I will fall.
21 Q. And do you have a medical condition that
22 kept you from being able to climb up to the
23 top?
24 A. No. I just have pains in my knees.
25 Q. Okay, and when you were brought into

Page 26

1  Batavia, you were issued bedding that
2  consisted of sheets, a pillow, and two
3  blankets?
4  A. One blanket.
5  Q. Okay. So sheets, a pillow, and one
6  blanket?
7  A. Yes.
8  Q. Now, there were electronic tablets
9  available for detainee usage in the unit.
10 Is that correct?
11 A. Yes.
12 Q. And those were shared among the detainees?
13 A. Yes.
14 Q. And when you were processed into Batavia,
15 were you provided with a pin number so that
16 you could access the tablet and use it?
17 A. Yes.
18 Q. Was there anything else that you used that
19 pin for?
20 A. The phones.
21 Q. Phones. Okay. Were there certain things
22 that you could do on the tablets for free,
23 like, place a sick call or make a
24 commissary order?
25 A. I'm not sure. I never used the tablet, but

Page 27

1  to use a tablet you needed to have funds,
2  and I didn't have funds to do so, so I
3  never used the tablet.
4  Q. You never used the tablet at all during
5  your -- during your time in Batavia?
6  A. (Witness shakes head.)
7  Q. Did you ever attempt to use it?
8  A. No.
9  Q. There were religious services available if
10 you wanted to participate?
11 A. Yes.
12 Q. And were there barber services available
13 for haircuts?
14 A. Yes.
15 Q. There was a laundry available for
16 detainees?
17 A. Yes.
18 Q. And that was located in the indoor
19 recreation area or the common area?
20 A. Yes.
21 Q. And there was also a law library?
22 A. Yes.
23 Q. And pubic visitation was allowed; is that
24 correct, your family and friends could come
25 and visit?

Page 28

1  A. I'm sorry. Could you repeat the question.
2  Q. Yes. Public visitation was allowed so your
3  family and friends could come and visit?
4  A. Yes.
5  Q. Did you ever have visitation of your family
6  or friends denied?
7  A. No, I never had anyone to come and visit
8  me.
9  Q. You could also have legal counsel meet with
10 you on site?
11 A. Yes.
12 Q. Did you ever have legal counsel denied to
13 you?
14 A. No.
15 Q. And you could send and receive mail?
16 A. Yes.
17 Q. Did you ever have your incoming or outgoing
18 mailed denied?
19 A. No.
20 Q. Did you have access to outdoor recreation
21 every day?
22 A. Yes, it was every day.
23 Q. And was that open recreation, you could
24 come and go within certain time periods?
25 A. Yes.

7 (Pages 25 to 28)

