# Deposition Transcript

Case Number: 1:20-cv-01281-TJM-CFH
Date: September 29, 2023

In the matter of:

# YEEND, et al. v AKIMA GLOBAL SERVICES, LLC

# Gail Brabon



Reported by:

Jillian Moore
Notary Public

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

EXHIBIT 15

```
 2  UNITED STATES DISTRICT COURT

    NORTHERN DISTRICT OF NEW YORK

 3  - - - - - - - - - - - - - - - - - - - - - - - - - -x

 4  DALILA YEEND, BOUNNAM PHIMASONE, ELVIN
    MINAYA RODRIGUEZ, LISA LAPOINTE AND
 5  SHANTADEWIE RAHMEE,

 6                          Plaintiff,

 7
                                    CASE NO.:
 8                                  1:20-CV-01281-TJM-CFH

 9
                    -against-
10
    AKIMA GLOBAL SERVICES, LLC,
11
                            Defendant.
12  - - - - - - - - - - - - - - - - - - - - - - - - - -x

13          Oral deposition of GAIL BRABON, taken

14  pursuant to Order, was held  VIA VIDEOCONFERENCE,

15  commencing September 29, 2023 at 1:00 P.M., on the

16  above date, before JILLIAN MOORE, a Stenographer and

17  Notary Public in and for the State of New York.

18  - - - - - - - - - - - - - - - - - - - - - - - - - -x
```

A P P E A R A N C E S:

KAUFMAN LIEB LEBOWITZ & FRICK, LLP
Attorneys for Plaintiff
18 East 48th Street, Suite 802
New York, New York 100017

BY: ALISON FRICK, ESQ.

THE KULLMAN FIRM
Attorneys for Defendant
1100 Poydras Street, Suite 1600
New Orleans, LA
BY: AMIEL PROVOSTY, ESQ.
HEATHER CROW

WORKERS JUSTICE CENTER OF NEW YORK
MAUREEN HUSSAIN
CRISTINA BRITO

ALSO PRESENT:
IAN BOLDEN, AKIMA GLOBAL CORPORATE COUNSEL

G A I L B R A B O N,
the WITNESS herein, after having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:
EXAMINATION BY
MS. FRICK:
THE COURT REPORTER: State your name for the record, please.
THE WITNESS: Gail Brabon.
THE COURT REPORTER: What is your address?
THE WITNESS: 13366 Brayroad, Albion, New York 14411.
THE COURT REPORTER: Counsel, this is District Court. Will you be ordering a copy?
MR. PROVOSTY: Yes.
Q Good morning. Just barely morning, Ms. Brabon. My name is Ali Frick. I'm one of the lawyers representing the Plaintiff's in this case and I want to thank you for

taking the time out of your I'm sure very busy and potentially wet day. I don't know if you guys are having the same weather that we are down here. So thank you for making time for this deposition.
A Okay. You're welcome.
Q Okay. Have you ever sat for a deposition before?
A No.
Q So let me go over a few ground rules. What's going to happen is, I'm going to asking you questions, your going to answer them and our Court Reporter, Jillian, is going to write down everything that is said. Everything I say, everything that you say, everything your attorney says. So because of that, it's really important that we try our best not to speak over each.
So please let me get all the way to the end of my question, even if you know where I'm going, before

you start your answer and I will do my best to let you get all the way to the end of your answer before I start my next question; is that fair?
A Yes.
Q Please keep your voice up. Now that you're sort of scooched in, that's great. So we can hear you. If at any time you can't hear me or can't see me or you have a technical issue, just, you know, alert us and we'll -- and we'll put the deposition on pause, okay?
A Okay.
Q You need to make verbal answers so that it's written down by the Court Reporter. So saying "Uh-huh," "Mh-hmm," shrugging your shoulders, all of those answers can't be transcribed clearly. So please answer verbally, okay?
A Yes.
Q If you answer a question, I'm

Page 6

2  going to assume that you understood
3  it.  But if you don't understand my
4  question just let me know and I will
5  do my best to rephrase it, okay?
6  A    Yes.
7  Q    If you need to take a break at
8  any time, for any reason, that's
9  totally fine.  If there is a
10 question pending, I just ask that
11 you answer it and then we can take a
12 short break.  I'll let you know that
13 my goal is to have you out of here
14 relatively quickly.  We have, you
15 know, some important material to
16 cover.  But I'm not trying to waste
17 anybody's time today, okay?
18 A    Yes.
19 Q    Okay.  So can you tell me what
20 your current job title is?
21 A    My current job title is
22 commissary lead.
23 Q    Do you have other people who
24 work below you or report to you?
25 A    No.

