UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DALILA YEEND, BOUNNAM PHIMASONE,
ELVIN MINAYA RODRIGUEZ, LISA
LAPOINTE, and SHANTADEWIE RAHMEE,

Individually, and on behalf of all others
similarly situated as Class Representatives,

                    Plaintiffs,

-against-

AKIMA GLOBAL SERVICES, LLC,

                  Defendant.

No.  20 Civ. 1281 (TJM) (CFH)


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO EXCLUDE EXPERT TESTIMONY**


Kaufman Lieb Lebowitz & Frick LLP
18 E. 48th Street, Suite 802
New York, New York 10017
(212) 660-2332


Worker Justice Center of New York
9 Main Street
Kingston, New York 12401
(845) 331-6615

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................i

TABLE OF AUTHORITIES.......................................................................... iii

INTRODUCTION......................................................................................... 1

SUMMARY OF EXPERTS' OPINIONS...................................................... 1

ARGUMENT .................................................................................................3

   I.     Courts Favor Admitting Expert Testimony Under Rule 702...................3

   II.    Dr. Grassian's Testimony Should Be Admitted ........................................5

     A.  AGS Misrepresents the Purpose of Dr. Grassian's Testimony ..................5

        1.     Because Dr. Grassian's opinion concerns the "reasonable person" in the detainees' position, no individualized mental health evaluations were required ..................................................................................................5

        2.     Because Dr. Grassian does not diagnose any conditions or assess individual damages, no differential diagnosis analysis was required ...............................7

     B.  Dr. Grassian's Testimony Satisfies Rule 702's Requirements...................9

        1.     Dr. Grassian's Opinions Relied on Sufficient Facts and Data...........................9

        2.     Dr. Grassian's Opinions Are Reliable ................................................. 12

        3.     Dr. Grassian's Opinion Will Aid the Factfinder ............................... 15

   III.    Dr. Childers's Testimony Should Be Admitted ...................................... 16

     A.  AGS's Disagreements with Dr. Childers's Opinions Are Matters for Cross-Examination, Not a Basis for Exclusion.................................................... 16

     B.  Dr. Childers's Proffered Testimony Satisfies Rule 702............................. 18

        1.     Dr. Childers Has the Requisite Technical Knowledge to Render an Expert Opinion About Work Time, Which Will Aid the Jury ..................................... 18

        2.     Dr. Childers's Opinions Are Reliable................................................. 20

           a. The APPA Guidelines Provide a Valid Methodology for Estimating Custodial Work Time, Which Dr. Childers Used Appropriately ......................................... 21

           b. Dr. Childers Was Entitled to Rely on AGS's Admissions .............................. 23

c. Dr. Childers Made Reasonable Decisions About Wage Rates to Form a Conservative Estimate of Labor Costs ................................................................ 24

d. Dr. Childers's Testimony Rests on a Reliable Foundation and Is Relevant to the Factual Determinations the Jury Must Make ............................................. 25

**CONCLUSION** ...................................................................................................... **25**

**Cases**

*Actava TV, Inc. v. Joint Stock Co. "Channel One Russ. Worldwide"*, No. 18 Civ. 06626, 2023 WL 2528542 (S.D.N.Y. Mar. 15, 2023) ................................................................17, 21

*Arruda v. C.R. Bard, Inc.*, No. 19 Civ. 1523, 2020 WL 4569436 (N.D.N.Y. Aug. 6, 2020) .....7

*Barrientos v. CoreCivic, Inc.*, No. 18 Civ. 70, 2023 WL 2666852 (M.D. Ga. Mar. 28, 2023)....................................................................................................7

*Borawick v. Shay*, 68 F.3d 597 (2d Cir. 1995) ......................................................................3

*Braggs v. Dunn*, 317 F.R.D. 634 (M.D. Ala. 2016)...............................................................12

*Cerbelli v. City of New York*, No. 99 Civ. 6846, 2006 WL 2792755 (E.D.N.Y. Sept. 27, 2006)................................................................................... 4, 12, 13

*Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) ................... 4

*Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950, 2022 WL 814074 (S.D.N.Y. Mar. 17, 2022) ....................................................................................8, 10, 25

*CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673 (S.D.N.Y. 2011) ..............................................................................................................12

*Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53 (S.D.N.Y. 2001) ...........................3

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)...........................................passim

*David v. Signal Int'l, LLC*, No. 12 Civ. 557, 2015 WL 151451 (E.D. La. Jan. 10, 2015)...........14

*DeRienzo v. Metro. Transp. Auth.*, 694 F. Supp. 2d 229 (S.D.N.Y. 2010) ..............................7

*Disability Advocs., Inc. v. Paterson*, No. 03 Civ. 3209, 2008 WL 5378365 (E.D.N.Y. Dec. 22, 2008) .................................................................................................12

*Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85 (2d Cir. 2000) ..........................................10

*Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447 (S.D.N.Y. 2014) ..................... 17, 24, 25

*In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5 (S.D.N.Y. 2020) ...................... 4

*In re M/V MSC FLAMINIA*, No. 12 Civ. 8892, 2017 WL 3208598 (S.D.N.Y. July 28, 2017)......................................................................................................10

*In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604 (8th Cir. 2011) .......................... 4

*Jacquety v. Baptista*, 538 F. Supp. 3d 325 (S.D.N.Y. 2021) .................................................15

*Krause v. CSX Transp.*, 984 F. Supp. 2d 62 (N.D.N.Y. 2013) ................................................ 20

*Kumho Tire v. Carmichael*, 526 U.S. 137 (1999)............................................................... 4

*Langley v. Coughlin*, 715 F. Supp. 522 (S.D.N.Y. 1989)...................................................... 6, 8

*Lappe v. Am. Honda Motor Co.*, 857 F. Supp. 222 (N.D.N.Y. 1994)....................................19

*Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316 (E.D.N.Y. 2013) ...........................................15

*McCullock v. H.B. Fuller Co.*, 981 F.2d 656 (2d Cir. 1992).................................................. 20

*Menocal v. GEO Grp., Inc.*, 320 F.R.D. 258 (D. Colo. 2017) ................................................15

*Munafo v. Metro. Transp. Auth.*, No. 00 Civ. 0134, 2003 WL 21799913
   (E.D.N.Y. Jan. 22, 2003) .................................................................................. 8

*New York State Nurses Ass'n v. Albany Med. Ctr.*, 473 F. Supp. 3d 63
   (N.D.N.Y. 2020) ...........................................................................................7

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) .................................................. 3, 8

*Paguirigan v. Prompt Nursing Emp't Agency LLC*, No. 17 Civ. 1302, 2018 WL 4347799
   (E.D.N.Y. Sept. 12, 2018)................................................................................7

*Reynolds v. Arnone*, 645 F. Supp. 3d 17 (D. Conn. 2022) .................................................. 6, 8

*Rowe Ent., Inc. v. William Morris Agency, Inc.,* No. 98 Civ 8272, 2003 WL 22124991
   (S.D.N.Y. Sept. 15, 2003) ................................................................................12

*Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249 (2d Cir. 2005)...........................................8

*Tardif v. City of New York*, 344 F. Supp. 3d 579 (S.D.N.Y. 2018) ........................................15

*U.S. v. Brown*, 415 F.3d 1257 (11th Cir. 2005) ............................................................. 4

