**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

DALILA YEEND, BOUNNAM PHIMASONE,
ELVIN MINAYA RODRIGUEZ, LISA
LAPOINTE, and SHANTADEWIE RAHMEE,
individually and on behalf of all others similarly
situated,

            1:20-cv-01281 (AMN/PJE)

       Plaintiffs,

  v.

AKIMA GLOBAL SERVICES, LLC,

       Defendant.

---

**APPEARANCES:**            **OF COUNSEL:**

**KAUFMAN LIEB LEBOWITZ & FRICK LLP**   **ALISON E. FRICK, ESQ.**
18 East 48th Street – Suite 802        **ALANNA G. KAUFMAN, ESQ.**
New York, New York 10017         **ALYSSA D. ISIDORIDY, ESQ.**
*Attorneys for Plaintiffs*

**WORKER JUSTICE CENTER OF NEW YORK**   **CRISTINA BRITO, ESQ.**
245 Saw Mill River Road – Suite 106
Hawthorne, New York 10532

9 Main Street              **MAUREEN HUSSAIN, ESQ.**
Kingston, New York 12401

1187 Culver Road           **OLIVIA POST RICH, ESQ.**
Rochester, New York 14609
*Attorneys for Plaintiffs*

**THE KULLMAN FIRM**          **HEATHER F. CROW, ESQ.**
2915 Kerry Forest Parkway – Suite 101
Tallahassee, Florida 32309

1100 Poydras Street – Suite 1600      **JESSICA L. MARRERO, ESQ.**
New Orleans, Louisiana 70163       **AMIEL J. PROVOSTY, ESQ.**
*Attorneys for Defendant*

**Hon. Anne M. Nardacci, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.      INTRODUCTION

On September 3, 2020, Plaintiffs Dalila Yeend and Bounnam Phimasone (together with Elvin Minaya Rodriguez, Lisa LaPointe, and Shantadewie Rhamee, "Plaintiffs") commenced this action against Akima Global Services, LLC a/k/a AGS ("AGS" or "Defendant") in New York State Supreme Court, asserting state law claims pertaining to their civil immigration detention at the Buffalo Federal Detention Facility ("BFDF").  Dkt. No. 2.  On October 16, 2020, Defendant removed this action to federal court.  Dkt. No. 1.  On September 7, 2022, Plaintiffs Yeend and Phimasone filed an amended complaint with class action allegations and claims for unjust enrichment and violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") and the New York Labor Law ("NYLL").  Dkt. No. 80 ("Amended Complaint").

Presently before the Court[1] is (i) Defendant's motion *in limine* seeking to exclude testimony from two experts proffered by Plaintiffs, Dkt. No. 158 ("*Daubert* Motion"); and (ii) Plaintiffs' motion for class certification and the appointment of class counsel, Dkt. No. 144 ("Class Certification Motion").  Each Motion is fully briefed.  *See* Dkt. Nos. 150, 153, 159-60.

For the reasons set forth below, the *Daubert* Motion is granted in part and denied in part, and the Class Certification motion is granted.

### II.      BACKGROUND

The Court assumes familiarity with the factual background of this case for purposes of this Memorandum-Decision and Order, which is set forth in Section II of the Memorandum-Decision and Order on Defendant's motion to dismiss.  *See* Dkt. No. 161 at 3-7.

---

[1] This case was reassigned to the undersigned on April 10, 2024.  Dkt. No. 139.

### A. Procedural History

In September 2020, Plaintiffs Yeend and Phimasone commenced this action against Defendant in New York State Supreme Court, Rensselaer County. *See* Dkt. No. 2. The original complaint asserted claims exclusively based on state law, namely New York State's Constitution, the NYLL, and unjust enrichment. *Id.* In October 2020, Defendant removed this action to federal court, asserting federal jurisdiction on numerous grounds. *See* Dkt. No. 1. Following motion practice, in September 2022, Plaintiffs received permission to file the Amended Complaint, *see* Dkt. No. 80, and Defendant answered, *see* Dkt. No. 84, asserting various affirmative defenses. Discovery appears to have proceeded in fits and starts, with the parties raising numerous disputes and requesting various extensions. *See generally* Docket Sheet.

On February 8, 2024, Defendant filed a motion to dismiss and for summary judgment, *see* Dkt. No. 117, which Plaintiffs opposed on March 14, 2024, *see* Dkt. No. 129. On April 9, 2024, Defendant filed a letter seeking leave to file a motion to strike certain supporting affidavits Plaintiffs annexed to the opposition to Defendant's motion to dismiss and for summary judgment. *See* Dkt. No. 137. On May 1, 2024, Plaintiffs filed the Class Certification Motion pursuant to Fed. R. Civ. P. 23, *see* Dkt. No. 144, which Defendant opposed on June 17, 2024, *see* Dkt. No. 150. The same day, Defendant filed a second motion for summary judgment. *See* Dkt. No. 149.

On July 24, 2024, based in part on the unusually large number of requests filed by the Parties, the Court held a status conference and subsequently ordered that (i) Defendant's request to strike would be decided on the existing papers and without a hearing; (ii) the portion of Defendant's first dispositive motion pertaining to summary judgment would be held in abeyance pending the Court's ruling on the portion of the motion pertaining to dismissal; (iii) Defendant would be permitted to file a motion *in limine* seeking to exclude testimony from two experts proffered by Plaintiffs; and (iv) the Parties would not be permitted to file any further motions

without the Court's approval. *See* Dkt. No. 156. Accordingly, on August 14, 2024, Defendant filed the *Daubert* Motion, *see* Dkt. No. 158, which Plaintiffs opposed on September 4, 2024, *see* Dkt. No. 159.

On September 24, 2024, the Court issued a Memorandum-Decision and Order denying the portion of Defendant's first dispositive motion seeking dismissal. *See* Dkt. No. 161. On November 22, 2024, the Court directed Plaintiffs to file their opposition to Defendant's second dispositive motion on or before December 20, 2024, and permitted Defendant to file its reply on or before January 10, 2025, *see* Dkt. No. 162, and the Parties subsequently made these filings, *see* Dkt. Nos. 165, 166.

### B. The *Daubert* Motion

Defendant seeks to preclude the expert testimony of Dr. Stuart Grassian and Dr. Michael Childers "from the class certification inquiry, summary judgment analysis, and trial." *See* Dkt. No. 158-1 at 7. Dr. Grassian is a Board-certified psychiatrist with forty years of clinical psychiatric experience, including experience in evaluating individuals who face conditions of confinement. *See* Dkt. No. 144-21 at ¶ 1; *see also* Dkt. No. 158-2 at 25. Dr. Childers is a Professor in the Department of Labor Education at the University of Wisconsin-Madison and has experience working with unions and companies on issues related to production standards, workloads, and staffing levels, in which he has "developed estimates of the time that should be allowed to perform work activities," and has experience conducting "hundreds of time studies in manufacturing, warehousing, service, and government organizations." Dkt. No. 158-4 at ¶¶ 1, 4.

### C. The Class Certification Motion

Plaintiffs seek to certify three classes. First, in connection with their TVPRA claims, Plaintiffs seek to certify a "Forced Labor Class," which is defined as "all detainees who participated in the [Voluntary Work Program ("VWP")] from February 1, 2015 through the date

of final judgment in this action." Dkt. No. 144-1 at 9. Second, in connection with their NYLL

claims, Plaintiffs seek to certify a "Labor Law Class," which is defined as "all detainees who

participated in the VWP from September 8, 2016 through the date of final judgment in this action."

*Id.* Third, in connection with their unjust enrichment claims, Plaintiffs seek to certify an "Unjust

Enrichment Class," which is defined as "VWP participants who performed work in the housing

units or the kitchen from September 8, 2016 through final judgment." *Id.* at 10.[2]

## III.    STANDARDS OF REVIEW

### A.  *Daubert* & Fed. R. Evid. 702

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of

Evidence. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993).

Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if the proponent
> demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods
> to the facts of the case.

---

[2] The relevant time period for each prospective class is primarily defined by their respective
statutes of limitation. While the TVPRA has a ten-year statute of limitations, *see* 18 U.S.C. §
1595(c), Plaintiffs utilize February 1, 2015 as the start date for the Forced Labor Class. Dkt. No.
144 at 1. The statute of limitations for NYLL claims is six years. *See* N.Y. Lab. Law § 663(3)
(minimum wage claims); § 198(3) (wage notice and statement claims). Because the Amended
Complaint was filed on September 8, 2022, *see* Dkt. No. 80, Plaintiffs utilize September 8, 2016
as the start date for the Labor Law Class. Discussed in more detail, *infra* Section IV(B)(2)(iii), the
Parties dispute the proper statute of limitations for Plaintiffs' unjust enrichment claim. But
Plaintiffs posit that the requisite statute of limitations is six years, and therefore utilize September
8, 2016 as the start date for the Unjust Enrichment Class, as well.

