**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

DALILA YEEND, BOUNNAM PHIMASONE,
ELVIN MINAYA RODRIGUEZ, LISA
LAPOINTE, and SHANTADEWIE RAHMEE,
individually and on behalf of all others similarly
situated,                                                                              1:20-cv-01281 (AMN/PJE)

                          Plaintiffs,

          v.

AKIMA GLOBAL SERVICES, LLC,

                          Defendant.

**APPEARANCES:**                                              **OF COUNSEL:**

**KAUFMAN LIEB LEBOWITZ & FRICK LLP**         **ALISON E. FRICK, ESQ.**
18 East 48th Street – Suite 802                               **ALANNA G. KAUFMAN, ESQ.**
New York, New York 10017                                      **ALYSSA D. ISIDORIDY, ESQ.**
*Attorneys for Plaintiffs*

**WORKER JUSTICE CENTER OF NEW YORK**         **CRISTINA BRITO, ESQ.**
245 Saw Mill River Road – Suite 106
Hawthorne, New York 10532

9 Main Street                                                **MAUREEN HUSSAIN, ESQ.**
Kingston, New York 12401

1187 Culver Road                                             **OLIVIA POST RICH, ESQ.**
Rochester, New York 14609
*Attorneys for Plaintiffs*

**THE KULLMAN FIRM**                                         **HEATHER F. CROW, ESQ.**
2915 Kerry Forest Parkway – Suite 101
Tallahassee, Florida 32309

1100 Poydras Street – Suite 1600                             **JESSICA L. MARRERO, ESQ.**
New Orleans, Louisiana 70163                                 **AMIEL J. PROVOSTY, ESQ.**
*Attorneys for Defendant*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.     INTRODUCTION

On September 3, 2020, Plaintiffs Dalila Yeend and Bounnam Phimasone (together with Elvin Minaya Rodriguez, Lisa LaPointe, and Shantadewie Rhamee, "Plaintiffs") commenced this action against Akima Global Services, LLC a/k/a AGS ("AGS" or "Defendant") in New York State Supreme Court, asserting state law claims pertaining to their civil immigration detention at the Buffalo Federal Detention Facility ("BFDF").  Dkt. No. 2.  On October 16, 2020, Defendant removed this action to federal court.  Dkt. No. 1.  On September 7, 2022, Plaintiffs Yeend and Phimasone filed an amended complaint with class action allegations and claims for unjust enrichment and violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") and New York Labor Law ("NYLL").  Dkt. No. 80 ("Amended Complaint").

Presently before the Court[1] is Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Dkt. Nos. 117, 149 ("Motion"), Plaintiffs' opposition, Dkt. Nos. 129, 165, and Defendant's reply papers in further support, Dkt. Nos. 136, 166.

For the reasons set forth below, the Motion is denied.

## II.     BACKGROUND[2]

### A.  The Buffalo Federal Detention Facility

Located in Batavia, New York, the BFDF is a processing center for civil immigration

---

[1] This case was reassigned to the undersigned on April 10, 2024.  Dkt. No. 139.

[2] Unless otherwise indicated, the following facts have been asserted by the Parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response.  *See* N.D.N.Y. L.R. 56.1.  The Court has also considered the Parties' other submissions and attached exhibits.  *See generally* Dkt. Nos. 117, 129, 136-37, 140, 149, 151-54, 165-67.

detainees.  *See, e.g.,* Dkt. No. 117-1 at ¶ 1; U.S. Immigration & Customs Enforcement, Detention Facilities, https://www.ice.gov/detention-facilities (last visited March 31, 2025).  The BFDF includes nine general housing units, one special management housing unit, a kitchen, laundry, space for indoor and outdoor recreation, a chapel, law library, processing area, visitation area, medical area, warehouse area, and an immigration court, Dkt. No. 117-1 at ¶ 3; Dkt. No. 129-5 at 48, ¶ 22;[3] Dkt. No. 149-1 at ¶ 87.  The facility can house 650 detainees in normal operations and 834 detainees in emergency circumstances.  Dkt. No. 117-5 at 47; Dkt. No. 117-6 at 39.

The facility is owned by non-party United States Immigration and Customs Enforcement ("ICE").[4]  Dkt. No. 117-4 at ¶ 2.  ICE maintains an on-site presence at the BFDF but does not operate all aspects and portions of the facility.  Dkt. No. 117-1 at ¶¶ 4-10, 20.  As relevant here, ICE previously entered into a contract with Defendant for Defendant to provide certain detention management services at the BFDF (the "Contract").  Dkt. No. 117-4 at ¶ 3; Dkt. No. 117-5 at ¶ 5; *see also infra* Section II.D.  Pursuant to the Contract, Defendant has provided such services since at least February 1, 2015.[5]  Dkt. No. 117-1 at ¶ 43.

### B.  The Parties

Defendant is a limited liability company whose ultimate owner is a privately held Alaska Native Corporation.  *Id.* at ¶ 14; Dkt. No. 7; Dkt. No. 129-3 at 14:4-15:1.

All Plaintiffs are adults who were detained at the BFDF for varying periods of time in

---

[3] Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the documents' internal pagination.

[4] The Court previously denied Defendant's motion to dismiss the case for failure to join ICE as an indispensable party.  *See* Dkt. No. 161.

[5] The Parties disagree about precisely when prior to this date Defendant began providing detention management services at the BFDF.  *Compare* Dkt. No. 117-1 at ¶ 43, *with* Dkt. No. 129-1 at ¶ 43.  This dispute is immaterial for purposes of summary judgment, however, because no Plaintiff class asserts claims prior to February 1, 2015.  *See* Dkt. No. 144 at 1.

connection with civil immigration proceedings.  Dkt. No. 80 at ¶¶ 1, 13-17.  Plaintiff Yeend was detained from on or about June 2, 2018 until August 16, 2018, Dkt. No. 129-17 at 14:17-24, 17:12-14; Dkt. No. 80 at ¶¶ 58, 60; Plaintiff Phimasone from on or about December 2018 until August 6, 2019, Dkt. No. 129-21 at 84:22-25; Dkt. No. 80 at ¶¶ 73, 78, 86; Plaintiff Minaya Rodriguez from on or about April 26, 2019 until April 1, 2021, *id.* at ¶ 90; Dkt. No. 129-16 at 16:12-17; Plaintiff Rahmee from on or about October 28, 2019 until March 31, 2020, Dkt. No. 129-18 at 13:3-12, 17:13-15; Dkt. No. 80 at ¶ 141; and Plaintiff LaPointe from on or about December 13, 2019 until April 3, 2020, Dkt. No. 129-22 at 19:7-10, 21:6-8; Dkt. No. 80 at ¶ 116.

Following their release, Plaintiffs Yeend, Phimasone, Minaya Rodriguez, and Rahmee reside in New York (in the counties of Rensselaer, Oneida, New York, and Queens respectively), while Plaintiff LaPointe resides in Canada.  Dkt. No. 80 at ¶¶ 13-17.

### C.  The Voluntary Work Program

Authorized by Congress, the Voluntary Work Program ("VWP") enables immigration detainees to be paid for labor they perform while detained.  *See* 8 U.S.C. § 1555 (stating that appropriations "shall be available for . . . payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed").  ICE reimburses AGS at a rate of one dollar per day for each detainee who participates in the VWP.  Dkt. No. 129-1 at 47, ¶ 14; Dkt. No. 117-4 at ¶ 7. Detainees are paid directly by AGS, with funds deposited into their commissary accounts.  Dkt. No. 129-1 at ¶ 64.  According to ICE, "[t]here is no contract, rule, or law that prevents AGS from paying detainee workers more than $1.00 per day."  Dkt. No. 117-4 at ¶ 7.

ICE has promulgated national standards for the detention of civil immigration detainees. Dkt. No. 117-1 at ¶ 59; *see also* U.S. Immigration & Customs Enforcement, *Performance-Based*

National Detention Standards 2011 (2016 ed.) ("PBNDS"), https://www.ice.gov/ doclib/detention-standards/2011/pbnds2011r2016.pdf (last visited March 31, 2025).[6]   The PBNDS include a standard for the VWP with the following expected outcomes, among others:

1.  Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility.

2.  Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping.

3.  Essential operations and services shall be enhanced through detainee productivity.

4.  The negative impact of confinement shall be reduced through decreased idleness, improved morale and fewer disciplinary incidents.

5.  Detainee working conditions shall comply with all applicable federal, state and local work safety laws and regulations.

Dkt. No. 117-3 at 6; Dkt. No. 117-1 at ¶ 60.  The PBNDS also distinguish between voluntary work and personal housekeeping.  Dkt. No. 117-3 at 7.

The PBNDS require that a participating "detainee shall be required to sign a voluntary work program agreement before commencing each new assignment."   Dkt. No. 117-3 at 8 (emphasis omitted).

In terms of work hours, the PBNDS provide that:

Detainees who participate in the volunteer work program are required to work according to a schedule.

The normal scheduled workday for a detainee employed full time is a maximum of 8 hours.  Detainees shall not be permitted to work in excess of 8 hours daily, 40 hours weekly.

Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program.

---

[6] As detailed below, the Contract references the PBNDS.  *See infra* Section II.D; Dkt. No. 117-5 at 18.

*Id.*

As for compensation, the PBNDS provide that "[d]etainees shall receive monetary compensation for work completed in accordance with the facility's standard policy. The compensation is at least $1.00 (USD) per day." *Id.*

Beyond the standards set forth in the PBNDS, several other documents also discuss the VWP. The ICE National Detainee Handbook ("National Handbook") states:

> If your facility has a volunteer work program, you may be able to volunteer to work. ICE detainees are not required to work, and many facilities do not allow ICE detainees to participate in their work programs. It is your responsibility to know ICE's and your facility's local handbook for the work program.
>
> Will I get paid for my work?
>
>> If you participate in the voluntary work program at your facility, you will get at least $1 for each day you work, not for each assignment. You will get paid at the end of every day you work unless your facility has a different way of paying detainees. For example, some facilities will pay everything that you are owed before you are transferred or released. Check your facility's local handbook.
>
> How often will I get paid?
>
>> Most facilities pay detainees every day. Your facility may use another system where you get paid before you are transferred or released.
>
> How many hours can I work?
>
>> You cannot work more than eight (8) hours per day or 40 hours a week.
>
> What are the requirements for the work program?
>
>> To take part in this program, you must:
>> - Sign a voluntary work program statement;
>> - Complete any work-related training;
>> - Follow all dress, grooming, and hairstyle requirements for your work assignment;
>> - Work the schedule assigned to you; and
>> - Do your assigned work satisfactorily.
>
> Can I be fired from the Voluntary Work Program?