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

EXHIBIT 13

```
                                                      Page 49
 1       you participated that the dollar that you
 2       earned each day would be deposited into
 3       your commissary account?
 4    A. Yes.
 5    Q. You participated in the voluntary work
 6       program, correct?
 7    A. Yes.
 8    Q. And you were there about two weeks before
 9       you began working?
10    A. Yes.
11    Q. And you learned that a position in the work
12       program was available?
13    A. Yes.
14    Q. How did you learn that?
15    A. From the detainees.
16    Q. So other detainees told you that there was
17       an open spot?
18    A. Yes.
19    Q. And was there sometimes a wait list for
20       these spots?
21            MS. HUSSAIN:
22            Objection to form.
23            THE WITNESS:
24            Yes.
25    BY MS. CROW:

                                                      Page 50
 1    Q. And you asked the officer on duty if you
 2       could take that position?
 3    A. Yes.
 4    Q. Do you recall who you asked about that?
 5    A. I spoke to Ms. Bordonaro.
 6    Q. All right. Did anyone force you to sign
 7       up?
 8    A. No.
 9    Q. Did anyone threaten you if you didn't sign
10       up?
11    A. No.
12    Q. What position were you assigned to or what
13       job were you assigned to?
14    A. Buffing the floors.
15    Q. All right. Now, before you could
16       participate, you received a short training.
17       Is that right?
18    A. No.
19    Q. No one taught you how to use the buffing
20       machine?
21    A. No.
22    Q. Did you already know how to use the buffing
23       machine?
24    A. No.
25    Q. How did you figure out how to use the

                                                      Page 51
 1       buffing machine?
 2    A. The girl that was leaving, she showed me
 3       how to use the machine.
 4    Q. Did you -- you didn't have to submit an
 5       application or anything like that in
 6       writing? You just had to advise the
 7       officer that you wanted to participate. Is
 8       that right?
 9    A. Yes.
10    Q. Aside from the buffing, did you have any
11       other jobs or work assignments?
12    A. Repeat the question.
13    Q. Aside from the buffing assignment, did you
14       have any other jobs or work assignments?
15    A. No.
16    Q. Could you quit the voluntary work program
17       if you wanted to?
18    A. Yes.
19    Q. Did you ever see detainees from a different
20       housing unit cleaning inside your housing
21       unit?
22    A. No.
23    Q. And was the cleaning that you did just
24       inside of your unit?
25    A. No. We also did painting outside the unit

                                                      Page 52
 1       and cleaning other dorms.
 2    Q. You said you did painting?
 3    A. Painting, cleaning the other dorms or --
 4    Q. How many -- let's talk about painting
 5       first. How many days would you say that
 6       you painted?
 7    A. Every day.
 8    Q. You painted every day that you were in
 9       detention?
10    A. Well, when -- when they started the paint
11       program. I'm not sure when -- when that
12       was.
13    Q. Okay. So when the paint program started,
14       do you know how long that lasted?
15    A. I'm not sure. Probably a month.
16    Q. So are you saying that you painted every
17       day for a month?
18    A. Yes.
19    Q. What were you painting?
20    A. The dorms, the hallway.
21    Q. Okay. Were there other detainees doing
22       that as well?
23    A. Yes.
24    Q. Did you volunteer for that position?
25    A. Yes.
```

13 (Pages 49 to 52)

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

EXHIBIT 13

Page 53

```
 1    Q.  I'm sorry.  I couldn't hear.
 2    A.  Yes.
 3    Q.  I want to show you another document, and
 4        we'll mark this as "Exhibit 8."  This is
 5        Bates No. D-562.  Do you recognize this as
 6        the Voluntary Work Program Agreement that
 7        you signed whenever you began the program?
 8    A.  Okay.  Can you just scroll down.  I just
 9        need to read.
10    Q.  I'm sorry.  I'll -- I'll give you a moment.
11    A.  Yes, that's good.
12    Q.  Tell me when you're ready, and I'll scroll
13        down.  No rush.
14    A.  Okay.  Could you scroll up.
15    Q.  That's the top of it.
16    A.  Okay.  Down.
17    Q.  Okay.
18    A.  Yes, that's my signature.
19    Q.  Okay, and is that your -- was that your
20        housing unit at the time A-1?
21    A.  Yes.
22    Q.  All right, and this is dated November the
23        14th, 2019?
24    A.  Yes.
25    Q.  And you understood before you started that
```

Page 54

```
 1        the rate of pay was one dollar a day?
 2    A.  Yes.
 3    Q.  Okay.  I'm going to pull another document
 4        to show you.  Just a moment.  We'll mark
 5        this as "Exhibit 9," and this is Bates No.
 6        D-563.  I'll give you just a moment to look
 7        at that.  Is that your signature on the
 8        first line?
 9    A.  Yes, that's my signature.
10    Q.  Okay, and this appears to be a chemical
11        training that detainees were provided along
12        with the particular cleaners for the
13        buffer.  Do you recall this?
14            MS. HUSSAIN:
15            Objection to form.
16            THE WITNESS:
17            No, I don't.
18  BY MS. CROW:
19    Q.  Okay, but that's your signature?
20    A.  That's my signature.
21    Q.  Okay.  You mentioned painting and buffing.
22        Were there any other jobs that you did?
23    A.  Painting, buffing, cleaning.
24    Q.  You mentioned cleaning other --
25    A.  Other dorms.
```