Page 7

2  Q    Are there any other people who
3  work in the Commissary Department?
4  A    No.
5  Q    So what are your job duties as
6  the Commissary Lead?
7  A    I essentially handle all of
8  the detainee's money coming in and
9  going out.
10 Q    Anything else?
11 A    No.  That's pretty much it.
12 Q    Okay.  How long have you been
13 a Commissary Lead at Batavia?
14 A    I have been in this position
15 for 25 years but they changed the
16 title in 2015.
17 Q    What was your title before
18 2015?
19 A    The accountant four.
20 Q    Accountant four, as in the
21 number four?
22 A    Yes.
23 Q    And did the title change come
24 about because the contractor --
25 withdrawn.

Page 8

2       Did your employer change in
3  2015?
4  A    Yes.
5  Q    So who were you employed by
6  before 2014 -- 2015?
7  A    Valley Metro.
8  Q    And then starting in 2015 you
9  were employed by AGS?
10 A    Yes.
11 Q    And that's your current
12 employer?
13 A    Yes.
14 Q    And just so I'm clear, when I
15 say Batavia, you know I'm referring
16 to the Buffalo Federal Detention
17 Facility?
18 A    Yes.
19 Q    Okay.  Have you had any other
20 role or title at Batavia since 2015?
21 A    No.
22 Q    So part of your job is to
23 handle payments for the voluntary
24 detainee worker program, right?
25 **A    Yes.**

Page 9

**2  Q    And the pay is one dollar per**
**3  day, is that right?**
**4  A    Yes.**
5  Q    As long as you have worked at
6  Batavia, has that pay rate always
7  been one dollar per day?
8  A    Yes.
9  Q    What, if anything, about your
10 job changed when your employer
11 became AGS?
12 A    I would say just my title.
13 Q    Your job functions were the
14 same?
15 A    Exactly the same.
16 Q    So I would like to ask you
17 some questions about the detainee
18 worker program, okay?
19 A    Yes.
20 Q    So when a detainee joins the
21 worker program, what if any
22 information is provided to you?
23 A    None.
24 Q    How do you know which
25 detainees you are running payroll

GAIL BRABON
SEPTEMBER 29, 2023

JOB NO. 712862

Page 22

2  manager.  Was there away to run
3  queries with respect to just payroll
4  data?
5  A     No, there wasn't.
6  Q     So your testimony is that you
7  can't sort by say deposits?
8        MR. PROVOSTY:  Objection.
9           Form.  You can answer.
10 A     Ask it again please.
11 Q     Can you sort the data in KIF
12 by deposits?
13       MR. PROVOSTY:  Objection.
14          Form again.
15 A     Not by payroll, no.
16 Q     Well, my question is whether
17 you can sort by deposit?
18 A     I don't know.
19 Q     Okay.  And payroll would be --
20 would show up as a type of deposit?
21 A     Yes.
22 Q     How long had you been using
23 KIF?
24 A     Since April 5th, of 2023.
25 Q     Did you receive training on

Page 23

2  how to use the program?
3  A     Yes.
4  Q     Who trained you?
5  A     I can't think of her name.  Oh
6  my God.  It's on the tip of my
7  tongue.  I can't recall her name I'm
8  sorry.
9  Q     That's totally understandable.
10 Was it somebody who works for AGS?
11 Somebody who works for KIF or
12 somebody else?
13 A     KIF.
14 Q     And did that person come to
15 the facility to train you?
16 A     Yes.
17 Q     Did they give you any sort of
18 user manual or user guide in
19 writing?
20 A     No, I don't think so.
21 Q     Did they give you any other
22 written training materials?
23 A     No.
24 Q     Is detainee payroll run on a
25 certain day each week?

Page 24

2  A     The bulk of it is done on
3  Thursdays.
4  Q     What do you mean by the bulk
5  of it?
6  A     If a detainee leaves before
7  payday, I look them up and I see if
8  I owe him pay.  I will call the area
9  where he worked, and I will ask how
10 many pay do I owe him?  He is
11 leaving today.
12 Q     And how do you get that money
13 to the detainee who is leaving?
14       MR. PROVOSTY:  Objection.
15          Form.
16 A     Well, I will deposit it into
17 his account and then when I actually
18 release him, I will take cash down
19 to processing.
20 Q     How often do you have to check
21 whether a detainee is leaving --
22 withdrawn let me ask a different
23 question.
24       You said if you find out that
25 that a detainee is leaving you

Page 25

2  inquire about whether they are owed
3  pay, correct?
4  A     Correct.
5  Q     Are you told every single time
6  a detainee is leaving?
7  A     Yes.
8  Q     How do you -- how are you told
9  that?
10 A     I could be called on the
11 telephone or I could be given a call
12 out.  I would say most the time it's
13 a phone call.
14 Q     How much notice are you given
15 typically before a detainee is
16 leaving?
17 A     I don't know.  It varies.
18 Q     Is it typically three hours,
19 three days, something else?
20 A     Honestly, I would -- I don't
21 know.
22 Q     You can't give me an estimate
23 of the typical notice that you
24 receive?
25 **A     No, I mean it changes all the**