*U.S. v. Brown*, 776 F.2d 397 (2d Cir. 1985)..................................................................19

*U.S. v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004) .......................................................... 20

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003)...................................................16

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) .....................................................10

*United States v. Paul*, 175 F.3d 906 (11th Cir. 1999)..................................................... 20

*United States v. Raniere*, No. 18 Cr. 2041, 2019 WL 2212639
   (E.D.N.Y. May 22, 2019) ..........................................................................6, 8, 14

*United States v. Ray*, 20 Cr. 110, 2022 WL 101911 (S.D.N.Y. Jan. 11, 2022) ................... 13, 16

*United States v. Swanquist*, 161 F.3d 1064 (7th Cir. 1998) ................................................... 20

*United States v. Torres*, No. 20 Cr. 608, 2021 WL 1947503 (S.D.N.Y. May 13, 2021) .......... 16

*Vazquez v. City of New York*, No. 10 Civ. 6277, 2014 WL 4388497
    (S.D.N.Y. Sept. 5, 2014) ..................................................................................................... 14

*Williams v. Brown*, 244 F. Supp. 2d 965 (N.D. Ill. 2003) .................................................. 6, 16

*Wills v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004) ...................................................... 5

*Wilson v. Woods,* 163 F.3d 935 (5th Cir. 1999) .................................................................... 20

**Rules and Statutes**

18 U.S.C. § 1589(c)(2) .............................................................................................................. 1

Fed. R. Evid. 702 ...................................................................................................................... 3

**INTRODUCTION**

Defendant AGS's motion to exclude the testimony of Plaintiffs' experts should be denied. First, AGS's arguments to exclude Dr. Stuart Grassian's testimony rely on a fundamental misunderstanding of his testimony. Dr. Grassian does not purport to offer a forensic psychiatric evaluation of Plaintiffs or any other witness, diagnose any psychological conditions, or assess individual damages; instead, his testimony is relevant to showing how a reasonable person in the detainees' situation would react to the alleged conditions at BFDF: namely, that they would feel compelled to work. *See* 18 U.S.C. § 1589(c)(2) (unlawful to create conditions that would "compel a reasonable [detainee] . . . to perform or to continue performing labor or services in order to avoid incurring that harm"). In forming his opinion, Dr. Grassian reviewed testimony of multiple detainees and AGS employees, learned information from interviews with additional detainees, examined photographs and other evidence about the conditions of the facility, and relied on his own expertise regarding the coercive nature of incarceration to analyze the effects these conditions—if true as described by the detainees—would have on a reasonable detainee in a similar situation. That the detainees' assertions of those conditions are contested by AGS and will have to be proven by Plaintiffs at trial does not render Dr. Grassian's testimony inadmissible.

Second, Dr. Michael Childers's opinion about the number of hours detainees spent performing their work tasks and the cost of paying non-detained workers to perform those tasks is reliable and admissible. He has the necessary qualifications and his opinions were rendered from reliable methodologies. AGS's quibbles with minor details of his testimony are subjects for cross-examination, not justification for exclusion.

**SUMMARY OF EXPERTS' OPINIONS**

Plaintiffs produced two expert reports in this case. Dr. Stuart Grassian is Board-certified psychiatrist with a specialty in evaluating individuals who were confined in prisons,

ICE detention facilities, and secure psychiatric hospitals. Dr. Grassian reviewed four sworn statements from detainees at BFDF; the deposition testimony of the named Plaintiffs and several AGS employees; the BFDF Detainee Handbook; training materials for AGS officers at BFDF; and photos of the inside of the facility. His assistant, with his guidance and oversight, also conducted phone interviews of eight detainees (seven of whom were either Plaintiffs or sworn declarants). Dr. Grassian reviewed notes from those interviews and discussed them with his assistant at length. Summarizing these materials, his opinion describes the experiences common to BFDF detainees: the inherently vulnerable condition of being detained; the inadequacy of the food provided; the reliance on AGS staff for basic necessities, like access to tampons; the widespread belief that AGS would punish people who refused to work, including by influencing their immigration cases; the repeated threats of collective punishment for a whole housing unit if someone refused to work; and the dignitary harms of being paid only $1 per day of work. With this information, Dr. Grassian opined that the conditions at BFDF as described by the detainees would be coercive to a reasonable person in the detainees' position and, specifically, would induce detainees to join the "voluntary" work program. *See generally,* Grassian Rep.[1]

Michael Childers, PhD, is a professor in the Department of Labor Education at the University of Wisconsin-Madison and an industrial engineer. Throughout his career, he has conducted hundreds of time studies in manufacturing, warehousing, service, and government organizations, and has worked with unions and companies to help determine production standards, workloads, and staffing levels. Dr. Childers examined testimony from Plaintiffs, AGS, and several AGS employees regarding the work that detainees performed at the facility, AGS documents reflecting the number of work shifts detainees completed in

---

[1] Citations to "Grassian Rep." refer to the Dr. Grassian's expert report, attached as Exhibit 1 (ECF No. 158-2) to Defendant's motion.

each job category, photos of the facility, and information provided by ICE regarding the square footage of different areas of the facility to determine the time it likely took for detainees to perform their tasks,[2] how much a worker paid at minimum wage would be paid for those tasks, and how much it would have cost to compensate non-detained employees to perform those tasks. *See generally*, Childers Rep.[3]

## ARGUMENT

## I. COURTS FAVOR ADMITTING EXPERT TESTIMONY UNDER RULE 702

Expert testimony is admissible if the witness is appropriately qualified and his or her testimony is based on sufficient data, is the product of reliable methods, and is likely to assist the trier of fact. Fed. R. Evid. 702. The rule "embodies a liberal standard of admissibility for expert opinions," *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005), and, after *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)*,* "the rejection of expert testimony is the exception rather than the rule," *see Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 75 (S.D.N.Y. 2001).

In *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995), the court explained the impact of the *Daubert* decision:

> First, ... *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence. Second, it emphasizes the need for flexibility in assessing whether evidence is admissible. Rather than using rigid "safeguards" for determining whether testimony should be admitted, the Court's approach is to permit the trial judge to weigh the various considerations pertinent to the issue in question. Third, *Daubert* allows for the admissibility of scientific evidence, even if not generally accepted in the relevant scientific community, provided its reliability has independent support. Finally, the Court has expressed its faith in the power of the

---

[2] This determination was necessary because AGS did not track the hours detainees worked. Trippany 30b6 Tr. 34:17-25. Craig Trippany testified in both an individual capacity and on behalf of Defendant AGS, pursuant to Federal Rule of Civil Procedure 30(b)(6). His testimony on behalf of AGS is cited as "Trippany 30b6 Tr." The full transcript was attached as Exhibit C (ECF No. 129-5) to Plaintiffs' opposition to AGS's first motion for summary judgment.

[3] Citations to "Childers Rep." refers to the expert report of Michael Childers, attached as Exhibit 3 (ECF No. 158-4) to Defendant's motion.

adversary system to test "shaky but admissible" evidence and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable.

Ultimately, the court's gatekeeping inquiry must be "flexible" and "tied to the facts of a particular case." *Cerbelli v. City of New York*, No. 99 Civ. 6846, 2006 WL 2792755, at *2 (E.D.N.Y. Sept. 27, 2006) (quoting *Kumho Tire v. Carmichael*, 526 U.S. 137, 150 (1999)).