While district courts perform a "gatekeeping role" to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," *Daubert*, 509 U.S. at 597, "[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." *U.S. v. Napout*, 963 F.3d 163, 187 (2d Cir. 2020) (quoting *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005)).

"A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Advisory Committee Notes, 2000 Amendments, Fed. R . Evid. 702. Nevertheless, the proponent of the expert testimony bears the burden of establishing its admissibility on each of the enumerated grounds by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10; *see also Souther v. Eli Lilly & Co. (In re Zyprexa Prods. Liab. Litig.)*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007); Fed. R. Evid. 702 Advisory Committee Note ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

### B.  Class Certification

Federal Rule of Civil Procedure 23(a) sets forth four prerequisites for class certification:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a) ("Rule 23(a)").  A class action may be maintained if the requirements of Rule 23(a) are satisfied and if, as relevant here, "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) ("Rule 23(b)(3)").  The Second Circuit "has also recognized

an implied requirement of ascertainability in Rule 23, which demands that a class be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (quotations and citation omitted).

In the Second Circuit, "Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility in deciding whether to grant certification." *Story v. SEFCU*, No. 18-CV-764, 2021 WL 736962, at *5 (N.D.N.Y. Feb. 25, 2021) (quotations and citation omitted).

## IV.    DISCUSSION

### A.  The *Daubert* Motion

The Second Circuit has interpreted Rule 702 to require that a district court first determine whether a proposed expert is (1) qualified to provide an opinion, and then assess (2) the reliability and (3) the relevance of the qualified expert's proffered testimony. *See, e.g.*, *Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016) (summary order) ("As a threshold matter, trial courts must consider whether the witness is qualified . . . before reaching an analysis of the testimony itself."); *Nimely*, 414 F.3d at 396-97 ("[A]fter determining that a witness is 'qualified as an expert' to testify as to a particular matter . . . and that the opinion is based upon reliable data and methodology, Rule 702 requires the district court to make a third inquiry: whether the expert's testimony (as to a particular matter) will 'assist the trier of fact.'") (citations omitted); *see also Faison-Williams v. United States*, No. 20-cv-08329, 2024 WL 1195033, at *8 (S.D.N.Y. Mar. 20, 2024).  The Court undertakes this analysis for each of Plaintiffs' proposed experts.

#### 1.  Dr. Stuart Grassian

Dr. Grassian is a Board-certified psychiatrist and former faculty member of Harvard Medical School with experience in "evaluating individuals who were in conditions of confinement

in prisons, ICE detention facilities, and secure psychiatric hospitals[.]"  Dkt. No. 158-2 at 2.  He

has authored articles on topics such as the psychiatric effects of solitary confinement and the

effects of restricted and isolated conditions of confinement, and has previously provided expert

testimony in cases regarding conditions of confinement.  *Id.*  Plaintiffs seek to introduce Dr.

Grassian's testimony in support of their TVPRA claims.

A defendant is liable under the TVPRA when they "knowingly . . . obtain[] the labor or

services of a person by any one of, or by any combination of, the following means—"

> (1) by means of force, threats of force, physical restraint, or threats of physical
> restraint . . . (2) by means of serious harm or threats of serious harm . . .  or (4) by
> means of any scheme, plan, or pattern intended to cause the person to believe that,
> if that person did not believe such labor or services, that person or another person
> would suffer serious harm or physical restraint.

*See* 18 U.S.C. § 1589(a); *see also Ngono v. Owono*, No. 23-339, 2024 WL 911797, at *1 (2d Cir.

Mar. 4, 2024) (summary order) (citing *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 92-93 (2d Cir.

2019)).  The TVPRA defines "serious harm" as used in § 1589(a)(2) and (4) as:

> any harm, whether physical or nonphysical, including psychological, financial, or
> reputational harm, that is sufficiently serious, under all the surrounding
> circumstances, to compel a reasonable person of the same background and in the
> same circumstances to perform or to continue performing labor or services in order
> to avoid incurring that harm.

18 U.S.C. § 1589(c)(2); *see also United States v. Zhong*, 26 F.4th 536, 550 (2d Cir. 2022).  With

respect to serious harm, "the relevant question" is whether a defendant's conduct induced "harm

serious enough to 'compel a reasonable person of the same background and in the same

circumstances to perform or to continue performing labor or services in order to avoid incurring

that harm.'"  *Magtoles v. United Staffing Registry*, 665 F. Supp. 3d 326, 359 (E.D.N.Y. 2023)

(quoting *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648,

at *16 (E.D.N.Y. Sept. 24, 2019)).  And when assessing whether an individual was coerced into

providing labor or services by any of the means set forth in Section 1589(a), "[t]he correct standard

is a hybrid: it permits the jury to consider the particular vulnerabilities of a person in the victim's position but also requires that her acquiesce be objectively reasonable under the circumstances." *United States v. Rivera*, 799 F.3d 180, 186-87 (2d Cir. 2015) (citation omitted); *see also Magtoles*, 665 F. Supp. 3d at 359.

Relevant to this analysis, Dr. Grassian opines "to a reasonable degree of medical certainty, that for a reasonable person in the position that the Batavia detainees find themselves, and with the attitude, threats, and punishments inflicted on those who refused to work, the work program at ICE-Batavia is coercive in nature."  Dkt. No. 158-2 at 14.  In addition, Dr. Grassian concludes that (i) "[t]he conditions of the detention center collectively amount to a deprivation scheme;" (ii) "AGS exploits detainees' access to resources and safety in order to coerce workers into working for wages that few people would voluntarily accept;" and (iii) "to a reasonable degree of medical certainty [] the [VWP] at Batavia was psychologically damaging and scarring for the detainees exposed to it."  *Id.*  Dr. Grassian bases these opinions primarily on his professional experience, statements made by certain BFDF detainees during interviews performed by his assistant, and other record evidence.  *Id.* at 3.

### i.    Qualifications

Plaintiffs proffer Dr. Grassian as a psychiatric expert.  Defendant does not appear to dispute that Dr. Grassian is qualified to render expert opinions in the field of psychiatry.  *See generally* Dkt. No. 158-1.  Given this lack of dispute and upon review of Dr. Grassian's curriculum vitae and experience opining in the field of psychiatry, and particularly with respect to conditions of confinement, the Court finds that Dr. Grassian possesses the requisite knowledge, skill, experience, training, and education necessary to provide expert testimony in the field of psychiatry in this matter under Rule 702(a).

### ii.    Relevance

While Defendant does not challenge Dr. Grassian's qualifications, it argues that his report "does nothing more than endorse Plaintiffs' allegations," Dkt. No. 158-1 at 21, and that his opinions are "an impermissible invasion of the role of the Court and the jury," Dkt. No. 160 at 9. The Court agrees.

Under Rules 701 and 702, opinions must be helpful to the trier of fact. An expert may not "simply rehash[] otherwise admissible evidence about which he has no personal knowledge," and "[w]hile an expert must of course rely on facts or data in formulating an expert opinion, an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005) (citing *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (excluding portions of an expert opinion that presented "a narrative reciting selected regulatory events" because "[s]uch material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence")). Moreover, the Second Circuit "has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." *Nimley v. City of N.Y.*, 414 F.3d 381, 398 (first citing *U.S. v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); and then citing *U.S. v. Scop*, 846 F.2d 135, 142-43 (2d Cir. 1988)).

In addition, expert testimony "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (citing, *inter alia*, *Scop*, 846 F.2d at 139-40). "As a general rule an expert's testimony on issues of law is inadmissible." *Id.*

Here, as an initial matter, Dr. Grassian's report includes a lengthy recitation of selected record evidence, as well as references to the Amended Complaint. *See generally*, Dkt. No. 158-2. Indeed, of his less than fourteen-page report, approximately seven pages appear to be direct quotes from interview notes taken by Dr. Grassian's assistant, witness declarations, depositions, and the Amended Complaint. *Id.* Additionally, in multiple areas of his report, Dr. Grassian appears to inject his subjective characterizations of detainee testimony to bolster his conclusions regarding the VWP. *See, e.g.*, Dkt. No. 158-2 at 13 (statements that detainees were lonely and depressed at the BFDF generally characterized as detainees feeling "utterly helpless" and being "frighten[ed] and humiliat[ed by] the experience of the" VWP); *id.* at 11 (opining that "[i]nterviewees spoke of how indifferent the guards were to how much they worked," but then quoting three interviewees primarily complaining of how little money they were making in the VWP, and not stating that the guards were indifferent to the amount that the detainees worked). The Court finds that Dr. Grassian's report largely recites testimony and characterizes it in a manner that is favorable to Plaintiffs and, thus, impermissibly "construct[s] a factual narrative based upon record evidence." *Highland Cap. Mgmt., L.P.*, 379 F. Supp. 2d at 468-69.