Yes, you can be taken out of this program if you miss work without permission, or you do not do your work satisfactorily.

Will I get paid for keeping my living area clean?

No. You must keep areas that you use clean, including your living area and any general-use areas that you use. If you do not keep your areas clean, you may be disciplined. It is up to you to know your facility's rules for keeping living areas and detainee general use-areas clean and orderly in a group living environment.

Dkt. No. 117-6 at 84.

Like the National Handbook, the BFDF Detainee Handbook ("Local Handbook") also distinguishes between personal housekeeping and the VWP. As to the latter, the Local Handbook indicates that VWP participants work in the following areas: (i) "Kitchen – food preparation and custodial duties (pending medical and classification approval);" (ii) "Recreation – custodial duties;" (iii) "Barbering – custodial duties;" (iv) "Processing – custodial duties;" (v) "Housing units – custodial duties in common areas;" (vi) "Main hall way and traverse areas (visiting, court holding area) – custodial duties;" and (vii) "Library – detainee librarian." Dkt. No. 117-6 at 43; *see also id.* at 38. Plaintiffs all worked in the VWP while detained at the BFDF, in various roles.[7] *See* Dkt. No. 117-11 at 11; Dkt. No. 117-12 at 12; Dkt. No. 117-13 at 7; Dkt. No. 117-14 at 11; Dkt. No. 117-15 at 10; Dkt. No. 129-16 at 56:4-22.

With respect to the VWP, the Local Handbook further states:

Every effort will be made to provide you an opportunity to participate in the voluntary work program. Detainees will not be denied voluntary work opportunities based on race, religion, national origin, gender, sexual orientation or disability. Any detainee wanting a work detail position must put in a written request to the detainee work program coordinator for review and approval. Wages are $1

---

[7] Plaintiffs' Unjust Enrichment Class includes only VWP participants who performed work in the housing units or kitchen; Plaintiffs' Forced Labor and Labor Law Classes include all participants in VWP, regardless of work assignment. *See* Dkt. No. 144 at 1; Dkt. No. 165 at 5 n.2; Dkt. No. 168, Sections II.C, IV.B.

per day.  Typically, you are not allowed to work more than eight hours daily, five days per week or 40 hours per week unless a request is made and approved by the OIC/AOIC.  In addition, you are required to sign a voluntary work program statement.  You may only work one job assignment at any given time.

Detainees who participate in the volunteer work program are required to work according to an assigned work schedule.  Unexcused absences from work or unsatisfactory work performance will result in removal from the voluntary work program.  If you receive an incident report, you may not be eligible to volunteer for or continue a work detail.

Dkt. No. 117-6 at 43.

At least two BFDF policies ("BFDF Policies") also address the VWP as well as personal housekeeping.  BFDF Policy 5.1.2 provides in pertinent part:

Detainees will not be required to work other than keeping their personal area clean.  All detainees may volunteer to for [sic] a work assignment if they so choose.

Generally, detainees may decline organized work assignments, but in the event that there are insufficient volunteers available, Immigration and Customs Enforcement (ICE) detainees being held pending decisions on their immigration status may be required to participate in a work assignment.  In such an instance, this mandatory work will last for as short a time as possible and the detainee will be compensated at the same rate as the volunteer workers.[8]

Detainees will be assigned to meaningful work assignments . . . .

. . .

BFDF provides a variety of work assignments for detainees in food service, processing, custodial maintenance, housing units, law library and other special assignments. . . .

The contract maintenance provider for the Facility will provide training to detainee workers and assist the work detail Supervisor in coordination of the program.

Detainees will not be assigned "make-work" projects.

Dkt. No. 129-4 at 3-4.

---

[8] Defendant states that while "detainees can be required to work if there are insufficient volunteers" pursuant to this policy, "such a situation ha[s] never occurred."  Dkt. No. at 166-1 at ¶ 56.

BFDF Policy 5.1.3 provides in pertinent part: "It is the policy of the BFDF to provide modest pay incentives for detainees employed in selected Facility maintenance assignments. . . . Pay will be established at, at least one dollar ($1.00) per day."[9]  Dkt. No. 129-9 at 2.

### D.  The Contract

Defendant's Contract[10] with ICE is a "Fixed Price Services contract" that appears to provide a guaranteed minimum as well as fixed prices at which ICE will pay Defendant for various additional services.  Dkt. No. 117-5 at 13, 45; Dkt. No. 129-3 at 19:21-20:4 (deposition of Defendant's president) ("[T]he majority of the work has to be done in that guaranteed minimum. It's very little that you're actually adding at that point, adding some extra food, adding maybe one extra rover that's in the facility, but it's not -- the majority of the work happens in the guaranteed minimum.").  As Defendant provides such additional services, it then submits invoices to ICE for reimbursement at fixed prices.  Dkt. No. 117-1 at ¶ 48; Dkt. No. 129-3 at 15:22 (deposition of Defendant's president) (A. "[I]t's a performance-based contract.  So the amount that's paid to us is a fixed price no matter what.  We don't get reimbursed if our costs go over that number.  Q. And if your costs go under, you still get that price?  A. Yes.  That's correct."); *id.* at 156:10-157:4 ("So ICE incrementally funds the [C]ontract. . . . So they'll fund us on each CLIN [contract line item] a certain amount.  We'll get through three or four months of billing and then they'll fund it again. . . . [W]e are not allowed to invoice anything we have not been funded for.").  The Contract can

---

[9] The VWP agreement that each Plaintiff signed stated that "[c]ompensation shall be $1.00 per day."  Dkt. No. 117-11 at 11; Dkt. No. 117-12 at 12; Dkt. No. 117-13 at 7; Dkt. No. 117-14 at 11; Dkt. No. 117-15 at 10.

[10] The Parties seem to agree, Dkt. No. 117-1 at ¶ 14; Dkt. No. 129-1 at ¶ 14; Dkt. No. 149-1 at ¶ 19; Dkt. No. 165-1 at ¶ 19, that the Contract consists of documents totaling several hundred pages, Dkt. No. 117-5 at ¶ 5; *id.* at 6-246.  The Contract's terms indicate a period of performance from December 1, 2014 to January 31, 2025 and that the Contract's total duration "shall not exceed ten (10) years."  *Id.* at 18, 103.

be, and has been, modified by the bilateral agreement of ICE and Defendant.  Dkt. No. 129-1 at ¶ 43; Dkt. No. 149-1 at ¶ 36; Dkt. No. 166-1 at ¶ 89.

The Contract states that "[t]he Contractor shall provide all management, supervision, labor, and materials necessary to perform the services identified in the Performance Work Statement ['PWS']."  Dkt. No. 117-5 at 45.  According to the PWS:

> Under this contract, the Contractor shall provide detention management services including detention officers, management personnel, supervision, manpower, training, certifications, licenses, drug testing, relief officer(s), uniforms, equipment, and supplies . . . necessary to provide detention management and transportation services seven (7) days a week, twenty-four (24) hours per day at BFDF.  The Contractor shall also be responsible for other ancillary services including but not limited to transportation and food service.

*Id.* at 47.

Among the requirements in the PWS is that Defendant "shall perform all services in accordance with ICE 2011 Performance-Based National Detention Standards (PBNDS) (https://www.ice.gov/detention-standards/2011/)."  *Id.*  The PWS further provides that:

> The Contractor shall not use or permit the use of the Government premises for any unlawful purposes, or any unlawful act.
>
> . . .
>
> All services must comply with the Performance Work Statement (PWS) and all applicable state and local laws and standards.  Should a conflict exist between any of these standards, the most stringent shall apply.  If the Contractor is unable to determine which standard is more stringent, the Contracting Officer's Representative (COR) shall determine the appropriate standard."

*Id.* at 57.[11]

---

[11] The Contract also requires conformance with orders setting forth responsibilities at various posts within the BFDF.  *See id.* at 56; *see also* Dkt. No. 117-6 at 8-19 (post order for housing unit officer); *id.* at 20-23 (post order for kitchen officer); *id.* at 24-26 (post order for corridor officer); *id.* at 27-29 (post order for work detail officer); *id.* at 30-32 (post order for barber shop officer); *id.* at 33-35 (post order for recreation officer).

With respect to the VWP, the PWS provides in pertinent part:

Detainee voluntary work details consist of cleaning, painting, floor stripping and waxing, lawn mowing inside the fence line, kitchen and laundry work, and other duties which the contractor shall directly oversee in accordance with PBNDS. Contractor shall determine whether a detainee will be allowed to perform on voluntary work details in accordance with ICE classification standards. Specific work details shall be determined by ICE. The contractor is responsible for training detainees on how to perform work. Contractor is responsible for providing any cleaning products, detainee safety items (gloves, boots, safety glasses, masks, etc.) and any routine consumable products used by detainee workers. This includes but is no[t] limited to: general cleaning products, floor stripper, wax, fuel for lawn mower, etc. ICE is responsible for providing the fully functioning equipment and other tools needed to perform the various jobs. Non-routine products (i.e. paint and painting accessories) needed for work details will be provided by ICE.

*Contractor is ultimately responsible for the cleanliness of the BFDF housing units.*

*Id.* at 89 (emphasis added).

With respect to "Food Services," the PWS provides that Defendant is required to fulfill numerous responsibilities. *See, e.g., id.* at 96 ("The contractor shall provide all personnel, supervision, food, and other kitchen tools necessary to perform full food services for the detainee population."); *id.* at 98 ("The contractor shall maintain a clean and orderly kitchen facility in accordance with Federal, State, County and local laws and regulations. . . . The contractor shall properly clean all dishes, pots, pans, cooking equipment, and floors."); *id.* at 99 ("The contractor shall determine the number of personnel needed to perform the Food Services outlined herein. . . . Detainee workers may be utilized to perform basic kitchen tasks; however, detainees are prohibited from preparing food at any time. Historically, detainee workers have been used primarily for cleaning efforts, to include dishwashing, and serving line duties.").