Page 55

```
 1    Q.  Other dorms.  Those are empty dorms?
 2    A.  Empty dorms, folding laundry.
 3    Q.  Did you fold laundry within your own
 4        housing unit?
 5    A.  Yes.
 6    Q.  All right.  When you cleaned an empty dorm,
 7        how many days would you say you did that?
 8    A.  We did that, it was from time to time, so
 9        probably to clean a dorm would take us
10        maybe two days.
11    Q.  And how many times did you do that?
12    A.  I'm not sure.
13    Q.  How many dorms did you clean?  Was it just
14        one or was there more than one?
15    A.  More than one.
16    Q.  You said it took about two days.  How many
17        times did you do the two-day dorm cleaning?
18    A.  In the afternoon -- in the afternoon and
19        after lunch.
20    Q.  Do you recall how many days that happened?
21    A.  I'm not sure.
22    Q.  What about laundry, how often did you fold
23        laundry?
24    A.  Laundry was -- laundry was every day.
25    Q.  Was it your own laundry or were you --
```

Page 56

```
 1    A.  No.  I was just helping fold the laundry
 2        that came into the dorm.
 3    Q.  Were you required to do that or was that
 4        something you volunteered for?
 5    A.  Something I volunteered for.
 6    Q.  Did you ever see anyone lose privileges
 7        entertainment or recreation, and I mean,
 8        television or tablets or recreation because
 9        they didn't clean up after themselves?
10    A.  Yes.  Not only after themselves.  If there
11        was no -- if someone quit -- if someone
12        quit the voluntary program.
13    Q.  If someone quit the voluntary program,
14        would the next person on the wait list be
15        offered that position?
16            MS. HUSSAIN:
17            Objection to form.
18            THE WITNESS:
19            It was more voluntary.  So if
20        there was someone on the next wait
21        list and they decided that they
22        didn't want to participate anymore,
23        they didn't really have to, but that
24        would be the consequences.  If
25        nobody volunteers, they take away
```

14 (Pages 53 to 56)

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

EXHIBIT 13

```
                                                           Page 97
 1             C E R T I F I C A T E
 2        THIS CERTIFICATION IS VALID ONLY FOR
      A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
 3    SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
      PAGE.
 4
           I, RAYNEL E. SCHULE, Certified Court
 5    Reporter, #77005, in good standing, in and for
      the State of Louisiana, as the officer before
 6    whom this testimony was taken, do hereby certify
      that SHANTADEWIE RAHMEE, after having been duly
 7    sworn by me upon authority of R.S. 37:2554, did
      testify as hereinbefore set forth in the
 8    foregoing 96 pages; that this testimony was
      reported by me in stenotype reporting method,
 9    was prepared and transcribed by me or under my
      personal direction and supervision, and is a
10    true and correct transcript to the best of my
      ability and understanding; that the transcript
11    has been prepared in compliance with transcript
      format guidelines required by statute or by
12    rules of the Board, that I have acted in
      compliance with the prohibition on contractual
13    relationships, as defined by Louisiana Code of
      Civil Procedure Article 1434 and in rules and
14    advisory opinions of the Board; that I am not of
      counsel, not related to counsel or to the
15    parties herein, nor am I otherwise interested in
      the outcome of this matter.
16
17
18    8-15-2023    _____
      Date         Raynel E. Schule, CSR
19                 Certified Shorthand Reporter
                   State of Louisiana
20
21
22
23
24
25
                                              25 (Page 97)
```

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

EXHIBIT 13

U.S. Department of Homeland Security
Immigration & Customs Enforcement

Buffalo Federal Detention Facility
Batavia, New York

## DETAINEE VOLUNTARY WORK PROGRAM AGREEMENT

Detainees that participate in the volunteer work program will not be permitted to work in excess of 8 hours daily or 40 hours weekly.

Detainees that participate in the volunteer work program are required to work according to an assigned work schedule and to participate in all work-related training. Unexcused absence from work or unsatisfactory work performance could result in removal from the voluntary work program. Detainees must adhere to all safety regulations and to all medical and grooming standards associated with the work assignment. Compensation shall be $1.00 per day.

I, **RAHMEE, Shangodawie** (Detainee name), ID# **070 898 110**, from Housing Unit **A1-127A** have read, understand, and agree to comply with the above. I have received and understand relevant safety training regarding my work assignment.

_____Cleaner_____
(Work Assignment)

_____*signed*_____
(Detainee Signature)

_____11/14/19_____
(Date)

_____*signed* Laurie Finch_____
(Department Manager Signature)

Original: Department Manager
Yellow: Detention File

Pink: Detainee
Gold: COTR

BFDF – 0016
Revised 07/10

D-000562

EXHIBIT 13