GAIL BRABON
SEPTEMBER 29, 2023

JOB NO. 712862

Page 66

2  Q    But you feel confident that
3  the detainees who were scheduled to
4  work that day, did, in fact, perform
5  work that day?
6  A    Oh, yes.
7  Q    So let's look at Lisa Lapoint.
8  She is listed here as one of the
9  relief workers.  Do you see that?
10 A    Yes.
11 Q    So I first want to ask you if
12 we zoom in a lot, if we can see it.
13 There are these little numbers that
14 say J2 and then something and then
15 J3 and J9.  Do you know what those
16 numbers refer to?
17 A    Yes, that means they are doing
18 job number 2 which is on the top
19 part of that pay sheet.  So whatever
20 that little J number is, it's
21 probably if you would scroll back
22 up, you could see it's somebody's
23 day off in that job and that's why
24 they're getting to do that job.
25 Q    Got it.  So that just

Page 67

2  indicates the job that they
3  performed that day?
4  A    Correct.
5  Q    Great.  Thank you.  And so Ms.
6  Lapoint's day off on this week were
7  Thursday and Tuesday, correct?
8  A    Yes.
9  Q    And she worked the other days
10 Friday, Saturday, Sunday, Monday,
11 Wednesday, right?
12 A    Yes.
13 Q    Do you know why that five is
14 crossed out?
15 A    She is no longer in the
16 building, I think.
17 Q    Okay.  Let's go to the second
18 page.  This is for the same week
19 March 11th, 2020.  And I'll just
20 show you this -- up here March 11th,
21 2020.  And this is the sign in sheet
22 for the paint detail.  Do you see
23 that?
24 A    Okay.
25 Q    Let me go up to -- first back

Page 68

2  to the first page.  Ms. Rahmee also
3  worked five days in the pod.  Do you
4  see that?
5  A    Yes.
6  Q    And she worked Tuesday -- I'm
7  sorry Thursday, Friday, Monday,
8  Tuesday, Wednesday, right?
9  A    Yes.
10 Q    Okay.  So now she's also
11 listed here on the paint detail
12 having worked Monday.  Do you see
13 that?
14 A    Yes.
15 Q    And all of the workers here,
16 all of these days are crossed off.
17 Do you know why that is?
18 A    Because it says all pod
19 workers.
20 Q    So tell me what that means?
21 A    They've already been paid $5.
22 They're not getting paid anymore
23 than $5.
24 Q    So since they all already have
25 a job they're not going to get paid

Page 69

2  additionally for the paint detail,
3  right?
4       MR. PROVOSTY:  Objection.
5       Form.
6  A    That is correct.
7  Q    Okay.  So is it fair to say
8  that it's AG's policy to pay one
9  dollar per day no matter how many
10 different jobs somebody might work
11 on that day?
12      MR. PROVOSTY:  Objection.
13      Form.
14 A    It is Ice policy.
15 Q    And what -- how -- where does
16 your understanding that it's Ice
17 policy come from?
18 A    I was told many years ago and
19 it's on the forms that Ice designed.
20 Q    When you say it's on the forms
21 that Ice designed.
22 A    Yes.
23 Q    What forms are you talking
24 about?
25 **A    All these pay sheets.**

Page 70

```
 2   Q     And how do you know that Ice
 3   designed them?
 4   A     Because I was here when they
 5   did it.
 6   Q     When did that happen?
 7   A     In 1998.
 8   Q     So tell me about what you know
 9   about Ice designing the forms?
10   A     They structured it.  This is
11   how they wanted it.  This is how
12   they built it and I got copies of
13   it.
14   Q     Was there a different rule in
15   place before 1998?
16   A     I wouldn't know.
17   Q     So in 1998, who was the
18   contractor at the Batavia facility?
19   A     For the support staff it was
20   Kuznik.
21   Q     Is that -- was that your
22   employer?
23   A     Yes.
24   Q     And so tell me how you know
25   that it was Ice who did these sheets
```

Page 71

```
 2   as opposed to Kuznik?
 3   A     Because I worked with a person
 4   that was in charge of it.  In charge
 5   of payroll.
 6   Q     You worked with the Ice
 7   representative.  Is that what you're
 8   saying?
 9   A     Yes.  Yes.
10   Q     Okay.  What was that person's
11   job?
12   A     I don't know.
13   Q     In your role now, do you
14   report to anybody at Ice?
15   A     No.
16   Q     Are you supervised by anybody
17   at Ice?
18         MR. PROVOSTY:  Objection.
19             Form.
20   A     No, but I take direction.
21   Q     What do you mean that, you
22   take direction?
23   A     If I'm told to do something by
24   Ice, then I have to do it.
25   Q     How often does Ice give
```