Courts are even more lenient at the class certification and summary judgment stages. AGS seeks to exclude Plaintiffs' proffered expert testimony for all purposes, including class certification, summary judgment, and trial, yet elides the different purposes for which expert evidence is assessed at each of these procedural stages. The scope of the *Daubert* analysis when determining whether to consider expert testimony to assist with class certification is "limited to whether or not the expert reports are admissible to establish the requirements of Rule 23," *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020) (internal citation removed) (denying motion to exclude), and courts have found that it would be "premature to decide whether aspects of an expert opinion that go exclusively to the merits and not to the elements of Rule 23 would be admissible in subsequent proceedings," *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110 (S.D.N.Y. 2015). At this stage, courts are less concerned with whether a jury will be swayed by unreliable testimony. *Id.* Similarly, on summary judgment, there is no need "to protect juries from being swayed by dubious scientific testimony," as the judge is the decision maker. *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) (discussing a "less stringent application" of *Daubert* in bench trials); *U.S. v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself."). A district court's role at this stage is limited to "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see also Wills v. Amerada*

*Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004). The proffered testimony of Dr. Grassian and Dr. Childers easily satisfies these requirements.

## II.    DR. GRASSIAN'S TESTIMONY SHOULD BE ADMITTED

### A.    AGS Misrepresents the Purpose of Dr. Grassian's Testimony

AGS's attack on the forensic reliability of Dr. Grassian's report is based on a fundamental misunderstanding of the range of acceptable methodologies for psychiatric opinions and the purpose of Dr. Grassian's report. *Cf.* Def. Br. 13-17. Psychiatric experts, like other experts, are "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. There is no requirement that all psychiatric expert opinions must include an independent mental health examination or a differential diagnosis, particularly where the opinion concerns general psychological impacts of environmental stimuli and does not involve any specific diagnosis or damages assessment.

### 1.    Because Dr. Grassian's opinion concerns the "reasonable person" in the detainees' position, no individualized mental health evaluations were required

The purpose of Dr. Grassian's report was not to assess any Plaintiff or witness for a specific psychological condition, but rather to explain, from a psychiatric standpoint, how the environment at BFDF and the reported actions of AGS employees would affect a "reasonable person" in the detainees' position. As he testified, Dr. Grassian did not provide a "psychiatric evaluation of detainees." Grassian Dep. 66:23-24; 67:2-7.[4] Instead, his more "limited and general" opinion analyzed the emotional effects of "the detainees' experience of confinement at BFDF and their experience of the work program." *Id.* 65:7-13, 67:2-7. In reviewing materials related to the detainees' experiences, Dr. Grassian identified patterns,

---

[4] Citations to "Grassian Dep." refers to the deposition of Dr. Stuart Grassian, attached as Exhibit 2 (ECF No. 158-3) to Defendant's motion.

including "attitude, threats, and punishment inflicted on those who refused to work," that, in the context of the "deprivation scheme" of the detention center, led to his conclusion, "to a reasonable degree of medical certainty, that for a reasonable person in the position that the Batavia detainees find themselves," "the work program at ICE-Batavia is coercive in nature." Grassian Rep. 13.

Testimony like Dr. Grassian's can help courts to "answer hypothetical questions about what sequelae are likely to follow from a given event," even absent an individual mental health evaluation. *Williams v. Brown*, 244 F. Supp. 2d 965, 968 (N.D. Ill. 2003) (admitting opinion on the general psychological impact of unlawful police searches in a class action case). Recognizing Dr. Grassian as "an expert with regard to the psychological effects of restricted and isolated conditions of prolonged confinement," numerous courts have admitted his psychiatric opinions concerning the general effects of environmental restrictions in carceral and non-carceral settings, including in cases that do not involve individual mental health evaluations. *E.g., United States v. Raniere*, No. 18 Cr. 2041, 2019 WL 2212639, at *6 (E.D.N.Y. May 22, 2019) (admitting Dr. Grassian's opinions that environmental restrictions have a "profoundly deleterious effect on mental functioning" and that "individuals experiencing environmental restriction often experience fear and helplessness because they have to depend entirely on others," among other opinions).[5] The fact that AGS's rebuttal expert, Dr. Harold Bursztajn, disagrees with Dr. Grassian's opinion does not render it inadmissible. *See* Def. Br. 14 (Dr. Bursztajn mischaracterized Dr. Grassian's opinion as "ostensibly" a "mental health evaluation.").

---

[5] *See also, e.g., Reynolds v. Arnone*, 645 F. Supp. 3d 17, 25 (D. Conn. 2022) (admitting Dr. Grassian's opinions about "the medical risks of prolonged isolation in general" and whether certain "confinement conditions could plausibly cause a person emotional distress"); *Langley v. Coughlin*, 715 F. Supp. 522, 540 (S.D.N.Y. 1989) (Dr. Grassian's opinion offered to analyze "the severe psychological impact that placement in SHU is likely to have on disordered individuals" in a class action prisoner lawsuit).

AGS's citation to an out-of-circuit case concerning the need for individualized assessments under the TVPRA is unavailing here for the same reasons it was unpersuasive in AGS's opposition to Plaintiffs' motion for class certification: It employs legal standards contrary to Second Circuit precedent. *Compare* Def. Br. 14 (discussing *Barrientos v. CoreCivic, Inc.*, No. 18 Civ. 70, 2023 WL 2666852 (M.D. Ga. Mar. 28, 2023)) *with* ECF No. 153 (Plaintiffs' Reply in Further Support of their Motion to Certify Rule 23 Classes) at 7-8 (same). Within the Second Circuit, the relevant question for Plaintiffs' TVPRA claim is "whether 'a reasonable person of the same background and circumstances would have also felt coerced,'" by AGS's scheme. *Doe 1 v. JPMorgan Chase Bank, N.A.*, No. 22 Civ. 10019, 2023 WL 3945773, at *9 (S.D.N.Y. June 12, 2023). The inquiry focuses on *AGS's actions* and assesses "how a reasonable person from the Plaintiffs' background would respond." *Paguirigan v. Prompt Nursing Emp't Agency LLC*, No. 17 Civ. 1302, 2018 WL 4347799, at *8 (E.D.N.Y. Sept. 12, 2018). Contrary to AGS' view, courts within the Second Circuit agree that "individual consideration" of each plaintiff's claims is "not necessary to prove that Defendant violated the TVPA under an objective reasonable person standard." *New York State Nurses Ass'n v. Albany Med. Ctr.*, 473 F. Supp. 3d 63, 70 (N.D.N.Y. 2020).