In addition, and most notably, the Court finds that Dr. Grassian's expected testimony would impermissibly "tell the jury what results to reach." *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992). After the lengthy recitation and characterization of testimony, Dr. Grassian proceeds to offer opinions that impermissibly invade upon the functions of the court and the jury. As outlined above, to succeed on their TVPRA claims, Plaintiffs must show that, "considering the particular vulnerabilities of a person in [their] position," detainees' acquiescence to Defendant's alleged coercion was "objectively reasonable under the circumstances." *Rivera*, 799 F.3d at 186-87. Thus, by offering the opinion that "for a reasonable person in the position that the Batavia detainees find

themselves, and with the attitude, threats, and punishments inflicted on those who refused to work, the work program at ICE-Batavia is coercive in nature[,]" Dr. Grassian impermissibly opines on an ultimate legal issue in the case. Dkt. No. 158-2 at 14. *See, e.g.*, *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (stating testimony is impermissible where it "repeatedly tracked the exact language of the [law] which the defendant allegedly violated"); *Rutherford v. City of Mount Vernon*, 698 F. Supp. 3d 574, 611 (S.D.N.Y. 2023) (assessing whether expert's expected testimony "track[s] the elements of Plaintiff's claim" to determine whether the expert impermissibly opines on an ultimate legal issue); *Hatala v. Port Auth. of N.Y. & N.J.*, 15-Civ-9218, 2017 WL 9832293, at *4-5 (S.D.N.Y. Oct. 30, 2017) (finding conclusion that a defendant "failed to take safety precautions that a 'reasonable' person would take in a given situation" was impermissible expert testimony).[3]

Moreover, even though Plaintiffs contend that Dr. Grassian is being proffered only to "explain, from a psychiatric standpoint, how the environment at [the] BFDF and the reported actions of AGS employees would affect a 'reasonable person' in the detainees' position," Dkt. No. 159 at 11, as outlined above, the report contains additional conclusions that the Court finds suffer from the same defect. By opining that (i) "AGS exploits detainees' access to resources and safety in order to coerce workers into working;" and that (ii) "the [VWP] at Batavia was psychologically damaging and scarring for the detainees exposed to it," Dkt. No. 158-2 at 14, Dr. Grassian is essentially telling the jury that Defendant knowingly coerced participation in the VWP and that

---

[3] Indeed, Dr. Grassian's opinion appears to mirror not only the hybrid standard set forth in *Rivera* and *Magtoles*, but also the language from the TVPRA's definition of "serious harm." *Compare* Dkt. No.158-2 at 14 *with* 18 U.S.C. § 1589(c)(2) ("any harm . . . that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm").

the detainees exposed to the VWP at the BFDF did, in fact, feel psychologically coerced. Like the "reasonable person" conclusion, these additional opinions speak directly to essential elements of TVPRA claims. *See* 18 U.S.C. § 1589(a) ("Whoever *knowingly* provides or obtains the labor or services of a person by any one of, or by any combination of, the following means. . . .") (emphasis added). Moreover, Dr. Grassian's opinion that "[t]he conditions of the detention center collectively amount to a deprivation scheme" also speaks to an essential element of Plaintiffs' claims, which Plaintiffs themselves concede. *See* Dkt. No. 144-1 at 23-24 (noting that "[w]hether AGS used a deprivation scheme to cause VWP participants to fear or experience serious harm if they did not work is another question common to the members of the Forced Labor Class," and arguing that "[a] jury could find that this deprivation scheme created by AGS . . . constituted serious harm"). Thus, these additional opinions are likewise inadmissible and the Court finds that Dr. Grassian has not offered any opinions that are admissible.

Accordingly, the portion of the *Daubert* Motion seeking to preclude Dr. Grassian's testimony from consideration in relation to class certification, summary judgment, and trial, is granted.[4]

### 2. Dr. Michael Childers

Dr. Childers is a Professor in the Department of Labor Education at the University of Wisconsin-Madison, holds an M.S. and Ph.D. in workforce education and development and a B.S. in industrial engineering, and has worked on numerous "time studies" to assess "the time that should be allowed to perform work activities." Dkt. No. 158-4 at 2. Dr. Childers was retained to

---

[4] Defendant also argues that Dr. Grassian's testimony should be excluded because his opinions are not based on sufficient data or a reliable methodology. *See* Dkt. No. 158-1 at 9-21. While Dr. Grassian's opinions may be deficient in other regards, the Court declines to analyze these other potential deficiencies and instead bases its decision to exclude Dr. Grassian's testimony on the grounds set forth above.

(i) determine the work time necessary for the performance of certain VWP tasks; and (ii) calculate the amount BFDF detainees would have been compensated for performing those tasks had they been paid the minimum wage. *Id.* at 3. Dr. Childers also used those work times to calculate what AGS would have had to pay its own non-detainee employees, making market wages, to do the same work performed by detainees in the VWP. *Id.*

### i. Qualifications

Defendant argues that Dr. Childers' background in industrial engineering, education, and labor relations is not relevant to assessing required staffing levels and associated costs at a secure federal detention facility, and that Dr. Childers lacks the requisite specialized knowledge related to federal contracts, regulations, or detention facilities necessary to render opinions on those topics. *See* Dkt. No. 158-1 at 22-24. In opposition, Plaintiffs highlight Dr. Childers' Ph.D. in workforce education and development, and his extensive experience in work time studies, including prior expert testimony on the topic. *See* Dkt. No. 159 at 24-26.

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 240 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)). "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d at 282 (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997)). "Liberality and flexibility in evaluating qualifications should be the rule [and] the expert should not be required to satisfy an overly narrow

test of his own qualifications." *Lappe v. Am. Honda Motor Co.*, 857 F. Supp. 222, 226 (N.D.N.Y. 1994), *aff'd*, 101 F.3d 682 (2d Cir. 1996); *see also United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) ("The words 'qualified as an expert by knowledge, skill, experience, training, or education' must be read in light of the liberalizing purpose of the Rule[.]" (quoting Fed. R. Evid. 702)); *see also Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 474 (N.D.N.Y. 2004) ("Generally speaking, expert qualifications are liberally construed.").

Here, Defendant does not dispute that Dr. Childers holds advanced degrees in workforce education and development. Dr. Childers' curriculum vitae indicates he is currently teaching courses on topics such as "contract costing, budget and financial analysis, . . . and stopwatch time study." Dkt. No. 158-4 at 12. Defendant also does not dispute Dr. Childers' attestation that he has "conducted hundreds of time studies in manufacturing, warehousing, service, and government organizations." *Id.* at ¶ 4. Additionally, Dr. Childers has previously provided expert deposition testimony in a number of cases, many involving labor law claims, as well as in *Novoa v. GEO Group, Inc.*, No. 17-cv-2514, 2018 WL 4057814 (C.D. Cal. Aug. 22, 2018), which this Court has already found is notably similar to this one. *See* Dkt. No. 161 at 19-20. In his report, Dr. Childers utilizes resources that are common in the field in which he holds degrees and instructs, as well as schematics and internal documents from the BFDF, to calculate the average number of hours an individual would need to complete certain labor while in the VWP. He then uses those work hour determinations to calculate the wages detainees would have earned if paid the minimum wage, and the wages AGS would have had to pay its own non-detainee employees for such labor if they were paid the market wage. The Court rejects Defendant's contention that Dr. Childers is unqualified to undertake these analyses because he lacks knowledge in "federal contracts or regulations, [or] detention facilities." Dkt. No. 158-1 at 23. Defendant fails to explain why Dr. Childers'

undisputed experience in other work settings, including with "government organizations," would

be inapplicable in the detention setting, nor is it apparent to the Court.  Indeed, the Court finds that

Dr. Childers' experience, particularly with respect to conducting time studies, is sufficiently

applicable here.  Moreover, disputes as to the strength of an expert's credentials generally go to

the weight, not the admissibility, of the expert's testimony.  *McCullock v. H.B. Fuller Co.*, 61 F.3d

1038, 1044 (2d Cir. 1995) (citing *Daubert*, 509 U.S. at 596).