### E.  Plaintiffs' Allegations

Plaintiffs raise three categories of claims in connection with their participation in the VWP while detained at the BFDF. *See* Dkt. No. 80 at ¶¶ 173-198.

First, Plaintiffs allege that participation in the VWP is not actually voluntary. They claim that Defendant knowingly and unlawfully forced them and others to work in the program, in violation of the TVPRA. Dkt. No. 80 at ¶¶ 173-181. Second, Plaintiffs allege that Defendant's administration of the VWP violated numerous provisions of the NYLL, including the minimum wage requirement. *See id.* at ¶¶ 182-192; *see also* N.Y. Lab. Law § 652. Third, Plaintiffs allege that their forced labor in the housing units and kitchen unjustly enriched Defendant under New York law. *See* Dkt. No. 80 at ¶¶ 193-198; Dkt. No. 144-1 at 9-10.

### F. Procedural History

As relevant here, beginning in February 2024, the Parties filed more than 4,000 pages of motions and related submissions in order to ultimately address two issues: class certification and summary judgment.[12] *See* Dkt. Nos. 117-18, 120-21, 123-25, 129-130, 132-33, 136-38, 140-41, 143-46, 148-54, 158-60, 163, 165-66. The Court previously addressed Plaintiffs' request for class certification and detailed the procedural history of this case in a Memorandum-Decision and Order dated March 31, 2025. Dkt. No. 168; *id.* at Section II.A. Defendant's request for summary judgment has been fully submitted since January 2025.

### III. STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first

---

[12] Given the Parties' voluminous submissions, the Court has not considered any arguments improperly raised for the first time only in reply. *See, e.g., Browe v. CTC Corp.*, 15 F.4th 175, 191 (2d Cir. 2021) ("[I]t is hornbook law that '[a]rguments may not be made for the first time in a reply brief.'") (second alteration in original) (quoting *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993)); *Lalonde v. City of Ogdensburg*, 662 F. Supp. 3d 289, 317 (N.D.N.Y. 2023) (same).

determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Galeotti v. Cianbro Corp.*, No. 12-cv-00900, 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

Defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

## IV.    DISCUSSION

The Motion raises four primary arguments in support of Defendant's request for summary judgment. First, Defendant argues that it is entitled to derivative sovereign immunity based on its Contract with ICE, apparently as to all of Plaintiffs' claims. Dkt. No. 117-2 at 27-30; Dkt. No.

136 at 14-18.  Second, Defendant argues that Plaintiffs' TVPRA claims are meritless and unsupported by the factual record.  Dkt. No. 149-2 at 21-30; Dkt. No. 166 at 17-19.  Third, Defendant argues that all of Plaintiffs' NYLL claims fail because VWP participants are not "employees" under the statute.  Dkt. No. 149-2 at 10-17; Dkt. No. 166 at 6-14.  Fourth and finally, Defendant argues that Plaintiffs' unjust enrichment claims fail because Plaintiffs have not demonstrated that their labor directly benefitted Defendant.  Dkt. No. 149-2 at 17-21; Dkt. No. 166 at 14-17.  Below, the Court details Plaintiffs' opposition and addresses each of Defendant's arguments in turn.

### A.  Derivative Sovereign Immunity

The Motion's first argument is that Defendant is entitled to derivative sovereign immunity under *Yearsley v. W.A. Ross Construction Company*, 309 U.S. 18 (1940), because the Contract required Defendant to undertake certain actions on behalf of ICE.  In response, Plaintiffs mainly argue that (i) the Contract neither directs nor requires Defendant's challenged conduct; (ii) Defendant retained discretion under the Contract; and (iii) factual disputes prevent the application of this immunity doctrine at summary judgment.  Dkt. No. 129 at 25-31.  The Parties also quarrel over whether Defendant seeks immunity from all of Plaintiffs' claims, or only those arising under the NYLL.  *Compare* Dkt. No. 129 at 25*, with* Dkt. No. 136 at 14.

In certain situations, government contractors can "obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016) (quoting *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943)).  This "[d]erivative sovereign immunity protects a private entity that has contracted with the federal government, provided that the government acted within its constitutional authority and that the government has specifically authorized the contractor's

actions at issue." *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 770 (9th Cir. 2025) (citations omitted). Indeed, "[w]here the Government's 'authority to carry out the project was validly conferred . . . there is no liability on the part of the contractor' who simply performed as the Government directed." *Campbell-Ewald*, 577 U.S. at 167 (quoting *Yearsley*, 309 U.S. at 20-21). Both the Supreme Court and the Second Circuit have noted in recent years that the "[c]ritical factor" in determining the availability of such immunity is whether "'the contractor's performance [was] in compliance with all federal directions'; in other words, [whether] the contractor had a defense because its actions were 'all authorized and directed by the Government of the United States.'" *Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 125 n.8 (2d Cir. 2021) (first alteration in original) (quoting *Campbell-Ewald*, 577 U.S. at 167 & n.7).

Given that the Parties do not appear to contest whether federal authority was validly conferred, *see* Dkt. No. 117-2 at 28-29; Dkt. No. 129 at 25, the Court focuses its analysis on the question of federal direction. And on that "critical factor," Defendant's arguments are unpersuasive. Foremost, the Contract simply does not require what Defendant contends. Defendant broadly argues that "the Government's directives were contained in the [ ] Contract, the PBNDS, the National . . . [and Local] Handbooks, BFDF Policies, and BFDF Post Orders." Dkt. No. 136 at 15. These various documents total several hundred pages. *See, e.g.,* Dkt. No. 117-5 at 6-246; PBNDS at 1-455; Dkt. No. 117-6 at 8-140. Defendant characterizes the significance of the Contract and these related documents, but ultimately fails to identify specific provisions by which the federal government directed the core conduct that Plaintiffs challenge.

The essence of Plaintiffs' TVPRA claims is that Defendant knowingly and unlawfully coerced detainees into doing significant work in the VWP by means of, *inter alia*, conduct constituting "serious harm" and "physical restraint" or threats thereof. 18 U.S.C. § 1589(a)(1)-

(2), (4).   In response, Defendant largely references language from the Contract and related documents regarding its obligation to make the VWP available so that detainees could participate therein.  *See, e.g.,* Dkt. No. 117-2 at 29; Dkt. No. 136 at 15.   The referenced provisions are clear that participation in the VWP should be voluntary—yet Plaintiffs allege that their participation was involuntary and coerced by Defendant.  *See Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1277 (11th Cir. 2020) ("[T]he fact that the PBNDS require [defendant] to operate a work program for detainees does not mean that such a program can never be operated in a manner—i.e., by forcing labor through illegal coercive means—that violates the TVP[R]A.").   And while portions of the related documents do address personal housekeeping, Plaintiffs have, at least for purposes of summary judgment, sufficiently established that they performed significant labor at the BFDF beyond personal housekeeping.  *Id.* at 1277 ("[N]othing in the PBNDS permits [defendant], or other private contractors operating immigration detention facilities, to force detainees to perform labor (beyond personal housekeeping tasks), and certainly not through the illegal coercive means listed in the TVP[R]A.").   In short, Defendant has failed to establish that any portion of the Contract and related documents required Defendant to coerce detainees to provide custodial, kitchen, and other labor in the VWP.  Because the federal government did not require such conduct, Defendant is not entitled to derivative sovereign immunity on Plaintiffs' TVPRA claims.

Defendant similarly identifies no portion of the Contract or related documents which directs Defendant to enrich itself using detainee labor, or that exempts compliance with the NYLL.  As to unjust enrichment, "[t]he government has no interest in directing a private entity to maximize its profits[.]"  *Menocal v. GEO Grp., Inc.*, 635 F. Supp. 3d 1151, 1176 & n.17 (D. Colo. 2022); *see also infra* Section IV.D.  As to state law labor law claims, the reasoning in the Ninth Circuit's recent decision in *Nwauzor v. GEO Group, Inc.* is insightful.  In proceedings below, Washington

State and a class of immigration detainees had alleged that the defendant federal contractor's administration of the VWP at a private[13] immigration detention center violated Washington's minimum wage laws ("MWA") and unjustly enriched defendant.  127 F.4th at 757.  Following jury and bench trials, the defendant was found liable for more than $23 million in damages and subsequently appealed.  *Id.*

In rejecting the defendant's derivative sovereign immunity argument, a majority of the divided appellate panel found that (i) the "contract with ICE does not forbid [defendant] to comply with Washington's MWA," and (ii) "even if the contract did not require [defendant] to pay its detainees in accordance with Washington's MWA, there is nothing in the contract that would forbid [defendant] to do so."  *Id.* at 770-71.

The Court reaches similar conclusions here.  Neither the Contract nor the related documents forbid Defendant from complying with the NYLL.  Instead, the Contract requires that "[a]ll services" provided by Defendant "must comply" with "all applicable state and local laws and standards" and that "[s]hould a conflict exist between any of these standards, the most stringent shall apply."  Dkt. No. 117-5 at 57.  The Contract also provides a mechanism by which Defendant could have assessed the applicability of the NYLL to its administration of the VWP: "If the

---

[13] As it has done previously, Defendant repeatedly asserts that the BFDF was ICE owned and operated.  *See, e.g.,* Dkt. No. 117-2 at 7; Dkt. No. 149-2 at 7.  As to the former, Defendant has not established the legal significance of such ownership for purposes of summary judgment.  *See also* Dkt. No. 161 at 20 ("And while the Court acknowledges certain aspects of a facility like BFDF may differ from [ ] privately owned facilities . . . Defendant fails to explain which of those (if any) [are relevant to its motion to dismiss].")  As to the latter, the current record does not establish that ICE operated all aspects of the BFDF.  Moreover, if ICE did operate all aspects of the BFDF, it would have no need to pay Defendant millions of dollars under the Contract to provide detention management services at the facility.  *See* Dkt. No. 136-1 at ¶ 9; Dkt. No. 117-5 at 47 ("Under this contract, the Contractor shall provide detention management services including detention officers, management personnel, supervision, manpower, training, certifications, licenses, drug testing, relief officer(s), uniforms, equipment, and supplies . . . necessary to provide detention management and transportation services seven (7) days a week, twenty-four (24) hours per day at BFDF.").