Page 72

```
 2   direction to you that you have to
 3   do?
 4   A     Not very often.
 5   Q     When was the last time that
 6   Ice directed you to do something?
 7   A     I couldn't begin to guess.  I
 8   have no idea.
 9   Q     Long enough ago that you don't
10   remember?
11   A     Probably yeah.
12   Q     Okay.  I'm going to show you
13   what was previously marked as
14   Exhibit 48.  This is another payroll
15   sheet for the week of January 29th,
16   2020.  So if we first, I'm going to
17   first look at the second page.  This
18   is a payroll sheet for the week of
19   January 29th, 2020.  So if we look
20   again at Lisa Lapoint, she was the
21   relief worker in her housing unit,
22   and she worked Friday, Saturday,
23   Sunday, Monday, Wednesday, correct?
24   A     Yeah.
25   Q     And then on the first page,
```

Page 73

```
 2   that same week, she also did a paint
 3   detail looking at Ms. Lapoint on
 4   Monday and Tuesday, right?
 5   A     Yes.
 6   Q     And so that's the total of six
 7   days?
 8   A     Okay.
 9   Q     Because Tuesday was her day
10   off in the pod, right?
11   A     Hang on a minute, yes.
12   Q     Okay.  So but Ms. Laoint was
13   only paid $5 for that week, correct?
14   A     Correct.
15   Q     Because the adjustor's policy
16   is to can't pay it $5, correct.
17         MR. PROVOSTY:  Objection to
18             form.
19   A     It is not AGS it is Ice
20   policy.
21   Q     Okay.  And it is the policy
22   that you respond to when you were
23   making payroll that you pay only a
24   cap of $5 per week, correct?
25   A     That is correct.
```

Page 138
```
 2           THE WITNESS:  Okay.  Thank
 3              you.
 4           MR. PROVOSTY:  No questions
 5              for us.  So just on the
 6              record, we do want to read
 7              and sign.
 8           (Whereupon, the examination of
 9              GAIL BRABON
10              was concluded at 2:30 P.M. )
11
12                 _____
13                    GAIL BRABON
14
15   Subscribed and sworn to
16   before me on this_____ day
17   of _____, _____.
18   _____
19   Notary Public
20
21
22
23
24
25
```

Page 139
```
 2                    I N D E X
 3   WITNESS           EXAMINATION BY         PAGE
 4   GAIL BRABON       MS. FRICK              3
 5
 6                    EXHIBITS
 7
     PLAINTIFF'S       DESCRIPTION            PAGE
 8
      47              BATCH LISTING           51
 9
      48              PAYROLL SHEET           56
10
      50              TWO PAGE DOCUMENT       83
11
      51              THREE PAGE DOCUMENT     97
12
      52              SIGN-IN SHEET           105
13
      53              ACTIVITY LEDGER         106
14
      54              DOCUMENT                120
15
      55              SIGN-IN SHEET           121
16
17
18
19
20
21
22
23
24
25
```

Page 140
```
 2               C E R T I F I C A T E
 3       I, JILLIAN MOORE, a Shorthand Reporter and
 4   Notary Public of the State of New York, do
 5   hereby certify:
 6   That the WITNESS whose examination is
 7   hereinbefore set forth, was duly sworn, and
 8   that such examination is a true record of the
 9   testimony given by such WITNESS.
10   I further certify that I am not related to any
11   of the parties to this action by blood or
12   marriage; and that I am in no way interested in
13   the outcome of this matter.
14
15
16
17
18
19
20
21
22           *Jillian Moore* (signature)
              JILLIAN MOORE
23
24
25
```

Page 141
```
 2         ERRATA SHEET FOR THE TRANSCRIPT OF:
     Case Name:       DALILA YEEND, BOUNNAM PHIMASONE,
 3   ELVIN MINAYA RODRIGUEZ, LISA LAPOINTE, AND SHANTADEWIE
     RAHMEE V. AKIMA GLOBAL SERVICES, LLC.
 4   Dep. Date:       SEPTEMBER 29, 2023
     Deponent:        GAIL BRABON
 5
                     CORRECTIONS:
 6
     Pg.  Ln.  Now Reads       Should Read       Reason
 7   ___  ___  _____     _____       _____
          ___  _____     _____       _____
 8   ___  ___  _____     _____       _____
          ___  _____     _____       _____
 9   ___  ___  _____     _____       _____
          ___  _____     _____       _____
10   ___  ___  _____     _____       _____
          ___  _____     _____       _____
11   ___  ___  _____     _____       _____
          ___  _____     _____       _____
12
13                            _____
14                                GAIL BRABON
15   SUBSCRIBED AND SWORN TO BEFORE ME
16   THIS___DAY OF_____, 20__
17
18
19   _____
20   (Notary Public) MY COMMISSION EXPIRES:_____
21
22
23
24
25
```