### 2. Because Dr. Grassian does not diagnose any conditions or assess individual damages, no differential diagnosis analysis was required

Dr. Grassian was not required to conduct a "differential diagnosis analysis" because he did not diagnose any condition, opine on any diagnosed injuries, or assess individual damages.[6] "A differential diagnosis is a patient-specific process of elimination that medical

---

[6] Unlike Dr. Grassian, the experts in the cases cited by AGS offered opinions concerning the specific cause of a plaintiff's diagnosed medical condition. Def. Br. at 15-16 (citing *Arruda v. C.R. Bard, Inc.*, No. 19 Civ. 1523, 2020 WL 4569436, at *21 (N.D.N.Y. Aug. 6, 2020) (permitting expert causation opinion in case involving alleged injuries caused by defective pelvic mesh device); *DeRienzo v. Metro. Transp. Auth.*, 694 F. Supp. 2d 229, 239 (S.D.N.Y. 2010) (excluding testimony where expert identified but failed to rule out numerous potential causes of a plaintiff's

practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005) (cleaned up). But, as described above, Dr. Grassian did not and was not required to conduct individualized assessments for purposes of his report. Nor did he make a causation analysis. Offering a psychiatric opinion about the effects of confinement at BFDF and the Voluntary Work Program ("VWP") on a "reasonable person," Dr. Grassian was not required to prove that no other conditions or life experiences could contribute to feelings of fear or coercion among detainees. *See, e.g.*, *Raniere*, 2019 WL 2212639, at *6 (admitting Dr. Grassian's opinions without differential diagnoses); *Reynolds*, 645 F. Supp. 3d at 25 (same); *Langley*, 715 F. Supp. at 540 (same).

Moreover, the specific purported deficits identified by AGS would not aid any so-called differential diagnosis analysis. For example, AGS suggests that Dr. Grassian should have explained the potential for "the detainees' desperation to remain in the United States as a motivating factor to distort or exaggerate." Def. Br. 15. But consideration of this factor would not constitute a differential diagnosis so much as an impermissible attack on witness credibility. *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) ("[E]xpert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702.").[7] Nor is it relevant to Dr. Grassian's opinion whether the conditions were caused by AGS or ICE. *Cf.*

_____

diagnosed apoplexy); *Munafo v. Metro. Transp. Auth.*, No. 00 Civ. 0134, 2003 WL 21799913, at *19 (E.D.N.Y. Jan. 22, 2003) (limiting treating psychopharmacologist's opinion to matters involving his personal diagnosis and treatment of plaintiff's depression)).

[7] Dr. Grassian's reliance on the truthfulness of the select interviewees statement in no way undermines the admissibility of his work. "Possible bias in the data underlying an expert's opinion is a subject for cross-examination, and goes to the weight, not the admissibility, of the expert testimony." *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950, 2022 WL 814074, at *14–16 (S.D.N.Y. Mar. 17, 2022) (cleaned up).

Def. Br. 16. His task was to assess the effect that the relevant conditions would have on a reasonable detainee; Plaintiffs' task will be to prove that those conditions were caused or exacerbated by AGS. And the fact that some detainees found that participation in the VWP helped to "alleviate boredom," or that others feared general violence in the detention center, would not in any way disturb Dr. Grassian's conclusions about the coercive nature of the VWP at BFDF to a reasonable detainee. *Cf.* Def. Br. 15-16.

### B. Dr. Grassian's Testimony Satisfies Rule 702's Requirements

Under Rule 702, an expert opinion must be "based upon sufficient facts or data" and "the product of reliable principles and methods." Fed. R. Ev. 702. The expert must also apply "the principles and methods reliably to the facts of the case." *Id.* Dr. Grassian's report meets this standard.

### 1. Dr. Grassian's Opinions Relied on Sufficient Facts and Data

AGS's assertion that Dr. Grassian's report is based on a "complete lack of factual data" overlooks the wide variety of material upon which Dr. Grassian based his opinions. *Cf.* Def. Br. 6. In addition to the interviews conducted by his assistant and reviewed by him, Dr. Grassian reviewed deposition transcripts of Plaintiffs and AGS employees, declarations from several detainee witnesses, facility handbooks, excerpts from officer training materials, documents related to meal plans, an incident report and related documents, and photos of BFDF provided by ICE. Grassian Rep. 2. Collectively, this information provided Dr. Grassian with a clear picture of the facility, the programming, and the detainees' experiences. Grassian Dep. 110:24-11:4; 114:20-115:1. It is well-settled that an expert may "offer opinions . . . that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. 1t 592. These sources, combined with Dr. Grassian's own prior knowledge of similar carceral settings, are sufficient "factual data" to assess whether a reasonable person would have felt coerced to join the VWP. *United States v. Litvak*, 808 F.3d 160, 180 n.265 (2d Cir.

2015) ("[I]n many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert."). Defendant cites no law to say otherwise.

Dr. Grassian is entitled to rely on information gleaned from interviews conducted by his long-time colleague, Andrea Perini, whose work he closely supervised. *In re M/V MSC FLAMINIA*, No. 12 Civ. 8892, 2017 WL 3208598, at *22 (S.D.N.Y. July 28, 2017) ("An expert may certainly present the findings and conclusions of those whose work he or she supervised and that he or she could personally replicate if necessary."). AGS's contention that Ms. Perini was provided "scant instruction" is baseless. *Cf.* Def. Br. 8. Prior to the interviews, Ms. Perini and Dr. Grassian discussed the goals for the interviews and techniques to ensure that the interviews were successful. Grassian Dep. 55:19-56:7. Ms. Perini has accompanied Dr. Grassian for "a lot of interviews" and is herself experienced in interviewing. *Id.*; *see also* 139:21-141:2. Following each interview, Dr. Grassian reviewed Ms. Perini's interview notes and discussed the interviews with her. *Id.* 62:11-13. Relying on interviews conducted by Ms. Perini does not undermine the reliability of his conclusions. *See Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 94 (2d Cir. 2000) ("[A]n expert may rely on data that she did not personally collect."); *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950, 2022 WL 814074, at *14–16 (S.D.N.Y. Mar. 17, 2022) (expert permitted to rely on assistants, particularly when the role does not require "specialized training"), *rev'd on reconsideration in part*, 2022 WL 3586460 (S.D.N.Y. Aug. 22, 2022).

AGS's laundry list of information it claims Dr. Grassian "should have" considered is misleading. *See* Def. Br. 6-7. In many instances, Dr. Grassian *did* consider the information cited. For example, AGS asserts that Dr. Grassian made "no effort to familiarize himself with the facility," *id.* at 6, which is patently incorrect, as proven by the voluminous documents and photographs he reviewed. Similarly, Dr. Grassian *did* review and consider the deposition testimony of four AGS employees. *Cf. Id.* AGS also fails to give a practical or legal

basis to explain why some of the other data it cites even matters. For example, AGS argues that Dr. Grassian "did not ascertain what, if any services were provided by other contractors." *Id.* But AGS does not describe what "services" it believes to be relevant, and as described above, it is of no consequence to the detainees' experience, or to Dr. Grassian's opinion, whether certain conditions were caused by AGS or some other entity.