Accordingly, the Court finds that Dr. Childers is qualified to render the expert opinions set

forth in his report.

### ii.  Sufficient Facts or Data and Reliable Methodology

Defendant next argues that Dr. Childers' opinions are unreliable because they "(i) rel[y]

upon outdated and irrelevant methodology, and (ii) fail[] to reliably apply the chosen methodology

to the facts of this case."  Dkt. No. 158-1 at 24.

In his report, Dr. Childers describes the materials on which he relies and the assumptions

he makes in reaching his conclusions.[5]  Specifically, Dr. Childers relies on the Association of

Physical Plant Administrators' ("APPA")[6] methodologies, applicable Federal Service Contract

Act ("SCA") wage data, discovery documents, and deposition testimony in this matter to determine

the rate at which AGS would substitute market labor for detainee labor "but for the work program."

*Id.* at 3-4.  For his work time analyses related to VWP custodial duties in particular, Dr. Childers

relies upon "facility blueprints, photos of the areas," and the declaration of an ICE Facility

---

[5] Dr. Childers also includes as an exhibit to his report an eight-page list of all materials he reviewed throughout the drafting of his report which, on the Court's review, is extensive.  Dkt. No. 158-4 at 21-28.

[6] Dr. Childers attests that the APPA is "recognized globally as a leader in professional development programs, credentialing, research, publications, networking, and information services for the education facilities profession."  *Id.* at ¶ 17.

Operations Specialist "for information regarding the physical spaces" at the BFDF.  *Id.* at ¶ 16.

Using this information about the physical space, Dr. Childers relies on the APPA Custodial

Staffing Guidelines (2d Edition),[7] matching certain information therein with internal BFDF

documents and deposition testimony to compute the amount of time required to complete certain

activities.  *Id.* at ¶¶ 17-19.  For his work time analyses related to other VWP duties, Dr. Childers

relies on deposition testimony and certain discovery documents that outline hours detainees

historically spent performing those duties, the accuracy of which Defendant does not dispute.  *See*

*id.* at ¶¶ 24-25.  For all wage analyses, Dr. Childers relies on New York State's minimum wage,

as well as reported data from the SCA and United States Department of Labor Bureau of Labor

Statistics ("BLS").  *Id.* at ¶ 20.  Dr. Childers then uses the aforementioned resources, as well as

data resulting from the use of those resources, to calculate: (1) the amount detainees would have

made if they were making the minimum wage, and the savings AGS arguably retained from paying

detainees only one dollar per day; and (2) the cost that would have been required to replace

detainee labor with full-time, non-detainee AGS employees, and the savings AGS purportedly

retained from not doing so and instead paying detainees one dollar per day.  *Id.* at ¶ 21.

The Court finds that this methodology is sufficiently reliable.

First, Defendant concedes that the APPA Guidelines "provide a detailed methodology for

estimating custodial requirements for a particular space[.]"  Dkt. No. 158-1 at 25.  Defendant

nonetheless asserts that the data that Dr. Childers extrapolated from the APPA Guidelines is too

---

[7] While Defendant takes issue with the fact that Dr. Childers does not rely on the fourth edition of
the APPA Custodial Staffing Guidelines, Dr. Childers testified that "[t]here really weren't any
major substantive changes" between the fourth edition and the second edition, and that using the
second edition actually results in more conservative wage estimates, which is more favorable to
Defendant.  *See* Dkt. No. 159-1 at ¶ 6 ("the fourth edition guidelines resulted in an estimate of
approximately 8% higher work time than under the second edition guidelines").

generic, overly inclusive, and fails to consider certain data adjustments that Defendant contends should have been made. *Id.* at 24-26. However, similar to disagreements as to an expert's qualifications, disputes as to faults in an expert's use of a particular methodology "are grist for cross-examination, and go towards weight, not admissibility." *Packard v. City of N.Y.*, 15-Civ-7130, 2020 WL 1479016, at *5 (S.D.N.Y. Mar. 25, 2020) (citing *Daubert*, 509 U.S. at 596).

Next, regarding Defendant's contention that Dr. Childers somehow makes causation or liability determinations because his report assumes that AGS operates the BFDF (as opposed to ICE or other contractors), "[a]s an expert on damages, Dr. [Childers] can assume a finding of liability." *See, e.g.*, *Actava TV, Inc. v. Joint Stock Co. "Channel One Russia Worldwide"*, 18-cv-06626, 2023 WL 2529115, at *6 n.9 (S.D.N.Y. Mar. 15, 2023) (citing *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 333 (N.D.N.Y. 2021)); *Bernstein v. Cengage Learning, Inc.*, 19-Civ-7541, 2023 WL 6303424, at *13-14 (S.D.N.Y. June 9, 2023); *Luipold Pharma., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-cv-681, 2015 WL 5459662, at *10 (S.D.N.Y. Sept. 16, 2015) ("[A] damages expert does not need to perform her own causation analysis to offer useful expert testimony.") (citation omitted). Indeed, Dr. Childers was instructed to assume that "AGS operates the Batavia immigrant detention facility and must do so by standards issued by the Department of Homeland Security (DHS) and U.S. Immigration and Customs Enforcement (ICE)." Dkt. No. 158-4 at ¶ 14. As such, Dr. Childers' assumption that AGS would be responsible for the damages calculated does not render his conclusions or methodologies unreliable.

Based on the foregoing, the Court finds that Dr. Childers' conclusions are based on sufficient facts and that he used reliable principles and methods in reaching such conclusions.

### iii.  Relevance

Finally, Defendant argues that Dr. Childers' opinions are not relevant and ultimately unhelpful to the trier of fact.  *See* Dkt. No. 158-1 at 29.  The Court disagrees.

Expert testimony "must be directed to matters within the witness' scientific, technical or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help."  *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

Here, as described above, Dr. Childers' damages analyses utilize various specialized resources to calculate work times and wage rates that the Court finds are not easily interpreted by a lay person.  In addition, Dr. Childers performs technical calculations not readily undertaken by a lay person, including calculation of the cost that Defendant would have incurred to pay outside contractors to perform the work covered by the VWP during the relevant time periods.  This is precisely the type of assistance that Rule 702 and *Daubert* allow.

Accordingly, the portion of the *Daubert* Motion seeking to preclude Dr. Childers' testimony in relation to class certification, summary judgment, and trial, is denied.

### B.  The Class Certification Motion

#### 1.  Standards Pertinent to All Proposed Classes

As detailed *supra*, Section III(B), for each of Plaintiffs' proposed classes, the first step of the class certification analysis is determining whether the proposed class satisfies the requirements of Rule 23(a): numerosity, commonality, typicality, adequacy.  *See* Fed. R. Civ. P. 23(a)(1)-(4). The Second Circuit has also "recognized an implied requirement of ascertainability in Rule 23." *In re Petrobras Sec.*, 862 F.3d at 260 (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)).  Thereafter, Plaintiffs must also show that the requirements of at least one of the three subsections of Rule 23(b) is satisfied.  *See* Fed. R. Civ. P. 23(b).

### i. Numerosity

Rule 23(a)(1) requires that the prospective class be so large that joinder of all members is "impracticable," though not necessarily impossible. *See* Fed. R. Civ. P. 23(a)(1); *see also Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). Numerosity "is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (citation omitted). A plaintiff need not determine the precise number or identity of potential class members to meet the numerosity requirement but must offer some evidence supporting a reasonable estimate of the number of potential class members. *See Robidoux*, 987 F.2d at 935.

### ii. Commonality

The purpose of the commonality requirement is to test "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Lowe v. NBT Bank, N.A.*, No. 19-CV-1400, 2022 WL 4621433, at *4 (N.D.N.Y. Sept. 30, 2022) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)). "Although the claims need not be identical, they must share common questions of fact or law." *Id.* (citing *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 181 (W.D.N.Y. 2005)). Further, those questions of law or fact must lead to "common answers" amongst the class. *See Wal-Mart Stores*, Inc., 564 U.S. at 350 (citation omitted). Courts liberally construe the commonality requirement. *Lowe*, 2022 WL 4621433, at *4 (citation omitted). Where "the class members' claims will turn on one legal question," the commonality requirement of Rule 23(a) is satisfied. *Selby v. Principal Mut. Life Ins. Co.*, 197 F.R.D. 48, 57 (S.D.N.Y. 2000).