Contractor is unable to determine which standard is more stringent, the Contracting Officer's Representative (COR) shall determine the appropriate standard." *Id.* Defendant's president testified that Defendant did not utilize this mechanism. Dkt. No. 129-3 at 51:20-52:7 ("Q. The contracting officer's representative, the COR, is that an ICE employee? A. Yes. . . . Q. Prior to this lawsuit, did AGS ever ask the COR about applicable labor laws that would apply to detainees? A. Detainees are not AGS employees. So there would be no reason for us to ask the COR about labor laws for the detainees, for the noncitizens, which is ICE's new phrase for them, but no."). Moreover, a representative of ICE has declared in this litigation that "[t]here is no contract, rule, or law that prevents AGS from paying detainee workers more than $1.00 per day." Dkt. No. 117-4 at ¶ 7. The terms of the Contract and the factual record before the Court thus do not establish that the federal government forbids Defendant from complying with applicable state labor law. *See Nwauzor*, 127 F.4th at 770.[14]

Further, even if the Contract did not require Defendant to comply with state labor law, Defendant nonetheless retained the discretion to do so. The Contract repeatedly states that Defendant was to perform in accordance with the PBNDS. *See* Dkt. No. 117-5 at 18 ("[A]ll services shall be furnished in compliance with the following regulations: 2011 Performance Based National Detention Standards[.]"); *id.* at 47 ("The Contractor shall perform all services in accordance with ICE 2011 Performance-Based National Detention Standards[.]"); *id.* at 56 ("The Contractor shall abide by all rules and regulations found in . . . The ICE Performance Based National Detention Standards[.]"); *id.* at 89 ("Detainee voluntary work details consist of cleaning,

---

[14] Moreover, Plaintiffs do not assert any contractual claims, and thus the Court finds Defendant's argument unpersuasive for this reason, as well. *See, e.g., Chao Chen v. GEO Grp., Inc.*, No. 17-cv-05769, 2018 WL 1963669, at *4 (W.D. Wash. Apr. 26, 2018) ("If [defendant] is violating its contract with ICE, that appears to be beyond the issues raised by the Complaint.").

painting, floor stripping and waxing, . . . kitchen and laundry work, and other duties which the contractor shall directly oversee in accordance with PBNDS."). The PBNDS, in turn, explicitly state that VWP "compensation is at least $1.00 (USD) per day." Dkt. No. 117-3 at 8. Based on the PBNDS, ICE has stated that "AGS has the discretion to pay detainees that participate in the VWP more than $1.00 per day." Dkt. No. 117-4 at ¶ 7. The National Handbook and BFDF Policies further emphasize that VWP compensation should be "at least" one dollar per day. Dkt. No. 117-6 at 84 ("If you participate in the voluntary work program at your facility, you will get at least $1 for each day you work[.]"); Dkt. No. 129-9 at 2 ("Pay will be established at, at least one dollar ($1.00) per day."). Given this record, the Court concludes that Defendant retained discretion under the Contract to pay detainees more than one dollar per day.

Federal courts across the country have reached similar results at summary judgment. *See Menocal*, 635 F. Supp. 3d at 1177 ("Because [defendant] was not complying with any federal direction or contractual requirement to compensate VWP participants $1.00 per day and no more, but was instead exercising its discretion, [defendant] cannot escape liability on the grounds that it is immune from suit.") (finding that defendant contractor had not established entitlement to derivative sovereign immunity and denying defendant's motion for summary judgment on TVPRA and unjust enrichment claims by federal immigration detainees), *aff'd*, 2024 WL 4544184 (10th Cir. Oct. 22, 2024); *Novoa v. GEO Grp., Inc.*, No. 17-cv-2514, 2022 WL 2189626, at *20 (C.D. Cal. Jan. 25, 2022) (citations omitted) ("[Defendant] has not shown that ICE directed it to pay VWP participants only $1 per day. . . . The Court thus rejects [defendant]'s claims that its challenged actions were directed by the Federal Government.") (finding that defendant contractor had not established entitlement to derivative sovereign immunity and denying defendant's motion for summary judgment on, *inter alia*, TVPRA, unjust enrichment, and state minimum wage claims

by federal immigration detainees); *Washington v. GEO Grp., Inc.*, No. 17-cv-05806, Dkt. No. 288, slip op. at 9 (W.D. Wash. Aug. 8, 2019) ("[Defendant]'s motion for summary judgment, based on derivative sovereign immunity should be denied. [Defendant] has not shown that it was directed to pay participants in the VWP only a $1 for the relevant period.") (finding that defendant contractor had not established entitlement to derivative sovereign immunity and denying defendant's motion to dismiss state minimum wage and unjust enrichment claims arising from its administration of a VWP), *reconsideration denied*, 2020 WL 1955558 at *4 (W.D. Wash. Apr. 23, 2020); *see also Nwauzor*, 127 F.4th at 771 ("The contract sets a minimum compensation of $1 per day, but it does not forbid payments in excess of that amount. . . . [Defendant] could equally well have chosen, consistent with the contract, to exceed that amount by paying workers Washington's minimum wage.").

Accordingly, the Court denies Defendant's request for summary judgment based on derivative sovereign immunity.

### B. TVPRA Claims

Plaintiffs allege that Defendant knowingly forced them to work in the VWP by means of (i) involuntary servitude, as Defendant controlled "all aspects of their lives in detention," Dkt. No. 80 at ¶ 175; *see also* 18 U.S.C. § 1584; and (ii) a consistent practice of punishing, depriving, threatening, or otherwise coercing detainees to join the VWP and perform labor in the VWP, conduct which constitutes "serious harm" and "physical restraint" or threats thereof. Dkt. No. 80 at ¶¶ 176, 180; *see also* 18 U.S.C. § 1589(a)(1)-(2), (4); Dkt. No. 165 at 19-20. Examples of such alleged coercion include punishing all detainees on a housing unit when detainees did not volunteer and/or did not work by locking detainees in their cells; providing detainees less food; and revoking access to privileges, such as telephones, recreation, exercise, and entertainment. *See, e.g.,* Dkt.

No. 165 at 20.  Plaintiffs further assert that Defendant knowingly coerced detainees to join and participate in the VWP by denying them basic necessities, like edible food and toiletries; creating an environment "in which detainees were hungry, bored, and desperate for any activity;" and subjecting detainees who refused to work "to unit-wide shakedowns and solitary confinement, as well as threats thereof." *See, e.g., id.* at 21.

Defendant moves for summary judgment on all aspects of Plaintiffs' TVPRA claims, arguing that (i) Plaintiffs were not held in involuntary servitude; (ii) Plaintiffs' participation in the VWP did not constitute forced labor under 18 U.S.C. § 1589(a)(1)-(4); (iii) Plaintiffs were not threatened with or subjected to serious harm or any other coercion; and (iv) in any event, Plaintiffs cannot prove that Defendant knowingly coerced their labor.  *See* Dkt. No. 149-2 at 21-30; Dkt. No. 166 at 17-19.

In response, Plaintiffs "withdraw their claims pursuant to 18 U.S.C. § 1584 (the TVPRA's 'involuntary servitude' provision) and elect to pursue their TVPRA cause of action under the standards of 18 U.S.C. § 1589 alone." Dkt. No. 165 at 20 n.17.  Accordingly, the Motion is granted as to Plaintiffs' TVPRA claims based on involuntary servitude.[15]

With respect to the balance of Plaintiffs' TVPRA claims under 18 U.S.C. § 1589(a) ("Section 1589"), Plaintiffs primarily contend that a reasonable factfinder could find in their favor and that factual disputes render summary judgment inappropriate.  *See* Dkt. No. 165 at 19-32.  As discussed below, the Court agrees.

---

[15] To the extent the Amended Complaint pleads such a claim, the Court finds that Plaintiffs have also abandoned any claims based on 18 U.S.C. § 1589(3) (forced labor "by means of the abuse or threatened abuse of law or legal process") by failing to oppose summary judgment on this theory of liability.  *Compare* Dkt. No. 149-2 at 21-22*, with* Dkt. No. 165 at 19; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").

"The TVP[R]A grants a private right of action to victims of trafficking and forced labor."
*Ngono v. Owono*, No. 23-339, 2024 WL 911797, at *1 (2d Cir. Mar. 4, 2024) (first citing *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 92-93 (2d Cir. 2019); and then citing 18 U.S.C. §§ 1589(a), 1590(a), 1595(a)). "Together, §§ 1589(a) and 1595 impose civil liability on '[w]hover knowingly provides or obtains the labor or services of a person by any one of, or by any combination of' four coercive methods." *Gonzalez v. CoreCivic, Inc.*, 986 F.3d 536, 538 (5th Cir. 2021) (alteration in original) (first quoting 18 U.S.C. § 1589(a); and then citing 18 U.S.C. § 1595). As the Second Circuit has explained:

> A plaintiff asserting a forced-labor claim under § 1589 may proceed under several alternative theories, consisting of (1) force, threats of force, physical restraint, or threats of physical restraint; (2) serious harm or threats of serious harm; . . . or (4) any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

*Ngono*, 2024 WL 911797, at *1 (citing 18 § 1589(a)(1)-(4)). In addition, the TVPRA defines "serious harm" as used in § 1589(a)(2) and (4) as:

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2); *see also United States v. Zhong*, 26 F.4th 536, 550 (2d Cir. 2022). With respect to serious harm, "the relevant question" is whether a defendant's conduct induced "harm serious enough to 'compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.'" *Magtoles v. United Staffing Registry*, 665 F. Supp. 3d 326, 359 (E.D.N.Y. 2023) (quoting *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648, at *16 (E.D.N.Y. Sept. 24, 2019)). Finally, as the parties agree, *see* Dkt. No. 149-2 at 23; Dkt. No.

165 at 23-24, when assessing coercion under Section 1589(a), "[t]he correct standard is a hybrid: it permits the jury to consider the particular vulnerabilities of a person in the victim's position but also requires that her acquiesce be objectively reasonable under the circumstances." *United States v. Rivera*, 799 F.3d 180, 186-87 (2d Cir. 2015) (citation omitted); *see also Magtoles*, 665 F. Supp. 3d at 359.