In addition to significantly minimizing the scope of information Dr. Grassian relied upon, AGS also fails to acknowledge that it refused to produce some of the evidence it now claims Dr. Grassian overlooked. Namely, AGS criticized Dr. Grassian for not "review[ing] any video footage or photographs of detainees working." *Id.* But AGS vehemently objected to producing any video or photographs of the detainees working, and ICE similarly refused, so no video was available. And AGS did not produce evidence demonstrating "the percentage of participation in the VWP" or showing the number of people who *chose* not to participate. *Id.* As Plaintiffs have previously explained, AGS's claim that half of the detainees *chose* not to join the program is not proven by the evidence.[8]

The witness interviews and sworn declarations were sufficient to understand the VWP participants' perspectives. Dr. Grassian was not providing a typical "forensic mental-health evaluation" of each Plaintiff. *See* Sec. II.A.1., *supra.* Because he was evaluating psychological effects from the standpoint of the "reasonable person," *Doe 1*, 2023 WL 3945773, at *9, there was no reason for him to delve into each Plaintiff's "life history" nor "learn about any BFDF detainee" beyond their account of conditions within BFDF and the VWP. *Cf.* Def. Br. 7. Indeed, in similar circumstances, courts have recognized that when

---

[8] *See* ECF No. 153 (Plaintiffs' Reply in Further Support of their Motion to Certify Rule 23 Classes) at 7. The waiting list for at least some jobs shows that there were more detainees than jobs. AGS cannot have it both ways by citing to the number of detainees who supposedly chose not to participate as evidence that the program was not coercive, even as it points to wait lists for jobs to show that that the VWP was highly desirable and thus also not coercive.

making an evaluation of the psychological status of a class as a whole, it is not necessary to conduct individual "clinical examinations." *See, e.g., Disability Advocs., Inc. v. Paterson*, No. 03 Civ. 3209, 2008 WL 5378365, at \*4-5 (E.D.N.Y. Dec. 22, 2008) (expert opinion in class action case deemed reliable where expert opined on whether individual adult home residents were qualified to move to alternative housing, despite not conducting individual clinical examinations, based on expert's "experience, visits with adult home residents and staff, and review of relevant materials, including depositions of adult home residents and other fact witnesses, scholarly articles, and state and federal government publications").

Courts regularly find that a small or non-random sample size is not grounds to attack an expert opinion, particularly in cases involving prisons and other restrictive housing environments, because "statistical models are simply not the only method for making general inferences from specific data." *Braggs v. Dunn*, 317 F.R.D. 634, 645 (M.D. Ala. 2016) (citing cases) (cleaned up).[9]

## 2. Dr. Grassian's Opinions Are Reliable

Dr. Grassian's expert opinion is reliable and admissible because he has expertise in the relevant field of psychiatry and has adequately explained "how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts." *Cerbelli*, 2006 WL 2792755, at \*2 (citation omitted).

---

[9] The cases cited by AGS concerning the adequacy of self-reports do not apply. In *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.,* 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011), the expert relied on a client's own conclusory testimony about how he would have acted in a hypothetical circumstance. Here, the relevant testimony concerned the past, is corroborated through multiple sources, and is not conclusory or hypothetical. *See* Grassian Dep. 145:20-25 ("But in this particular case, the most powerful was really the consistency among the inmates and detainees in describing the atmosphere of the place, the way the work program was, the fact that the whole unit would be punished if somebody refused to work, et cetera."). And *Rowe Ent., Inc. v. William Morris Agency, Inc.,* No. 98 Civ. 8272, 2003 WL 22124991, at \*3 (S.D.N.Y. Sept. 15, 2003), concerned a quantitative, statistical analysis of a set of contracts, rather than qualitative interviews.

Dr. Grassian's training and experience serve as the basis for the reliability of his testimony. *See* Fed. R. Civ. P. 702 advisory committee's note (2000) ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."). Psychiatric or psychological expert opinions have been admitted based on similar foundations to analyze how people are "likely to respond to" certain stimuli, *Cerbelli*, 2006 WL 2792755, at *6, or "the effect of [certain] conduct on the individuals," *United States v. Ray*, 20 Cr. 110, 2022 WL 101911, at *10-11 (S.D.N.Y. Jan. 11, 2022). In *Cerbelli,* the court admitted a psychiatrist's opinion about "typical" behavior of emotionally disturbed persons ("EDPs"), and "how a dangerous EDP is likely to respond to specific types of police actions," even though she had "not herself observed examples of" the police actions, because her opinions were "founded on her thorough professional knowledge of schizophrenia and other mental illnesses." *Cerbelli*, 2006 WL 2792755, at *6. In *Ray,* the court admitted a psychologist's testimony concerning "the type of conduct that victims of sexual abuse and interpersonal violence have faced and the effect of that conduct on the victims" based on the expert's extensive training and treatment experience. *Ray*, 2022 WL 101911, at *11.

Like the experts in *Cerbelli* and *Ray*, Dr. Grassian is well qualified in his field and has specialized experience in areas that are directly relevant to the subject matter of his opinion. Dr. Grassian has more than 40 years of clinical and academic experience in the field of psychiatry and has specialized in the "restricted and isolated conditions of confinement." Grassian Rep. 1. He has "extensive experience in evaluating individuals who were in conditions of confinement in prisons, ICE detention facilities, and secure psychiatric hospitals" and has published several scholarly articles on topics involving the "psychiatric effects of solitary confinement," and the "effects of restricted and isolated conditions of confinement as well as other situations involving restricted environmental and social stimulation." *Id*. As other courts have concluded, Dr. Grassian's "curriculum vitae makes

clear that he is an expert with regard to the psychological effects of restricted and isolated conditions of prolonged confinement." *Raniere*, 2019 WL 2212639, at *6.

Dr. Grassian has also adequately explained how his experience leads to the conclusions reached. He describes that the conditions of incarceration tend to create the condition of "learned helplessness," a phenomenon by which "an individual experiences himself as powerless to prevent aversive consequences." Grassian Rep. 5. Because people experiencing "powerlessness are exceedingly vulnerable to being abused and coerced by those who do have power," he opines, learned helplessness is exacerbated by the "general deprivation scheme" at BFDF. *Id*. This opinion was based on his clinical and academic experience with "total institutions," or environments "where one group of individuals has virtually total control over another group." *Id*. at 11.[10]

As described above, the lack of individualized psychiatric evaluations and differential diagnosis in Dr. Grassian's report do not damage its reliability, and AGS's citation to *Barrientos* is unavailing. *See supra*, Part II.A.1. The other cases cited by AGS concerning reliability are similarly distinguishable. In the Eastern District of Louisiana case, the expert's opinion was excluded because the court found "too great" an "analytical gap[]" between his expertise in prison crowding and his opinions concerning the conditions within housing for employees at an industrial site. *David v. Signal Int'l, LLC*, No. 12 Civ. 557, 2015 WL 151451, at *2 (E.D. La. Jan. 10, 2015). In contrast, Dr. Grassian's expertise is squarely relevant to the subject matter of his opinion. The *Signal Int'l* expert also purported to offer an opinion on the plaintiffs' emotional distress without examining them, *id*., something Dr.

---

[10] Even if the Court adopts AGS' view that Dr. Grassian's stray remark that AGS "'cynically' deprived the BFDF detainees of access to resources" inappropriately opined on AGS employees' credibility, any purported "defects" in the "few stray sentences" can be addressed by the Court "at trial by ruling on objections to particular questions and testimony." *Vazquez v. City of New York*, No. 10 Civ. 6277, 2014 WL 4388497, at *12 (S.D.N.Y. Sept. 5, 2014).