### iii. Typicality

Typicality requires that a class representative have "the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they

initiating individualized actions." *Story*, 2021 WL 736962, at *5 (quotation and citation omitted). "The requirement is met if . . . (1) [the] claims of representative plaintiffs arise from [the] same course of conduct that gives rise to claims of the other class members, (2) . . . the claims are based on the same legal theory, and (3) . . . the class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representative." *Id.* (quotations and citations omitted). Although the analyses of commonality and typicality "tend to merge . . . [t]he commonality requirement tests the definition of the class itself, while the typicality requirement focuses on how the named plaintiff's claims compare to the claims of the other class members." *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 532 (E.D.N.Y. 2017) (citations omitted).

### iv.  Adequacy

To determine adequacy, the Court inquires as to "whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). "The adequacy requirement exists to ensure that the named representatives will 'have an interest in vigorously pursuing the claims of the class, and . . . have no interests antagonistic to the interests of the other class members.'" *Story*, 2021 WL 736962, at *6 (quoting *Toure v. Cent. Parking Sys. of N.Y.*, No. 05-Civ-5237, 2007 WL 2872455, at *7 (S.D.N.Y. Sept. 28, 2007) (quoting *Penney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006))).

### v.  Ascertainability

Ascertainability is a "modest threshold requirement" for class certification that requires that the "proposed class is defined using objective criteria that establish a membership with definite

boundaries." *In re Petrobras Sec.*, 862 F.3d at 260. The ascertainability requirement "does not directly concern itself with plaintiffs' ability to offer proof of membership." *Id.* Instead, it focuses on how clearly the class is defined. *Id.* at 266-67.

### vi. Rule 23(b)(3)

Plaintiffs seek class certification pursuant to Rule 23(b)(3). *See* Dkt. No. 144-1 at 6. A class action may be maintained pursuant to Rule 23(b)(3) if Rule 23(a) is satisfied and "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b). "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459-60 (2013) (emphasis in original); *see also UFCW Loc. 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010) ("Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.") (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)); *Erickson v. Jernigan Cap., Inc.*, 692 F. Supp. 3d 114, 121 (S.D.N.Y. 2023). If the class "will prevail or fail in unison" after merits determinations are made, Rule 23(b)(3) is satisfied. *Amgen Inc.*, 568 U.S. at 460. Moreover, under Rule 23(b)(3), a class action is likely superior to other available methods of litigating the claims "where the costs of bringing individual actions outweigh the expected recovery." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013); *see also Wood v. Mike Bloomberg 2020, Inc.*, 746 F. Supp. 3d 185, 203 (S.D.N.Y. 2024).

### 2. Application to Each Proposed Class

#### i. Forced Labor Class

First, the Court finds that Plaintiffs' proposed Forced Labor Class meets the requirements of Rule 23(a).

With respect to the numerosity prong, the record contains sufficient documentary evidence establishing that the proposed class exceeds the forty-person presumption. This includes, *inter alia*, records reflecting commissary deposits for work performed in the VWP, a sample list of detainees who worked in the VWP during the relevant time period, and worker sign-in sheets for jobs in various housing units. *See* Dkt. Nos. 144-8, 144-9, 144-16. Based on this evidence, Plaintiff asserts that there are over five thousand putative class members. *See* Dkt. No. 144-1 at 15. Defendant does not dispute that the proposed class has more than forty members. Instead, Defendant offers one counterargument: that not all of the detainees who fall within the proposed class have viable claims. *See* Dkt. No. 150 at 27. Defendant disputes the notion that "because every VWP participant was allegedly subjected to the same conditions, [] all participated because they were forced or coerced." *Id.* Instead, Defendant asserts that "there is significant evidence to the contrary," including that "over 70% of detainees at the BFDF chose not to participate in the VWP."[8] *Id.* But Defendant's argument is a misplaced merits argument that cannot suffice to defeat numerosity. *See, e.g.*, *Bayne v. NAPW, Inc.*, No. 18-CV-3591, 2021 WL 4822426, at *5 (E.D.N.Y. Aug. 10, 2021) (declining to make a merits determination as part of a numerosity analysis and noting doing so would be "put[ting] the proverbial cart before the horse"). Thus, especially since Defendant does not contest the validity of the records showing the names of the

---

[8] Defendant's assertion in this regard presumes that 100% of detainees could work in the VWP, which is contradicted by its argument in favor of summary judgment. *See, e.g.,* Dkt. No. 149-2 at 8 (stating that "[t]he VWP offers limited participation spots").

detainees who participated in the VWP on any given day, *see* Dkt. Nos. 144-1 at 29-30, 144-9, 144-16, the Court finds that the numerosity requirement is satisfied. *See, e.g.*, *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 230 (2010) (citing *Cons. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)) (even where parties disagree as to exact class size, numerosity presumed where record evidence establishes the class contains "at least hundreds" of members).

With respect to the commonality prong, Plaintiffs argue that it is satisfied because "the factual questions underlying [the class's] common contentions will have answers that are likewise common to the class." Dkt. No. 144-1 at 21. As discussed above in relation to Defendant's *Daubert* Motion, courts in the Second Circuit have interpreted the TVPRA to utilize a "hybrid" standard for assessing coercion, which requires consideration of whether a reasonable person facing the conditions imposed on the alleged victims would have been compelled to perform labor services, taking into consideration the alleged victims' particular vulnerabilities. *See supra* Section IV(A)(1). Applying that standard, the Forced Labor Class members' claims will turn on common legal questions, including whether Defendant obtained VWP labor by threatening or imposing conditions which would have compelled a reasonable detainee at the BFDF to participate in the VWP. Similarly, the Forced Labor Class members' claims will turn on common questions of fact, including the general conditions in portions of the BFDF overseen by Defendant, the operation of the VWP, and the nature of any allegedly coercive methods utilized by Defendant's employees, all of which might inform the hybrid analysis under the TVPRA. Accordingly, the commonality prong is satisfied.

With respect to the typicality prong, it is usually satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. . . . When it is alleged that the same unlawful conduct was directed

at or affected both the named plaintiff[s] and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936-37 (citations omitted); *see also, e.g.*, *Francisco v. NY Tex Care, Inc.*, No. 19-CV-1649, 2022 WL 900603, at *8 (E.D.N.Y. Mar. 28, 2022) ("Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding.") (citations omitted). Typicality "ensure[s] that class representatives have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *Francisco*, 2022 WL 900603, at *8 (citation omitted).

Here, each putative class member's TVPRA claim, including those of the named Plaintiffs, arises from Defendant's course of conduct at the BFDF, and each putative class member, including the named Plaintiffs, will challenge that conduct as violating the TVPRA. The Court acknowledges that the specific conditions purportedly threatened or imposed by Defendant may differ from class member to class member. And while Plaintiffs assert that the named Plaintiffs and the remaining class members all "lived and worked in each of the regular housing units, ate the same food . . . and experienced the same deprivations," Dkt. No. 144-1 at 26, Defendant rightly points out that certain detainees assert that they experienced additional coercive conduct or threats of such conduct that others did not. *See* Dkt. No. 150 at 29 ("None of the named Plaintiffs experienced criminal prosecution or threats thereof, . . . deportation of threats thereof, . . . or disciplinary segregation or solitary confinement or threats thereof[.]"). However, these variations in experience between the class members do not defeat typicality. In total, because the named Plaintiffs' claims "arise out of the same course [of] events as those of other class members, and since similar legal arguments bear on [their] claims, the Court finds that the typicality requirement

is satisfied." *Doe 1 v. JPMorgan Chase Bank, N.A.*, No. 22-cv-10019, 2023 WL 3945773, at *5-6 (S.D.N.Y. June 12, 2023) (finding typicality based on the broad presumption that the named plaintiffs and the remaining class members were all broadly victims of a "sex-trafficking venture" without delving into the specific manner in which the class representatives were coerced); *see also Menocal v. GEO Grp., Inc.*, 320 F.R.D. 258, 265 (D. Colo. 2017) (finding typicality even though "no [r]epresentative was actually disciplined with segregation").

With respect to the adequacy prong, Defendant does not posit any substantive challenge, *see generally* Dkt. No. 150, and there does not appear to be evidence in the record to demonstrate that the named Plaintiffs' interests are at odds with other members of the proposed Forced Labor Class. Additionally, Defendant does not dispute the qualifications or experience of counsel. Therefore, the adequacy prong is satisfied.