Defendant first argues that Plaintiffs' labor in the VWP fails to provide the basis for any TVPRA claim, because, in Defendant's view, forced labor in the human trafficking context is "[t]ypically" worse and ICE was ultimately responsible for Plaintiffs' detention. Dkt. No. 149-2 at 23-24. The Court finds these assertions unpersuasive. As a general matter, numerous appellate courts have rejected similar arguments about what constitutes "real" human trafficking under the TVPRA. *See, e.g., Barrientos*, 951 F.3d at 1279 ("[W]hile none of our sister circuits has addressed the specific application of the TVP[R]A now before us, they have found § 1589 applicable outside the core human-trafficking context to which [defendant] would apparently have us limit the statute's reach.") (collecting cases). And the Fifth and Eleventh Circuits have specifically rejected such arguments with respect to claims by individuals detained by ICE who, like Plaintiffs, provide labor through work programs administered by private contractors in federal immigration detention centers. *See Gonzalez*, 986 F.3d at 538-39 ("[Defendant] contends that this language [in Section 1589] does not capture labor performed in work programs in a federal immigration detention setting. But nothing in the text supports this claim. . . . Alternatively, [defendant] claims that § 1589 must be construed narrowly to cover only forced labor that arises in the international human trafficking context. . . . But the text of § 1589 itself is broad, and not limited to forced labor in the international human trafficking context."); *Barrientos*, 951 F.3d at 1277, 1279 ("Again, nothing in the text of the statute excludes federal contractors providing immigration detention services from

liability under the TVP[R]A, even when that liability might arise out of the operation of a federally mandated work program. . . . We do not find a private government contractor's obtaining forced labor through actual or threatened force, restraint, or serious harm to be so far removed from the purpose Congress identified as to cause us to look beyond the plain statutory language."). Defendant's arguments do not support a contrary result here.

Further, Plaintiffs have established a sufficient record to defeat summary judgment on the question of whether their work in the VWP constituted forced labor.  As an initial matter, the parties do not appear to dispute that work detainees performed in the VWP constituted "labor." *See United States v. Kelly*, 128 F.4th 387, 416 (2d Cir. 2025) (observing when interpreting Section 1589 that "'[l]labor' is the 'expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory[]'") (quoting *United States v. Marcus*, 628 F.3d 36, 44, n.10 (2d Cir. 2010)).  And with respect to whether Plaintiffs' labor in the VWP was coerced, the record is sufficient to defeat summary judgment.  Defendant argues that Plaintiffs were not threatened with or subjected to serious harm or physical restraint, were not denied basic necessities and, in any event, Plaintiffs have not demonstrated scienter. Dkt. No. 149-2 at 23-30; Dkt. No. 166 at 17-19. Plaintiffs respond that, based on the current factual record, a reasonable factfinder could find for them on these issues. Dkt. No. 165 at 23-32.  Particularly given the broad statutory definition of "serious harm" and the hybrid standard used in assessing coercion, the Court again agrees with Plaintiffs.  *See* 18 U.S.C. § 1589(c)(2); *Rivera*, 799 F.3d at 186-87.

In brief, Plaintiffs assert that Defendant knowingly used a consistent practice of punishing, depriving, threatening, or otherwise coercing detainees to join and labor in the VWP.  Examples of such alleged coercion include, *inter alia*, threatening and imposing punishment on individuals and collectively on entire housing units when detainees did not volunteer and/or work in the VWP

by confining them in their cells and providing them with fewer privileges. *See, e.g.,* Dkt. No. 80 at ¶¶ 173, 176-81; Dkt. No. 165-1 at 124, ¶¶ 121-22; Dkt. Nos. 144-3, 144-5, 144-6, 144-7.[16] Defendant has not established a sufficient factual record on these issues to demonstrate entitlement to judgment as a matter of law. *See, e.g., Novoa*, 2022 WL 2189626, at *20 ("Here, the Court agrees with Plaintiffs that a reasonable jury may infer [defendant] intended detainees to believe they could be harmed for refusing to clean."); *Bridges v. Poe*, 487 F. Supp. 3d 1250, 1254-55, 1261 (N.D. Ala. 2020) ("As a trustee, [Plaintiff] was able to leave her cell block to perform work under the supervision of her jailers. . . . Inmates coveted the position of trustee because it eased the conditions of confinement, which would otherwise restrict them to their cells or cell blocks for twenty-three hours per day. . . . 'Confinement' to a jail cell that restricts an inmate's freedom of movement certainly meets the ordinary definition of 'physical restraint.'") (citations omitted); *see also Menocal*, 635 F. Supp. 3d at 1188 ("Increasing the level of confinement for already detained individuals—as Plaintiffs allege [defendant]'s policies threaten to do—can constitute physical restraint.") (citing *Bridges*, 487 F. Supp. 3d at 1261).

Illustrating the factual disputes that exist in the current record, Plaintiffs have submitted declarations from detainees who claim to have been also personally subjected to collective punishment. *See, e.g.,* Dkt. No. 129-14; Dkt. No. 129-15; Dkt. No. 129-19. Plaintiffs assert that one such punishment was a housing-unit wide "shakedown" by dozens of Defendant's officers when detainees refused to work, and purported threats from one of Defendant's supervisory

---

[16] Defendant argues in passing that certain declarations submitted by Plaintiffs contradict their deposition testimony and should be disregarded. *See, e.g.,* Dkt. No. 166 at 19. Defendant's brief argument is unpersuasive and appears to implicate witness credibility, which is not a valid basis for summary judgment. *See Walker v. Senecal*, 130 F.4th 291, 297 n.2 (2d Cir. 2025) ("'Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury,' however, 'not the court on summary judgment.'") (quoting *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994)).

officers.[17]   For his part, Defendant's supervisory officer did not recall the specifics of the alleged incident during his deposition.  Dkt. No. 129-12 at 78:17-84:18 ("Q. What is a work stoppage?  A. Again, I'm not sure because I never dealt with it or experienced it.   Q. Isn't it true that in mid-April of this year, about three months ago, you sent a detainee to disciplinary segregation after he refused to work?  A. That I did?  Q. Yes.  A. That, I'm not sure.  I don't recall.  Q. Isn't it true that there was a detainee who refused to work and then a shakedown was ordered?  A. I don't recall. Q. After the shakedown, you told detainees that if they keep refusing to work there will be shakedowns every week; do you remember saying that?  A. I do not. . . . Q. All right.  That was a unit-wide shakedown; correct?  A. Yes, I believe I remember that being a whole-unit shakedown. Q. Sitting here today, you don't know why that shakedown took place?  A. No.  I don't want to guess because I don't remember.  Q. At the time of the shakedown you knew why it took place; correct?  A. Yes.  There would have been a reason for a shakedown.  Q. And you would have been aware of that reason, is my point?  A. Correct.").[18]

---

[17] Defendant's request to strike these affidavits, *see* Dkt. No. 137, is denied, largely for reasons set forth in Plaintiffs' opposition, *see* Dkt. No. 140.  Plaintiffs disclosed each affidavit during discovery, approximately a year and a half ago.  *Id.* at 1.  Defendant appears to have neither deposed any of the declarants nor raised any purported discovery dispute—even as Defendant challenged other alleged discovery deficiencies by Plaintiffs.  *See* Dkt. No. 157 (denying Defendant's motion to compel).  To the extent portions of the affidavits, unspecified by Defendant, do contain inadmissible material, the Court has not considered such material.  *See Riverkeeper, Inc. v. Coeymans Recycling Ctr., LLC*, No. 20-cv-1025, 2022 WL 17819738, at *12 (N.D.N.Y. Dec. 20, 2022) ("Generally, courts in this Circuit have expressed a preference for 'declin[ing] to consider those portions of an affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible,' instead of striking them.") (quoting *Trustees of Local 8A-28A Welfare Fund v. Am. Grp. Administrators*, No. 14-cv-1088, 2017 WL 3700899, at *3 (E.D.N.Y. Aug. 25, 2017)).

[18] Defendant contends that records created during the pendency of this litigation conclusively establish that the disciplinary charges in connection with this incident were unrelated to any work stoppage.  *See* Dkt. Nos. 136-3, 166-1 at ¶ 122.  The Court finds this argument unpersuasive for purposes of summary judgment.  The records themselves state that at approximately 7:00 a.m. on April 18, 2023, the detainee was "encouraging other detainees in the unit to not perform their daily

In sum, Defendant has not met its "burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law" on Plaintiffs' TVPRA claims. *Rodriguez*, 72 F.3d at 1060-61 (citation omitted). Accordingly, the Court denies the Motion as to Plaintiffs' TVPRA claims.

### C. NYLL Claims

Defendant argues that the NYLL does not apply to Plaintiffs, and thus their claims fail. *See* Dkt. No. 80 at ¶¶ 182-192. More specifically, Defendant primarily argues that (i) Plaintiffs are not "employees" under the FLSA; (ii) their employment status under the FLSA should similarly determine their employment status under the NYLL; and (iii) legislative intent does not support applying the NYLL to Plaintiffs. Dkt. No. 149-2 at 10-17; Dkt. No. 166 at 6-14. In opposition, Plaintiffs contend that (i) the plain text of the NYLL "is exceedingly broad;" (ii) there are numerous distinctions between the FLSA and NYLL; (iii) they are employees under the NYLL; (iv) authority based on prison labor and the FLSA is distinguishable; and (v) material disputes of fact preclude summary judgment. Dkt. No. 165 at 8-19.

At the outset, neither the Parties nor the Court have identified a decision addressing the applicability of the NYLL to federal immigration detainees. The Court is cognizant of the federalism considerations that are implicated when federal courts interpret novel issues of state law. *See, e.g., East Fork Funding LLC v. U.S. Bank, N.A.*, 118 F.4th 488 (2d Cir. 2024) ("'[B]asic principles of federalism' suggest that 'the controlling interpretation of the relevant statute be given by the state, rather than federal, courts' because a 'a federal court 'risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court.'")

---

job duties" and that the detainee purportedly informed an officer "that if he tried waking the workers up they would probably quit working." Dkt. No. 136-3 at 3-4.

(alteration in original) (quoting *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 150 (2d Cir. 2001)); U.S. Courts, Comparing Federal & State Courts, https://www.uscourts.gov/about-federal-courts/court-role-and-structure/comparing-federal-state-courts ("State courts are the final arbiters of state laws and constitutions.") (last visited March 31, 2025).