Grassian very intentionally did not do. Also unlike the expert in *Signal*, Dr. Grassian relied on direct interviews with Plaintiffs in formulating his analysis.[11]

Dr. Grassian adequately considered the "particular vulnerabilities in the victim's position," as is required under the "hybrid objective-subjective test for coercion" in the TVPRA context. *Doe 1*, 2023 WL 3945773, at *9. His report acknowledged that detainees share vulnerabilities arising from an extremely controlled environment in which they are subjected to a "general deprivation scheme" related to the "conditions of the detention center collectively." Grassian Rep. 5, 13. Like in all carceral settings, Dr. Grassian opines that the conditions within the facility "tend to create a pattern of learned helplessness." *Id.* at 5. As other courts have noted, it is precisely because the individuals confined within detention centers share this environment and the resultant vulnerabilities that such "circumstances are uniquely suited for a class action." *Menocal v. GEO Grp., Inc.*, 320 F.R.D. 258, 261 (D. Colo. 2017), *aff'd*, 882 F.3d 905.

### 3. Dr. Grassian's Opinion Will Aid the Factfinder

Dr. Grassian's opinion is based on more than four decades of clinical and academic experience with "total institutions," Grassian Rep. 11, in addition to a review of a wide variety of materials relevant to this case. Like many psychiatric experts who offer opinions on generalized responses to specific conditions, his report and testimony in this case provide the Court with a greater understanding of "what sequelae are likely to follow from a

---

[11] The other cases cited by AGS are also inapposite because they involve different types of expert reports. Def. Br. 13 n.46. Two of the cases involved psychiatric experts who completed individual examinations for the purposes of making a clinical diagnosis. *Jacquety v. Baptista*, 538 F. Supp. 3d 325, 370 (S.D.N.Y. 2021) (diagnosis of PTSD in one child); *Tardif v. City of New York*, 344 F. Supp. 3d 579, 602 (S.D.N.Y. 2018) (diagnoses of PTSD, general anxiety disorder, and general depressive disorder). And the third involved an expert testifying as to the structure and organization of a terrorist organization and its influence. *See Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 322 (E.D.N.Y. 2013). Because these reports involve entirely different kinds of mental health opinions, they do not set the standards for what is "forensically accepted" with respect to opinions like Dr. Grassian's.

given event." *Williams*, 244 F. Supp. 2d at 968. In other words, the opinion assists the jury in understanding the relevant psychological considerations to the question of coercion, particularly in a detention environment with which they may not be personally familiar.

AGS's argument that Dr. Grassian's report is an "impermissible attempt to admit hearsay (or double hearsay) into evidence" is directly contradicted by Second Circuit jurisprudence. *See* Def. Br. 17. "'An expert witness may base opinions on otherwise inadmissible facts or data,' such as the alleged hearsay statements of the interview subjects, 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *United States v. Torres*, No. 20 Cr. 608, 2021 WL 1947503, at *7 (S.D.N.Y. May 13, 2021) (quoting *United States v. Dukagjini*, 326 F.3d 45, 51 (2d Cir. 2003)), *aff'd*, 2023 WL 378942 (2d Cir. Jan. 25, 2023). Because Dr. Grassian is entitled to "reasonably rely" on the qualitative interviews of detainee witnesses, the inclusion of those statements in his report comports with hearsay rules. *Ray*, 2022 WL 101911, at *11.

Dr. Grassian's opinion derives from his highly specialized training and experience. He was entitled to rely upon the qualitative interviews that he reviewed, in addition to a voluminous record, and the basis of his conclusions are adequately explained. His expert opinion is highly relevant to factual issues concerning the psychological impact of AGS's administration of the VWP and the conditions of BFDF, and it should be admitted.

## III. DR. CHILDERS'S TESTIMONY SHOULD BE ADMITTED

### A. AGS's Disagreements with Dr. Childers's Opinions Are Matters for Cross-Examination, Not a Basis for Exclusion

In his report, Dr. Childers estimated the time that it would have taken for detainee laborers to perform the work tasks assigned to them by AGS so as to calculate minimum wages. Childers Rep. at 3. He also computed how much it would have cost to compensate non-detained employees for performing those same tasks. *Id.* Dr. Childers has technical

knowledge relevant to these issues and has based his opinions on time-tested, reliable methods, which will aid the jury in understanding the evidence and determining facts currently in dispute. While AGS's argument to exclude Dr. Childers's testimony is not particularly well-articulated, it appears to have two main thrusts: (1) that his background and experience is not specifically tailored to federal detention facilities or federal contractors, thus rendering him unqualified to opine on work-time at BFDF; and (2) that its disagreements with minor components of his calculations render his entire methodology unreliable. Neither of these arguments is persuasive.

The Supreme Court has explained that, within our adversarial system, the appropriate way to contest evidence, including expert testimony, is "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. Neither *Daubert* nor the Federal Rules of Evidence requires that an expert's opinion be unassailable to be admissible. *See Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 450 (S.D.N.Y. 2014) (holding that an expert's analysis "need not be perfect to be received in evidence—it need only rest on a reliable foundation that is relevant to the task at hand"). Small disputes regarding an expert's techniques or methodology are not grounds for excluding expert testimony and are among issues "better resolved by the trier of fact and go to the weight given to the [expert] rather than their admissibility." *Actava TV, Inc. v. Joint Stock Co. "Channel One Russ. Worldwide"*, No. 18 Civ. 06626, 2023 WL 2528542, at \*15-16 (S.D.N.Y. Mar. 15, 2023) ("Defendants' concerns about the expert's methodology can be addressed during cross-examination."). Because Dr. Childers's testimony satisfies Rule 702, Defendant's motion to exclude it should be denied.

### B. Dr. Childers's Proffered Testimony Satisfies Rule 702

#### 1. Dr. Childers Has the Requisite Technical Knowledge to Render an Expert Opinion About Work Time, Which Will Aid the Jury

Dr. Michael R. Childers has been a professor in the Department of Labor Education at the University of Wisconsin-Madison since 2005. Childers Rep. at 2. He was chair of that department from 2012-2020 and again from 2022-2023. *Id.* at 12. He holds a degree in industrial engineering and a Ph.D. in workforce education and development. *Id.* Over the past 15 years, he has trained hundreds of people to perform work time studies and apply the principles of work measurement. *Id.* at 2. He has worked with unions and companies on issues related to production standards, workloads, and staffing levels, conducting hundreds of time studies across multiple industries, including manufacturing, warehousing, service, and government. *Id.* at 2. In addition to his academic expertise, he spent ten years working directly as an Industrial Engineer and Plant Manager in the private sector. *Id.* He has previously served as an expert witness related to work time in cases brought under the Fair Labor Standards Act. *Id.*

Because AGS tracked only the number of shifts (i.e. days) detainees worked, and not the hours they worked,[12] it will ultimately fall to the jury to determine how many hours detainees worked in order to determine how much compensation they are owed, should it find AGS liable under the New York Labor Law. Dr. Childers's testimony will be helpful to the jury in that regard, as it provides a reliable basis from which to translate *shifts* into *time*, and *time* into *damages*.