With respect to ascertainability, Defendant again relies on a merits argument to argue that the proposed Force Labor Class members are not ascertainable. *See* Dkt. No. 150 at 25-26 ("Plaintiffs have presented scant (if any) evidence that they were forced to participate in the VWP. . . . [and] the persistent existence of a waiting list to participate in the VWP coupled with the fact that a large percentage of the VWP population did not participate in the VWP establishes that the class is not ascertainable."). However, as with the numerosity prong, regardless of whether Plaintiffs are ultimately successful on the merits, it remains the case that ascertaining Plaintiffs' proposed Forced Labor Class is "objectively possible." *See In re Petrobras Sec.*, 862 F.3d at 266-67 (a court does not need to consider the merits of the underlying claims in making an ascertainability determination). Since Defendant does not contest the validity of the records showing the names of the detainees who participated in the VWP on any given day, the job they

worked, and the wages they obtained from such work, *see* Dkt. Nos. 144-1 at 29-30, 144-9, 144-16, and because the proposed class is sufficiently defined, the ascertainability prong is satisfied.

Second, the Court finds that Plaintiffs' proposed Forced Labor Class meets the predominance requirement of Rule 23(b)(3).

Defendant contends that the question of coercion underlying Plaintiffs' TVPRA claims is too individualized and that "such a determination cannot be made on a class-wide basis." Dkt. No. 150 at 29 n.126. Specifically, Defendant argues that "Plaintiffs have not and cannot point to a single written AGS policy which mandates, authorizes, or allows these or any other deprivations for refusing to work in the VWP," and so whether a reasonable person in the detainees' position would have felt compelled to work based upon Defendant's actions can only be established through examining the specific experiences of each individual who has worked in the VWP at the BFDF. *Id.* at 31-32. Although Plaintiffs concede that class-wide proof of coercion is "not codified in a written policy," Dkt. No. 144-1 at 32, the Court finds that the absence of such a document is hardly fatal here. For one, the language of Section 1589 is not limited to a "written policy." *See, e.g.,* 18 U.S.C. § 1589(a)(4) (prohibiting forced labor "by means of any scheme, plan or pattern"); *Gonzalez v. CoreCivic, Inc.*, 986 F.3d 536, 538 (5th Cir. 2021) (observing that "the text of § 1589 is broad"). Moreover, Plaintiffs contend that class-wide proof of coercion exists because Defendant maintained a "consistent practice" of punishing, depriving, threatening or otherwise coercing detainees to join and remain in the VWP. Dkt. No. 144-1 at 21-25. According to Plaintiffs, examples of such alleged coercion include AGS employees regularly threatening VWP participants that if they failed to fulfill their duties, all detainees on the housing unit, including those not involved in the VWP, would lose access to facility privileges, "such as time outdoors and access to phones and tablets," and, at times, following through on the threats. *Id.* at 21-23.

Plaintiffs further claim that these threats included "locking an entire unit in their cells," "conducting unit-wide shakedowns," and the risk of solitary confinement. *Id.* at 21.

Such coercive practices are described by each named Plaintiff in their respective declarations or depositions:

1. Plaintiff Yeend, who was detained at the BFDF from on or about June 2, 2018 through August 17, 2018, contends in her declaration that AGS employees "often refused to turn on the TVs in the unit or threatened to cancel rec time outside until detainees 'volunteered' to clean up after lunch, to wipe down tables and sweep the floor" and that, on one occasion AGS employees "said that if no one 'volunteered'" to clean out two cells infested with head lice, "then everyone in the unit would get locked into [their] cells." Dkt. No. 144-3 at ¶¶ 12-13. In describing her motivation for remaining in the VWP, Plaintiff Yeend states that "I [] worked when the guards asked because I didn't want to feel responsible for getting everyone locked into their cells or losing the TV." *Id.* at ¶ 20.

2. Plaintiff Phimasone, who was also detained at the BFDF from on or about December 2018 through August 6, 2019, states in his deposition that on an occasion when he fell ill and could not perform his VWP duties, "the telephone and TV got taken away . . . we were sent to stay in bed, everybody. [B]ut it did not just happen to me. [If] other people also [] did not work, everything was turned off." Dkt. No. 144-23 at 41:25, 42:1-9. He further testified that "other detainees accused me why I did not work, because they did not get to use television, telephone, microwave" and then assaulted him. *Id.* at 42:5-12.

3. Plaintiff Minaya Rodriguez, who was detained at the BFDF from on or about April 25, 2019 through April 1, 2021, notes in his declaration that he performed "additional cleaning work in the housing unit when a worker was needed because AGS officers threatened to take away privileges like watching TV or access to the recreation yard if no one did the work. I did not want those privileges to be taken away from all of us, so I felt pressured to work." Dkt. No. 144-5 at ¶ 20. Plaintiff Minaya Rodriguez also states that VWP participants "knew the work program was 'voluntary' but in reality[,] everyone worked out of need or fear that a privilege would be taken away." *Id.* at ¶ 30.

4. Plaintiff LaPointe, who was detained at the BFDF from December 2019 through April 2020, contends in her declaration that "[o]ver the period of time I was detained, I regularly saw detainees being told to work under the threat of turning off the TVs, phones and denying access to recreation. If nobody volunteered to fill a position, the officers followed through on their threats and withheld those privileges until someone agreed to work." Dkt. No. 144-6 at ¶ 6; *see also id.* at ¶ 14 ("Detainees who were working felt coerced to work because . . . guards threatened and punished us as a group if there weren't enough volunteers to work.").

5. Plaintiff Rahmee, who was detained at the BFDF from on or about October 28, 2019 through March 30, 2020, states in his declaration that "I felt obligated to take on more tasks because I saw AGS staff threaten to turn off TVs, turn off the phones, and cut off access to the recreation yard if nobody 'volunteered' to perform the work. . . . Many times, AGS guards made good on those threats and actually took away these privileges." Dkt. No. 144-7 at ¶ 8. Plaintiff Rahmee also notes that "detainees [] felt forced to take on a job because if jobs weren't done everyone was punished by the guards taking away TV or rec . . . These were the reasons I worked in the program." *Id.* at ¶ 22; *see also id.* at ¶ 24 ("The people I knew in the work program worked because they did not want to lose privileges.").

Additionally, non-Plaintiff VWP participants currently housed at the BFDF submitted testimony with similar assertions.[9] Barrington Walker, who has been detained at the BFDF since on or about September 30, 2022, contends that "AGS officers threaten us by stating that if we do not complete our work assignments, officers will send us to our bunk area in our dorms and/or take away our privileges, like our access to telephones[,] . . . and access to the recreation area, TV, or tablets." Dkt. No. 144-28 at ¶ 23. Mr. Walker also states that "if a detainee does not want to work on a certain day (because he feels sick or for any other reason), the officers will deny privileges for all detainees until the following day or until the work gets done." *Id.* at ¶ 28; *see also id.* at ¶ 29 ("when a detainee in the VWP is not able to work or refuses to work, I feel forced to work or complete those tasks so that me and the other detainees are not punished.").

Further, Rigoberto Antonio Chavez Gonzalez, who has been detained at the BFDF since on or about June 24, 2022, notes that AGS employees "threaten me and other workers saying that if we did not complete our work assignments, officers would send us to our cells and/or take away our privileges, like our access to the TV, the toaster, the microwave, the recreation yard, or tablets." Dkt. No. 144-30 at ¶ 17; *see also id.* at ¶ 20 ("[w]hen one person refuses to work, privileges are

---

[9] While Defendant has requested to strike these declarations, *see* Dkt. No. 137, that request is denied for the reasons outlined in the Court's forthcoming Memorandum-Decision and Order regarding Defendant's motions for summary judgment.

taken away from all detainees."). Moreover, Jeyder Lopez Sandoval, who was detained at the BFDF from on or about September 8, 2022 through June 29, 2023, attests that AGS employees "frequently threaten[ed] workers. Specifically, an officer threatened us by stating that if we did not complete our work assignments, officers would move me to a celled unit and/or take away our privileges, like our access to the TV, the recreation yard, telephones, or tablets," Dkt. No. 144-29 at ¶ 18, and that "[t]his type of intimidation and threatening behavior to force us to work happened at least once or twice per week, or any time the officers needed more people to work," *id.* at ¶ 20.

While Defendant insists that "Plaintiffs [] have not demonstrated that the VWP practices are sufficiently uniform and also uniformly coercive," Dkt. No. 150 at 32, the Court finds that the above-referenced witness testimony, which covers activity throughout a significant portion of the proposed class period, sets forth sufficiently generalized proof from which a reasonable factfinder could infer that Defendant consistently coerced the proposed class members to work through a variety of means, including by threatening collective punishment and, at times, implementing it. Even if, as Defendant argues, each witness's testimony contains "unique idiosyncrasies," *id.* at 39, the proposed class members' additional allegations with respect to other types of coercive behavior are not dispositive of the predominance inquiry. To the contrary, predominance only "tests whether proposed classes are *sufficiently cohesive* to warrant adjudication by representation" and "asks whether the *common, aggregation-enabling, issues* in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (first quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997); and then quoting 2 W. Rubenstein, Newberg on Class Actions § 4:49, pp. 195-96 (5th ed. 2012)) (emphasis added).