Certain federal courts that have determined the applicability of state labor laws to detainees have had the benefit of certified answers from state high courts. *See, e.g., Nwauzor v. GEO Grp., Inc.*, 62 F.4th 509 (9th Cir. 2023) (certifying questions to the Washington Supreme Court related to minimum wage and unjust enrichment class claims based on defendant's operation of a VWP pursuant to a contract with ICE); *Nwauzor v. GEO Grp., Inc.*, 2 Wash. 3d 505 (2023) (answering certified questions); *Nwauzor*, 127 F.4th 750 (affirming judgments on state claims against defendant); *Ruelas v. Cnty. of Alameda*, 51 F.4th 1187 (9th Cir. 2022) (certifying question to the California Supreme Court regarding whether putative class of non-convicted detainees performing services in county jail for a private company had claims for minimum wage and overtime under California law); *Ruelas v. Cnty. of Alameda*, 15 Cal. 5th 968, 971 (2024) ("We conclude the answer is no."); *Ruelas v. Cnty. of Alameda*, 108 F.4th 1208 (9th Cir. 2024) (reversing district court's denial of defendant's motion to dismiss state claims).

But this Court is not able to certify questions to the New York Court of Appeals. *See* N.Y. Const. Art. 6, § 3(9); N.Y. Ct. R. § 500.27(a); Judith S. Kaye & Kenneth I. Weissman, *Interactive Judicial Federalism: Certified Questions in New York*, 69 Fordham L. Rev. 373, 396 (2000) ("Like every other certification jurisdiction, New York accepts certified questions from the United States Supreme Court and federal courts of appeals. Along with 18 other states, it also accepts questions from other state high courts. Unlike 36 jurisdictions, however, New York does not accept certified questions from federal District Courts.") (citations omitted); *see also Del Rio v. Amazon.com.dedc,*

*LLC*, No. 23-1337, 2025 WL 826426, at *3 (2d Cir. Mar. 17, 2025) (discussing Second Circuit's certification considerations and discretion in the context of state wage laws and regulations); *Article 13 LLC v. Ponce De Leon Fed. Bank*, No. 23-7247, 2025 WL 899035, at *3 (2d Cir. Mar. 25, 2025) (discussing Second Circuit's certification considerations and discretion with respect to the New York Court of Appeals).

The Court thus turns to the Motion's NYLL arguments. As the New York Court of Appeals has instructed, "[w]hen presented with a question of statutory interpretation, as here, [a court's] 'primary consideration is to ascertain and give effect to the intention of the [l]egislature,' the clearest indicator of which is the statutory text." *ACE Secs. Corp. v. DB Structured Prods., Inc.*, 38 N.Y.3d 643, 652 (2022) (first quoting *Matter of Marian T.*, 36 N.Y.3d 44, 49 (2020); additional citation omitted); *see also East Fork Funding*, 118 F.4th at 504 (Liman, D.J., concurring) ("New York courts may not always place the same importance on the plain text of a statute passed by the New York Legislature as the federal courts place on a statute passed by the United States Congress.") (citation omitted).

The Parties cite definitions from several different sections of the NYLL. Dkt. No. 149-2 at 11; Dkt. No. 165 at 8-9. The NYLL is "found in Chapter 31 of the Consolidated Laws of New York[ and] is organized into articles governing various aspects of employment."[19] *Cavalotti v. Daddyo's BBQ, Inc.*, No. 15-cv-6469, 2018 WL 5456654, at *12 (E.D.N.Y. Sept. 8, 2018). NYLL § 2, which states that it applies "[w]henever used in this chapter," provides that employee "means a mechanic workingman or laborer working for another for hire" and that employer "means the

---

[19] The Complaint styles Plaintiffs' four NYLL claims as arising from specified sections of Article 6 (entitled "Payment of Wages"), *see* Dkt. No. 80 at ¶¶ 188-192; Article 19 (entitled "Minimum Wage Act"), *see id.* at ¶¶ 182-184; as well as the "NYLL and its regulations" more generally, *see id.* at ¶¶ 185-187. *See also id.* at ¶¶ 19, 23; 12 N.Y.C.R.R. § 142-2.4.

person employing any such mechanic, workingman or laborer, whether the owner, proprietor, agent, superintendent, foreman or other subordinate." N.Y. Lab. Law. § 2(5)-(6). NYLL § 190, which states that it applies [a]s used in this article [6]," provides that employee "means any person employed for hire by an employer in any employment" and that employer "includes any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service. The term 'employer' shall not include a governmental agency." N.Y. Lab. Law § 190(3)-(4).

NYLL § 651(5), which states that it applies "[a]s used in this article [19]," provides that the term employee:

> includes any individual employed or permitted to work by an employer in any occupation, but shall not include any individual who is employed or permitted to work: (a) on a casual basis in service as a part time baby sitter in the home of the employer; (b) in a bona fide executive, administrative, or professional capacity; (c) as an outside salesman; (d) as a driver engaged in operating a taxicab; (e) as a volunteer, learner or apprentice by a corporation, unincorporated association, community chest, fund or foundation organized and operated exclusively for religious, charitable or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual; (f) as a member of a religious order, or as a duly ordained, commissioned or licensed minister, priest or rabbi, or as a sexton, or as a christian science reader; (g) in or for such a religious or charitable institution, which work is incidental to or in return for charitable aid conferred upon such individual and not under any express contract of hire; (h) in or for such a religious, educational or charitable institution if such individual is a student; (i) in or for such a religious, educational or charitable institution if the earning capacity of such individual is impaired by age or by physical or mental deficiency or injury; (j) in or for a summer camp or conference of such a religious, educational or charitable institution for not more than three months annually; (k) as a staff counselor in a children's camp; (l) in or for a college or university fraternity, sorority, student association or faculty association, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and which is recognized by such college or university, if such individual is a student; (m) by a federal, state or municipal government or political subdivision thereof; (n) as a volunteer at a recreational or amusement event run by a business that operates such events, provided that no single such event lasts longer than eight consecutive days and no more than one such event concerning substantially the same subject matter occurs in any calendar year, where (1) any such volunteer shall be at least eighteen years of age, (2) a business seeking coverage under this paragraph shall notify every

> volunteer in writing, in language acceptable to the commissioner, that by volunteering his or her services, such volunteer is waiving his or her right to receive the minimum wage pursuant to this article, and (3) such notice shall be signed and dated by a representative of the business and the volunteer and kept on file by the business for thirty-six months; (o) in the delivery of newspapers or shopping news to the consumer by a person who is not performing commercial goods transportation services for a commercial goods transportation contractor within the meaning of article twenty-five-C of this chapter; or (p) having entered into a contract to play baseball at the minor league level and who is compensated pursuant to the terms of a collective bargaining agreement that expressly provides for the wages, hours of work, and working conditions of employees.  The exclusions from the term "employee" contained in this subdivision shall be as defined by regulations of the commissioner.

N.Y. Lab. Law § 651(5); *see also* 12 N.Y.C.R.R. § 142-2.14.  This portion of the statute also states that the term employer "includes any individual, partnership, association, corporation, limited liability company, business trust, legal representative, or any organized group of persons acting as employer."  *Id.* § 651(6).

As an initial matter, Defendant identifies no statutory language that explicitly excludes either itself or Plaintiffs from the relevant definitions.  Dkt. No. 149-2 at 8–20.  And given the litany of statutory exceptions set forth in NYLL § 651(5),[20] the absence of an exception applicable to Plaintiffs undercuts Defendant's position that it is entitled to judgment as a matter of law because the NYLL simply does not apply to Plaintiffs.  "Under the interpretative aid of *expressio unius est exclusio alterius*," courts "may resolve ambiguity in a statute by looking to what a legislature has expressly included to conclude that other, dissimilar items were meant to be excluded."  *Stefanik v Hochul*, No. 86, 2024 WL 3868644, at *8 (N.Y. Aug. 20, 2024) (citations omitted).  This canon

---

[20] Because much of the Parties' arguments addresses the NYLL's minimum wage provisions, the Court similarly focuses its analysis on NYLL § 652.  *See, e.g.,* Dkt. No. 149-2 at 15-17; Dkt. No. 165 at 8-9, 11-12; Dkt. No. 166 at 12-14.  While the Second Circuit has observed that Article 6 of the NYLL contains "a narrower definition of employment" than Article 19, *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 78-79 (2d Cir. 2003), Defendant has not identified the legal significance of any such differences and, in fact, does not distinguish among Plaintiffs' NYLL claims.  *See* Dkt. No. 149-2 at 10 n.15.

of statutory interpretation applies with "particular force" where, as here, "a statute creates provisos or exemptions, because 'the inclusion of such provisos or exceptions is generally considered to deny the existence of others not mentioned.'"  *Id.* (citations omitted); *accord Gonzalez*, 986 F.3d at 539 (noting that federal courts do not have "a free-floating power to create statutory exemptions anytime a judge thinks Congress would have exempted a certain activity had anyone asked").[21]

Defendant has not identified any legislative history that warrants a different interpretation of the statutory text.  *See* Dkt. No. 149-2 at 15-17 (quoting, *inter alia*, NYLL § 650).  And Plaintiffs' cited authority supports reading the statute according to its terms.  *See* Dkt. No. 165 at 8-10; *see also Article 13 LLC*, 2025 WL 899035, at *5 ("Under New York law, the 'primary consideration' when interpreting a statute is legislative intent.") (quoting *Town of Aurora v. Vill. of E. Aurora*, 32 N.Y.3d 366, 372 (2018)); *Konkur v. Utica Acad. of Sci. Charter Sch.*, 38 N.Y.3d 38, 48 (2022) ("The Labor Law's overarching goal is to protect employees from wage law violations.") (Rivera, J., dissenting) (citations omitted); *see also Chao Chen v. GEO Grp., Inc.*, 287 F. Supp. 3d 1158, 1168 (W.D. Wash. 2017) ("[T]o interpret this State's statutory exception to include federal detainees moves beyond interpretation to legislation.  In the absence of binding authority, the undersigned should respectfully decline the invitation to add to the statute.").  In short, the Court cannot conclude that the legislative intent presented by the Parties entitles Defendant to judgment as a matter of law on Plaintiffs' claims.  *See ACE Secs. Corp.*, 38 N.Y.3d at 652; *see also Chao Chen*, 287 F. Supp. 3d at 1168 ("Defendant's . . . [position] boils down to

---

[21] Defendant's brief argument regarding a different New York statute fails for similar reasons.  *See* Dkt. No. 166 at 11 n.11, 13 n.13; N.Y. Corr. Law § 187.  That New York specifically enacted a statute that appears to permit a state agency to set wages for incarcerated individuals in state correctional facilities is in fact contrary to Defendant's position that the NYLL does not apply to Plaintiffs, given that no such state statute has been enacted with respect to federal immigration detainees.

the argument that the legislature intended to do something it did not do, or that it should have done something that it did not do.  This Court should not re-write legislation.").