Because AGS cannot claim that Dr. Childers's experience is irrelevant to his ability to estimate work time spent on different tasks, it instead contends that his lack of specific experience related to federal contractors and detention centers makes him unqualified to

---

[12] It is undisputed that AGS did not track detainees' hours. Trippany 30b6 Tr. 34:17-25.

opine as to how long certain tasks would take at BFDF. But AGS fails to identify any significant detail about the federal detention facility context that would necessitate different expertise than that possessed by Dr. Childers in order to estimate work time for tasks performed by detainee laborers, or any reason that in-depth knowledge of federal contracting would be relevant, let alone essential, to the opinions he offers. AGS states that "only individuals with special clearance can be present in detainee housing units," Def. Br. 23 n.66, but does not suggest how that is relevant to an analysis of how long it takes a worker to perform cleaning tasks, fold laundry, or serve meals.[13] Moreover, Rule 702 does not require a laser-precise match between the expert's background and opinion. "The words 'qualified as an expert by knowledge, skill, experience, training, or education' must be read in light of the liberalizing purpose of the Rule." *U.S. v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985). "Liberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." *Lappe v. Am. Honda Motor Co.*, 857 F. Supp. 222, 227 (N.D.N.Y. 1994), *aff'd without opinion*, 101 F.3d 682 (2d Cir. 1996).

AGS asserts, without explanation, that Dr. Childers's expertise "has no connection to his opinion regarding custodial, food service, laundry, and barber staffing needs and costs and the contractual obligations of federal contractors including AGS at BFDF absent the VWP program." Def. Br. 19. But Dr. Childers offers no opinion with respect to "the

---

[13] To the extent AGS is trying to claim that detainee labor costs more than hiring non-detained workers, common sense suggests that individuals with special clearance would command even higher wage rates than the standard rates used by Dr. Childers in calculating the cost to employ non-detained individuals, rendering Dr. Childers's calculations even more conservative. *See* Childers Tr. (ECF No. 158-8) at 102:17-103:2 (explaining his conservative estimates).

contractual obligations of federal contractors including AGS at BFDF,"[14] and as explained above, his extensive expertise in work-time analysis and staffing estimates is directly relevant to the opinions he does offer: namely, an estimate of the work actually performed by detainee workers and the minimum compensation that would be required for non-detained employees. AGS's other purported objections to Dr. Childers's qualifications—that he utilized the APPA guidelines and ignored "key considerations" that AGS contends are relevant to its labor costs and financial benefit from operating the VWP, *see* Def. Br. 23—go to his methodology, not his qualifications. The cases AGS relies on provide no basis to conclude that Dr. Childers is unqualified to render his opinions.[15]

### 2. Dr. Childers's Opinions Are Reliable

In seeking to exclude Dr. Childers, AGS unleashes a litany of petty grievances against his approach, many of which it presents in a misleading way. First, AGS falsely claims that Dr. Childers "relied almost entirely on a single table" in the APPA Guidelines. Def. Br. 24.

---

[14] To the extent AGS is objecting to Dr. Childers offering an opinion that it would have been contractually obligated to hire non-detained individuals to do all the jobs performed by detainee laborers if detainees did not do them, Dr. Childers offers no such opinion. His calculations simply compute AGS's avoided labor costs if it were so obligated. Plaintiffs intend to prove that AGS *was* contractually obligated to clean the housing units and the kitchen, as explained more fully in the motion for class certification, *see* ECF No. 144-1, but have no need to rely on Dr. Childers's opinions to do so. Dr. Childers's computations simply aid the jury in determining the amount by which AGS was unjustly enriched. AGS also objects to Dr. Childers offering an opinion "as to alleged cost-savings motivations of AGS in facilitating the ICE-mandated VWP." Def. Br. 24 n.71. But Dr. Childers offers no opinion to that effect either.

[15] AGS's cases are inapposite. *See U.S. v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004) (excluding expert testimony based on methodology, not qualifications); *Krause v. CSX Transp.*, 984 F. Supp. 2d 62 (N.D.N.Y. 2013) (expert lacking a medical degree not qualified to address physiological questions); *McCullock v. H.B. Fuller Co.*, 981 F.2d 656 (2d Cir. 1992) (excluding testimony on the adequacy of warning labels due to the expert's lack of toxicology expertise); *Wilson v. Woods,* 163 F.3d 935 (5th Cir. 1999) (excluding testimony of expert who did not hold any educational rank and did not meet certification requirements set by governing body in the field); *United States v. Swanquist*, 161 F.3d 1064 (7th Cir. 1998) (excluding confusing and ambiguous expert testimony of accountant opining on technical banking matters); *United States v. Paul*, 175 F.3d 906 (11th Cir. 1999) (excluding handwriting analysis testimony where proffered expert lacked relevant qualifications, held only a law degree, and previously reviewed articles about the subject),

But the list of materials Dr. Childers reviewed and relied on is extensive and includes not only the APPA Guidelines, but also the pleadings in the case, facility maps and drawings, CBA wage tables, declarations, invoices from AGS to ICE, AGS emails regarding coverage in the kitchen during COVID, photos of the facility, deposition transcripts and exhibits (including lists of job duties), documents produced by AGS regarding the number of shifts worked by detainees in each job category, and wage data related to the Service Contract Act and the U.S. Bureau of Labor Statistics. Childers Rep. at 3, 21-28. Moreover, Dr. Childers used the APPA methodology only to estimate custodial work time. *See* Childers Rep. ¶¶ 16-19, 22-23. He did not use the APPA at all in tabulating detainee work shifts across the years of AGS's contract; computing the annual hours spent by detainees performing barber, laundry/processing, and kitchen duties; calculating the minimum New York State wages that would be due to detainees based on the annual work hours; determining the minimum hourly wages and fringe benefits for employees of federal contractors in the relevant labor market; or calculating the savings in labor costs realized by utilizing detainee labor. *See id.* ¶¶ 24-28. None of AGS's complaints about Dr. Childers's methodology is persuasive. But even if they were, they would go to the weight of Dr. Childers's testimony, not its admissibility. *See Actava TV, Inc.*, 2023 WL 2528542, at *15-16.

a. **The APPA Guidelines Provide a Valid Methodology for Estimating Custodial Work Time, Which Dr. Childers Used Appropriately**

APPA Guidelines are a widely recognized standard for developing custodial staffing plans. Though the Guidelines were originally developed for use in educational facilities, the methodology is now used by other types of employers to create staffing plans. Childers Tr. 170:23-171:2. Dr. Childers chose the APPA methodology for the analysis in this case because it has the ability "to assume a standard set of tasks required to maintain a certain kind of area to a specific level of cleanliness," and it would provide "as conservative an estimate as

[he] could." Childers Tr., at 102:17-103:2. He described how the method proscribes "standard space definitions" that help calculate "the amount of labor necessary . . . to clean them to various cleanliness levels," and that he assessed approximately one hundred photographs of the detention facility, the lists of duties associated with each job, and the frequency of tasks in order to select the appropriate cleanliness level on which to base his analysis. *Id.* at 89:8-90:1. While AGS complains that Dr. Childers failed to make adjustments to the standard space definitions to account for the particular details of the spaces at BFDF, Def. Br. 25-26, it cites no authority to support its own interpretation of the proper application of the APPA methodology. Rather, as Dr. Childers testified, "the purpose of having generic standard space definitions is to allow you to estimate when you don't have detailed information about every exact activity that's performed, which is why the APPA was the most appropriate versus . . . any other industrial standard because in the absence of all that micro data, I needed a method by which I could come up with a macro estimate . . . for the time required." Childers Tr. at 123:13-124:6. In other words, Dr. Childers used the methodology as intended, in a context for which it is appropriate.