In that regard, the Court finds that the common question of whether a reasonable person of the proposed class members' background would have felt compelled to work based on Defendant's actions predominates over any proposed class member's individual experience.  *See Paguirigan*, 2018 WL 4347799, at *8 ("The question is not whether each individual felt compelled to continue her employment as a result of defendants' conduct, but whether a reasonable person of the same background and in the same circumstances would find that conduct a threat of serious harm sufficient to compel continued work.") (finding that common questions predominated over individual issues with respect to TVPRA claims).  Not only do common issues predominate with respect to Defendants' alleged coercion, but the proposed class members also share many common characteristics that would allow a jury to apply the TVPRA "reasonable person" standard in a manner that considers the proposed class members' particular vulnerabilities.  *See Rivera*, 799 F.3d at 186-87.  These common characteristics include, *inter alia*, the class members' status as non-citizens, their confinement at the same civil detention center where they are all subject to the same living conditions, their anticipation of immigration proceedings and associated fear of deportation, their participation in the same VWP program, and their supervision by AGS.

The cases upon which the Parties rely strengthen the Court's conclusion.  While some forced labor classes have been certified where the plaintiffs relied on a standard contract or formal written policy, *see, e.g.*, *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 911, 916 (10th Cir. 2018); *Novoa v. GEO Grp., Inc.*, No. 17-cv-2514, 2021 WL 4913286, at *5 (C.D. Cal. Sept. 30, 2021), the case law bears out that the lack of such a contract or policy is not determinative.  For example, in *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, No. 10-Civ-01172, 2011 WL 7095434, at *11 (C.D. Cal. Dec. 12, 2011), the plaintiffs, who traveled to the United States on visas to teach, uniformly alleged that, upon arrival to the United States, recruiter defendants engaged in a common practice

of demanding substantial payments that were not previously disclosed, otherwise the plaintiffs would face threats that their visas and jobs would terminated.  The Court held that the evidence of this common practice, which was derived from the plaintiffs' testimony, satisfied the predominance requirement even though the plaintiffs may have had differing personal backgrounds and the defendants interacted with each plaintiff concerning the hidden fees in a different manner.  *Id.*

Similarly, in *Rosas v. Sarbanand Farms, LLC*, 329 F.R.D. 671 (W.D. Wash. 2018), the court found that the plaintiffs, who were Mexican nationals in the United States through a visa program and were subject to the same working conditions, satisfied the predominance requirement where they claimed that the defendants threatened all proposed class members in the same general manner, even though the individual class members may have perceived the threats differently.  *Id.* at 689 ("Contrary to Defendants' assertions that individual inquiries will be necessary to determine whether individual members perceived Growers' statements as threats, the inquiry under the statute focuses on whether a reasonable person in the same circumstances would be compelled to continue to work.  As the members of the 2017 Blueberry Harvester Class share many salient characteristics, . . . worked under the same conditions, and were subjected to the same threats, a uniform reasonable person standard may be applied to determine whether Growers' statements violated the TVP[R]A.") (citations omitted).

Relatedly, the Court notes that *Barrientos v. CoreCivic, Inc.*, No. 18-CV-70, 2023 WL 2666852 (M.D. Ga. Mar. 28, 2023)—the case upon which Defendant primarily relies—is distinguishable from the instant action.  In that case, the named plaintiffs also participated in a VWP at a civil immigration detention center and argued that detainees were coerced to join or remain in the VWP largely based on their need to make money to purchase items from the

detention center's commissary because of alleged lack of access to adequate food, clothing, or hygiene items. *Id.* at *2. However, the plaintiffs did not allege any overarching pattern of punishment, deprivation, or coercion connected to a failure to work, let alone a pattern of collective punishment that was sufficiently uniform as to the manner and means by which it was threatened or implemented. *Id.* at *3-4.

The Court also notes that the predominance requirement is satisfied regardless of the fact that the amount of damages may differ by class member. In *Comcast Corp. v. Behrend*, the Supreme Court explained that, to prevail on predominance, "any model supporting a plaintiff's damages case must be consistent with its liability case." 569 U.S. 27, 35 (2013). Thus, the Court must "examine the proposed damages methodology . . . to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 123 n.8. As Plaintiffs recognize and Defendant does not dispute, victims who establish a TVPRA claim may recover "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor." Dkt. No. 144-1 at 34 (quoting 18 U.S.C. § 1593(b)(3)). Here, Dr. Childers' damages analysis is consistent with the proposed class's liability case and provides a class-wide method of proving damages. Particularly, he provides an analysis of the value of the VWP participants' services by calculating the amount AGS would have had to pay non-detainees if certain labor was not included as part of the VWP and supplies a common methodology for calculating those damages as to each proposed class member. Thus, the fact that some class members may recover more if, for example, they worked more than others, does not defeat the finding that Plaintiffs have satisfied Rule 23(b)(3). *See, e.g.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (noting that the Second Circuit has found damages models to be in accord with *Comcast* where the "proposed

measure of damages is directly linked with their underlying theory of classwide liability" and certifying a class where "damages for individual class members could be calculated by applying a method across an entire class") (quoting *U.S. Foodservice, Inc. Pricing Litig.*, 729 F.3d at 123 n.8).

Finally, a class action is superior to other available methods for litigating the claims of the Forced Labor Class.  Rule 23(b)(3) demands that courts consider the following factors: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Here, each factor weighs in favor of certifying the Forced Labor Class.  The putative class members were subjected to the same VWP conditions and are now geographically dispersed, *see* Dkt. No. 144-1 at 35, meaning that individual class members likely do not have the resources to litigate their own claims. *See Robidoux*, 987 F.2d at 936 (noting where putative class members were "economically disadvantaged[,]" superiority weighed in favor of certification).  In addition, the Court has not been made aware of any litigation that has "already begun" by or against any prospective class members, and given the availability of a standard method of calculating damages, the Court sees no difficulty in managing the class action.

Thus, after giving "careful scrutiny to the relation between common and individual questions" relevant to Plaintiffs' claims, *Tyson Foods, Inc.*, 577 U.S. at 453, the Court finds that Plaintiffs have satisfied Rule 23(b)(3).  Accordingly, the Court grants Plaintiffs' motion to certify the proposed Forced Labor Class.

### ii.  Labor Law Class

With respect to Plaintiffs' proposed Labor Law Class, Defendant argues only that since Plaintiffs' New York Labor Law claims will fail on the merits, the motion to certify a Labor Law Class should be denied.  *See* Dkt. No. 150 at 10 ("AGS' basis for opposing certification of the Labor Law Class is a complete lack of merit of the underlying claims").  Plaintiffs contend that, since Defendant did not address the Rule 23 requirements at all with respect to the proposed Labor Law class, it has "waived its opposition to certifying the class."  Dkt. No. 153 at 5 (citations omitted).

Despite Defendant's implied request that the Court do so here, courts typically do not make merits determinations on motions for class certification.  *See Schweizer v. Trans Union Corp.*, 136 F.3d 233, 239 (2d Cir. 1998) ("*Eisen* [*v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)] makes clear that the determination of whether a class meets the requirements of Rule 23 must be performed separately from the determination of the merits"); *Lewis Tree Serv., Inc. v. Lucent Techs. Inc.*, 211 F.R.D. 228, 231 (S.D.N.Y. 2002) ("A motion for class certification should not, however, become a mini-trial on the merits.") (internal citations omitted).  And while Plaintiffs may be correct that Defendant waived its argument with respect to the certification of the proposed Labor Law Class, the Court will nevertheless address Plaintiffs' argument that the class should be certified under Rule 23.

As with the proposed Forced Labor Class, Plaintiffs have satisfied the requirements of Rule 23(a) with respect to the proposed Labor Law Class.  As to numerosity, discussed above, sufficient documentary evidence exists to show that the number of detainees who participated in the VWP in the relevant timeframe exceeds the forty-person presumption.  As to commonality, questions of whether the NYLL applies and whether Defendant's practices with respect to detainees in the

VWP violate the NYLL are uniform across the proposed class. As to typicality, the proposed class members' claims arise from the same course of conduct and there are no conceivable differences among the proposed class members as to the legal theory they pursue. And, as to adequacy and ascertainability, as with the proposed Forced Labor Class, there is no evidence that any member of the proposed Labor Law Class would have interests that are antagonistic to the named Plaintiffs, and the undisputed documentary evidence in the record shows that ascertaining the proposed class members is "objectively possible." *In re Petrobras Sec.*, 862 F.3d at 270.