Defendant next argues that case law supports its position that the FLSA and NYLL should be interpreted similarly.  *See* Dkt. No. 149-2 at 11-12; *see also Marcelino v. 374 Food, Inc.*, 2018 WL 1517205, at *12 (S.D.N.Y. Mar. 27, 2018) ("Neither the New York Court of Appeals nor the Second Circuit has decided whether the tests for 'employer' status are the same under the FLSA and the NYLL.  However, district courts in this Circuit have consistently interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA.'") (quoting *Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 511 (S.D.N.Y. 2015)); *see also Holick v. Cellular Sales of N.Y., LLC*, 2020 WL 13281260 at *9 (N.D.N.Y. May 29, 2020) ("'Although the FLSA and NYLL standards differ, courts have recognized that [t]here is general support for giving the FLSA and the [NYLL] consistent interpretations[,] [a]nd there appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa).'") (quoting *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F.2d Supp. 901, 924 (S.D.N.Y. 2013)).  While district courts in this Circuit have undoubtedly interpreted provisions of the FLSA and the NYLL similarly—and even identically—on multiple occasions, the Court does not draw from this line of authority the conclusion that the statutes must be interpreted in lockstep.  *See, e.g., Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013) ("Plaintiffs assert that the tests for 'employer' status are the same under the FLSA and the NYLL, but this question has not been answered by the New York Court of Appeals."); *see also Ocampo v. Brown & Appeal, LLC*, No. 21-2579-cv, 2022 WL 17684587, at *1 n.1 (2d Cir. Dec. 15, 2022) (similar); *Rick's Cabaret*, 967 F. Supp. 2d at 922 ("However, notwithstanding these similarities,

the law is unsettled whether precisely the same test for employee status applies under the two statutes.").

Defendant nonetheless asserts that the reasoning in various FLSA cases should be persuasive when interpreting the NYLL. Dkt. No. 149-2 at 12-15. Plaintiffs counter, *inter alia*, that the prison setting for many of these cases makes them factually distinguishable. Dkt. No. 165 at 12-18. The weight of the authority cited by Defendant is not without force. As the Fourth Circuit observed in its decision affirming a district court's dismissal of FLSA, state minimum wage law, and unjust enrichment claims by federal immigration detainees against a federal contractor:

> Our circuit is hardly alone in refusing to expand the Act to custodial detentions. Each circuit to address the issue—whether the litigants sought FLSA application for inmates, or pretrial detainees, or civil detainees—has concluded that the FLSA's protections do not extend to the custodial context generally. *See, e.g.*, *Loving v. Johnson*, 455 F.3d 562, 563 (5th Cir. 2006) (inmate labor); *Bennett v. Frank*, 395 F.3d 409, 409 (7th Cir. 2005) (same); *Gambetta v. Prison Rehab. Indus. & Diversified Enters., Inc.*, 112 F.3d 1119, 1124 (11th Cir. 1997) (same); *Danneskjold v. Hausrath*, 82 F.3d 37, 43-44 (2d Cir. 1996) (same); *Abdullah v. Myers*, 52 F.3d 324, at *1 (6th Cir. 1995) (same); *McMaster v. Minnesota*, 30 F.3d 976, 980 (8th Cir. 1994) (same); *Henthorn v. Dep't of Navy*, 29 F.3d 682, 686-87 (D.C. Cir. 1994) (same); *Franks v. Okla. State Indus.*, 7 F.3d 971, 973 (10th Cir. 1993) (same); *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1325 (9th Cir. 1991) (same); *see also Smith v. Dart*, 803 F.3d 304, 314 (7th Cir. 2015) (pre-trial detainee labor); *Tourscher v. McCullough*, 184 F.3d 236, 243-44 (3d Cir. 1999) (same); *Villarreal v. Woodham*, 113 F.3d 202, 206-07 (11th Cir. 1997) (same); *see also Sanders v. Hayden*, 544 F.3d 812, 814 (7th Cir. 2008) (civil detainee labor); *Miller v. Dukakis*, 961 F.2d 7, 9 (1st Cir. 1992) (same); *Williams v. Coleman*, 536 F. App'x 694 (9th Cir. 2013) (same).

*Ndambi v. CoreCivic, Inc.*, 990 F.3d 369, 373-74 (4th Cir. 2021); *see also Whyte v. Suffolk Cnty. Sheriff's Dep't*, No. 16-P-751, 2017 WL 2274618, at *1 (Mass. App. Ct. 2017).

Defendant's argument by analogy is ultimately unavailing, however. First, as Plaintiffs point out, much of the authority cited by Defendant concerns prisons, and the Court agrees with Plaintiffs that, in this particular case, it "should decline to take the extraordinary step of exporting

FLSA case law applied in the prison context to state law in the civil detention context." Dkt. No. 165 at 12.

Second, the primary authority cited by Defendant that concerns federal immigration detainees does not address the potential distinctions between the FLSA and any particular state labor laws. *See* Dkt. No. 149-2 at 12-13. In *Ndambi*, for instance, the Fourth Circuit's analysis was explicitly "limited to interpreting the FLSA," because "[t]he parties agree[d] that the [state labor law] should be interpreted in accordance with the FLSA and that the appellants' unjust enrichment claim depends on the success of their FLSA claim." *Ndambi*, 990 F.3d at 371 n.1. Here, there is no such agreement of the Parties. The cases before the Fifth and Federal Circuits are even more dissimilar, as each only addressed FLSA claims by immigration detainees against the federal government. *See Alavardo Guevara v. I.N.S.*, 902 F.2d 394 (5th Cir. 1990) (*per curiam*); *Guevara v. I.N.S.*, 954 F.2d 733 (Fed. Cir. 1992) (*per curiam*) (unpublished table decision). Thus, neither of these appellate courts had occasion to consider whether state labor law claims against a private entity might warrant a different result. And as discussed earlier, the Ninth Circuit recently affirmed a jury finding of liability on such claims. *Nwauzor*, 127 F.4th at 757; *see also supra* Section IV.A.

Third, the Second Circuit has only addressed the FLSA in the factually distinguishable context of prisoners, and not the factually applicable context of civil immigration detainees. *See Danneskjold*, 82 F.3d at 43-44. The Parties offer competing characterizations concerning the Second Circuit's reasoning in *Danneskjold*. Dkt. No. 149-2 at 14-15; Dkt. No. 165 at 13-15. Having carefully reviewed *Danneskjold*, the Court understands much of its reasoning to be specific

to the prison context.[22]  Yet even within that context, the Circuit explicitly did "not disturb [its] rejection of a rule that a prisoner's labor is at all times and in all circumstances exempted from the FLSA, or discard use of an economic reality test to determine whether such labor is subject to the FLSA."  *Danneskjold*, 82 F.3d at 40.  Thus, the Court does not read *Danneskjold* as authority that entitles Defendant to judgment as a matter of law on Plaintiffs' claims.

The Parties dispute which non-exhaustive multifactor test should be used to evaluate Plaintiffs' NYLL claims.  Defendant advocates for the "economic realities" test frequently utilized to assess employment status under the FLSA.  *See* Dkt. No. 149-2 at 12-15; Dkt. No. 166 at 6-10; *see also Brito v. Marina's Bakery Corp.*, No. 19-cv-00828, 2022 WL 875099, at * (E.D.N.Y. Mar. 24, 2022) ("The Second Circuit has adopted a multi-factor test based on 'economic reality' to determine whether an employment relationship exists between a plaintiff and defendant [under the FLSA].")  (quoting *Izirarry*, 722 F.3d at 104-05); *Holick*, 2020 WL 13281260, at *9 ("Courts in this circuit commonly apply the factors outlined by the Second Circuit in the case of *Brock v. Superior Care, Inc.*, which readily apply to many factual scenarios: '(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.'") (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-59 (2d Cir. 1988)).  Plaintiffs contend that the "control test"

---

[22] For example, the Circuit concluded that the job performed by the plaintiff "served only the institutional purpose of prisoner rehabilitation and in no way undermined the FLSA wage scale." *Danneskjold*, 82 F.3d at 44.  But, rehabilitation is not a consideration in immigration detention according to the PBNDS: "Detention is an important and necessary part of immigration enforcement. . . . ICE detains people for no purpose other than to secure their presence both for immigration proceedings and their removal . . . ." Dkt. No. 117-2 at 2.

frequently used to assess employment status under the NYLL should apply here.  *See* Dkt. No. 165 at 11-12; *see also Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003) ("[T]he critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results. . . . 'Factors relevant to assessing control include whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule.'") (citations omitted); *Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74 (2d Cir. 2020) (noting that "[a]lthough these factors are similar to those considered under the FLSA inquiry, the focus of the *Bynog* test is slightly different" and the "critical inquiry" focuses on control); *Holick*, 2020 WL 13281260, at *9 ("These factors, however, are not exhaustive: New York courts commonly consider additional factors.") (quoting *Rick's Cabaret*, 967 F. Supp. 2d at 923).

    For reasons similar to those discussed with respect to Defendant's FLSA arguments, the Court finds that the test set forth by the New York Court of Appeals should apply to Plaintiffs' NYLL claims.  While it is true that sometimes this test has been articulated in cases addressing whether workers are independent contractors, the reasoning within those decisions does not appear so limited.  *See, e.g., In re Empire State Towing & Recovery Ass'n, Inc.*, 15 N.Y.3d 433, 437 (2010) ("An employer-employee relationship exists when the evidence shows that the employer exercises control over the results produced or the means used to achieved the results. . . . However, 'control over the means is the more important factor to be considered.'") (citations omitted); *In re Hertz Corp.*, 2 N.Y.3d 733, 735 (2004) (similar).  Indeed, one of the cases relied upon by Defendant makes clear that this test is indeed applied more broadly: "New York courts apply th[is] 'common law' test—a test used not only in connection with wage-protection statutes, but also to

determine such issues as *respondeat superior* liability in tort suits, eligibility for unemployment benefits, and compliance with tax laws." *Rick's Cabaret*, 967 F. Supp. 2d at 923.