AGS also complains that Dr. Childers's use of the second edition of the APPA Guidelines rather than the fourth edition, published in 2023, renders his opinion "outdated." But Dr. Childers explained during his deposition that "[t]here really weren't any major substantive changes" between the two editions, Childers Tr. 97:23-98:2, and that he chose the second edition "[b]ecause for this project I thought it was the most straightforward and understandable way to present the information," *id.* at 88:11-16. Indeed, Dr. Childers used the method he believed would result in the most conservative estimate, Childers Tr. 102:22-23. When Dr. Childers recently performed a similar analysis using *both* the second and fourth editions of the APPA guidelines, the fourth edition

guidelines led to an 8% *increase* in work hours. *See* Declaration of Michael Childers, dated Sept. 4, 2024 ("Childers Decl.").

### b. Dr. Childers Was Entitled to Rely on AGS's Admissions

AGS criticizes Dr. Childers for relying on "the recollection of two individuals" to calculate labor costs for laundry, food service, and barber duties. Def. Br. 26. Yet those two individuals were AGS officer Penny Sheffield, who supervised detainee kitchen staff, and AGS project manager Craig Trippany, whom AGS designated as a Rule 30(b)(6) witness. Childers Rep. ¶ 25. Contrary to Defendant's misleading contention that, if the number of hours worked are at issue, an expert will "typically" observe the workforce, it was not necessary for Dr. Childers to personally observe the workforce to draw his conclusions here, because he reasonably relied on Defendant's own admissions for time worked in non-custodial job categories. Childers Rep. ¶¶ 16-19, 25; Childers Tr. 89:17-90:1.[16] As Dr. Childers explained at his deposition, observing workers is simply "one approach" to estimating work content. Childers Tr. 25:21-26:24. AGS points to nothing beyond its own (non-expert) assertions for the proposition that direct observation would have been the "typical" approach to developing an expert opinion here, let alone that Dr. Childers's conclusions are unreliable because he adopted the accuracy of AGS's testimony.

---

[16] Defendant's suggestion that Dr. Childers should have observed detainees working is also strikingly disingenuous given the history of this litigation. When Plaintiffs requested to inspect BFDF under Rule 34, AGS issued blanket objections, including on the grounds of "overbreadth" and "relevance" and asserted that the request was "completely beyond the permissible scope of discovery." It further objected that any inspection "would be an invasion of the privacy of detainees"—the same detainees whose work it now argues should have been observed at length. *See* Declaration of Maureen Hussain, dated Sept. 4, 2024 ("Hussain Decl."). When Plaintiffs ultimately arranged, through ICE, for counsel to visit the premises, the visit was tightly orchestrated and escorted by ICE and AGS. *See id.* Under these conditions, it would have been impossible for an expert to observe the detainee workforce in their typical day-to-day activities.

### c. Dr. Childers Made Reasonable Decisions About Wage Rates to Form a Conservative Estimate of Labor Costs

AGS argues that Dr. Childers should have used the wage rates for "barbers,"
"dishwashers," and "housekeeping aides" to calculate labor costs, instead of what it
characterized as the "higher" wage rates for "hairdressers, hairstylists, and cosmetologists,"
"food service workers," and "janitors."[17] AGS offers no support for the assertions that its
preferred job categories are lower-paid and/or more applicable to the tasks detainees
actually performed. For example, the Service Contract Act wage rates for "housekeeping
aide" and "janitor" were the same in 2022 (the most recent year of Dr. Childers's analysis):
$13.42. Hussain Decl., Ex. C (shared with defendant via email link 11/6/2023). In addition,
AGS's claim that "dishwasher" is a more appropriate category than "food service worker" is
without support. AGS's own documents, reviewed by Dr. Childers, refer to "detainee food
service workers" and describe detainees' duties that include assisting in panning up and
wrapping food, stock rotation and product deliveries, and serving line. In any event, the
difference in wage rates between these two categories in 2022 was $0.50. *Id*.[18]

AGS's quibbles with the job categories used by Dr. Childers provide no grounds for
exclusion. "A minor flaw in an expert's reasoning or a slight modification of an otherwise
reliable method will not render an expert's opinion per se inadmissible." *Hart*, 60 F. Supp.
3d at 465. *Daubert* does not require an expert's report to be flawless beyond reproach. "The
judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good

---

[17] AGS appears to concede that using wage rates from the Service Contract Act and the Bureau of Labor Statistics—Dr. Childers's approach—is appropriate.

[18] AGS also claims that the Bureau of Labor Statistics ("BLS") wage rate for "hairdressers" was higher than that for "barbers," and accuses Dr. Childers of erroneously using the former when the "barber" job description more closely tracks the duties of detainee laborers. But in support of this proposition, AGS does not cite the source materials Dr. Childers used (which were disclosed to AGS), but rather the 2023 BLS wage rates. Dr. Childers relied on data from each relevant year, ending in 2022, since AGS's discovery production—and thus, his analysis—ended in 2022.

grounds' for his or her conclusions." *Daubert*, 509 U.S. at 590. Here, even if AGS disagrees

that Dr. Childers chose the *best* category for each job, they are not so far afield from what

AGS concedes would be appropriate as to deprive his conclusions of "good grounds."

> **d.    Dr. Childers's Testimony Rests on a Reliable Foundation and Is Relevant to the Factual Determinations the Jury Must Make**

While AGS objects to Dr. Childers's findings, his decision to use the APPA

methodology was intentional to achieve a conservative estimate, Childers Tr. 102:17-103:2,

and he otherwise credits Defendant's own testimony for the factual underpinnings of his

calculations, Childers Rep. ¶ 25. Courts have weighed in favor of finding an expert's opinion

sufficiently reliable where the expert employed conservative assumptions in the

methodology. *Hart*, 60 F. Supp. 3d at 466. Notably, AGS does not offer an alternative or

superior way of making these calculations nor a work measurement expert of its own;

accordingly, it has "failed to provide any good reason to discredit [the expert's] estimate of

damages as other than 'just and reasonable.'" *Id.* at 467. Indeed, Dr. Childers has used a

similar methodology in other cases, including one involving the analysis of detainee labor in

an immigration detention center. *See* Childers Tr. 27:1-20. Defendant's disagreements with

Dr. Childers's conclusions do not undermine their essential reliability; they are properly the

stuff of cross-examination, not grounds to exclude his testimony outright. *See Daubert*, 509

U.S. at 596; *Hart*, 60 F. Supp. 3d at 450; *Chen-Oster*, 2022 WL 814074, at *14–16.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion to exclude the

testimony of Dr. Grassian and Dr. Childers.

Dated: September 4, 2023
       New York, New York

               KAUFMAN LIEB LEBOWITZ & FRICK LLP


_____
Alison Frick
Alyssa Isidoridy

18 E. 48th Street, Suite 802
New York, New York 10017
(212) 660-2332
africk@kllf-law.com
aisidoridy@kllf-law.com

WORKER JUSTICE CENTER OF NY

Maureen Hussain
Cristina Brito
Olivia Post Rich
9 Main Street
Kingston, NY 12401
845-331-6615
mhussain@wjcny.org
cbrito@wjcny.org
opostrich@wjcny.org


*Attorneys for Plaintiffs*