Regarding Rule 23(b)(3), the Court finds that Plaintiffs have satisfied the predominance requirement with respect to the proposed Labor Law Class. Plaintiffs' labor law claims do not present individualized questions that predominate over common questions. Indeed, especially since it is undisputed that Defendant paid all detainees who participated in the VWP one dollar per day, capped at five dollars per week, the only remaining questions to be decided apply to the proposed class uniformly, particularly (i) whether the proposed class members qualify as "employees" under the NYLL; and, if so, (ii) whether Defendant's pay practice violates New York's minimum wage laws. If it is determined that the proposed class members are "employees," and that Defendant's pay practice did violate the wage laws, all proposed Labor Law Class members will be able to recover in some capacity. If it is determined that the proposed class members are not "employees," or that Defendant's pay practice did not violate the wage laws, there will be no recovery at all. Therefore, common issues predominate and Rule 23(b)(3) is satisfied.

As with the Forced Labor Class, the predominance requirement is satisfied regardless of the fact that the amount of damages may differ by class member, since some detainees presumably worked more hours than others. Dr. Childers provides an analysis of the amount AGS would have

had to pay detainees if New York's minimum wage law applied and supplies a common methodology for calculating those damages as to each proposed class member. Thus, the fact that some class members may recover more if they worked more hours than others does not defeat the finding that Plaintiffs have satisfied Rule 23(b)(3). And the NYLL enumerates statutory penalties for several of Plaintiff's claims. *See* N.Y. Lab. Law § 198. Finally, the Court finds a class action is the superior method of litigating the putative Labor Law Class members' claims for the same reasons considered in relation to the Forced Labor Class.

Accordingly, Plaintiffs' motion to certify the proposed Labor Law Class is granted.

### iii. Unjust Enrichment Class

As an initial matter, the Court addresses the statute of limitations arguments presented by the Parties. Courts within the Second Circuit apply a three-year or six-year statute of limitations to unjust enrichment claims depending on the substantive remedy sought by the plaintiff. *See, e.g.*, *Bascuñan v. Elsaca*, No. 15-Civ-2009, 2021 WL 3540315, at *6 n.5 (S.D.N.Y. Aug. 11, 2021). If monetary relief is sought, a three-year statute of limitations applies. *Id.* at *6 (citations omitted). If an equitable remedy is sought, a six-year statute of limitations applies. *Id.* Here, Plaintiffs argue that the six-year statute of limitations applies to their unjust enrichment claims because "Plaintiffs do not seek compensatory damages but, instead, disgorgement of AGS's unjust profits[.]" Dkt. No. 159 at 7 n.3 (citing, *inter alia*, *Philips Int'l Invs., LLC v. Pektor*, 117 A.D.3d 1, 7 (1st Dep't 2014)). Defendant disagrees, arguing that the three-year statute of limitations applies because "Plaintiffs are seeking only monetary restitution." Dkt. No. 150 at 9 n.6 (citing, *inter alia*, *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 595-96 (S.D.N.Y. 2018)).

The Court agrees with Defendant that the three-year statute of limitations applies. It is well-settled that where an unjust enrichment claim seeks an "order requiring the return of all funds

misappropriated by the defendants," the plaintiff is seeking money damages and thus the three-year statute of limitations applies. *Bascuñan*, 2021 WL 3540315, at *7; *see also Lia v. Saporito*, 541 F. App'x 71, 75 (2d Cir. 2013) ("[T]he calculated use of the term 'disgorgement' instead of other equally applicable terms such as repayment, recoupment, refund, or reimbursement, should not be permitted to distort the nature of [the] claim so as to expand the applicable limitations period from three years to six.") (quoting *Access Point Med., LLC v. Mandell*, 106 A.D.3d 40, 44 (1st Dep't 2013)). Contrary to Plaintiffs' assertion, Plaintiffs do not request disgorgement in the Amended Complaint's prayer for relief. Instead, as it relates to the unjust enrichment claim, Plaintiffs request only that Defendant "pay [] such amounts necessary to prevent Defendant from being unjustly enriched." Dkt. No. 80 at ¶ 207. The Court interprets this prayer for relief to seek money damages. Therefore, the three-year statute of limitations applies to Plaintiffs' unjust enrichment claim, and the proposed Unjust Enrichment Class must be limited to the period from September 8, 2019 through final judgment.

Next, on the question of whether the Unjust Enrichment Class should be certified, the Court answers in the affirmative.

Regarding the Rule 23(a) analysis, the numerosity prong is satisfied for the same reasons it was satisfied as to the proposed Forced Labor and Labor Law Classes. With respect to commonality, for their unjust enrichment claim, Plaintiffs will need to show that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 186 (2d Cir. 2023). Courts have found viable unjust enrichment claims where the defendant benefited from the plaintiff's unpaid labor. *See, e.g.*, *Kossoff v. Felberbaum*, 281 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017). Thus, since the proposed Unjust Enrichment Class

members' claims will turn on one legal question—particularly, whether Defendant unjustly retained a benefit from paying class members one dollar per day for their labor, capped at five dollars per week—the commonality element is satisfied. *See Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 139 (2d Cir. 2015) (commonality satisfied where court is able to identify "issues . . . that will affect the liability determination for all members of the class"). With respect to the typicality prong, the proposed class members' claims arise from the same course of conduct and the legal theory on which the proposed Unjust Enrichment Class relies is the same for all proposed members. And, again, with respect to adequacy and ascertainability, there is no evidence that any member of the proposed Unjust Enrichment Class has interests that are antagonistic to the named Plaintiffs, and the undisputed documentary evidence in the record shows that ascertaining the proposed class members is "objectively possible." *In re Petrobras Sec.*, 862 F.3d at 270.

Plaintiffs have also satisfied Rule 23(b)(3) with respect to the Unjust Enrichment Class. There are no individualized questions that predominate, since the proposed class's recovery will rise or fall on the determination of whether Defendant inequitably benefited from detainee labor in the VWP. And, as with the Forced Labor and Labor Law Classes, Dr. Childers' damages analysis is consistent with the class-wide theory of liability—particularly, Dr. Childers provides an analysis of what AGS would have had to pay non-detainees if certain labor was not included as part of the VWP. This supplies a common methodology for calculating damages as to each proposed class member. Finally, the Court finds a class action is the superior method of litigating the putative Unjust Enrichment Class members' claims for the same reasons considered in relation to the Forced Labor Class and Labor Law Class.

Accordingly, Plaintiffs' motion to certify the Unjust Enrichment Class is granted for the class period September 8, 2019 through final judgment.

### 3. Appointment of Class Counsel

Lastly, the Court considers counsel for Plaintiffs' request to be appointed as class counsel. To be appointed as counsel for a class, counsel "must fairly and adequately represent the interests of the class" and meet the requirements of Rule 23(g), which states, *inter alia*, that a court must consider (i) "the work counsel has done in identifying or investigating potential claims in the action"; (ii) "counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action"; (iii) "counsel's knowledge of the applicable law"; and (iv) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Here, Defendant does not appear to dispute the qualifications of Plaintiffs' counsel to serve as class counsel for the approved classes. *See generally* Dkt. No. 150. As set forth in the Class Certification Motion, Kaufman Lieb Lebowitz & Frick LLP "ha[s] competently and diligently litigated this case through discovery and dispositive motions," has "extensive experience in complex federal civil rights litigation, and [] has been recently certified as class counsel in two complex civil rights matters in this circuit." Dkt. No. 144-1 at 29. Additionally, the Worker Justice Center of New York has "represented low-wage workers throughout New York State in significant employment litigation matters, including many collective and class actions, for several decades." *Id.* Both organizations also filed declarations attesting to their qualifications to serve as class counsel. *See* Dkt. Nos. 144-2, 144-31.

Accordingly, after considering the requirements of Rule 23(g), and given their experience and expertise in this area of law, the Court appoints Plaintiffs' counsel as class counsel for the Forced Labor, Labor Law, and Unjust Enrichment Classes.

### V. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendant's motion *in limine* to exclude the testimony of Dr. Stuart Grassian and Dr. Michael Childers, Dkt. No. 158, is **GRANTED in part** and **DENIED in part**, consistent with Section IV(A) of this Memorandum-Decision and Order; and the Court further

**ORDERS** that Plaintiffs' motion to certify class and appoint class counsel, Dkt. No. 144, is **GRANTED,** consistent with Section IV(B) of this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk serve a copy of this Order on the Parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 31, 2025
    Albany, New York

Anne M. Nardacci
U.S. District Judge