Application of this test is relatively straightforward for purposes of summary judgment. Supported by record citations, Plaintiffs describe how Defendant purportedly controlled all aspects of their work at the BFDF in the VWP:

> AGS's supervision of the VWP clearly evinces the control of an employer. AGS assigns detainees their jobs and determines workers' shifts. . . . It provides job training to detainee workers. . . . AGS maintains records of which detainees performed which jobs on each day. . . . AGS staff supervise detainee workers to ensure they perform their job adequately and they can fire detainees for poor performance. . . . AGS provides detainees with the materials and supplies they need to perform their jobs. . . . AGS pays detainees by depositing pay directly into workers' commissary accounts and keeps records of those payments. . . . AGS determined that detainees would be paid $1 per day of work and no more than $5 per week, regardless of the number of hours or days worked. . . . In short, AGS controls all aspects of VWP participants' job performance, from hiring, training, and supervising to setting pay policies and depositing funds into workers' accounts.

Dkt. No. 165 at 12 (citations omitted); *see also id.* at 11, 18-19. Plaintiffs conclude that Defendant "does not argue otherwise." *Id.* In response, Defendant argues that the control test simply "does not apply" and "is unworkable in the detention context." Dkt. No. 166 at 8-9. But Defendant does not provide a competing analysis of the relevant factors under this test, *id.*, and thus, as the moving party, Defendant has failed to demonstrate its entitlement to judgment as a matter of law.

For all these reasons, the Court denies the Motion as to Plaintiffs' NYLL claims.

**D.  Unjust Enrichment**

Defendant argues that Plaintiffs' unjust enrichment claims fail because Plaintiffs have not demonstrated that any of their labor directly benefitted Defendant, in part because the Contract did not obligate Defendant to provide various services which detainees performed. Dkt. No. 149-2 at 17-21; Dkt. No. 166 at 14-17. In response, Plaintiffs concede that they "ground their unjust

enrichment claim[s] only on the unjust profits AGS obtained from detainee labor in the housing units and the kitchen (not the laundry, barber, or other areas of the facility)[.]"  Dkt. No. 165 at 5 n.2.  Accordingly, the Motion is granted to the extent that Plaintiffs' unjust enrichment claims based on labor outside of the housing units and kitchen at the BFDF is dismissed.  As to labor within those areas, Plaintiffs mainly argue that "[b]ecause AGS was responsible for cleaning the housing units and kitchen, it directly benefitted from detainees' labor."  *Id.* at 6.

For purposes of summary judgment, the Court agrees.  "The basic elements of an unjust enrichment claim in New York[23] require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  *Pauwels v. Deloitte LLP*, 83 F.4th 171, 186 (2d Cir. 2023) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004)).

As noted earlier, the Contract states that "Contractor is ultimately responsible for the cleanliness of the BFDF housing units."  Dkt. No. 117-5 at 89.  The Contract also obligates Defendant to fulfill numerous responsibilities in the kitchen.  *See, e.g., id.* at 96 ("The contractor shall provide all personnel, supervision, food, and other kitchen tools necessary to perform full food services for the detainee population."); *id.* at 98 ("The contractor shall maintain a clean and orderly kitchen facility in accordance with Federal, State, County and local laws and regulations. . . . The contractor shall properly clean all dishes, pots, pans, cooking equipment, and floors."); *id.* at 99 ("The contractor shall determine the number of personnel needed to perform the Food Services outlined herein. . . . Detainee workers may be utilized to perform basic kitchen tasks; however, detainees are prohibited from preparing food at any time.  Historically, detainee workers

---

[23] The Parties assume that Plaintiffs' unjust enrichment claims are governed by New York law. *See, e.g., Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 394 n.5 (2d Cir. 2023).

have been used primarily for cleaning efforts, to include dishwashing, and serving line duties."). Finally, because the Parties agree that a BFDF Policy requires that detainees are to "be assigned meaningful work assignments" in the VWP and that the work assignments detainees perform are not "make-work" assignments, work in the program presumably had some value. Dkt. No. 129-1 at 10, ¶¶ 17-18.

All of this is contrary to Defendant's position that detainee labor was effectively unnecessary and provided Defendant with no benefit. Defendant's own contemporaneous documents are contrary as well. For instance, in an email thread regarding whether Defendant was responsible for paying sales tax on custodial supplies it had purchased for use at the BFDF, Defendant's president wrote to colleagues:

> We had a conversation back in 2015 where you explained that if we are using cleaning products to clean the facility ourselves then we pay sales tax. If we are purchasing cleaning products that are being provided to the government we are not subject to sales tax.
>
> AGS is <u>not cleaning the facility</u> ourselves. 100% of the cleaning is done by volunteer detainees held in ICE custody (the government) . . . .
>
> In short, AGS is responsible for overseeing the detainees and all of their activities (including when they're working/cleaning), but we don't use the cleaning products ourselves. Those products are being provided to the government.

Dkt. No. 144-20 at 4 (emphasis in original). A colleague also wrote that "AGS provides purchased cleaning supplies to the client [ICE] since detainees are responsible for cleaning of the facility. . . . Did any discussions occur with the NYS auditors on who was actually using the cleaning supplies?" *Id.* at 2.

The Parties dispute the significance of further correspondence that suggests that Defendant had increased costs during 2021 as a result of fewer detainee kitchen workers during the pandemic. *See e.g.,* Dkt. No. 129-1 at 51, ¶ 43; Dkt. No. 136-5. Defendant's president and corporate

representative testified regarding some of these documents during her deposition. Dkt. No. 129-3 at 243:17-246:1 ("Q. And [your project manager at the BFDF] confirms that AGS incurred significant overtime expenses when detainee workers left the kitchen. Correct? A. Yes. Q. And this email was sent in an attempt to secure additional funding from the government. Right? A. He was asking a question. . . . Q. Yeah. [The ICE contracting officer's representative] email from February 17, 2021 says that the food services are part of the guaranteed minimum; so there won't be additional funding. Correct? A. Yes. Q. Then [your project manager at the BFDF] forwards this exchange to you. Right? Q. Yes. A. And then you responded: 'Our fixed-price minimum guarantee is based on having a detainee workforce available.' Do you see that? A. Yes. *Q. And you meant that when you had priced out the minimum guarantee that you needed in order for AGS to make a profit, it relied on detainees providing work in the kitchen. Correct? A. Yes.* So you have to make certain assumptions and certain assumptions come with some risk, but that's what a firm fixed price CLIN is, is it's firm fixed price. Sometimes you win. Sometimes you don't.") (emphasis added).

Defendant also does not adequately address the funds it received in connection with the VWP and contradicts itself as to the average number of detainees who participated therein. In support of summary judgment, Defendant's counsel submitted a declaration setting forth a "representative sample" of detainee participants in the VWP from 2018 through 2021. Dkt. No. 149-4. That declaration asserts that VWP participants ranged from a low of 73 detainees to a high of 152 and, based on the fluctuating number of detainees at the 650-bed facility, a participation rate of approximately 22% to 39%. *Id.* at 4-5. While the initial Contract suggests a maximum number of VWP participants each year in that ballpark (approximately 131 detainees, *see* Dkt. No. 117-5 at 8), Defendant's president and corporate representative vigorously disputed this number

during her deposition. *See* Dkt. 129-3 at 22:15-24:2 ("Q. Let's go CLIN 1003, which is the detainee volunteer work wages. This has no guaranteed minimum. Correct? A. That is correct. Q. And it has a maximum of [$]48,000 per year? Q. . . . So at $1 per day, that's a maximum of 48,000 workdays? A. That is correct. Q. . . . Which is exactly 400 workdays per month? A. That's correct. Yes. Q. And that comes out to just about 131 workers per day over 365 days. Right? A. Yeah, but -- yes. That is what that max says. Q. And that's approximately the number of detainee workers that are used? A. That is not true. Q. Okay. So tell me the -- A. *It's definitely not 131 per day. This number, this amount, was prefilled in. This was not our proposal. . . . It was prefilled in, and I don't know how much of that we've ever used. We could certainly find that out, but definitely it has not been on average anywhere near 131 workers a day*.") (emphasis added).

Yet, Plaintiff questioned Defendant's president on several invoices for reimbursement of VWP expenses that Defendant had submitted in excess of the apparent $48,000 maximum available under the Contract. Dkt. No. 126-1 at 53, ¶ 67. And the full Contract that Defendant submitted, as an exhibit to its president's declaration, contains several modifications that appear to nearly double funds available to Defendant for its administration of the VWP. *See* Dkt. No. 117-5 at 183 ("Adding funding in the amount of $60,000.00[;] As a result funding on this CLIN has increased"); *id.* at 193-94 ("Adding funding in the amount of $25,340.00 . . . As a result, funding on this CLIN has increased"); *id.* at 211 ("Adding funding in the amount of $10,000.00[;] As a result, funding on this CLIN has increased as follows: From $85,340.00 By: $10,000.00 To: $95,340.00"). The existence of these invoices and contract modifications could suggest that more than 131 detainees participated in the program and/or that Defendant received funds in excess of those necessary to pay 131 detainees one dollar per day on an annual basis. Both are material facts. Defendant asserts that the voluntariness of the VWP is demonstrated by the fact that "the

majority of detainees—*did not participate* in the VWP." Dkt. No. 149-2 at 26 (emphasis in original); Dkt. No. at 149-1 at ¶ 147. But if the contract modifications described above were necessary, that suggests a participation rate significantly higher than what Defendant represents. And at least one Plaintiff has testified that "[a]lmost all" of the detainees on her unit participated in the VWP. Dkt. No. 129-22 at 55:8-12. The Court cannot—and does not—resolve such factual disputes at summary judgment.

In sum, these factual disputes preclude summary judgment on Plaintiffs' claims that detainee labor in the VWP inequitably benefited Defendant, at the expense of detainees, by enabling Defendant to fulfill its contractual obligations in the detainee housing units and kitchen. *See Pauwels*, 83 F.4th at 186. Accordingly, the Court denies the Motion as to Plaintiffs' unjust enrichment claims.

## V.    CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, Dkt. Nos. 117, 149, is **DENIED**, as set forth in Section IV of this Memorandum-Decision and Order; and the Court further

**ORDERS** that Defendant's motion to strike, Dkt. No. 137, is **DENIED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 31, 2025
          Albany, New York

Anne M. Nardacci
U.S. District Judge